**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SISTERSONG WOMEN OF COLOR
REPRODUCTIVE JUSTICE
COLLECTIVE, on behalf of itself and
its members; FEMINIST WOMEN'S
HEALTH CENTER; PLANNED
PARENTHOOD SOUTHEAST, INC.,
ATLANTA COMPREHENSIVE
WELLNESS CLINIC, ATLANTA
WOMEN'S MEDICAL CENTER,
FEMHEALTH USA d/b/a CARAFEM,
COLUMBUS WOMEN'S HEALTH
ORGANIZATION, P.C., SUMMIT
MEDICAL ASSOCIATES, P.C., on
behalf of themselves, their physicians
and other staff, and their patients;
CARRIE CWIAK, M.D., M.P.H., LISA
HADDAD, M.D., M.S., M.P.H., and
EVA LATHROP, M.D., M.P.H., on
behalf of themselves and their patients,

     Plaintiffs,

vs.

BRIAN KEMP, Governor of the State
of Georgia, in his official capacity;
CHRISTOPHER M. CARR, Georgia
Attorney General, in his official
capacity; KATHLEEN TOOMEY,
Georgia Commissioner for Department
of Public Health, in her official
capacity; JOHN S. ANTALIS, M.D.,
GRETCHEN COLLINS, M.D., DEBI

Civil Action No.: _____

1

DALTON, M.D., E. DANIEL                    )
DeLOACH, M.D., CHARMAINE                   )
FAUCHER, PA-C, MICHAEL                     )
FOWLER, Sr., C.F.S.P., ALEXANDER           )
S. GROSS, M.D., THOMAS HARDIN              )
Jr., M.D., ROB LAW, C.F.A.,                )
MATTHEW W. NORMAN, M.D.,                   )
DAVID W. RETTERBUSH, M.D.,                 )
ANDREW REISMAN, M.D., JOE                  )
SAM ROBINSON, M.D., BARBY J.               )
SIMMONS, D.O., and RICHARD L.              )
WEIL, M.D., Members of the Georgia         )
Composite Medical Board, in their          )
official capacities; LaSHARN               )
HUGHES, M.B.A., Executive Director         )
of Georgia Composite Medical Board,        )
in her official capacity; PAUL L.          )
HOWARD, JR., District Attorney for         )
Fulton County, in his official capacity;   )
SHERRY BOSTON, District Attorney           )
for DeKalb County, in her official         )
capacity; JULIA SLATER District            )
Attorney for the Chattahoochee Judicial    )
Circuit, in her official capacity; JOHN    )
MELVIN, Acting District Attorney for       )
the Cobb Judicial Circuit, in his official )
capacity; DANNY PORTER, District           )
Attorney for the Gwinnett Judicial         )
Circuit, in his official capacity; and     )
MEG HEAP, District Attorney for the        )
Eastern Judicial Circuit, in her official  )
capacity,                                  )
                                           )
          Defendants.                      )
                                           )
                                           )
_____             )

## <u>VERIFIED COMPLAINT FOR</u><br><u>DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs, by and through their attorneys, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

## <u>INTRODUCTION</u>

1.      This is a constitutional challenge to House Bill 481 ("H.B. 481"), attached as Exhibit A, which bans practically all abortions. This law is an affront to the dignity and health of Georgians. It is in particular an attack on low-income Georgians, Georgians of color, and rural Georgians, who are least able to access medical care and least able to overcome the cruelties of this law. Georgians face a critical shortage of reproductive health care providers, including obstetrician-gynecologists, and the rate at which Georgians, particularly Black Georgians, die from pregnancy-related causes is among the highest in the nation.

2.      Rather than working to end those preventable deaths, and rather than honoring Georgians' reproductive health care decisions, the Legislature has instead chosen to criminalize abortion from the earliest stages of pregnancy. H.B. 481 criminalizes pre-viability abortions in direct conflict with *Roe v. Wade*, 410 U.S.

113 (1973), and nearly a half century of Supreme Court precedent reaffirming

*Roe*'s central holding. Specifically, it criminalizes abortion after embryonic cardiac

activity is detectable, which generally occurs around six weeks in pregnancy, when

many people are unaware they are pregnant. The law undermines a woman's

"ability . . . to participate equally in the economic and social life of the Nation,"

which "has been facilitated by their ability to control their reproductive lives."

*Planned Parenthood v. Casey*, 505 U.S. 833, 856 (1992).

3.      In addition, this law threatens a vast array of medical care critical for

the health of Georgia's women[1] of reproductive age. Its vague language threatens

clinicians with prosecution for any medical care they provide to pregnant patients

that could harm an embryo/fetus.[2] The threat of criminal liability is likely to have a

chilling effect on health care providers across Georgia, shaping provider and

patient decisions about a wide range of health conditions and restricting treatment

options for people who are pregnant or perceived to be capable of pregnancy.

---

[1] Plaintiffs use "woman" or "women" as a short-hand for people who are or may become pregnant, but people of all gender identities, including transgender men and gender-diverse individuals, may also become pregnant and seek abortion services, and would thus also suffer irreparable harm under H.B. 481.

[2] The embryonic stage of pregnancy lasts until approximately ten weeks, measured from the first day of a woman's last menstrual period ("lmp"), when the fetal stage begins.

4.     The Georgia Legislature passed H.B. 481 on March 29, 2019, and the Governor signed the bill into law on May 7, 2019. The effective date is January 1, 2020. H.B. 481 § 15, 155th Gen. Assemb., Reg. Sess. (Ga. 2019).

5.     Unless this Court grants an injunction in advance of the effective date, Plaintiff clinics and physicians will be forced to turn away pregnant patients seeking critical medical care. Patients seeking banned care will be forced to travel out of state if they are able; those who are unable to obtain care out of state will be forced to remain pregnant and give birth against their will, increasing the risk that they will experience death or serious injury, or they may be forced to seek care outside the regulated clinical setting.

6.     Absent an injunction, H.B. 481 will prevent Georgians from exercising their fundamental constitutional right to decide whether to have an abortion prior to viability and will threaten other critical medical care for pregnant women, causing irreparable harm.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. This is a civil and constitutional rights action arising under 42 U.S.C. § 1983 and the United States Constitution.

8.      Plaintiffs' claims for declaratory and injunctive relief are authorized

by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil

Procedure, and the general legal and equitable powers of this Court.

9.      Venue is appropriate under 28 U.S.C § 1391(b) because a substantial

part of the events or omissions giving rise to Plaintiffs' claims occur in this judicial

district and division.

<u>**PLAINTIFFS**</u>

10.     Plaintiff SisterSong Women of Color Reproductive Justice Collective

("SisterSong") is a non-profit organization based in Georgia that was formed in

1997 by 16 organizations led by and representing Indigenous, Black, Latinx, and

Asian American women and trans people who recognized their right and

responsibility to represent themselves in advancing their needs. By asserting the

human right to reproductive justice, SisterSong works to build an effective network

of individuals and organizations addressing institutional policies, systems, and

cultural practices that limit the reproductive lives of marginalized people. A

membership organization, SisterSong organizes with a large base whose members

include Georgians who can become pregnant and need the freedom to make their

own health care decisions, including the decision to end a pregnancy.

11.     H.B. 481's draconian prohibitions would force SisterSong to divert its scarce time and resources away from many other aspects of this work to focus on helping Georgians access abortion care out of state and otherwise adjust to H.B. 481's sweeping impact. SisterSong and its members are directly impacted by H.B. 481's restrictions. SisterSong sues on behalf of itself and its members.

12.     Plaintiff Feminist Women's Health Center ("Feminist") is a non-profit reproductive health care facility registered in the state of Georgia and located in Dekalb County. Feminist has been providing reproductive health care in the state since 1976. It currently provides a range of services, including abortion up to 21.6 weeks from the first day of a woman's last menstrual period ("lmp"),[3] contraception, annual gynecological examinations, miscarriage management, sexually transmitted infection ("STI") testing and treatment, and transgender health care, such as hormone replacement therapy. Feminist also engages in community education, grassroots organizing, public affairs, and advocacy programs to advance reproductive health, rights, and justice for all Georgians. Feminist sues on behalf of itself, its physicians and other staff, and its patients.

---

[3] Physicians often date pregnancy with the weeks before the decimal and the days after: "21.6 weeks lmp" means "21 weeks and six days lmp."

13.     Plaintiff Planned Parenthood Southeast, Inc. ("PPSE") is a not-for-profit corporation, registered in the state of Georgia. PPSE operates four health centers in Georgia, located in DeKalb, Gwinnett, Cobb, and Chatham counties, and an additional three health centers in Alabama and Mississippi. PPSE provides comprehensive reproductive health care, including family planning services, testing and treatment for sexually transmitted infections, cancer screening and treatment, pregnancy testing and all options counseling. At its four Georgia health centers, PPSE also provides medication abortion up to 10 weeks lmp. PPSE and its corporate predecessors have provided care in Georgia for over 50 years. Plaintiff PPSE sues on behalf of itself, its physicians and other staff, and its patients.

14.     Plaintiff Atlanta Comprehensive Wellness Clinic ("ACWC") is a private medical practice registered in the state of Georgia and located in Fulton County. ACWC has been providing reproductive health services, including abortion care up to 13.6 weeks lmp, since 2017. ACWC sues on behalf of itself, its physicians and other staff, and its patients.

15.     Plaintiff Atlanta Women's Medical Center ("AWMC") is a private company registered in the state of Georgia and located in Fulton County. AWMC has been providing reproductive health services, including abortion care up to 21.6

weeks lmp, since 1977. AWMC sues on behalf of itself, its physicians, its staff, and its patients.

16.     Plaintiff FemHealth USA d/b/a carafem is a nonprofit organization registered in the state of Georgia and located in Fulton County. Carafem has been providing reproductive health services, including abortion care up to 12.6 weeks lmp, since 2016. Carafem brings this action on behalf of itself, its physicians, staff, and its patients.

17.     Plaintiff Columbus Women's Health Organization, P.C. ("CWHO") is a private medical office registered in the state of Georgia and located in Muscogee County. CWHO has been providing reproductive health services, including abortion care up to 13.6 weeks lmp, since 2010. CWHO brings this action on behalf of itself, its physicians and other staff, and its patients.

18.     Plaintiff Summit Medical Associates, P.C. ("Summit") is a professional corporation registered in the state of Georgia and located in Fulton County. Summit has been providing reproductive health services, including abortion care up to 21.6 weeks lmp, since 1976. Summit brings this action on behalf of itself, its physicians and other staff, and its patients.

19.     Plaintiff Carrie Cwiak, M.D., M.P.H., is a board-certified obstetrician and gynecologist licensed to practice in Georgia. She is Professor of Gynecology

and Obstetrics and Family Planning at Emory University School of Medicine. In addition to teaching residents, her medical practice includes providing her patients with labor and delivery care and comprehensive obstetrical and gynecological care including abortions at Emory University Hospital Midtown in Fulton County, where she is Chief of Service of Obstetrics and Gynecology, and Fulton-DeKalb Hospital, d/b/a Grady Memorial Hospital, in Fulton County. Dr. Cwiak sues as an individual on behalf of herself and her patients, and does not sue in her capacity as an employee or representative of Emory or any other organization.

20.     Plaintiff Lisa Haddad, M.D., M.S., M.P.H., is a board-certified obstetrician and gynecologist licensed to practice in Georgia. She is Associate Professor of Gynecology and Obstetrics at Emory University School of Medicine. In addition to teaching residents, her medical practice includes providing her patients with labor and delivery care and comprehensive obstetrical and gynecological care including abortions at Emory University Hospital Midtown in Fulton County, and Fulton-DeKalb Hospital, d/b/a Grady Memorial Hospital, in Fulton County. Dr. Haddad sues as an individual on behalf of herself and her patients, and does not sue in her capacity as an employee or representative of Emory or any other organization.

21.     Plaintiff Eva Lathrop, M.D., M.P.H. is a board-certified obstetrician and gynecologist licensed to practice in Georgia. She is Associate Professor – and as of September 1, 2019, will become Adjunct Professor – of Gynecology and Obstetrics and Family Planning at Emory University School of Medicine. In addition to teaching residents, she provides her patients with labor and delivery care and comprehensive obstetrical and gynecological care including abortions at Fulton-DeKalb Hospital, d/b/a Grady Memorial Hospital, in Fulton County. Dr. Lathrop sues as an individual on behalf of herself and her patients, and does not sue in her capacity as an employee or representative of Emory or any other organization.

## **DEFENDANTS**

22.     Defendant Brian Kemp is the Governor of the State of Georgia. He has the power to direct the Attorney General to prosecute crimes, including alleged criminal violations of H.B. 481. *See* Ga. Const. art. V, § III, ¶ IV; O.C.G.A. § 45-15-35; O.C.G.A. § 45-15-3(3). Defendant Kemp is sued in his official capacity.

23.     Defendant Christopher M. Carr is the Attorney General of the State of Georgia. He has the power to prosecute crimes, including alleged criminal violations of H.B. 481, when directed to do so by the Governor. *See* Ga. Const. art.

11

V, § III, ¶ IV; O.C.G.A. § 45-15-3 (detailing Attorney General's powers and

duties). Defendant Carr is sued in his official capacity.

24.     Defendant Kathleen Toomey is the Commissioner for Georgia's

Department of Public Health and has the authority to impose civil fines on

physicians who fail to comply with H.B. 481's requirement that they report and

justify any abortion to demonstrate that it was not unlawful under H.B. 481. *See*

H.B. 481 § 11 (amending reporting requirements under O.C.G.A. § 31-9B-3);

O.C.G.A. § 31-9B-3(d) (sanctions for reporting violations); O.C.G.A. § 31-9A-6

(civil fines for reporting violations). In addition, the Department of Public Health

must collect these reports, *see* O.C.G.A. § 31-9B-3, and publish information

reflecting H.B. 481's new ban, *see* H.B. 481 § 8 (amending O.C.G.A. § 31-9A-4).

Defendant Toomey is sued in her official capacity.

25.     Defendants John S. Antalis, M.D.; Gretchen Collins, M.D.; Debi

Dalton, M.D.; E. Daniel DeLoach, M.D.; Charmaine Faucher, PA-C; Michael

Fowler, Sr., C.F.S.P.; Alexander S. Gross, M.D.; Thomas Harbin Jr., M.D.; Rob

Law, C.F.A.; Matthew W. Norman, M.D.; David W. Retterbush, M.D.; Andrew

Reisman, M.D.; Joe Sam Robinson, M.D.; Barby J. Simmons, D.O.; and Richard

L. Weil, M.D., are the fifteen Members of the Georgia Composite Medical Board

with voting power. They are responsible for overseeing professional licensure and

12

discipline of physicians, physician assistants, and resident physicians. *See* O.C.G.A. § 43-34-5. The Board has the authority to discipline such professionals who have been convicted of a felony, O.C.G.A. § 43-34-8(a)(3), have engaged in any "unprofessional" conduct, O.C.G.A. § 43-34-8(a)(7), or have violated or attempted to violate any law which relates to the practice of medicine, O.C.G.A. § 43-34-8(a)(10). Performing an abortion in violation of H.B. 481, by its terms, "constitutes unprofessional conduct." H.B. 481 § 10 (amending O.C.G.A. § 31-9B-2). Defendant Members of the Georgia Composite Medical Board are sued in their official capacity.

26.     Defendant LaSharn Hughes, M.B.A., is the Executive Director of the Georgia Composite Medical Board. She is responsible for conducting investigations of any unprofessional conduct. *See* O.C.G.A. §§ 43-34-6(e), 43-34-8(d). Defendant Hughes is sued in her official capacity.

27.     Defendant District Attorneys, concurrently with the Governor and Attorney General, are responsible for criminal prosecution, including the prosecution of the acts made criminal by H.B. 481. *See* Ga. Const. art. 6, § 8, ¶ I(d); O.C.G.A. § 15-18-6(4).

28.     Defendant Paul L. Howard, Jr. is the District Attorney for the Atlanta Judicial Circuit, which covers Fulton County. Plaintiffs ACWC, AWMC, carafem,

Summit, and Drs. Cwiak, Haddad, and Lathrop provide abortion care in Fulton County. Defendant Howard is sued in his official capacity.

29.     Defendant Sherry Boston is the District Attorney for the Stone Mountain Judicial Circuit, which covers DeKalb County. Plaintiffs PPSE, Feminist, and Drs. Cwiak and Haddad provide abortion care in DeKalb County. Defendant Boston is sued in her official capacity.

30.     Defendant Julia Slater is the District Attorney for the Chattahoochee Judicial Circuit, which includes Muscogee County. Plaintiff CWHO provides abortion care in Muscogee County. Defendant Slater is sued in her official capacity.

31.     Defendant John Melvin is the Acting District Attorney for the Cobb Judicial Circuit, which covers Cobb County. Plaintiff PPSE has a clinic that provides abortion care in Cobb County. Defendant Melvin is sued in his official capacity.

32.     Defendant Danny Porter is the District Attorney for the Gwinnett Judicial Circuit, which covers Gwinnett County. Plaintiff PPSE has a clinic that provides abortion care in Gwinnett County. Defendant Porter is sued in his official capacity.

33.     Defendant Meg Heap is the District Attorney for the Eastern Judicial Circuit, which covers Chatham County. Plaintiff PPSE has a clinic that provides abortion care in Chatham County. Defendant Heap is sued in her official capacity.

## STATUTORY FRAMEWORK

34.     Current Georgia law prohibits abortion starting at 22.0 weeks lmp,[4] with extremely narrow exceptions. O.C.G.A. § 16-12-141(c)(1). Georgia also already singles out abortion with numerous regulations: it mandates that an abortion patient hear a government-created script and then delay her care at least 24 hours before she can consent, O.C.G.A. § 31-9-A-3(2); prohibits non-physicians from providing abortions, but allows them to provide comparable health care, O.C.G.A. §§ 16-12-141(a), 43-34-110, 43-34-25(l); limits where second-trimester abortions can take place, O.C.G.A. § 16-12-141(b)(1); and mandates specialized reporting for abortion, O.C.G.A. §§ 31-9B-3(a), 31-10-19, 16-12-141.1, 16-12-143, among other regulations.

---

[4] Current Georgia law prohibits abortion at "20 weeks or more," O.C.G.A. § 16-12-141(c)(1), "from the time of fertilization," O.C.G.A. § 31-9B-1(5). Medical standards date pregnancy based on last menstrual period. Because fertilization typically occurs at two weeks lmp, current Georgia law bans abortions at 22 weeks lmp.

35.    H.B. 481 makes a series of amendments to Georgia laws related to abortion and to laws not heretofore related to abortion. Specifically, H.B. 481 bans almost all abortions and makes sweeping changes to Georgia's definition of "natural person" in an effort to justify the abortion ban.

36.    Section 2 of H.B. 481 declares that it is the policy of the State of Georgia to recognize embryos/fetuses "as natural persons," H.B. 481 § 2(6); *see also id.* §§ 2(2), (5), purporting to promote a "more expansive state recognition of" embryos/fetuses "as persons" than "exist[ed] when *Planned Parenthood v. Casey* (1992) and *Roe v. Wade* (1973) established abortion related precedents," *id.* § 2(3).

37.    Section 3 of H.B. 481 amends O.C.G.A. § 1-2-1 – which contains definitions of "Persons and their Rights" that apply throughout the Georgia Code – to define "natural person" as including "any human being including an unborn child," and defines "unborn child" as an embryo/fetus "at any stage of development" in utero. H.B. 481 § 3 (creating new O.C.G.A § 1-2-1(b), (e)(2)). It mandates the inclusion in "population based determinations" of all "natural persons," including embryos/fetuses in utero with "a detectable human heartbeat," defined as "embryonic or fetal cardiac activity or the steady and repetitive rhythmic contraction of the heart within the gestational sac." *Id.* (creating new O.C.G.A § 1-2-1(d)-(e)).

38.    Because Section 3's new definition of "natural person" is not limited to H.B. 481, and appears to apply to the relevant terms throughout the entire Georgia code, the impact of Section 3's new definition of "natural person," when read in conjunction with other parts of the Georgia code, is vague and potentially vast. For example, pursuant to O.C.G.A. § 16-5-60, a person commits the crime of "Reckless Conduct" when he or she "causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person." Under this provision, it is unclear what potentially "risky" behavior could be deemed criminally reckless inasmuch as "person" is now re-defined to mean an embryo/fetus. Section 3 renders numerous other provisions of the Georgia code similarly vague. *See, e.g.*, O.C.G.A § 16-5-70 (cruelty to children); § 16-5-21 (aggravated assault); § 16-12-171 (sale or distribution to, or possession by, minors of cigarettes and tobacco related objects); § 19-7-5 (reporting of child abuse).

39.    Under Section 4 of H.B. 481, "[n]o abortion is authorized or shall be performed if an" embryo/fetus "has been determined in accordance with Code Section 31-9B-2 to have a detectable human heartbeat," and "[n]o abortion is authorized or shall be performed in violation of subsection (a) of Code Section 31-

9B-2." H.B. 481 § 4 (amending O.C.G.A. § 16-12-141(b); creating new O.C.G.A. § 16-12-141(d)). H.B. 481 accordingly amends O.C.G.A. § 31-9B-2, "relating to physician's obligation in performance of abortions," to require "a determination of the presence of a detectable human heartbeat, as such term is defined in Code Section 1-2-1." H.B. 481 § 10 (amending O.C.G.A. § 31-9B-2(a)).

40.    Under Section 4 of H.B. 481, "abortion" does not include removing an "ectopic pregnancy" or a "dead" embryo/fetus "caused by a spontaneous abortion." However, unless "a spontaneous abortion" (sometimes called miscarriage) has already caused embryonic/fetal demise, H.B. 481 prohibits completing the miscarriage. H.B. 481 § 4 (amending O.C.G.A. §§ 16-12-141(a)(1)(A), (a)(5)).

41.    Section 4 of H.B. 481 has three very limited exceptions. It permits otherwise banned care only when:

a. a "medical emergency" exists, defined as "a condition in which an abortion is necessary in order to prevent the death of the pregnant woman or the substantial and irreversible physical impairment of a major bodily function of the pregnant woman." It does not allow abortion care necessary to reduce *the risk of* death or substantial harm; to prevent substantial but reversible physical impairment of a major bodily function; to prevent less than substantial but irreversible

18

physical impairment of a major bodily function; or to prevent

substantial and irreversible physical impairment of a non-major bodily

function. This exception also does not allow care that is necessary to

prevent death or substantial impairment that would result from "a

diagnosis or claim of a mental or emotional condition . . . or that the

pregnant woman will purposefully engage in" self harm. H.B. 481 §§

4(a)(3), 4(b)(1). H.B. 481 will force a patient with such non-exempted

medical conditions to remain pregnant, notwithstanding the risk to her

life and health;

b.  the pregnancy is at or below 20 weeks post-fertilization and is the

result of rape or incest in which an official police report has been filed

alleging the offense of rape or incest. H.B. 481 § 4(b)(2); or

c.  the "physician determines, in reasonable medical judgment, that the

pregnancy is medically futile," defined as "a profound and

irremediable congenital or chromosomal anomaly that is incompatible

with sustaining life after birth." H.B. 481 §§ 4(a)(4), (b)(3).

42.   Violation of Section 4 of H.B. 481 is punishable by imprisonment of

one to ten years. O.C.G.A. § 16-12-140(b). Such a violation also exposes a

physician to licensing penalties up to and including revocation, because it both

constitutes "unprofessional conduct" under O.C.G.A. § 43-34-8(a)(7); H.B. 481 §

10(b), and constitutes independent grounds for such discipline, O.C.G.A. § 43-34-

8(a)(8). *See also* O.C.G.A. § 43-34-8(b)(1)(F) (penalties include license

revocation). A patient may also bring a civil action for violation of Section 4. H.B.

481 § 4(g).

43.    Section 4 provides affirmative defenses if a physician, nurse,

physician assistant, or pharmacist "provide[d] care for a pregnant woman which

results in the accidental or unintentional injury or death of an" embryo/fetus, H.B.

481 §§ 4(h)(1-4), and if "[a] woman sought an abortion because she reasonably

believed that an abortion was the only way to prevent a medical emergency." H.B.

481 § 4(h)(5). Once a prosecutor proves the *prima facie* case of a violation of H.B.

481, an accused may try to escape conviction and incarceration by raising the

applicable affirmative defense, but bears the burden of proving the elements of that

defense to a jury.

44.    Sections 7 through 9 and 11 of H.B. 481 amend Georgia's abortion

informed consent and abortion reporting statutes to mandate that the information

the patient receives 24 hours before an abortion include "the presence of . . .

detectable" embryonic/fetal cardiac activity, H.B. 481 § 7, to mandate that the

Department of Public Health materials available to abortion patients refer to

detectable cardiac activity, H.B. 481 § 8, and to reflect the ban on abortion where there is detectable embryonic/fetal cardiac activity, H.B. 481 § 11.

## FACTUAL ALLEGATIONS

45.     Georgians who seek clinical abortion care will struggle and suffer under H.B. 481. Those who can will travel of out of state, though for many, such travel will delay care and impose other hardships; others will remain pregnant and give birth against their will; still others will end their own pregnancies or seek care outside the regulated clinical setting, which will expose some women to increased risk of harm. H.B. 481 will be particularly devastating for low-income Georgians, Georgians of color, and rural Georgians, who are already least able to access medical care, and who have the least resources to navigate the law's cruelties.

46.     Women seek abortions for a variety of deeply personal reasons, including familial, medical, and financial. Some women have abortions because they conclude that it is not the right time in their lives to have a child or to add to their families. For example, some decide to end a pregnancy because they want to pursue their education; some because they feel they lack the economic resources or level of partner support or stability they want to raise children; some because they are concerned that if they increase their family size, they will be unable to provide and care adequately for their existing children and/or for their ill or dying parents.

21

Others end a pregnancy in order to be able to leave an abusive partner. Some women seek abortions to preserve their life or health by reducing their risk of injury or death; some because they have become pregnant as a result of rape or incest; and others because they decide not to have children at all. Some women decide to have an abortion because of a diagnosed fetal medical condition. Some families feel they do not have the societal or personal resources—financial, medical, educational, or emotional—to care for a child with physical or intellectual disabilities, or to do so and simultaneously provide for their existing children. The decision to terminate a pregnancy is motivated by a constellation of diverse, complex, and interrelated factors, intimately related to the individual's core religious beliefs, values, and family circumstances.

47.     Approximately one in four women in this country will have an abortion by age forty-five. A majority of women having abortions (61%) already have at least one child, while most (66%) also plan to have a child or additional children in the future.[5]

---

[5] *See* Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 AM. J. PUBLIC HEALTH 1904 (2017), https://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304042; News Release, Guttmacher Inst., *Concern for Current and Future Children a Key Reason Women Have Abortions*, (Jan. 7, 2008), https://www.guttmacher.org/news-

. . . *footnote continues on next page*

## Medical Background

48.    Almost uniformly, clinicians measure pregnancy from the first day of a woman's last menstrual period ("lmp"). A full term pregnancy is approximately forty weeks lmp.

49.    Some women have fairly regular menstrual cycles, and four weeks is a typical cycle; other women have regular cycles of different lengths; and still others have irregular cycles. In a person with regular monthly periods, fertilization typically occurs two weeks after lmp – that is, two weeks after the first day of the last menstrual period. A woman with a highly regular, four-week cycle would be four weeks lmp when she misses her period.

50.    In a typically developing embryo, cells that eventually form the basis for development of the heart later in pregnancy produce cardiac activity that is generally detectible – via ultrasound – beginning at approximately six weeks lmp.[6]

---

release/2008/concern-current-and-future-children-key-reason-women-have-abortions; *Abortion Facts*, Nat'l Abortion Fed'n, https://prochoice.org/education-and-advocacy/about-abortion/abortion-facts/ (last visited June 26, 2019).

[6] *See* Thomas Gellhaus, M.D., *ACOG Opposes Fetal Heartbeat Legislation Restricting Women's Legal Right to Abortion*, Am. Cong. Obstetricians & Gynecologists (Jan. 18, 2017), https://www.acog.org/About-ACOG/News-Room/Statements/2017/ACOG-Opposes-Fetal-Heartbeat-Legislation-Restricting-Womens-Legal-Right-to-Abortion.

51.     The great majority of abortion patients are simply not able to confirm a pregnancy and schedule and obtain an abortion before 6 weeks lmp.

52.     Prior to and even after six weeks lmp, many women do not know they are pregnant – particularly the many women who have irregular cycles, who have certain medical conditions, who have been using contraceptives, or who are breastfeeding.

53.     Even for women with highly regular four-week cycles, six weeks lmp is a mere two weeks after they will have missed their period.

54.     The great majority of abortions take place at or after six weeks lmp.

55.     The U.S. Supreme Court has defined viability as a reasonable likelihood of sustained survival outside the uterus, with or without artificial aid.

56.     Six weeks is a previability point in pregnancy: Viability does not occur until months later.

57.     Legal abortion is one of the safest medical procedures in the United States. A woman's risk of death associated with childbirth is approximately 14 times higher than that associated with abortion, and every pregnancy-related

complication is more common among women giving birth than among those

having abortions.[7]

58.     According to the Centers for Disease Control and Prevention,

pregnancy is becoming more dangerous, with pregnancy-related deaths on the rise

across the United States.[8]

59.     Georgians face one of the highest risks of pregnancy-related death in

the nation,[9] and pregnancy is three times as deadly for Black Georgians as it is for

white Georgians.[10] As Defendant Commissioner Toomey's Department of Public

---

[7] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 OBSTETRICS & GYNECOLOGY 215, 215 (Feb. 2012).

[8] Ctr. for Disease Control & Prevention,  *Pregnancy Mortality Surveillance System*, https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregnancy-mortality-surveillance-system.htm (last reviewed June 26, 2019).

[9] America's Health Rankings, United Health Found., *Maternal Mortality* (2019), https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/maternal_mortality (analyzing data from CDC WONDER Online Database, 2011-2015).

[10] In Georgia, "[b]etween 2012-2014, Black non-Hispanic women were about 3.3 times more likely to die due to pregnancy-related complications than White, non-Hispanic women." Ga. Dep't Pub. Health, Maternal Mortality Review Comm., *Maternal Mortality Report 2014* (March 2019) at 11, https://dph.georgia.gov/sites/dph.georgia.gov/files/related_files/site_page/Maternal%20Mortality%20BookletGeorgia.FINAL_.hq_.pdf.

*. . . footnote continues on next page*

Health has recognized, the State could do a great deal to drive down this shameful statistic and save women's lives: In Georgia, "[b]etween 2012-2014, 61% of pregnancy-related deaths were determined to be preventable."[11]

### Devastating Impact of HB 481

60.    HB 481 will ban the great majority of abortions, depriving Georgians of their constitutional rights.  It will have a devastating impact.

61.    As between maintaining a pregnancy or having an abortion, H.B. 481 would mandate the medically far riskier course, regardless of whether it is contrary to an individual patient's will. Forcing a woman to continue a pregnancy against her will can pose a risk to her physical, mental, and emotional health, and even her life, as well as to the stability and wellbeing of her family, including her existing children.

62.    Even those able to overcome the obstacles to accessing care outside Georgia would be delayed, which would increase the risks of the care: although abortion is extremely safe, the risks associated with pregnancy increase as pregnancy advances.

---

[11] *Id.* at 20.

63.    H.B. 481's three narrow exceptions provide little relief from its near complete ban on abortions.

64.    First, H.B. 481 will force women pregnant as a result of sexual assault to continue their pregnancies against their will. H.B. 481's exception for sexual assault survivors applies only before 20 weeks post-fertilization, and only when "an official police report has been filed alleging the offense of rape or incest." § 4(b)(2). Many survivors of these crimes are never able to file a police report for many reasons, including that they fear violent retaliation by the rapist, that they are coping with trauma, or that filing a report would deepen their trauma. Many more are unable to file a police report within the timeframe that H.B. 481 requires to abort a pregnancy resulting from those crimes. Plaintiffs' abortion patients include survivors of rape or incest who have not filed police reports.

65.    Second, there are severe and potentially lethal fetal conditions that lead women to decide to have an abortion, but that would not satisfy H.B. 481's narrow exception for "medically futile" pregnancies, which is limited to the presence of "a profound and irremediable congenital or chromosomal anomaly that is incompatible with sustaining life after birth." H.B. 481 § 4 (amending O.C.G.A. § 16-12-141(a)(4)). For example, in the condition severe diaphragmatic hernia, the fetal intestines impinge on the lungs and prevent their development, which can

27

result in a stillbirth. If a baby is born with this condition, surgeries may allow

breathing, or such surgeries may fail, resulting in death. Yet, these and many other

similarly severe conditions would not qualify as "medically futile" under H.B. 481.

66.    Third, H.B. 481's "medical emergency" exception is so limited that

the ban would block care even for many women who desperately need abortions to

protect their health, including some of Plaintiffs' patients. A patient who was not

in, or who had not yet deteriorated to the point that she was in, a medical

emergency as narrowly defined would have to remain pregnant, regardless of the

harm to her health.

       a.    In one of many examples, high blood pressure can worsen as

           pregnancy advances. In some patients, this leads to serious conditions

           during pregnancy including pre-eclampsia, eclampsia, cardiac

           hypertrophy, heart attack, and stroke; for some patients, remaining

           pregnant with high blood pressure can lead to heart or kidney damage

           well after pregnancy. Some patients with this profile seek abortion

           care to avoid these serious risks; others remain pregnant and have

           their physicians manage the risk as best as possible; and of those,

           some later decide that the risk has passed the point that they deem

           acceptable, and they have an abortion. But unless such a patient had

deteriorated to the point of a "medical emergency" as defined in H.B. 481, she would have to remain pregnant and be exposed to those near-term and long-term medical risks.

b.  In another example, patients also include women with underlying cardiac disease, which greatly increases the risk that pregnancy will kill or harm the woman – during pregnancy or perhaps years later. A woman with cardiac disease may be reasonably healthy at 8 weeks lmp, and her doctors may well be able to manage her condition reasonably well throughout her pregnancy. But for many other patients, it is only much later in pregnancy – around 28 weeks, when pregnancy places much higher stress on the woman's heart – that the condition becomes critical. To protect themselves from the risk that their condition will become critical, many patients with cardiac disease seek abortion care earlier in pregnancy, when they are still reasonably healthy. At that point, with real concern and yet uncertainty that the condition would dramatically worsen in the third trimester for this particular patient, the physician would not be able to say that an abortion was "necessary . . . to prevent" her "death . . . or the substantial and irreversible physical impairment of a major bodily

function." H.B. 481 § 4(a)(3). Under H.B. 481, such a patient would remain pregnant and face those risks, against her will.

67.     Moreover, under H.B. 481, pregnant Georgians will also face increased risk of injury or death as a result of miscarriage, which is common at and after six weeks lmp. In the great majority of cases, a woman miscarrying would not fall within any of Section 4's limited exceptions, including the narrow exception for a "medical emergency."

a.  In some cases of miscarriage (sometimes called spontaneous abortion), the process of pregnancy loss itself ends embryonic/fetal cardiac activity. In those cases, H.B. 481 would allow a woman to access medical care to empty her uterus. *See* H.B. 481 § 4 (amending O.C.G.A. § 16-12-141(a)(1)(A)).

b.  However, in other cases of miscarriage, cardiac activity persists while the woman is actively miscarrying.  In those cases as well, the standard of care is to offer a patient medical treatment to empty her uterus, but H.B. 481 would tie the doctor's hands. In those instances, H.B. 481 will force a woman to continue undergoing the miscarriage, regardless of how desperately she wants to complete the inevitable loss of her pregnancy, and regardless of the medical risks she faces –

30

unless and until her condition deteriorates to the point of a "medical
emergency" as H.B. 481 narrowly defines it. This would be true
starting at six weeks – months before there is any possibility of
survival outside the uterus. While actively miscarrying, a woman
experiences some combination of symptoms including bleeding,
cramping, partially passing the embryo/fetus, physical pain, emotional
pain, and risk of infection.

    c.   Denying that treatment for miscarriage management would only
increase the already high maternal mortality rate that Georgians face,
including Plaintiffs' patients and SisterSong's members. It would also
cruelly force women to endure needlessly prolonged physical and
mental anguish.

68.    In addition, the vagueness created by Section 3's definition of "natural
person," as well as Section 4's affirmative defenses for clinicians whose care
accidentally harms an embryo/fetus, threatens a wide range of treatment for
patients who are or may be pregnant.  After getting a measles, mumps, rubella
vaccine, for example, a woman should avoid pregnancy for several weeks; if she
does not, accidental harm to the embryo can result. Certain common antibiotics
such as tetracycline can harm an embryo, and there is no way to rule out pregnancy

definitively before prescribing or dispensing them: even were a clinician and

pharmacist to insist on a blood pregnancy test – rather than rely on a patient's

potentially incorrect report that she is not pregnant – such tests show negative

results in the first days of pregnancy.  When a pregnant woman requires surgery –

to treat a ruptured appendix, for example – the physician may cause a miscarriage,

and the anesthesia can harm the embryo/fetus by causing the woman's blood

pressure or oxygen saturation to fall. Under H.B. 481, clinicians and others in the

care team will be chilled from providing routine care – and, critically, specialized

care – to pregnant patients that may result in accidental injury to an embryo or

fetus. H.B. 481 Section 4's affirmative defenses provide no comfort. First,

providers must still fear prosecution under Section 4, in which they would have to

raise and prove as an affirmative defense that the impact on the pregnancy was

accidental. Second, H.B. 481's affirmative defenses would not protect against civil

or criminal liability under the many other parts of the Georgia code that H.B. 481's

new definition of "natural person" alters. By threatening the provision of a wide

range of medical care for people who are or may be pregnant, H.B. 481 will only

increase the medical risks that Plaintiffs' patients and members face.

69.    Finally, pregnancy-related deaths are so high in Georgia in part

because of the state's critical shortage of obstetrician-gynecologists, particularly in

rural areas. By threatening obstetrician-gynecologists with criminal penalties for abortion and other standard-of-care treatment, H.B. 481 can only drive doctors out of Georgia, exacerbating the crisis.

————————————————

70.    As SisterSong represents the needs and rights of the most oppressed communities, absent an injunction, H.B. 481 would force SisterSong to divert its scarce time and resources away from other aspects of its crucial work to help Georgians access abortion care out of state and otherwise adjust to H.B. 481's sweeping impact. SisterSong is already fielding inquiries from Georgians panicked about obtaining abortions because of H.B. 481. Its members are among the people who would be most devastated were H.B. 481 to take effect.

71.    Absent an injunction, Plaintiff clinics and physicians will have no choice but to turn away patients in need of banned care. Their patients would suffer the irreparable harm of gross violations of their constitutional rights, assault to their dignity, and the unconscionable imposition of risks to their health and lives.

**CLAIMS FOR RELIEF**

COUNT I

(Substantive Due Process / Privacy and Liberty)

72.     Plaintiffs reallege and incorporate by reference the allegations contained in in Paragraphs 1 through 71.

73.     By prohibiting an individual from making the ultimate decision whether to continue or to terminate a pregnancy prior to viability, H.B. 481 violates Georgians' right to privacy and liberty secured by the Fourteenth Amendment to the United States Constitution.

74.     By redefining the meaning of natural person throughout the entire Georgia code to include an embryo/fetus in utero at any stage of development, H.B. 481 infringes on women's right to abortion and bodily autonomy and thereby violates Georgians' right to privacy and liberty secured by the Fourteenth Amendment to the United States Constitution.

COUNT II

(Due Process / Vagueness)

75.     Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 71.

76.     It is unclear if and/or how the new definitions in Section 3 of H.B. 481 effectively amend other provisions of the Official Code of Georgia Annotated that include the term "person" and/or "human being." These terms appear in the Code hundreds of times, and they are included in sections of the code that set forth the scope of, *inter alia*, criminal acts and civil liability.

77.     These provisions and others, as amended by the new definitions in Section 3 of H.B. 481, make it impossible for pregnant women and medical providers to know what actions are forbidden or required, and thus do not provide adequate guidance as to how they can comply with the law.

78.     Because these provisions, as amended by the new definitions in Section 3 of H.B. 481, do not clearly define what actions are forbidden or required, they do not meaningfully limit the actions of law enforcement and do not protect against arbitrary and discriminatory enforcement.

79.     Because Plaintiffs are unable to determine what is required under the Official Code of Georgia Annotated, as amended by Section 3 of H.B. 481, H.B. 481 violates Plaintiffs' rights secured to them by the Due Process guarantees of the Fourteenth Amendment to the United States Constitution.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A.      To issue a preliminary injunction in advance of the January 1, 2020, effective date and a permanent injunction restraining Defendants, their employees, agents, and successors in office from enforcing H.B. 481.

B.      To enter a judgment declaring that H.B. 481 violates the Fourteenth Amendment to the United States Constitution.

C.      To award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

D.      To grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 28th day of June, 2019.

Susan Talcott Camp*
Rebecca Chan*
Elizabeth Watson*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
tcamp@aclu.org
rchan@aclu.org
ewatson@aclu.org

*Attorneys for Plaintiffs SisterSong,
ACWC, AWMC, carafem, Summit,
and Drs. Cwiak, Haddad and Lathrop*

Carrie Y. Flaxman*
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Avenue, NW
Suite 300
Washington, DC 20005
(202) 973-4800
carrie.flaxman@ppfa.org

Susan Lambiase*
PLANNED PARENTHOOD FEDERATION
OF AMERICA
123 William St., Floor 9
New York, NY 10038
(212) 541-7800 (phone)
(212) 247-6811 (fax)
susan.lambiase@ppfa.org

*Attorneys for PPSE*

s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
(770) 303-8111 (phone)
(770) 303-0060 (fax)
syoung@acluga.org

*Attorney for Plaintiffs*

Julie Rikelman*
Emily Nestler*
Kirby Tyrrell*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3670 (phone)
(917) 637-3666 (fax)
jrikelman@reprorights.org
enestler@reprorights.org
ktyrrell@reprorights.org

*Attorneys for Plaintiffs Feminist and
CWHO*

*\*Pro hac vice applications
forthcoming*

37

# EXHIBIT A

House Bill 481 (AS PASSED HOUSE AND SENATE)

By: Representatives Setzler of the 35th, Lott of the 122nd, Taylor of the 173rd, Bonner of the 72nd, Ehrhart of the 36th, and others

A BILL TO BE ENTITLED

AN ACT

1   To amend Chapter 2 of Title 1 of the Official Code of Georgia Annotated, relating to persons
2   and their rights, so as to provide that natural persons include an unborn child; to provide that
3   such unborn children shall be included in certain population based determinations; to provide
4   definitions; to amend Article 5 of Chapter 12 of Title 16 of the Official Code of Georgia
5   Annotated, relating to abortion, so as to provide definitions; to revise the time when an
6   abortion may be performed; to provide for exceptions; to provide for the requirements for
7   performing an abortion; to provide for a right of action and damages; to provide for
8   affirmative defenses; to amend Chapter 6 of Title 19 of the Official Code of Georgia
9   Annotated, relating to alimony and child support, so as to provide a definition; to provide a
10  maximum support obligation for certain circumstances; to amend Chapter 7 of Title 19 of the
11  Official Code of Georgia Annotated, relating to parent and child relationship generally, so
12  as to provide that the right to recover for the full value of a child begins at the point when a
13  detectable human heartbeat exists; to amend Chapter 9A of Title 31 of the Official Code of
14  Georgia Annotated, relating to the "Woman's Right to Know Act," so as to provide for
15  advising women seeking an abortion of the presence of a detectable human heartbeat; to
16  provide for the content of certain notices; to repeal certain penalties; to amend Chapter 9B
17  of Title 31 of the Official Code of Georgia Annotated, relating to physician's obligation in
18  performance of abortions, so as to require physicians performing abortions to determine the
19  existence of a detectable human heartbeat before performing an abortion; to provide for the
20  reporting of certain information by physicians; to amend Chapter 7 of Title 48 of the Official
21  Code of Georgia Annotated, relating to income taxes, so as to provide that an unborn child
22  with a detectable human heartbeat is a dependent minor for income tax purposes; to provide
23  for legislative findings; to provide for related matters; to provide for standing to intervene
24  and defend constitutional challenges to this Act; to provide a short title; to provide for
25  severability; to provide an effective date; to repeal conflicting laws; and for other purposes.

26          BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

19                                                                    HB 481/AP

27                              **SECTION 1.**

28   This Act shall be known and may be cited as the "Living Infants Fairness and Equality

29   (LIFE) Act."

30                              **SECTION 2.**

31   The General Assembly of Georgia makes the following findings:

32       (1)  In the founding of the United States of America, the State of Georgia and the several

33       states affirmed that: "We hold these Truths to be self-evident, that all Men are created

34       equal, that they are endowed by their Creator with certain unalienable Rights, that among

35       these are Life, Liberty, and the Pursuit of Happiness –  that to secure these Rights,

36       Governments are instituted among men;"

37       (2)  To protect the fundamental rights of all persons, and specifically to protect the

38       fundamental rights of particular classes of persons who had not previously been

39       recognized under law, the 14th Amendment to the United States Constitution was ratified,

40       providing that, "nor shall any State deprive any person of life, liberty, or property,

41       without due process of law; nor deny any person within its jurisdiction the equal

42       protection of the laws";

43       (3)  Modern medical science, not available decades ago, demonstrates that unborn

44       children are a class of living, distinct persons and more expansive state recognition of

45       unborn children as persons did not exist when *Planned Parenthood v. Casey* (1992) and

46       *Roe v. Wade* (1973) established abortion related precedents;

47       (4)  The State of Georgia, applying reasoned judgment to the full body of modern medical

48       science, recognizes the benefits of providing full legal recognition to an unborn child

49       above the minimum requirements of federal law;

50       (5)  Article I, Section I, Paragraphs I and II of the Constitution of the State of Georgia

51       affirm that "[n]o person shall be deprived of life, liberty, or property except by due

52       process of law"; and that "[p]rotection to person and property is the paramount duty of

53       government and shall be impartial and complete.  No person shall be denied the equal

54       protection of the laws"; and

55       (6)  It shall be the policy of the State of Georgia to recognize unborn children as natural

56       persons.

57                              **SECTION 3.**

58   Chapter 2 of Title 1 of the Official Code of Georgia Annotated, relating to persons and their

59   rights, is amended by revising Code Section 1-2-1, relating to classes of persons generally,

60   corporations deemed artificial persons, and nature of corporations generally, as follows:

61    ″1-2-1.

62    (a)  There are two classes of persons: natural and artificial.

63    (b)  'Natural person' means any human being including an unborn child.

64    ~~(b)~~(c)  Corporations are artificial persons. They are creatures of the law and, except insofar

65    as the law forbids it, they are subject to be changed, modified, or destroyed at the will of

66    their creator.

67    (d)  Unless otherwise provided by law, any natural person, including an unborn child with

68    a detectable human heartbeat, shall be included in population based determinations.

69    (e)  As used in this Code section, the term:

70    (1)  'Detectable human heartbeat' means embryonic or fetal cardiac activity or the steady

71    and repetitive rhythmic contraction of the heart within the gestational sac.

72    (2)  'Unborn child' means a member of the species Homo sapiens at any stage of

73    development who is carried in the womb.″

74                                 **SECTION 4.**

75    Article 5 of Chapter 12 of Title 16 of the Official Code of Georgia Annotated, relating to

76    abortion, is amended by revising Code Section 16-12-141, relating to restrictions on the

77    performance of abortions and availability of records, as follows:

78    ″16-12-141.

79    ~~(a)  No abortion is authorized or shall be performed in violation of subsection (a) of Code~~

80    ~~Section 31-9B-2.~~

81    ~~(b)(1)  No abortion is authorized or shall be performed after the first trimester unless the~~

82    ~~abortion is performed in a licensed hospital, in a licensed ambulatory surgical center, or~~

83    ~~in a health facility licensed as an abortion facility by the Department of Community~~

84    ~~Health.~~

85    ~~(2)  An abortion shall only be performed by a physician licensed under Article 2 of~~

86    ~~Chapter 34 of Title 43.~~

87    ~~(c)(1)~~(a)  As used in this article, the term:

88    (1)  'Abortion' means the act of using, prescribing, or administering any instrument,

89    substance, device, or other means with the purpose to terminate a pregnancy with

90    knowledge that termination will, with reasonable likelihood, cause the death of an unborn

91    child; provided, however, that any such act shall not be considered an abortion if the act

92    is performed with the purpose of:

93    (A)  Removing a dead unborn child caused by spontaneous abortion; or

94    (B)  Removing an ectopic pregnancy.

95    (2)  'Detectable human heartbeat' means embryonic or fetal cardiac activity or the steady

96    and repetitive rhythmic contraction of the heart within the gestational sac.

97   (3) 'Medical emergency' means a condition in which an abortion is necessary in order to

98   prevent the death of the pregnant woman or the substantial and irreversible physical

99   impairment of a major bodily function of the pregnant woman. No such greater risk shall

100  be deemed to exist if it is based on a diagnosis or claim of a mental or emotional

101  condition of the pregnant woman or that the pregnant woman will purposefully engage

102  in conduct which she intends to result in her death or in substantial and irreversible

103  physical impairment of a major bodily function.

104  (4) 'Medically futile' means that, in reasonable medical judgment, an unborn child has

105  a profound and irremediable congenital or chromosomal anomaly that is incompatible

106  with sustaining life after birth.

107  (5)  'Spontaneous abortion' means the naturally occurring death of an unborn child,

108  including a miscarriage or stillbirth.

109  (b)  No abortion is authorized or shall be performed if ~~the probable gestational age of the~~

110  an unborn child has been determined in accordance with Code Section 31-9B-2 ~~to be 20~~

111  ~~weeks or more unless the pregnancy is diagnosed as medically futile, as such term is~~

112  ~~defined in Code Section 31-9B-1, or in reasonable medical judgment, the abortion is~~

113  ~~necessary~~ to have a detectable human heartbeat except when:

114  ~~(A)~~(1)  ~~Avert the death of the pregnant woman or avert serious risk of substantial and~~

115  ~~irreversible physical impairment of a major bodily function of the pregnant woman. No~~

116  ~~such condition shall be deemed to exist if it is based on a diagnosis or claim of a mental~~

117  ~~or emotional condition of the pregnant woman or that the pregnant woman will~~

118  ~~purposefully engage in conduct which she intends to result in her death or in substantial~~

119  ~~and irreversible physical impairment of a major bodily function~~ A physician determines,

120  in reasonable medical judgment, that a medical emergency exists; ~~or~~

121  ~~(B)~~(2)  ~~Preserve the life of an unborn child~~ The probable gestational age of the unborn

122  child is 20 weeks or less and the pregnancy is the result of rape or incest in which an

123  official police report has been filed alleging the offense of rape or incest. As used in this

124  paragraph, the term 'probable gestational age of the unborn child' has the meaning

125  provided by Code Section 31-9B-1; or

126  (3)  A physician determines, in reasonable medical judgment, that the pregnancy is

127  medically futile.

128  ~~As used in this paragraph, the term 'probable gestational age of the unborn child' has the~~

129  ~~meaning provided by Code Section 31-9B-1.~~

130  ~~(2)  In any case described in subparagraph (A) or (B) of paragraph (1) of this subsection,~~

131  ~~the physician shall terminate the pregnancy in the manner which, in reasonable medical~~

132  ~~judgment, provides the best opportunity for the unborn child to survive unless, in~~

133  ~~reasonable medical judgment, termination of the pregnancy in that manner would pose~~

134   ~~a greater risk either of the death of the pregnant woman or of the substantial and~~
135   ~~irreversible physical impairment of a major bodily function of the pregnant woman than~~
136   ~~would another available method.  No such greater risk shall be deemed to exist if it is~~
137   ~~based on a diagnosis or claim of a mental or emotional condition of the pregnant woman~~
138   ~~or that the pregnant woman will purposefully engage in conduct which she intends to~~
139   ~~result in her death or in substantial and irreversible physical impairment of a major bodily~~
140   ~~function.  If the child is capable of sustained life, medical aid then available must be~~
141   ~~rendered.~~

142   (c)  In conducting an abortion, if the child is capable of sustained life, medical aid then
143   available shall be rendered.

144   (d)  No abortion is authorized or shall be performed in violation of subsection (a) of Code
145   Section 31-9B-2.

146   (e)(1)  No abortion is authorized or shall be performed after the first trimester unless the
147   abortion is performed in a licensed hospital, in a licensed ambulatory surgical center, or
148   in a health facility licensed as an abortion facility by the Department of Community
149   Health.

150   (2)  An abortion shall only be performed by a physician licensed under Article 2 of
151   Chapter 34 of Title 43.

152   ~~(d)~~(f)  ~~Hospital or other licensed health facility~~ Health records shall be available to the
153   district attorney of the judicial circuit in which the ~~hospital or health facility is located~~ act
154   of abortion occurs or the woman upon whom an abortion is performed resides.

155   (g)  Any woman upon whom an abortion is performed in violation of this Code section may
156   recover in a civil action from the person who engaged in such violation all damages
157   available to her under Georgia law for any torts.

158   (h)  It shall be an affirmative defense to prosecution under this article if:

159   (1)  A licensed physician provides medical treatment to a pregnant woman which results
160   in the accidental or unintentional injury to or death of an unborn child;

161   (2)  An advanced practice registered nurse or registered professional nurse, as such terms
162   are defined in Code Section 43-26-3, or a licensed practical nurse, as such term is defined
163   in Code Section 43-26-32, engages in the practice of nursing to provide care for a
164   pregnant woman which results in the accidental or unintentional injury to or death of an
165   unborn child;

166   (3)  A licensed pharmacist engages in the practice of pharmacy, as such term is defined
167   in Code Section 26-4-4, to provide care for a pregnant woman which results in the
168   accidental or unintentional injury or death of an unborn child;

169    (4)  A licensed physician assistant, as such term is defined in Code Section 43-34-102,
170    provides care to a pregnant woman which results in the accidental or unintentional injury
171    to or death of an unborn child; or
172    (5)  A woman sought an abortion because she reasonably believed that an abortion was
173    the only way to prevent a medical emergency."


174                                **SECTION 5.**
175    Chapter 6 of Title 19 of the Official Code of Georgia Annotated, relating to alimony and
176    child support, is amended by revising paragraph (4) of subsection (a) of Code
177    Section 19-6-15, relating to child support, guidelines for determining amount of award,
178    continuation of duty of support, and duration of support, and by adding a new subsection to
179    read as follows:
180    "(4)  ~~'Child' means child or children~~ Reserved."
181    "(a.1)(1)  As used in this chapter, the term 'child' means child or children, including any
182    unborn child with a detectable human heartbeat as such terms are defined in Code
183    Section 1-2-1.
184    (2)  Notwithstanding any provision of this Code section to the contrary, the maximum
185    amount of support which the court may impose on the father of an unborn child under this
186    Code section shall be the amount of direct medical and pregnancy related expenses of the
187    mother of the unborn child.  After birth, the provisions of this Code section shall apply
188    in full."


189                                **SECTION 6.**
190    Chapter 7 of Title 19 of the Official Code of Georgia Annotated, relating to parent and child
191    relationship generally, is amended by revising paragraph (1) of subsection (c) of Code
192    Section 19-7-1, relating to in whom parental power lies, how such power lost, and recovery
193    for homicide of child, as follows:
194    "(c)(1)  In every case of the homicide of a child, minor or sui juris, there shall be some
195    party entitled to recover the full value of the life of the child, either as provided in this
196    Code section or as provided in Chapter 4 of Title 51.  For the homicide of an unborn
197    child, the right to recover for the full value of the life of such child shall begin at the point
198    at which a detectable human heartbeat, as such term is defined in Code Section 1-2-1, is
199    present."

200                                   **SECTION 7.**

201    Chapter 9A of Title 31 of the Official Code of Georgia Annotated, relating to the "Woman's

202    Right to Know Act," is amended by revising paragraph (1) of Code Section 31-9A-3, relating

203    to voluntary and informed consent to abortion and availability of ultrasound, as follows:

204        "(1)  The female is told the following, by telephone or in person, by the physician who

205        is to perform the abortion, by a qualified agent of the physician who is to perform the

206        abortion, by a qualified agent of a referring physician, or by a referring physician, at

207        least 24 hours before the abortion:

208            (A)  The particular medical risks to the individual patient associated with the particular

209            abortion procedure to be employed, when medically accurate;

210            (B)  The probable gestational age <u>and presence of a detectable human heartbeat, as such</u>

211            <u>term is defined in Code Section 1-2-1,</u> of ~~the~~ <u>an</u> unborn child at the time the abortion

212            would be performed; and

213            (C)  The medical risks associated with carrying ~~the~~ <u>an</u> unborn child to term.

214    The information required by this paragraph may be provided by telephone without

215    conducting a physical examination or tests of the patient, in which case the information

216    required to be provided may be based on facts supplied to the physician by the female and

217    whatever other relevant information is reasonably available to the physician.  Such

218    information may not be provided by a tape recording but must be provided during a

219    consultation in which the physician or a qualified agent of the physician is able to ask

220    questions of the female and the female is able to ask questions of the physician or the

221    physician's qualified agent.  If in the medical judgment of the physician any physical

222    examination, tests, or other information subsequently provided to the physician requires

223    a revision of the information previously supplied to the patient, that revised information

224    shall be communicated to the patient prior to the performance of the abortion.  Nothing

225    in this Code section may be construed to preclude provision of required information in

226    a language understood by the patient through a translator;"


227                                   **SECTION 8.**

228    Said chapter is further amended by revising paragraph (3) of subsection (a) of Code

229    Section 31-9A-4, relating to information to be made available by the Department of Public

230    Health, format requirements, availability, and requirements for website, as follows:

231        "(3) Materials with the following statement concerning unborn children <u>with a detectable</u>

232        <u>human heartbeat, as such term is defined in Code Section 1-2-1, and</u> of 20 weeks' or more

233        gestational age:

234            <u>'As early as six weeks' gestation, an unborn child may have a detectable human</u>

235            <u>heartbeat.</u>  By 20 weeks' gestation, ~~the~~ <u>an</u> unborn child has the physical structures

236       necessary to experience pain.  There is evidence that by 20 weeks' gestation unborn
237            children seek to evade certain stimuli in a manner which in an infant or an adult would
238            be interpreted to be a response to pain.  Anesthesia is routinely administered to unborn
239            children who are 20 weeks' gestational age or older who undergo prenatal surgery.'
240       The materials shall be objective, nonjudgmental, and designed to convey only accurate
241       scientific information about the an unborn child at the various gestational ages."

### SECTION 9.

243   Said chapter is further amended by repealing in its entirety Code Section 31-9A-6.1, relating
244   to civil and professional penalties for violations and prerequisites for seeking penalties.

### SECTION 10.

246   Chapter 9B of Title 31 of the Official Code of Georgia Annotated, relating to physician's
247   obligation in performance of abortions, is amended by revising Code Section 31-9B-2,
248   relating to requirement to determine probable gestational age of unborn child, as follows:
249   "31-9B-2.
250   (a)   Except in the case of a medical emergency or when a pregnancy is diagnosed as
251       medically futile, no abortion shall be performed or attempted to be performed unless the
252       physician performing it such procedure has first made a determination of the probable
253       gestational age presence of a detectable human heartbeat, as such term is defined in Code
254       Section 1-2-1, of the an unborn child or relied upon such a determination made by another
255       physician.
256   (b)   Failure In addition to any criminal or civil penalties provided by law, failure by any
257       physician to conform to any requirement of this Code section constitutes unprofessional
258       conduct for purposes of paragraph (7) of subsection (a) of Code Section 43-34-8 relating
259       to medical licensing sanctions."

### SECTION 11.

261   Said chapter is further amended by revising subsection (a) of Code Section 31-9B-3, relating
262   to required reporting of physicians and departments, confidentiality, and failure to comply,
263   as follows:
264   "(a)   Any physician who performs or attempts to perform an abortion shall report to the
265       department, in conjunction with the reports required under Code Section 31-9A-6 and in
266       accordance with forms and rules and regulations adopted and promulgated by the
267       department:

268     (1) If a ~~determination of probable gestational age was made~~ <u>detectable human heartbeat,</u>
269     <u>as such term is defined in Code Section 1-2-1, exists</u>, the probable gestational age<u>,</u>
270     ~~determined~~ and the method and basis of the determination;

271     ~~(2) If a determination of probable gestational age was not made, the basis of the~~
272     ~~determination that a medical emergency existed or that a pregnancy was diagnosed as~~
273     ~~medically futile;~~

274     ~~(3)~~<u>(2)</u>   If ~~the probable gestational age was determined to be 20 or more weeks~~ <u>a</u>
275     <u>detectable human heartbeat, as such term is defined in Code Section 1-2-1, exists</u>, the
276     basis of the determination that the pregnant woman had a medically futile pregnancy<u>, that</u>
277     <u>a medical emergency existed, or that the pregnancy was the result of rape or incest</u> ~~or had~~
278     ~~a condition which so complicated her medical condition as to necessitate the termination~~
279     ~~of her pregnancy to avert her death or to avert serious risk of substantial and irreversible~~
280     ~~physical impairment of a major bodily function, or the basis of the determination that it~~
281     ~~was necessary to preserve the life of an unborn child~~; and

282     ~~(4)~~<u>(3)</u>  The method used for the abortion ~~and, in the case of an abortion performed when~~
283     ~~the probable gestational age was determined to be 20 or more weeks, whether the method~~
284     ~~of abortion used was one that, in reasonable medical judgment, provided the best~~
285     ~~opportunity for the unborn child to survive or, if such a method was not used, the basis~~
286     ~~of the determination that the pregnancy was medically futile or that termination of the~~
287     ~~pregnancy in that manner would pose a greater risk either of the death of the pregnant~~
288     ~~woman or of the substantial and irreversible physical impairment of a major bodily~~
289     ~~function of the pregnant woman than would other available methods.~~"

290                                           **SECTION 12.**
291     Chapter 7 of Title 48 of the Official Code of Georgia Annotated, relating to income taxes,
292     is amended by revising subsection (a) of Code Section 48-7-26, relating to personal
293     exemptions, as follows:

294     "(a)  As used in this Code section, the term 'dependent' shall have the same meaning as in
295        the Internal Revenue Code of 1986<u>; provided, however, that any unborn child with a</u>
296        <u>detectable human heartbeat, as such terms are defined in Code Section 1-2-1, shall qualify</u>
297        <u>as a dependent minor</u>."

298                                           **SECTION 13.**
299     Any citizen of this state shall have standing and the right to intervene and defend in any
300     action challenging the constitutionality of any portion of this Act.

301                                         **SECTION 14.**

302   All provisions of this Act shall be severable in accordance with Code Section 1-1-3.

303                                           **SECTION 15.**

304   This Act shall become effective on January 1, 2020.

305                                           **SECTION 16.**

306   All laws and parts of laws in conflict with this Act are repealed.

## **DECLARATION**

I declare under penalty of perjury under the laws of the United States of America that the statements contained in the Complaint are true and correct to the best of my knowledge and belief.

Carrie Cwiak, M.D., M.P.H.

Executed on Date: 6-26-19

## **DECLARATION**

I declare under penalty of perjury under the laws of the United States of America that the statements contained in the Complaint related to SisterSong Women of Color Reproductive Justice Collective ("SisterSong") are true and correct to the best of my knowledge and belief.

Monica Simpson
Executive Director
SisterSong

Executed on Date: 6/19/19

## **DECLARATION**

I declare under penalty of perjury under the laws of the United States of

America that the statements contained in the Complaint related to Feminist

Women's Health Center are true and correct to the best of my knowledge and

belief.

**Kwajelyn J. Jackson**
Executive Director
Feminist Women's Health Center

Executed on Date: 6-26-19

## DECLARATION

I declare under penalty of perjury under the laws of the United States of America that the statements contained in the Complaint related to Planned Parenthood Southeast, Inc., are true and correct to the best of my knowledge and belief.

_____
Staci L. Fox
President and Chief Executive Officer
Planned Parenthood Southeast, Inc.

Executed on: __6/27/19__

**DECLARATION**

I declare under penalty of perjury under the laws of the United States of America that the statements contained in the Complaint related to Atlanta Comprehensive Wellness Clinic ("ACWC") are true and correct to the best of my knowledge and belief.

Dr. Tamer Middleton

Atlanta Comprehensive Wellness Clinic

Executed on Date: _6-17-19_

# **DECLARATION**

I declare under penalty of perjury under the laws of the United States of America that the statements contained in the Complaint related to Atlanta Women's Medical Center ("AWMC") are true and correct to the best of my knowledge and belief.

Elizabeth Barnes
President
The Women's Centers

Executed on Date: _____6/18/19_____

## **DECLARATION**

I declare under penalty of perjury under the laws of the United States of

America that the statements contained in the Complaint related to FemHealth USA

d/b/a carafem are true and correct to the best of my knowledge and belief.


Melissa Grant
Chief Operations Officer
FemHealth USA d/b/a carafem


Executed on Date:  6-19-19

## <u>DECLARATION</u>

I declare under penalty of perjury under the laws of the United States of America that the statements contained in the Complaint related to Columbus Women's Health Organization, P.C. are true and correct to the best of my knowledge and belief.

**Shannon L. Brewer**
Director
Columbus Women's Health Organization, P.C.

Executed on Date: 6/26/2019

## **DECLARATION**

I declare under penalty of perjury under the laws of the United States of

America that the statements contained in the Complaint related to Summit Medical

Associates, P.C. are true and correct to the best of my knowledge and belief.


Elizabeth Hillston
Director
Summit Medical Associates


Executed on Date:   6 / 19 / 2019

## **DECLARATION**

I declare under penalty of perjury under the laws of the United States of

America that the statements contained in the Complaint related to Lisa Haddad,

M.D., M.S., M.P.H. are true and correct to the best of my knowledge and belief.


Lisa Haddad, M.D., M.S., M.P.H.

Executed on Date: ___6/26/19___

## **DECLARATION**

I declare under penalty of perjury under the laws of the United States of

America that the statements contained in the Complaint related to Dr. Eva Lathrop

are true and correct to the best of my knowledge and belief.


*Eva Lathrop*
_____

Eva Lathrop, M.D.


Executed on Date: _June 17, 2019_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. The Complaint will be served on the above-named Defendants.

Date: June 28, 2019

s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org