**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

SISTERSONG WOMEN OF COLOR REPRODUCTIVE JUSTICE COLLECTIVE *et al*.,

Plaintiffs,

vs.

BRIAN KEMP *et al*.,

Defendants.

Civil Action No.: 1:19-cv-02973-SCJ

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

## INTRODUCTION

House Bill 481 ("H.B. 481")[1] bans abortion. It does so in clear violation of *Roe v. Wade*, 410 U.S. 113 (1973), and nearly a half century of Supreme Court precedent reaffirming *Roe*'s central holding. It is an affront to the dignity and health of Georgians, and that is why Plaintiffs move the Court for a preliminary injunction.

Indeed, the Constitution protects the decision to have an abortion precisely because it involves one of "the most intimate and personal choices a person may make," and because retaining the authority to make that decision undergirds the "ability . . . to participate equally in the economic and social life of the Nation." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851, 856 (1992). The Supreme Court has repeatedly affirmed that the liberty to end a pregnancy—and to "retain the ultimate control over her destiny and her body," *id*. at 869—is essential to a person's dignity, equality, and ability to shape a meaningful life—freedoms at the core of Due Process, *see id.* at 851. By depriving women[2] of the most basic

[1] H.B. 481 is attached as Exhibit A to the Verified Complaint for Declaratory & Injunctive Relief, ECF No. 1 ("Compl.").

[2] Plaintiffs use "woman" or "women" as a short-hand for people who are or may become pregnant, but people of all gender identities, including transgender men

*. . . footnote continues on next page*

control over their bodies, their health, and their lives, H.B. 481 imposes on Plaintiffs' patients and members a single and unbending vision of their reproductive trajectories, forcing them to define their lives according to the State's prerogatives, rather than their own—precisely the result that Due Process prohibits.

H.B. 481 is in particular an attack on low-income Georgians, Georgians of color, and rural Georgians, who are least able to access medical care and least able to overcome the cruelties of this law. Georgians face a critical shortage of reproductive health care providers, including obstetrician-gynecologists. The maternal mortality rate in Georgia, particularly for Black Georgians, is among the highest in the nation.

Rather than working to end those preventable deaths, and rather than honoring Georgians' reproductive health care decisions, the Legislature has instead chosen to criminalize abortion from the earliest stages of pregnancy, to threaten a vast array of medical care critical for the health of Georgians of reproductive age, and to threaten medical providers with a vague law.

H.B. 481 is scheduled to take effect January 1, 2020. H.B. 481 § 15. Absent an order from this Court, it will inflict significant and irreparable harm on

---

and gender-diverse individuals, may also become pregnant and seek abortion services, and would thus also suffer irreparable harm under H.B. 481.

Plaintiffs and their patients and members for which there is no adequate remedy at law. This Court should therefore preliminarily enjoin Defendants from enforcing H.B. 481.

## FACTS[3]

Women seek abortion care for an array of deeply personal reasons. Each woman's decision is motivated by a constellation of profoundly diverse, complex, and interrelated factors—intimately related to her health, family and social circumstances, core religious beliefs, and values. Verified Compl. for Decl. & Inj. Relief, ECF No. 1 ("Compl.") ¶ 46. Approximately one in four women in this country will have an abortion by age forty-five. *Id*. ¶ 47. A majority of them (sixty-one percent) already have at least one child, and most (sixty-six percent) plan to have a child or additional children in the future.[4] *Id*.

---

[3] The allegations in the verified complaint are supported by sworn declarations attached to the complaint and by the literature citations contained therein.

[4] *See* Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 AM. J. PUB. HEALTH 1904 (2017), https://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304042; Guttmacher Inst., News Release, Concern for Current & Future Children a Key Reason Women Have Abortions, (Jan. 7, 2008), https://www.guttmacher.org/news-release/2008/concern-current-and-future-children-key-reason-women-have-abortions; Abortion Facts, Nat'l Abortion Fed'n, https://prochoice.org/education-and-advocacy/about-abortion/abortion-facts/ (last visited July 19, 2019).

Legal abortion is one of the safest medical procedures in the United States. A woman's risk of death associated with childbirth is approximately fourteen times higher than that associated with abortion, and every pregnancy-related complication is more common among women giving birth than among those having abortions.[5] *Id*. ¶ 57. According to the Centers for Disease Control and Prevention, pregnancy is becoming more dangerous, with maternal mortality on the rise across the United States.[6] *Id*. ¶ 58.

In a typically developing embryo, cells that eventually form the basis for development of the heart later in pregnancy produce cardiac activity that is generally detectable at approximately six weeks from a women's last menstrual period ("lmp").[7] Compl. ¶ 50.

Prior to and even after six weeks lmp, many women do not know they are pregnant—particularly the many women who have irregular menstrual cycles, who

---

[5] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 OBSTETRICS& GYNECOLOGY 215 (2012).

[6] Ctrs. for Disease Control & Prevention, Pregnancy Mortality Surveillance System, https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregnancy-mortality-surveillance-system.htm (last reviewed June 26, 2019).

[7] Clinicians measure pregnancy from the beginning of a woman's last menstrual period ("lmp").

have certain medical conditions, who have been using contraceptives, or who are breastfeeding. Even for women with highly regular four-week cycles, six weeks lmp is a mere two weeks after they will have missed their period. *Id*. ¶¶ 52-53. Because the great majority of abortion patients are simply unable to confirm a pregnancy and schedule and obtain an abortion before six weeks lmp, the great majority of abortions take place at or after that point. *Id*. ¶¶ 48-54.

Viability—a reasonable likelihood of sustained survival outside the uterus, with or without artificial aid—does not occur until months after the commencement of pregnancy. *Id.* ¶¶ 55-56.

**STATUTORY FRAMEWORK AND OPERATION OF H.B. 481**

H.B. 481 bans almost all abortions and, in an effort to justify doing so, declares a policy of both recognizing embryos/fetuses[8] "as natural persons," H.B. 481 § 2(6); *see also id.* §§ 2(2), (5), and establishing "more expansive state recognition of" embryos/fetuses "as persons" than "exist[ed] when" the Supreme Court decided *Roe* in 1973 and *Casey* in 1992, *id.* § 2(3).

[8] The embryonic stage of pregnancy lasts until approximately ten weeks lmp, when the fetal stage begins.

Section 3 amends Title I of the Georgia Code, which sets forth definitions of "Persons and their Rights" that apply throughout the civil and criminal Code. Section 3 amends Title I by redefining "natural person" to include "any human being including an unborn child," and by defining "unborn child" as an embryo/fetus "at any stage of development" in utero ("Personhood Definition"). H.B. 481 §§ 3(b), (e)(2).

While the interaction of Section 3 with the numerous provisions it amends is vague, the crux of the Personhood Definition is an attempt to make an end-run around 50 years of binding precedent.[9] The *Roe* Court rejected recognition of the embryo/"fetus [a]s entitled to Fourteenth Amendment protection as a person" for precisely this reason: allowing *any* abortion would then "be out of line with the Amendment's command[.]" 410 U.S. at 157 n.54; *see also id.* at 157-58 (noting

[9] For example, in multiple instances, H.B. 481 co-sponsor Rep. L. Edwin Setzler discussed *Roe* in great detail, always ending with, in substance, "[I]f a state ever establishes the personhood of the unborn child, the logic of Roe collapses." *See, e.g.*, Transcript of Record 19:10-12, Mar. 29, 2019, *Hearing on H.B. 481 Before the H.R.,* 155th Gen. Assemb., Reg. Sess. (Ga. 2019) (attached as Ex. F to Decl. of Sean J. Young dated July 22, 2019, attached to Pls.' Mot. For Prelim. Inj. ("Young Decl.")); *id*. 19:15-21 ("So we're following the *Roe v. Wade* case that says if the state ever establishes the personhood of the child, the pro-abortion protections that overwrite the child's right to life collapse. We, as a state, are doing that."); Transcript of Record 32:2-10, March 14, 2019, *Hearing on H.B. 481 Before the Senate Standing Committee on Science and Technology*, 155th Gen. Assemb., Reg. Sess. (Ga. 2019) (attached as Ex. C to Young Decl.).

that the Fourteenth Amendment speaks only of persons "born or naturalized in the United States," and holding that "the word 'person,' as used in the Fourteenth Amendment, does not include" embryos/fetuses).

Section 3's Personhood Definition amends the hundreds of Code provisions that contain the terms "person" and "human being." This amendment of numerous Code sections could have a vast impact on the wide array of medical treatments for pregnant women that can harm an embryo/fetus, in addition to abortion. Medical providers could face the threat of criminal prosecution for provision of abortion, as well as routine and specialized care to pregnant patients that may accidentally injure an embryo/fetus. Such care can include everything from certain vaccines and antibiotics, to surgeries such as those needed to treat a ruptured appendix. Compl. ¶ 68.

Section 4 of H.B. 481 explicitly bans abortion once there is "a detectable human heartbeat," defined as "embryonic or fetal cardiac activity," *id.* §§ 3(e)(1), 4(a)(2) & (b), 10.[10] By banning abortion starting at six weeks lmp, Section 4 bans

---

[10] Amending O.C.G.A. § 31-9B-2, "relating to physician's obligation in performance of abortions," Section 4 requires physicians to determine the presence of detectable cardiac activity. H.B. 481 § 10. H.B. 481 also amends Georgia's abortion informed consent and reporting statutes to mandate that twenty-four hours before an abortion, the patient receive information regarding "the presence of . . . detectable" cardiac activity, *id.* § 7; that materials available to abortion patients

*. . . footnote continues on next page*

the vast majority of abortions. Compl. ¶ 54. It also prohibits completing a miscarriage unless the miscarriage has already caused embryonic/fetal demise, H.B. 481 § 4(a)(1)(A), which will increase the risk of injury or death from miscarriage. Compl. ¶ 67. The consequences of violating Section 4 include imprisonment of one to ten years, O.C.G.A. § 16-12-140(b), licensing penalties up to and including license revocation, H.B. 481 § 10(b); O.C.G.A. §§ 43-34-8(a)(7), (8), and civil actions by patients, H.B. 481 § 4(g).

Section 4 provides affirmative defenses allowing an accused "woman [who] sought an abortion" to prove to the jury that "she reasonably believed that an abortion was the only way to prevent a medical emergency," H.B. 481 § 4(h)(5), and allowing an accused physician, nurse, physician assistant, or pharmacist to prove to the jury that she "provide[d] care for a pregnant woman which result[ed] in the accidental or unintentional injury or death of an" embryo/fetus, H.B. 481 §§ 4(h)(1-4). Thus, Section 4 threatens prosecution not just for abortion, but for a vast array of medical care for a pregnant woman that could injure an embryo/fetus. Charged for such conduct, medical providers would have to raise and prove as an affirmative defense that the impact on the pregnancy was accidental. Compl. ¶ 68.

---

refer to detectable cardiac activity, *id.* § 8; and that abortion reporting reflect the ban where there is detectable cardiac activity, *id.* § 11.

Section 4's three stringently narrow exceptions provide little relief. *See* Compl. ¶¶ 41, 63–67. They permit care only when:

a. a "medical emergency" exists, defined as limited to care necessary to prevent the death or the substantial and irreversible physical impairment of a major bodily function of the pregnant woman. H.B. 481 § 4(b)(1). The exception does not allow abortion to reduce the *risk of* death or to prevent substantial and irreversible physical impairment of a non-major bodily function or substantial but reversible physical impairment of a major bodily function, etc. *See* Compl. ¶ 41.a. A patient who had not yet deteriorated to the point of a medical emergency as narrowly defined by the statute would be forced to remain pregnant and suffer the concomitant harm to her health. *See id*. ¶ 66;

b. the pregnancy is at or below twenty weeks post-fertilization and is the result of rape or incest in which an official police report has been filed alleging the offense. H.B. 481 § 4(b)(2); *see* Compl. ¶ 41.b; or

c. the "physician determines, in reasonable medical judgment, that the pregnancy is medically futile," defined as "a profound and

irremediable . . . anomaly that is incompatible with sustaining life after birth." H.B. 481 §§ 4(a)(4), (b)(3). *See* Compl. ¶ 41.c.

## ARGUMENT[11]

The Court should grant Plaintiffs' motion for a preliminary injunction because (1) Plaintiffs are substantially likely to prevail on the merits; (2) preliminary injunctive relief is necessary to prevent irreparable injury to Plaintiffs and their patients and members; (3) those injuries outweigh any harm to Defendants; and (4) entry of relief in Plaintiffs' favor is in the public interest. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

## I. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

### A. H.B. 481 Is Unconstitutional Because it Bans Pre-viability Abortion.

In direct contravention of Supreme Court precedent, H.B. 481 bans abortion from the earliest stages of pregnancy, months before the point of viability. For nearly five decades, the U.S. Supreme Court has repeatedly and unequivocally held that a state may not ban abortion at any point prior to viability. *See, e.g.*, *Casey*, 505 U.S. at 879; *Roe*, 410 U.S. at 153–54, 164–65; *see also Whole Woman's*

---

[11] Unless otherwise indicated, all internal citations and quotations omitted.

*Health*, 136 S. Ct. at 2299; *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000). The State may "proscribe" abortion only *after* viability—and even then, must allow abortions necessary to preserve a woman's life or health. *Roe*, 410 U.S. at 163–64.

Since *Roe*, the Supreme Court has repeatedly affirmed that a "woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce." *Casey*, 505 U.S. at 871; *see also Whole Woman's Health*, 136 S. Ct. at 2299.[12] Therefore, a ban on abortion at *any* point before viability is *per se* unconstitutional, no matter what interests the state asserts to support it. "Before viability, the State's interests are not strong enough to support a prohibition of abortion. . . . [A] State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 846, 879.

[12] Although *Casey* abandoned *Roe*'s strict scrutiny standard in favor of the "undue burden" test, under which a pre-viability restriction may stand as long as it does not have the purpose or effect of placing a "substantial obstacle" in the path of a woman seeking abortion, the Court emphasized: "Our adoption of the undue burden analysis does not disturb the central holding of *Roe v. Wade*, and we reaffirm that holding." 505 U.S. at 879.

Accordingly, lower courts have uniformly rejected attempts to ban abortion prior to viability.[13] *See e.g.*, *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772–73 (8th Cir. 2015) (striking down ban at six weeks, based on detectable embryonic cardiac activity), *cert. denied*, 136 S. Ct. 981 (2016); *Edwards v. Beck*, 786 F.3d 1113, 1117–19 (8th Cir. 2015) (striking down 12-week ban), *cert. denied*, 136 S. Ct. 895 (2016); *Isaacson v. Horne*, 716 F.3d 1213, 1217, 1231 (9th Cir. 2013) (striking down 20-week ban), *cert. denied*, 134 S. Ct. 905 (2014); *Jane L. v. Bangerter*, 102 F.3d 1112, 1117-18 (10th Cir. 1996) (striking down 22-week ban), *cert. denied*, 520 U.S. 1274 (1997); *Sojourner T. v. Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992) (striking down total ban), *cert denied*, 507 U.S. 972 (1993); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368–69, 1371–72 (9th Cir. 1992) (same), *cert. denied*, 506 U.S. 1011 (1992); *Preterm-Cleveland v. Yost*, No. 1:19-cv-00360, 2019 WL 2869640, at *3–6 (S.D. Ohio July 3, 2019) (preliminarily enjoining 6-week ban based on detectable cardiac activity); *Jackson*

---

[13] The Eleventh Circuit has not ruled on an explicit ban such as H.B. 481, but has faithfully applied Supreme Court precedent to strike two laws that effectively banned abortion at 15 weeks, one by shutting down the only providers of second-trimester care in the state, and the other by banning the only second–trimester, outpatient method available. *See W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244 (M.D. Ala. 2017), *aff'd, W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310 (11th Cir. 2018), *cert. denied,* ___ S. Ct. ___ (June 28, 2019).

*Women's Health Org. v. Dobbs*, 379 F. Supp. 3d 549, 552-53 (S.D. Miss. 2019) (same), *appeal filed*, No. 19-60455 (5th Cir. June 24, 2019); *Bryant v. Woodall*, 363 F. Supp. 3d 611, 630–32 (M.D.N.C. 2019) (striking down 20-week ban); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, No. 3:19-CV-178-DJH, 2019 WL 1233575, at *2 (W.D. Ky. Mar. 15, 2019) (TRO against 6-week ban based on detectable cardiac activity); *Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536, 537–38, 544–45 (S.D. Miss. 2018) (striking down 15-week ban), *appeal filed*, No. 18-60868 (5th Cir. Dec. 17, 2018).[14]

The Supreme Court has squarely held that no State interest, including the interest in potential life, can *ever* justify a pre-viability ban. *See Casey*, 505 U.S. at 846. In other words, "*Casey*'s holding that a woman has the right to terminate her pregnancy prior to viability is categorical," and courts "cannot reweigh a woman's privacy right against the State's interest." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 305, 307 (7th Cir. 2018)

---

[14] Of course, Section 4's narrow exceptions cannot save H.B. 481. "Regardless of whether exceptions are made for particular circumstances, a State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 846, 879; *see also, e.g., W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1283 (M.D. Ala. 2017) ("[A] medical exception cannot save an otherwise unconstitutional [abortion] ban.").

(striking ban based on a woman's reason for the abortion), *cert. denied, Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019).[15]

H.B. 481 is thus plainly unconstitutional under binding precedent. *See, e.g.*, *W. Ala. Women's Ctr.*, 900 F.3d at 1329 (upholding decision striking abortion procedure ban and recognizing "[i]n our judicial system, there is only one Supreme Court . . . . [W]e follow its decisions"); *see also MKB Mgmt. Corp.*, 795 F.3d at 771, 772 (8th Cir. 2015) (rejecting argument that "the Supreme Court has called into question the continuing validity of its abortion jurisprudence" and holding all federal courts "are bound by those decisions"); *Richmond Med. Ctr. for Women v. Gilmore*, 219 F.3d 376, 376 (4th Cir. 2000) (Luttig, J., concurring) ("I understand the Supreme Court to have intended its decision in [*Casey*] to be a decision of super-stare decisis with respect to a woman's fundamental right to choose whether or not to proceed with a pregnancy."). Plaintiffs are therefore entitled to preliminary injunctive relief.[16]

---

[15] The Supreme Court denied review of the injunction blocking this unconstitutional abortion ban, although it summarily reversed the Seventh Circuit on an unrelated claim in the same case. *See id.*

[16] Because banning abortion is the main purpose of H.B. 481, once the provisions banning abortion are enjoined, the rest of H.B. 481 must be enjoined as well. "When an unconstitutional portion of a statute is so connected with the general scope of the statute that to sever it would result in a statute that fails to correspond to the main legislative purpose, or give effect to that purpose, the statute must fall

*. . . footnote continues on next page*

### B. H.B. 481 Is Unconstitutionally Vague.

H.B. 481 violates Due Process guarantees for the additional reason that the Personhood Definition's application throughout the Georgia Code makes it impossible for Plaintiffs to understand what many other Code provisions require. "In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). The "requirement of clarity in regulation is essential," and calls on courts to consider "two connected but discrete due process concerns." *F.C.C. v. Fox Television Stations*, *Inc.,* 567 U.S. 239, 253 (2012). First, the law must provide "fair notice" by giving "[a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 112 (1972); *see also Papachristou v. City of Jacksonville,* 405 U.S. 156, 162 (1972) (same). Second, the law must provide "explicit standards for those who apply them" to avoid "arbitrary

---

in its entirety." *State v. Jackson*, 496 S.E. 2d 912, 916-17 (Ga. 1998). Banning abortion is "inextricably woven into the whole" of H.B. 481. *Georgia Ass'n of Educators v. Harris*, 749 F. Supp. 1110, 1118 (N.D. Ga. 1990). The remaining provisions merely support, enforce, or have no operative effect without the provisions banning abortion. *See Daimler Chrysler Corp. v. Ferrante*, 637 S.E. 2d 659, 662 (Ga. 2006); *Harris*, 749 F. Supp. at 1118. Hence, H.B. 481 "simply cannot be severed." *Harris*, 749 F. Supp. at 1118. While the severability clause creates a presumption in favor of severability, where, as here, unconstitutional provisions are at "the heart of the Act[,]" they cannot be severed. *Daimler Chrysler Corp.*, 637 S.E. 2d at 662; *see also, e.g.*, *Harris,* 749 F. Supp. at 1118 (finding law not severable despite Georgia's severability statute).

and discriminatory enforcement." *Grayned*, 408 U.S. at 108 (1972); *see also Kolender v. Lawson,* 461 U.S. 352, 358 (1983) (same); *Papachristou ,* 405 U.S. at 170 (same). H.B. 481 fails these standards.

Under H.B. 481, "natural person" includes "any human being including an unborn child," and "unborn child" is defined as "a member of the species Homo sapiens at any stage of development . . . carried in the womb." H.B. 481 § 3. This Personhood Definition applies throughout the Georgia Code. *See* H.B. 481 § 3 (amending definitions of "Persons and Rights" in O.C.G.A. § 1-2-1, which apply throughout the Code). Thus, every time the term "person" or "human being" appears in the Georgia Code—and they appear hundreds of times—it must be read to include in utero embryos/fetuses at any stage of development. *See, e.g.*, O.C.G.A. § 16-5-60 (reckless conduct); § 16-5-70 (cruelty to children); § 16-5-21 (aggravated assault); § 16-12-171 (sale or distribution to, or possession by, minors of cigarettes and tobacco related objects); § 19-7-5 (mandatory reporting of child abuse by, *inter alia*, physicians, carrying criminal penalties). Given this broad reach, it is unsurprising that the Personhood Definition renders numerous criminal and civil provisions of the Georgia Code unclear.

To elaborate on just one example, a person commits "Reckless Conduct" in Georgia when he "causes bodily harm to or endangers the bodily safety of another

*person* by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other *person*." O.C.G.A. § 16-5-60 (emphasis added). Under such provisions as amended by the Personhood Definition, it is unclear whether and when clinicians could face criminal prosecution for providing abortions or even other medical treatment to pregnant patients that could harm an embryo/fetus, regardless of whether the pregnant woman needs the treatment for her health.

By creating uncertainty about what actions give rise to criminal and civil liability under numerous sections of the Georgia Code, the Personhood Definition violates both of the principles that underlie the vagueness doctrine. It leaves patients and providers without "fair notice of conduct that is forbidden or required." *Fox*, 567 U.S. at 253; *see also Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349 (11th Cir. 2011) ("[N]o man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."). And, the Personhood Definition leaves police and prosecutors[17]

[17] Georgia District Attorneys have expressed conflicting views regarding enforcement of H.B. 481, with Defendant Boston noting the "ambiguity" of the law. *See* Greg Bluestein & Maya T. Prabhu, "Digging Deeper: Georgia DAs Divided Over Prosecution of 'Heartbeat' Law," Atlanta Journal-Constitution, May 23, 2019, *available at* https://www.ajc.com/news/state--regional-govt--

*. . . footnote continues on next page*

without "explicit standards" to evaluate the conduct of pregnant women and medical providers, risking that they will disproportionately target the behavior of certain people or engage in "arbitrary and discriminatory" enforcement. *Grayned*, 408 U.S. at 108. *See also Kolender v. Lawson,* 461 U.S. 352, 358 (1983) (same). Accordingly, Plaintiffs are likely to succeed on the merits of their claim that H.B. 481 violates their due process rights guaranteed under the Fourteenth Amendment. Plaintiffs are entitled to relief on this ground as well.

## II. H.B. 481 WOULD INFLICT IRREPARABLE HARM.

Plaintiffs and their patients and members will suffer irreparable harm absent a preliminary injunction. First and foremost, H.B. 481 violates the right to privacy, which inflicts *per se* irreparable harm. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *accord Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) ("[C]ourts presume that violations to the fundamental right to privacy are irreparable."). Of course, since being subject to vague laws is itself a constitutional violation, *see supra* Point I.B., enforcement of H.B. 481 would

---

politics/georgia-das-divided-over-prosecution-heartbeat-law/cfYuXj3OZHnwd2OZsg1bCP/.

irreparably harm Plaintiff medical providers for that reason as well. *Cf. Am. Civil Liberties Union of Ga. v. Miller*, 977 F. Supp. 1228, 1235 (N.D. Ga. 1997).

Second, H.B. 481 will also impose irreparable physical, emotional, and psychological harms by forcing Plaintiffs' patients and members to remain pregnant against their will, putting them at "increased risk of death and . . . complications." *Bentley*, 951 F. Supp. 2d at 1289. *See also* Compl. ¶¶ 60-61 (same). As the Supreme Court held in *Roe*, "The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved." 410 U.S. at 153. Because a woman who carries to term and gives birth "is subject to anxieties, to physical constraints, to pain that only she must bear. . . . [h]er suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role." *Casey*, 505 U.S. at 852. Forcing a woman to continue a pregnancy against her will can also pose a risk to the stability and well-being of her family, including her existing children. Compl. ¶ 61. Still others will end their own pregnancies or seek care outside the regulated clinical setting, which will expose some women to increased risk of harm. Compl. ¶¶ 5, 45. This, too, is irreparable harm. *See, e.g.*, *Planned Parenthood of Wis., Inc. v. Van*

*Hollen*, 963 F. Supp. 2d 858, 868 (W.D. Wis. 2013) (abortion restriction caused irreparable harm by increasing health risks).

H.B. 481 will be particularly devastating for Georgians with low incomes, Georgians of color, and rural Georgians, who are already least able to access medical care, and who have the fewest resources to navigate the law's cruelties. *See* Compl. ¶¶ 45, 70. Black families will face particularly severe harm. Because Black Georgians access abortion care at four times the rate that white Georgians do,[18] banning abortion care will disparately harm those individuals and families. And because Black Georgians are disproportionately poor,[19] they will disproportionately lack resources to try to circumvent H.B. 481's ban on care.

Furthermore, Georgians who decide to carry a pregnancy to term face one of the highest risks of pregnancy-related deaths in the nation.[20] *Id*. ¶ 59. That

[18] *See* Ga. Dep't of Pub. Health, Online Analytical Statistical Information System, Induced Termination of Pregnancy (ITOP) Web Query, https://oasis.state.ga.us/oasis/webquery/qryITOP.aspx. (last visited July 19, 2019).

[19] Kayla Fontenot, Jessica Semega & Melissa Kollar, U.S. Census Bureau, Current Population Reports, P60-263, *Income and Poverty in the United States: 2017*, U.S. Government Printing Office (2018) at 14, https://www.census.gov/content/dam/Census/library/publications/2018/demo/p60-263.pdf.

[20] America's Health Rankings, United Health Found., Health of Women and Children, *Maternal Mortality* (2019),

*. . . footnote continues on next page*

appalling rate of maternal death stems in part from the state's critical shortage of obstetrician-gynecologists, particularly in rural areas. *Id*. ¶ 69. And again, the impact on Black Georgians will be most severe: As Defendant Commissioner Toomey's Department of Public Health has recognized, pregnancy is three times as deadly for Black Georgians as it is for white Georgians.[21] Moreover, "[b]etween 2012-2014, 61% of pregnancy-related deaths were determined to be preventable."[22] Compl. ¶ 59. Denying women desired abortions in the face of these existing crises and disparities will only increase deaths and medical harm for Black women and others. Compl. ¶ 69. This irreparable injury, which comes on top of the state's existing and unconscionable failure to end preventable pregnancy-related deaths—warrants the entry of injunctive relief.

---

https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/maternal_mortality (analyzing data from CDC WONDER Online Database, 2011–2015).

[21] Ga. Dep't of Pub. Health, Maternal Mortality Rev. Comm'n, *Maternal Mortality Report 2014* at 11 (March 2019), https://dph.georgia.gov/sites/dph.georgia.gov/files/related_files/site_page/Georgia%20Maternal%20Mortality%20Report%202014.pdf.

[22] *Id.* at 20.

## III. THE BALANCE OF HARM TIPS DECIDELY IN PLAINTIFFS' FAVOR.

While Plaintiffs and their patients and members will suffer numerous irreparable harms without an injunction, Defendants will suffer no injury whatsoever; Plaintiffs' requested relief will simply preserve the status quo of nearly five decades. *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1101 n.13 (11th Cir. 2004) ("[T]he textbook definition of a preliminary injunction [is that it is] issued to preserve the status quo and prevent allegedly irreparable injury until the court ha[s] the opportunity to decide upon issuing a permanent injunction."); *see also Preterm-Cleveland*, 2019 WL 2869640, at *5 (Enforcement of six-week ban based on detectable embryonic cardiac activity "would, per se, inflict irreparable harm."); *Dobbs*, 379 F. Supp. 3d at 552 ("Th[e] injury" of enforcing a 6-week ban "outweighs any interest the State might have in banning abortions"); *EMW Women's Surgical Ctr., P.S.C.*, 2019 WL 1233575, at *2 (same). Thus, the equities tip sharply in favor of granting a preliminary injunction. *See Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

## IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

Finally, the interests of Plaintiffs and the general public are aligned in favor of granting injunctive relief in this case. The public interest is not served by permitting the state to enforce unconstitutional statutes. *See Scott*, 612 F.3d at 1297; *KH Outdoor*, 458 F.3d at 1272. Particularly where civil rights are at stake, an injunction *serves* "the public interest by protecting those rights to which it too is entitled." *Nat'l Abortion Fed'n v. Metro. Atlanta Rapid Transit Auth.*, 112 F. Supp. 2d 1320, 1328 (N.D. Ga. 2000).

## V. SECURITY IS NOT NECESSARY IN THIS CASE.

This Court should waive the Rule 65(c) security requirement. "The amount . . . is a matter within the discretion of the trial court," which "may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). The Court should, in its discretion, waive the requirement here, as the preliminary injunction will result in no monetary loss for Defendants. Moreover, Plaintiffs SisterSong and the medical providers are dedicated to serving low-income and underserved communities, and a bond would strain their limited resources. If the Court requires security, Plaintiffs request that the Court set it at $1.00.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion.

Respectfully submitted this 23rd day of July, 2019.

Susan Talcott Camp*
Rebecca Chan*
Elizabeth Watson*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
tcamp@aclu.org
rchan@aclu.org
ewatson@aclu.org

*Attorneys for Plaintiffs SisterSong, ACWC, AWMC, carafem, Summit, and Drs. Cwiak, Haddad and Lathrop*

Carrie Y. Flaxman**
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Avenue, NW
Suite 300
Washington, DC 20005
(202) 973-4800
carrie.flaxman@ppfa.org

Susan Lambiase**
PLANNED PARENTHOOD FEDERATION OF AMERICA
123 William St., Floor 9
New York, NY 10038
(212) 541-7800 (phone)
(212) 247-6811 (fax)
susan.lambiase@ppfa.org

*Attorneys for PPSE*

**Sean Young**
Attorney Bar Number: 790399
Attorney for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org

Julie Rikelman**
Emily Nestler**
Kirby Tyrrell**
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3670 (phone)
(917) 637-3666 (fax)
jrikelman@reprorights.org
enestler@reprorights.org
ktyrrell@reprorights.org

*Attorneys for Plaintiffs Feminist and CWHO*

* *Pro hac vice applications pending*
** *Admitted pro hac vice*

## CERTIFICATE OF COMPLIANCE

Pursuant to N.D. Ga. Local Civil Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with N.D. Ga. Local Civil Rule 5.1(C) in Times New Roman 14-point typeface.

**Sean Young**
Attorney Bar Number: 790399
Attorney for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which constitutes service on ECF registered users. N.D. Ga. Civil Local Rule 5.1(A)(3). Defendants' attorneys who later enter a notice of appearance will be served a copy of the foregoing by mail. Fed. R. Civ. P. 5(b)(2)(C).

**Sean Young**
Attorney Bar Number: 790399
Attorney for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org