# EXHIBIT A

1

2

3    HOUSE HEALTH & HUMAN SERVICES COMMITTEE

4          2019 LEGISLATIVE SESSION

5             MARCH 6, 2019

6

7

8          TRANSCRIPT OF HEARINGS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Reported from electronic media by

25      Judy K. McNeill, CCR B-1611



1    HOUSE HEALTH & HUMAN SERVICES COMMITTEE HEARING

2                MARCH 6, 2019

3        MADAM CHAIR:  So if you do not have a

4    seat -- and this is not me -- if you do not

5    have a seat, you will have to vacate the

6    room.  So I'm very sorry, but the --

7        Okay.  All right.  Okay.  Hang on.

8    Okay.

9        I am sorry that that is the way it

10   is, but we are in the biggest room that we

11   have.  We have some sign-up sheets -- do we

12   have sign-up sheets?

13       Okay.  We will have a sign-up sheet,

14   but so that -- you know, people have other

15   meetings and so that we are not here all

16   day long or into the evening, I'm going to

17   do what they do in the House.

18       Each of the presenters on the two

19   abortion bills will have 20 minutes to

20   present their bills.  That's Jody Lott and

21   Ed Setzler.  Representative Setzler and

22   Representative Lott.

23       Then I will have 30 minutes of people

24   for, public comments; and 30 minutes for

25   people against.  That would be it.  So I

1    would say to each side, choose the people

2    that you want to speak very carefully so

3    that you do not have people repeating the

4    same message and we can go forward.

5          So just as soon as we can get going,

6    we will get going.  So if you do not have a

7    seat, the fire marshals -- and we will have

8    to find a couple of seats for people that

9    are employees and are here for other bills

10   also.

11              (Off-the-record comments)

12              (Upon resuming)

13   MADAM CHAIR:  And I will give

14   preference to the Representatives that want

15   to speak.  I mean, that is only common

16   courtesy to allow Representatives that want

17   to speak, speak.

18          We're trying to see if there is

19   another room where they can somehow, you

20   know, plug into the testimony and all.

21          I mean, if you're waiting to sign up

22   and you are about the 20th person in the

23   line, you're going to be way too far down

24   the line to sign up for 30 minutes.

25              (Brief pause)



Page 4

1            (Upon resuming)

2        MADAM CHAIR:  Okay.  Can somebody

3   tell people that are out in the hall --

4   Officers, can you tell them we're going to

5   stream this into room 415.  415.  If you

6   can tell them...

7        And if everybody will cut off their

8   cell phones and all -- since I just had

9   mine ring, I will be cutting mine off also.

10           (Brief pause)

11           (Upon resuming)

12       MADAM CHAIR:  Okay.  Everybody that's

13  standing needs to leave the room so we can

14  get started.  If you are standing without a

15  seat, please leave the room.  It's being

16  live-streamed in 415.  Live-streamed in

17  415.

18       Ladies -- okay.  Can you go pick up

19  the sign-up sheet and see if it looks like

20  it's way past 30 minutes?

21           (Off-the-record comments)

22           (Upon resuming)

23       MADAM CHAIR:  Representative, you may

24  not get to speak if you're way down the

25  list.  We need to pick up the list now.

1    Okay.

2         Okay.  Thank you.

3         I am sorry for having to cut it off
4    at a point, but we have to do that.

5         Let me just say we have some other
6    bills to hear first.  I know that I don't
7    have to say this.  I know that everybody is
8    going to act with decorum.

9         In the Legislature, we discuss very
10   serious bills and people on both sides of
11   an issue have a right to be heard.  And
12   even if you disagree with them, they have a
13   right to be heard with respect.  So I don't
14   expect for there to be clapping or cheering
15   or anything else like this.  We're going to
16   run this meeting with decorum.

17        These issues are not easy.  They're
18   not easy for my members on this committee.
19   Right?  But somehow or other, we seem to
20   manage down the road coming up with
21   reasonable legislation.  Sometimes, you
22   know, bills move.  Sometimes they don't.
23   Sometimes it takes a while to get the
24   mixture right, but we have to hear and we
25   want to hear from constituents.



Page 6

1        But here again, we are one day from

2    crossover.   That's the last day that a bill

3    can go over to the Senate or one can come

4    from the Senate to the House.   You know, we

5    are in a time crunch and we can't go on for

6    hours and hours.   That's why I said for

7    both sides to pick carefully who they

8    wanted to speak for them.

9        And I want to thank the police

10    officers for helping take us -- stay in

11    line with the fire marshal before they came

12    and actually closed the meeting down

13    because we have too many people.   And to

14    thank everybody here for biding by my

15    wishes to eliminate the people who were

16    standing.   And for my committee members

17    that are here, thank you very much.

18        I call this meeting of the House

19    Health and Human Services Committee to

20    order.

21        And, Representative Tanner, I believe

22    you're ready to go on House Bill 514.

23        REPRESENTATIVE TANNER:   Thank you,

24    Madam Chair.   And I will try to go as

25    quickly as I can because I know you have a



 1   lot of other things to do.

 2        In front of you is House Bill 514.

 3   It's a substitute LC 33 7903S.  This has

 4   been a collaboration of the House, the Lt.

 5   Governor's Office, and the Governor's

 6   Office to create a Behavioral Health Reform

 7   and Innovation Commission.

 8        This Commission would last for a

 9   period of four years.  It would follow much

10   like the Criminal Justice Reform Commission

11   did in taking a very deep dive into a very

12   difficult subject with a group of experts

13   from across Georgia from a wide variety of

14   expertise dealing with Behavioral Health

15   from providers, to psychiatrists, to

16   education professionals, to the law

17   enforcement community and others.

18        It would also have two members of the

19   House and two members of the Senate, and

20   the Governor would appoint the Chair of

21   this Commission.

22        And a lot of their work would be done

23   very similar to the Criminal Justice Reform

24   Commission in subcommittees.  Some of those

25   subcommittees are listed.  It also gives



Page 8

1   the authority to the Chair to be able to

2   add some additional subcommittees if they

3   feel like it's necessary when they get into

4   the work.

5        One of the things that's also in the

6   legislation is that the agenda for this

7   Commission, as long as we're under the

8   settlement agreement with Justice and

9   Behavioral Health, the agendas would have

10  to be approved by the Governor's Executive

11  Council to make sure we were not doing

12  anything that would hinder that settlement

13  agreement.

14       So, Madam Chair, I'll be happy to

15  answer any questions.  I'm not sure that

16  there's a reason to read down through every

17  member of the Commission.  But, again,

18  appreciate the -- all that's been done by

19  the Department of Behavioral Health over

20  the last decade to make great strides in

21  this area and look forward to this group of

22  experts continuing to work in this area to

23  continue to make more improvements.

24       And, Madam Chair, I'll be glad to

25  answer any questions.



Page 9

1      MADAM CHAIR:  Okay.  Questions from

2  the Committee for Chairman Tanner.

3      Representative Barr.

4      REPRESENTATIVE BARR:  Thank you,

5  ma'am.

6      Quick question, simple question:

7  What was the thought process on the end

8  date of 2023?

9      REPRESENTATIVE TANNER:  The idea was

10  that it would go for four years after it

11  was established.  That it would take a

12  lengthy time.  This is a very complicated

13  topic with a lot of different areas of

14  discussion and the General Assembly could

15  always come back and extend that.

16      Originally, there was some

17  consideration by doing this by executive

18  order from the Governor much like Criminal

19  Justice Reform was initiated in the

20  beginning, but then was decided to do it

21  legislatively.  But we could extend that

22  date if it was necessary in the future.

23      REPRESENTATIVE BARR:  Very good.  I

24  look forward to this one.  Thank you, sir.

25      REPRESENTATIVE TANNER:  Thank you.



1          MADAM CHAIR:  Okay.  Representative
2     Hutchins.
3          REPRESENTATIVE HUTCHINS:  Thank you.
4          I just had a question.  Will this
5     hinder anything that's proposed to move
6     forward like the Apex program or the 8.4
7     million dollars going into the budget this
8     year?
9          REPRESENTATIVE TANNER:  It definitely
10    wouldn't interfere with anything in the
11    budget.  It doesn't interfere with anything
12    that's being done at the Department of
13    Behavioral Health.  And as far as any
14    legislation now or in the future, then that
15    would be, of course, up to the members of
16    the General Assembly and the Governor's
17    Office how they chose to move bills
18    forward.
19         But this does not in any way stop any
20    action from happening, no.
21         REPRESENTATIVE HUTCHINS:  Okay.  I
22    like it.  Thanks.
23         MADAM CHAIR:  Other questions?
24         Okay.  Is there anyone -- okay.
25    We've got one.

1          Representative Dempsey.

2          REPRESENTATIVE DEMPSEY:  Yeah.

3    Chairman Tanner, I want to thank you for

4    your work.  I know you've worked real hard

5    on this.  I've not been a part of it and I

6    just want to make sure and make clear that

7    nothing will happen until the justice

8    settlement is actually settled because that

9    is such a fragile document that we have no

10   control over actually.

11         REPRESENTATIVE TANNER:  It's my

12   understanding from the way the Governor's

13   Office added language in, that any agenda

14   for any meeting submitted prior to the

15   settlement agreement would have to be

16   approved by the Governor's Executive

17   Council.

18         REPRESENTATIVE DEMPSEY:  So there's

19   not any date certain necessarily of when

20   you're trying -- I know it says, as I read

21   it, I think, that you plan to meet at least

22   two times a year -- or whoever -- whoever.

23   I don't mean to assume that --

24         REPRESENTATIVE TANNER:  Yeah.

25         REPRESENTATIVE DEMPSEY:  -- it's you



1   but that the --

2         REPRESENTATIVE TANNER:  That's right.

3         REPRESENTATIVE DEMPSEY:  -- because

4   often there are commissions that take place

5   and that we help with that we're never even

6   really --

7         REPRESENTATIVE TANNER:  Correct.

8   That's right.

9         REPRESENTATIVE DEMPSEY:  -- a part of

10  later.  Just like study committees.

11        But I just want to make that a very

12  important part of this conversation.  And

13  that while all of these entities are so

14  important to the whole umbrella of mental

15  health, that the real focus, the real focus

16  of this, I hope, will be on those who

17  struggle with true mental health and

18  addiction, the families that are genuinely

19  affected by it because the health part of

20  mental health is the root cause of what we

21  really need to deal with.

22        So I just want to ask you to please

23  make that your focus.

24        REPRESENTATIVE TANNER:  That's

25  correct.  I can tell you some personal



1    stories about my personal interactions with

2    family members and others who have been

3    lost by suffering from mental illness.  So

4    I know all too well how it affects

5    families.

6         But, again, it doesn't prohibit the

7    committee or commission from meeting prior

8    to that.  But it does require that the

9    Governor approve the agenda.  Again, to

10   make sure -- because the Governor's Council

11   will be involved in the conversations going

12   on behind the scenes with his Commissioner

13   of the Department of Behavorial Health to

14   make sure that this commission is not doing

15   anything that, in his opinion, would hamper

16   the progress of the settlement agreement.

17        REPRESENTATIVE DEMPSEY:  Well, I

18   think it would be fair to say, too, that

19   there probably is not a member in the House

20   or the Senate that do not hear from people

21   whose lives, as you say, are touched by

22   this, whether it's their own family or just

23   constituents that let us know.  It is a

24   huge challenge and I hope we can act with

25   care and caution and not move fast.



1          REPRESENTATIVE TANNER:  Thank you.

2          MADAM CHAIR:  Thank you,

3    Representative Dempsey.  I know of your

4    passion for people suffering with

5    behavorial disorders and illness.

6          Did you have an amendment or anything

7    or just...

8          REPRESENTATIVE DEMPSEY:  No, I just

9    have great concern about it -- of anything

10   that's sort of done this quickly.  I mean,

11   we're in that window of time right now when

12   a lot of things are moving fast and, you

13   know, as members, I think we have a huge

14   responsibility to be careful.

15         MADAM CHAIR:  Thank you.

16         Okay.  We have no other from our

17   members.

18         Do we have people in the audience

19   that want to speak on this issue?  Is there

20   somebody from the community service boards?

21         Okay.  Will you identify yourself and

22   be brief.

23         MS. DALLAS:  Yes, very brief.  Thank

24   you, Madam Chair, members of the committee.

25         We're just grateful to be here today



1  to help support what Representative Tanner

2  is putting forth.  And also want to extend

3  gratitude -- I've met with Representative

4  Tanner twice to talk about House Bill 514.

5  And want to just say that your community

6  service boards are funded for a very, very

7  important population.  Sometimes I think we

8  forget the specifics of that population.

9       When we look at the prevalence and

10 the population that we serve, it is a small

11 percentage of individuals, Georgians with

12 mental illness, substance abuse, behavioral

13 health conditions.  And we are absolutely

14 supportive of any type of reform which

15 increases access in greater comprehensive

16 services for individuals with behavioral

17 health disorders.

18      We see our General Assembly -- our

19 members of our General Assembly as key

20 strategic partners in this.  We see other

21 providers as key strategic partners.  And

22 we just ask that as we go forward and look

23 at this, that we think about some of the

24 innovation that is actually happening

25 currently and that represents our



1  communities and the needs in our

2  communities.

3      So we really would like to engage in

4  as we see you as strategic partners, we

5  also hope that you view us as strategic

6  partners as this bill and reform about the

7  Behavorial Health System in Georgia starts

8  to take shape.

9      Thank you for your time.  I want to

10 be very respectful of everything that

11 you've got on your agenda today.

12     MADAM CHAIR:  And you are with whom?

13     MS. DALLAS:  I am Melanie Dallas.

14 I'm the CEO for Highland Rivers Health.  We

15 are the community service board that is in

16 northwest Georgia.  We serve 11 counties.

17 We have about 18,000 individuals that we

18 serve annually up there.

19     MADAM CHAIR:  Okay.

20     Representative Tanner, is this the

21 version that I gave you yesterday?

22     REPRESENTATIVE TANNER:  The one that

23 I'm reading from is the version that you

24 gave me yesterday.

25     MADAM CHAIR:  Okay.



1            REPRESENTATIVE TANNER:  It's the one

2      that -- the original one only had 21.  This

3      one has 23.  So this is the one you

4      changed.

5            MADAM CHAIR:  Okay.  I can't -- I

6      think we're missing a page.

7            REPRESENTATIVE TANNER:  It has --

8      number 45 has a representative from the

9      Urban Community Service Board and 46 has

10     the representative from the Rural Community

11     Service Board.

12           MADAM CHAIR:  All right.  We're

13     missing a board -- a page.  We're missing a

14     page on this.  That's why I couldn't find

15     it.

16           REPRESENTATIVE TANNER:  Mine is five

17     pages.  I may have the full copy.

18           MADAM CHAIR:  We're missing a page.

19     Okay.  This is what happens when we're down

20     to the last wire and things happen in a

21     hurry.

22                (Off-the-record comments)

23                (Upon resuming)

24           MADAM CHAIR:  Okay.  Hold on for just

25     a second.  Hold on just a second.

1        If you're finished -- and who were

2    you with?

3        MS. DALLAS:  I'm with Highland Rivers

4    Health.  I'm one of the CSBs in northwest

5    Georgia and I'm happy to answer any

6    questions if there are any.

7        MADAM CHAIR:  Is there any questions

8    for the presenter?

9        No.  Okay.  What we're going to do is

10   -- Representative Tanner, we're going to

11   get the copies so the members can see them.

12   You can go.  I'll call for a vote.

13       REPRESENTATIVE TANNER:  Okay.

14       MADAM CHAIR:  All right.  And at a

15   later time so we'll get copies for

16   everybody and we can look at that page.

17       I'll tell you what's in the back --

18   the main thing on the page is it listed out

19   who would be the members on the commission.

20   And, you know, who is going to be on that

21   commission.  So I think you need to see it

22   before we vote on it and I apologize for

23   the thing.

24       We have -- legislative council has

25   worked themselves to death getting out last



1   minute substitutes for bills and so I

2   appreciate what's going on.

3        All right.  So we'll put that one on

4   hold and I would ask the committee to just

5   let me make that as a chair decision

6   without having to say we have to put it on

7   the table and move it back out again.

8        All right.  Let's go.

9        Representative Dempsey, House Bill

10  578.

11       Would you please check how many pages

12  are we supposed to have?  Let's make sure

13  we -- I have seven on mine.  Is that

14  correct?

15       REPRESENTATIVE DEMPSEY:  That is

16  correct.

17       MADAM CHAIR:  And it's LC 289312ER?

18       REPRESENTATIVE DEMPSEY:  That's

19  right.

20       MADAM CHAIR:  Okay.  Go ahead.

21       REPRESENTATIVE DEMPSEY:  That is so

22  right.

23       This is a bill that came in -- and I

24  apologize.  It did come in very last

25  minute.  But it deals with a very important



1   measure.

2       I'm going to try to stay back from it

3   because I had hear it vibrating.

4       So this deals with a challenge that

5   the Department of Human Services facing

6   that contractors who receive conviction

7   data on volunteer students, interns needs

8   to be used.  And right now, they are not

9   able to do that.

10      Currently, the statute allows for

11  fingerprint-based background checks of

12  final selectees for employment for the

13  Department of Human Services.  So those who

14  handle our elder care, DFACS, many of the

15  issues that are private and that we need to

16  make sure that those who see any records

17  actually do not have a criminal background

18  at all.

19      So those who provide direct care

20  treatment and custodial responsibility or

21  any combination of those issues, the

22  statute has not been updated to keep pace

23  with the Department's need to ensure that

24  anyone working on those services has

25  actually got a clean criminal background



1   check.

2          So this will allow them to fully vet

3   through fingerprinting-based background

4   checks and make sure that we have

5   appropriate people looking out for those

6   who are some of our most fragile Georgians.

7          MADAM CHAIR:  All right.

8   Representative Petrea.

9          REPRESENTATIVE PETREA:  Thank you,

10  Madam Chair.  I'm down here.

11         MADAM CHAIR:  Okay.

12         REPRESENTATIVE PETREA:  Thank you,

13  Representative Dempsey.

14         Just a quick question.  So this would

15  -- this bill would hold volunteers,

16  interns, students, et cetera to the same

17  standards we did in Senate Bill 406 last

18  year with fingerprinting requirements?

19         REPRESENTATIVE DEMPSEY:  I'm not sure

20  about 406 --

21         REPRESENTATIVE PETREA:  Is that true?

22         REPRESENTATIVE DEMPSEY: -- the

23  numbers right now at this point.

24         REPRESENTATIVE PETREA:  The

25  fingerprinting bill we had last year, would



1    it be -- would this be consistent with

2    that?

3         REPRESENTATIVE DEMPSEY:  It follows

4    that everyone who had access to any of

5    those records or are actually delivering

6    services is fully vetted and we are sure of

7    that.  Not just an employee.

8         REPRESENTATIVE PETREA:  Got you.

9    Thank you.

10        REPRESENTATIVE DEMPSEY:  And it has

11   come as a request from the Department.

12        MADAM CHAIR:  Other questions from

13   the committee?

14        Okay.  Representative Demetrius.

15        REPRESENTATIVE DEMETRIUS:  Thank you,

16   Madam Chair.

17        Madam Chairwoman, I love this bill or

18   resolution.  I have one little small

19   question.

20        With the people that's already there

21   in the facilities -- I know this is for new

22   hires.  Would the same thing apply to the

23   people that's already working in that

24   capacity right now?

25        REPRESENTATIVE DEMPSEY:  So right



1   now, the statute allows for

2   fingerprint-based background checks on

3   final selectees of employment.  So they are

4   under that right now.  It is making sure

5   that sort of those axillary employees that

6   are there are also fully vetted.

7          REPRESENTATIVE DEMETRIUS:  Okay.

8   Thank you.

9          At the appropriate time, Madam Chair?

10         MADAM CHAIR:  Okay.  At the

11  appropriate time.

12         Okay.  We have representatives from

13  the Department.  Would y'all like to --

14         UNIDENTIFIED SPEAKER:  We're just

15  here to support the representative from

16  DFACS.

17         MADAM CHAIR:  Okay.  So the

18  Department is in favor of the bill?

19         UNIDENTIFIED SPEAKER:  Yes.

20         MADAM CHAIR:  Okay.  Any other

21  questions from the committee?  Anyone else

22  that's here that wanted to speak on this

23  bill?

24         Okay.  All right.  Then what is the

25  Committee's pleasure?



1          Representative Demetrius?  Sorry.

2    Douglas.  I call you Demetrius all the time

3    and I apologize.

4          Representative Douglas.

5          REPRESENTATIVE DOUGLAS:  I'd like to

6    make a motion that we do pass on House

7    Resolution 421.

8          MADAM CHAIR:  We have a do pass and a

9    second.

10         Any other discussion?

11         All right.  Everyone in favor of the

12   passage of House Bill 578, say aye.

13         Anyone opposed, no.

14         The ayes have it, Representative

15   Dempsey.

16         REPRESENTATIVE DEMPSEY:  Thank you.

17         MADAM CHAIR:  Okay.  Do you have

18   another bill?

19         REPRESENTATIVE DEMPSEY:  I do.  I

20   have a House Resolution to put forward a

21   joint study committee.  This is House

22   Resolution 421.

23         As we look at so much on mental

24   health -- and I know that this committee is

25   so engaged and care so much about it, one

Elizabeth Gallo
COURT REPORTING, LLC

 1    of the particular areas that we have not

 2    really focused on is that very beginning,

 3    the intervention point that we really need

 4    to focus on to deal with the realities of

 5    some of the effects that come from not

 6    catching an issue early.

 7         So this is a joint study committee

 8    focused on infant and toddler social and

 9    emotional health.  It is laid out very

10    clearly in here recognizing -- and I've had

11    several members ask me as this began to

12    sort of bubble up, what can you do with an

13    infant or toddler.

14         Well, there is a lot.  There is Fetal

15    Alcohol Syndrome that we know will probably

16    produce effects later.  There is early,

17    early intervention now in the realm of

18    autism and on the spectrum on eye movement

19    and lack thereof to follow.  There are a

20    lot of windows to look into and to try to

21    diagnose early and to try to help those

22    children have the best opportunities later

23    in life.

24         There are also the issues of maternal

25    health that come into play.  If you do not



Page 26

1    have a healthy mother, it's very hard for

2    that mom who is perhaps out of balance and

3    not being treated for that to not really

4    provide the best environment for the child

5    to begin its early life experiences.

6         So those are some of the issues, I

7    think to look at.  It will be a joint House

8    and Study Committee.  It lays out very

9    clearly -- if you start looking at line 37,

10   talks about three members of the House,

11   three from the Senate, a representative

12   from Behavorial Health and Development on

13   Disabilities, Department of Early Care and

14   Learning, Department of Public Health,

15   Voices for Georgia's Children, and GEARS,

16   Georgia's Early Educational Reliance for

17   Ready Students, as well as one

18   representative from the Georgia Chapter of

19   the American Academy of Pediatrics.

20        So it is dealing with that earliest

21   most important window of time and I would

22   ask for y'all -- if there are any

23   questions, of course, I want to take them.

24   But I would ask for your support.  This is

25   a great opportunity I think we have.



Page 27

1          MADAM CHAIR:  Representative Newton.

2          REPRESENTATIVE NEWTON:  Thank you,

3     Chairman.  I really appreciate you bringing

4     this.  I know the previous governor and

5     first lady worked hard on that third grade

6     reading and realizing that was a key

7     predictor in success in the -- both in high

8     school and beyond, career academy or

9     wherever.

10          I appreciate you bringing that back

11    to the infants that are in our care.  We're

12    even talking about reading and all the

13    different studies that are coming out

14    realizing how crucial that is.  But I

15    really appreciate you bringing this bill

16    and look forward to supporting it.

17          MADAM CHAIR:  Are there other

18    questions for the Chairman, Chairman

19    Dempsey?

20          Okay.  Is there anybody in the

21    audience that wants to speak on this bill?

22          All right.  Seeing no one, what is

23    the will of the committee?

24          Okay.  I have a motion to move.

25          Do I have a second?



1        Motion to second.

2        Is there any further discussion?

3        Okay.  Hearing no further discussion,

4   everybody in favor of the passage of House

5   Resolution 421 say aye.

6        Everyone opposed, no.

7        And, Representative Dempsey, I hope

8   we got to you quick enough.  I know you

9   have other meetings.

10       Did we make it quick enough for you

11  to hit the other meetings okay?

12       Thank you.

13       All right.

14       We're waiting on Representative

15  Tanner's.  Okay.  We'll move on that when

16  we get it.

17       Okay.  Representative Setzler.  Let's

18  move on.  You have 20 minutes.

19       I hate that you only have 20 minutes

20  because I know you're passionate about this

21  issue, but this time I'll have to ask you

22  to be succinct.

23       REPRESENTATIVE SETZLER:  Thank you.

24       Ladies and gentlemen of the

25  committee, it's an honor to come before you



Page 29

1    today.  This is an important matter and

2    that's why we bring it before you.

3         MADAM CHAIR:  And it is House bill

4    and what is -- what are we working off of?

5         REPRESENTATIVE SETZLER:  We are

6    working off House Bill 481.  There is a

7    committee substitute, LC 41 1938 ERS.

8         I'll highlight the difference in the

9    substitute and the original bill.  And

10   Madam Chair, the original bill clearly was

11   my policy objective.  I think the

12   substitute was -- is being offered at the

13   request of others that care about this

14   issue deeply and want us to get to a

15   consensus so we can move on this --

16        MADAM CHAIR:  Well, I know there's

17   been a little confusion.  So this is your

18   bill and the one that Representative Lott

19   is going to present is the Governor's bill.

20   Correct?  That's my understanding.

21        REPRESENTATIVE SETZLER:  We have

22   moved forward with this language and with

23   the bill.  Our Governor is supportive of

24   the concept.  And I don't want to speak for

25   him, but this was -- one of the reasons



```
 1   it's HB 481 is we're waiting for consensus
 2   language that the Governor is comfortable
 3   with.  So I know we have support from him
 4   on this bill.
 5        MADAM CHAIR:  Okay.  But this is your
 6   bill to start with.
 7        REPRESENTATIVE SETZLER:  Yes.  Thank
 8   you.  That's why I'm head sponsor.  Thank
 9   you.
10        MADAM CHAIR:  Okay.
11        REPRESENTATIVE SETZLER:  Madam Chair,
12   members of the committee.  Again, it's an
13   honor to come before you today with HB 481.
14   I want to say before we start this, this is
15   a proposition that I believe we all
16   understand is very important.
17        It's a bill that is medically sound,
18   legally sound, and from the perspective of
19   common sense Georgians, something I think
20   we can coalesce around and strongly
21   support.
22        On a Wednesday afternoon in March of
23   1970, a 20-year old mother, single college
24   student here in Atlanta gave birth to a
25   young child in eye shot of where we're
```



1    sitting at Grady Hospital.

2          On March 18th of 1970, that 20-year

3    old single mom was under a circumstance

4    where abortion wasn't free and easy like it

5    is today.  And it is no -- it was no less

6    serious of an issue then than it is now.

7    It's a timeless issue.

8          As we go back really into the ancient

9    times, we see this issue of abortion was

10   something that medically was unacceptable;

11   even outside of the Christian world.

12         And that young mother as she gave

13   birth to me, as a 20-year old single mom,

14   laid the groundwork for my understanding of

15   this issue and it's something that I've

16   never been able to forget because on that

17   Wednesday afternoon when I was born at

18   Grady Hospital about a mile from here, that

19   20-year old college student from here in

20   Atlanta.

21         Seven days later -- seven days later

22   on March 25th, 1970, another mother,

23   married but in financial difficulties went

24   into Grady Hospital to pursue an abortion

25   and led to the series of circumstances



1    which led to the Doe v Bolton Case.  That

2    was the plant of the Doe v Bolton Case,

3    seven days after I was born.  Same

4    hospital, Grady Hospital, a mile from where

5    we're sitting.

6          This is deeply personal to me as I

7    know that it is to many of you.  We know

8    that the Roe v Wade decision, which also

9    came in 1973 came out of Texas, but the Doe

10   v Bolton decision came out of Grady

11   Hospital less than a mile of where we're

12   sitting right now.  Those two cases

13   together became -- set in action a series

14   of events that led to the structure we have

15   today and have had over the last 46 years

16   with respect to how abortion is treated in

17   this nation.

18          I bring this to you with great

19   humility because this is a serious policy

20   and something I think we need to talk about

21   and I'm proposing HB 481 because it's

22   deeply important to Georgians.

23          I bring it to you today because I

24   believe it's medically sound, I believe

25   it's legally sound.  And I believe from the



1 common sense of Georgians, they recognize

2 that science tells us that a living

3 distinct whole human being in the womb with

4 a heartbeat is worthy of protection.

5       We can debate matters of many things

6 in this legislature.  Many of us share

7 different governing philosophies from the

8 size, scope and scale of government in

9 American life.  But one thing the General

10 Assembly recognizes is that human life is

11 precious.  Human life is deeply precious

12 and that a child with a beating heart

13 inside their mother is worthy of full legal

14 protections.  That's what this bill does.

15       Let's walk through this.  And if I

16 could please the Chair and members of the

17 committee, I'm going to walk through the

18 bill.  I do want to talk through a couple

19 of things to outline to you how this is

20 medically sound and legally sound, and I

21 belive from a moral and common sense

22 perspective sound.  That's why I bring it

23 to you.

24       This isn't about politics.  This does

25 nothing for me politically.  It's not



1   pushed on me by any organization.  It's

2   something I've wanted to do for 13 years,

3   but I believe now is the time.

4        We see other states have taken a

5   stance that human being's lives can be torn

6   asunder from their mothers at 38, 39, 40

7   weeks gestation age right before they're

8   born.  I think the American people were

9   woken up by that and recognized life in the

10  womb is sacred and worthy of full legal

11  protections.

12       What this does is it draws the line

13  that when there is a beating heart, when

14  there is a human heart being inside of a

15  mother, that's a human being that's worthy

16  of protection.  And the privacy interest of

17  the mother which we recognize and respect,

18  and the life interest of the child -- as

19  those two things interact, this life

20  interest that we know begins at conception

21  and this privacy interest of the mother, as

22  those two things intersect, let's please

23  come to consensus in HB 481 that as those

24  two -- as the privacy interest of the

25  mother and the life interest of the child,



1    as they intersect, let's please come to

2    consensus that the point of a viable

3    pregnancy, the human heartbeat is a point

4    we can all agree -- people of both parties,

5    life is worthy of protection.

6         Madam Chair, members of the

7    committee, if I could point you to Section

8    1.2, page two of the substitute, we have

9    three pages of legislative findings because

10   this is not something that's been

11   unconsidered.  There's been -- I've worked

12   with a number of people who understand very

13   deeply legally and medically the

14   significance of this.

15        And we recognize that what we're

16   talking about here is 14th Amendment

17   protection.  Equal protections under the

18   law for living, distinct and whole human

19   beings in the womb.

20        And we recognize as the 14th

21   Amendment was passed in 1868, it was passed

22   for one reason.  It was passed to give

23   equal protections under the law to entire

24   classes of persons who have never been

25   recognized as people.  The 14th Amendment



1   was passed in 1868 to give full legal

2   recognition to entire classes of persons

3   that had never been given full legal

4   recognition.

5        That's exactly what we're doing here.

6   There is an entire class of people.  We

7   know that from the point of a beating

8   heart, you have a living, distinct and

9   whole human being in the womb that's worthy

10  of full legal protection.

11       So we're walking in the tradition

12  that was set forth in the 14th Amendment

13  when it was passed over 150 years ago.

14       As we walk through this, you can see

15  that we recognize the children in the womb

16  are living and distinct.  They have their

17  own blood types, they have their own DNA,

18  they have their own organ systems,

19  fingerprints and unique generic

20  characteristics unique from their parents.

21       We also know that as you see down in

22  Subsection 5, Pruneyard v Robins, a

23  California case from 1980, recognizes that

24  when states act to expand fundamental

25  rights more generously than the federal



Page 37

1    government requires, the minimum standard,

2    those are recognized.

3          You know, if you think back to the

4    same sex marriage debate, the State of

5    Massachusetts recognized the franchise of

6    marriage more expansively in Massachusetts

7    than the minimum requirement of federal

8    law.  And the federal law said, okay, we're

9    going to allow Massachusetts to recognize

10   the franchise of marriage more expansively

11   than a minimum standard required by federal

12   law.

13         This is walking that same tradition.

14   We, as a state, recognize Fourth Amendment

15   privacy more expansively than the minimum

16   standards required under federal law.  The

17   Fourth Amendment rights against

18   unreasonable search and seizure in Georgia

19   is more expansive, has -- recognizes one's

20   privacy against search and seizure more

21   expansively than federal law requires.  We

22   do that as states.

23         What this bill is doing is

24   recognizing the life interest of the child.

25   Recognizing the humanity of the child in



1    the womb as a human being more expansive

2    than the minimum standard that the federal

3    government mandates us to do.

4          And we find this case, Pruneyard v

5    Robins of California, as you study the

6    case, the same thing happened.  There was a

7    federal court case that says Californian's

8    don't have this right naturally.  The

9    legislature acted and then after that

10   legislative action, the U. S. Supreme Court

11   recognized, okay, now this interest that

12   California has affirmed by law is now

13   recognized because it's more expansive than

14   the requirement of federal law and it was

15   recognized in a very, very similar and

16   interesting parallel case.  I laid that out

17   here on page one.

18         I'm not going to spend too much time

19   in these legislative findings, but I do

20   want to highlight that the American College

21   of Obstetrics and Gynecology recognizes

22   there is one threshold for the standard of

23   a viable pregnancy.  The key threshold for

24   viability of pregnancy -- there are some

25   others, but the key threshold is the



1    presence of a heartbeat.  You have a viable

2    pregnancy when a heartbeat is present.

3          So we see medically that the

4    threshold for viability is pregnancy.  We

5    see under the Uniform Determination of

6    Death Act, a 40-year old law that applies

7    in almost all the states, the standard for

8    when someone's life is over is they don't

9    have a heartbeat, they don't have brain

10   activity and they have no respiratory

11   activity.

12         If any one of those three exist

13   without life support, the person is alive.

14   So throughout life, we recognize that if

15   there is the presence of a heartbeat,

16   medically the person is alive.  They're not

17   dead.

18         Why wouldn't we apply that in the

19   womb?  Of course, we would.  Common sense

20   tells us that we should and that's what HB

21   481 does.

22         MADAM CHAIR:  Representative, you

23   have a little less than 10 minutes left.

24         REPRESENTATIVE SETZLER:  Thank you,

25   Madam Chair.



Page 40

1        MADAM CHAIR:  I want you to walk

2    through the bill since this is a substitute

3    that I got less than an hour before this

4    meeting.

5        REPRESENTATIVE SETZLER:  I'll

6    highlight the six or seven lines that are

7    different, Madam Chair.  I'll be glad to do

8    that.  Thank you.

9        MADAM CHAIR:  You need to walk it

10   through with what the bill does.

11       REPRESENTATIVE SETZLER:  So as we lay

12   that groundwork medically and legally, we

13   recognize this is sound proposition.

14        Ladies and gentlemen, if I could have

15   you -- draw your attention to page five of

16   the bill, the bill doesn't make that many

17   changes to the structure of our existing

18   abortion law.  One thing that it does do is

19   we recognize the humanity of the child in

20   the womb.  We recognize that there are

21   certain practical considerations we want to

22   take into account.

23        Many things that we do as a state

24   with respect to population counts track

25   against the United States Census Standards.



1   They are promulgated and pushed and they

2   are subject to federal law.  Our elections

3   and all those kind of things, all of the

4   population that drives all those things are

5   all driven by the United States Census

6   Bureau.

7        But there are some state formulas

8   though that we maintain and we recognize

9   through a few of our agencies -- we could

10  have a discussion about some of the details

11  -- there are state-wide population counts

12  that we do that are not subject to census

13  data.

14       For example, the disproportionate

15  share of hospitals.  You know, the head

16  counts that apply through our indigent care

17  trust fund, there's a head count that

18  applies that's state specific.  It's not

19  purely tied to census data.

20       But what this allows you to do is it

21  recognizes that the state, in making some

22  determinations about how we count people,

23  you think about the unborn children are

24  part of the medical system, it allows us --

25  it may only have a half percentage or less



Page 42

1    than one percent impact on those numbers,

2    but allow -- this is permissive to allow

3    the state to take children in the womb into

4    account in these kind of state-wide

5    population counts.

6          Practical matter, simple matter,

7    doesn't cost us dollars.  But it also

8    recognizes the value of the child.

9          Madam Chair, the operative part of

10   this bill aside from those administrative

11   portions, lines 151 through 166.  151

12   through 163 don't change at all.  It simply

13   provides that no abortions are authorized

14   or shall be performed unless -- on an

15   unborn child unless there's the presence --

16   if the presence of a human heartbeat has

17   been determined.

18          For members who are new to the

19   Legislature, one thing we do, we try to

20   provide very broad berth to the medical

21   profession here in the state.  This bill

22   does not prescribe a medical standard of

23   care.  This does not tell doctors what kind

24   of ultrasound they would use to make these

25   determinations.  It doesn't distinguish



1    between doppler ultrasound or

2    transabdominal.  We don't get into --

3    because doctors are trusted to operate

4    within their standard of care to make these

5    determinations.

6         But it does say if there is a

7    detectable heartbeat, the child has a

8    beating heart, you can't take the child's

9    life through abortion.  The rest of it is

10   handed over to the doctor to be able to

11   manage within the medical standard of care.

12   We don't try to dictate doctor's operations

13   from the Legislature and I would never try

14   to put that into a bill.

15        So if there is questions about

16   details, as we walk through this, the

17   medical standard of care defines these

18   things and I think we'd do well to trust

19   our doctors to do that.

20        Madam Chair, one change I'll

21   highlight to members, lines 164 through

22   166.  While I recognize all life is

23   precious and the manner of conception has

24   nothing to do with the value of a human

25   life.  The manner of conception has nothing



Page 44

1    to do with the value of a human life.

2         I had a number of members come to me

3    and say, Representative SETZLER, this is

4    important.  This is an important matter.

5    We need to act on this this year and move

6    on this legislatively.  And they came to me

7    and they asked for this exception that in

8    essence provides an exception if the child

9    is conceived in rape or incest, that an

10   abortion wouldn't be prohibited starting at

11   human heartbeat.

12        I have misgivings about that in many

13   ways because I believe those children are

14   just as innocent as others that are

15   conceived intentionally.  I was an

16   unplanned pregnancy.  I'm not here because

17   my parents planned to have me here.  All

18   children have the same value.

19        But as a matter of members coming to

20   me and saying let's get a consensus bill

21   that we can get bipartisan support perhaps

22   in this chamber, I added lines 164 through

23   166 to this bill because some people

24   believe -- members are informed that they

25   believe that rape is an important exception



1    to have in this from heartbeat to our

2    current standard.

3        Madam Chair, really as you look

4    through the bill, everything is really just

5    clean up language.  Through page eight,

6    it's just inserting human heartbeat next to

7    the provisions that deal with informed

8    consent for mothers where doctors talk

9    about, you know, the gestational age.

10        Operatively, the next -- the only

11   piece that is operative after that is down

12   on lines 289 through 291.  Again, the exact

13   same language that was in the original

14   version and it says that if a child is

15   killed through a wrongful death action,

16   today at about 15 weeks, what is called

17   quickening, a mother can feel the child.

18   After that point, the full value of the

19   life of the child can be brought in a

20   wrongful death suit.  In this case, it

21   takes it back to the heartbeat.

22        Again, so our abortion law is

23   consistent with our civil law.  It all

24   lines up.  It's all consistent and I think

25   that's important to have that level of



Page 46

1   consistency.

2        The last thing we brought out, Madam

3   Chair, on lines 298 through 300 is

4   something that many members brought to me.

5   In fact, some prominent leaders in our

6   capital asked me to include.  It simply

7   says that -- from the perspective of our

8   tax code that if we recognize the humanity

9   of the child in the womb, if mom and dad

10  are pregnant with their first child on

11  December 31st, 2018, that instead of having

12  two family members for their taxes, they

13  have three.

14       And under our tax code, that

15  recognizes the child not just

16  theoretically, not just this -- this bill

17  is not just about abortion.  This bill is

18  about recognizing the humanity of the child

19  and that we recognize when people are

20  painting rooms getting ready for children

21  and incurring costs, maybe mom is on

22  bedrest cause she's pregnant, there's a

23  simple provision here that I think is

24  common sense that we can all get behind

25  that if mom and dad are pregnant, that that



1   child should be recognized with their

2   taxes.

3        Very simple proposition that some

4   leaders in the capital brought to me and I

5   think it's appropriate to bring before you,

6   Madam Chair.

7        And then, of course, the last change

8   is just the effective date of January 1st.

9        Some folks in the departments wanted

10  more time to implement this to make sure

11  that everyone is on line before it's

12  implemented.  So I moved it from July 1st

13  of 2019 to January 1st, 2020.

14       Be glad to answer questions, Madam

15  Chair.

16       MADAM CHAIR:  It's remaining --

17       REPRESENTATIVE SETZLER:  Dr. Kathy

18  Aultman is a physician.  She's going to

19  speak in the time allocated for speakers.

20  I just wanted her here in case there were

21  some questions.  Of course, Ms. Jane

22  Robbins, Attorney, Harvard educated

23  attorney has been involved with us in the

24  process and appreciate her presence in case

25  there are some questions.



Page 48

1        MADAM CHAIR:  Okay.  So you're ready

2    for questions?

3        REPRESENTATIVE SETZLER:  Yes, ma'am.

4        MADAM CHAIR:  Okay.  You made it in

5    about 18 minutes, Representative.

6        REPRESENTATIVE SETZLER:  What's that?

7        MADAM CHAIR:  You made it at about 18

8    minutes.  That's a lot shorter than

9    judiciary non-civil subcommittee meetings.

10        REPRESENTATIVE SETZLER:  I will

11    forgive the Chair if you say that's

12    uncharacteristic of me.

13        MADAM CHAIR:  All right.  It's

14    uncharacteristic.

15        Thank you for staying in line.

16        Okay.  We do have questions.

17        Representative Mitchell.  Pick your

18    best question.

19        REPRESENTATIVE MITCHELL:  Chairman

20    Setzler, my good friend.  I appreciate your

21    serenity and seriousness that you take this

22    with.  We've had many discussions about

23    this.

24        Just a quick question or two, if I

25    may.



Page 49

1       And that is line 164 through 166,

2   that wasn't based on any science that you

3   put that in there?  That's a political

4   consideration that we have there, that's no

5   fault of the -- as you called it, the

6   unborn child, there.  But we made a

7   political consideration.

8       REPRESENTATIVE SETZLER:  No, I

9   wouldn't say that.

10      REPRESENTATIVE MITCHELL:  You would

11   say --

12      REPRESENTATIVE SETZLER:  Thank you to

13   my friend.  We've been close since I came

14   down here 14 years ago.

15      We recognize children in the womb are

16   living, distinct and whole from conception

17   and their manner of conception has nothing

18   to do with their innocence and their right

19   to life.

20      I think there is such -- it's so

21   important that we act on this.  It's so

22   important that we protect children that

23   have heartbeats.  We know they're part of

24   the human community.  I think common sense

25   tells us that.  Medical science tells us



1  that.

2      As people came to me and said, you

3  know, the emotional complexity and the

4  difficulty of this rape question makes it

5  very difficult for me to support this even

6  though I know it's so important and people

7  were sort of tortured over this issue.  And

8  I don't want to be in a place where this

9  becomes a divider.

10      I don't want to be in a place where

11  this bill is one that has people sort of

12  torn apart in their handling of it.  And I

13  felt like this is something that although

14  we know these children are as innocent as

15  others, we could get broad consensus

16  around.  It's -- but I wouldn't call that a

17  political consideration.

18      MADAM CHAIR:  Representative, don't

19  make me go back on your uncharacteristic

20  thing.  If you'll make your answers

21  succinct.

22      And if you will -- all the committee

23  members will make their questions succinct

24  because my board is lighting up.

25      REPRESENTATIVE MITCHELL:  Chairman



Page 51

1   Setzler, your bill does not outlaw

2   abortions nationwide or worldwide.  Just in

3   the state which would inevitably create

4   those who have the resources to go other

5   places and other countries, could make

6   themselves -- avail themselves to licensed

7   professionals and good facilities, whereas

8   those without resources would avail

9   themselves to not credible places.

10        REPRESENTATIVE SETZLER:

11  Representative Mitchell, if you and I could

12  work together to enact protection for

13  children with human heartbeats in every

14  state, I would ask you to join me.  I'd

15  like to lead in Georgia and then I'd like

16  to have you join me on a nationwide effort

17  to make that happen because I think it's

18  very important to do that.

19        REPRESENTATIVE MITCHELL:  How do you

20  feel about the death penalty?

21        MADAM CHAIR:  Representative

22  Mitchell, let's stay on issue.

23        REPRESENTATIVE SETZLER:  I will tell

24  you --

25        MADAM CHAIR:  Wait, wait, wait.



1          REPRESENTATIVE SETZLER:  Madam --

2          MADAM CHAIR:  No, we're not going

3     there.  That's a different issue.  You

4     bring a different bill and see if it comes

5     to my committee.  I figure it probably

6     would go to judiciary, your committee.

7          Representative Petrea.

8          REPRESENTATIVE PETREA:  Thank you,

9     Madam Chair.

10         Thank you, Representative SETZLER.  I

11    just want to try to encapsulate -- make

12    sure I've got it right.  So currently, the

13    standard in Georgia, if you look, is

14    basically 20 weeks and the current statute

15    and the current language in this bill --

16    I'm going to get to it here -- the current

17    language is 20 weeks or less, right, that

18    abortion is available.

19         And so this fetal heartbeat bill

20    would basically make it plus or minus six

21    weeks.  Is that customary, about six weeks

22    for a heartbeat of a child?

23         REPRESENTATIVE SETZLER:  Yes.  Six

24    weeks gestational age is the -- is

25    approximately when science tells us the



1   heartbeat begins.  And 20 weeks is the

2   standard now.

3        And by the way, at 20 weeks, there is

4   no exception for rape.  It is a pure

5   recognition of the value of that child and

6   their life.

7        REPRESENTATIVE PETREA:  And that was

8   where I was leading.  So the exceptions are

9   going to be new to the statute all

10  together, that we've added exceptions for

11  here, rape, life of the mother and incest

12  -- or rape and incest, which are both rape,

13  are new.

14       And so I want to make sure I

15  understand -- but this does nothing to

16  encumber the availability of whatever

17  resources a woman might have prior to the

18  heartbeat of a child in the womb.

19       REPRESENTATIVE SETZLER:  No, sir.

20  Again -- I appreciate the gentleman's

21  question.  We know that life begins at

22  conception.  You have a living distinct

23  human being at conception.  And I believe

24  that's that -- and they're worthy of full

25  legal protection.



Page 54

1          I think from the standpoint of

2    looking at what is legally sound and what I

3    think we can get common sense support to

4    recognize is surely, certainly we can agree

5    that with a human heartbeat, we recognize

6    -- I mean, I believe strongly at conception

7    that all children -- no matter whether

8    they're conceived through rape or in a

9    loving family -- are worthy of full legal

10   -- I'll say that and I'll say it again and

11   again and again.  But, certainly, we can

12   come together and recognize that if there's

13   a human heartbeat, that child is worthy of

14   protection.

15        REPRESENTATIVE PETREA:  Thank you,

16   sir.

17        MADAM CHAIR:  Representative Newton.

18        REPRESENTATIVE NEWTON:  Thank you,

19   Madam Chair.

20        To the bill sponsor, I so appreciate

21   this bill in so many ways.

22        As an emergency physician, I

23   frequently take care of pregnant women and

24   there's two lives involved and we do our

25   best to take care of them.



1      One of the first things we do often

2  is an ultrasound, as you've mentioned.  And

3  in that ultrasound, two of the things come

4  back:  The estimated age and the heart

5  rate.  It is a key thing and I get to go

6  back in to some families and have to give

7  bad news that there is no heartbeat and

8  that things are not going well.  And I've

9  cried with people with that.  I get to

10  reassure others with the fact that that

11  heartbeat is a sign of life.

12      I do that at all extremes and I

13  appreciate -- for the elderly, we look at

14  that.  We try to revive someone.  The way

15  we can tell if it works or not, we get a

16  heartbeat.  Everyone knows a flat line, a

17  lack of a heartbeat which that represents

18  is a crucial distinction.

19      I appreciate the wisdom to go into

20  this and recognize that the presence of a

21  heartbeat is not a new idea with that

22  equating to life and that you've done a

23  great job with this.  I appreciate it.

24      REPRESENTATIVE SETZLER:  Thank you.

25      MADAM CHAIR:  All right.  Can we



1   leave our things to questions, please,

2   since we are on a time schedule.

3       Representative Hutchinson.

4       REPRESENTATIVE HUTCHINSON:   Thank

5   you, Madam Chair.

6       I have a question on line 40, Section

7   1.2 where you say -- you talk about early

8   infants in the womb.  I'm not familiar with

9   this term.  Can you define that because I

10  think it would make a difference when you

11  start talking about fingerprints and

12  distinct organ systems.  So can you define

13  early infants in the womb?

14      REPRESENTATIVE SETZLER:  Yeah.  Thank

15  you for the question.  Again, Section 1.2,

16  as you know, is legislative findings.  It's

17  -- but I think it's important to

18  understand, you know, we're talking about

19  infants.  We're talking about children that

20  have their own organ systems.  We have

21  children that have their own DNA, their own

22  -- and so forth.

23      And I think it's clear to use words

24  that mean something.  I think the child in

25  the womb is an infant.  They're a -- in



Page 57

1  fact, children that are growing from, you

2  know, spend probably half their time in the

3  womb, they could live outside or live

4  inside the womb.  We know these are

5  infants.

6       We simply use the word early infant

7  as a -- as sort of a general term to talk

8  about what we recognize.  The child in the

9  womb is not something else.  It's not

10  other.  It's a human and -- but they're

11  early in their development.  I think that's

12  our intention of just recognizing it that

13  way.

14       REPRESENTATIVE HUTCHINSON:  I think

15  your answer confused me more actually.

16       So an early infant in the womb, you

17  said can be sustained outside of the womb.

18  Correct?  That's what you just said?

19       REPRESENTATIVE SETZLER:  What I'm

20  telling you is when you think about a --

21  let's take, for example, some of the

22  horrific legislation we've seen in other

23  states --

24       MADAM CHAIR:  Succinct.

25       REPRESENTATIVE SETZLER:  Succinct.



Page 58

1          REPRESENTATIVE HUTCHINSON:  Is there

2     a definition like --

3          REPRESENTATIVE SETZLER:  Early

4     infants is infants in their early stages of

5     development.

6          REPRESENTATIVE HUTCHINSON:  So a six

7     week old can be an early infant?

8          MADAM CHAIR:  Is that correct?

9          REPRESENTATIVE SETZLER:  Yeah.

10         MADAM CHAIR:  Aren't they embryonic

11    at that time because if they're in that

12    position, they're called embryos at the

13    time.  Or embryonic stage because --

14         REPRESENTATIVE HUTCHINSON:  Because

15    at six weeks, they don't have fingerprints.

16         REPRESENTATIVE SETZLER:  I'm sorry?

17         REPRESENTATIVE HUTCHINSON:  At six

18    weeks, they do not have fingerprints.

19         REPRESENTATIVE SETZLER:  No, but

20    they're -- they are developing --

21         MADAM CHAIR:  Okay.  Wait a minute.

22    Wait a minute.  Wait a minute.  We are not

23    going to have that.

24         If we have this kind of thing from

25    the audience, I'm sorry, I will ask that

1   the officers remove you.  I don't want to

2   do that, but I will do that.

3        Okay.

4        REPRESENTATIVE SETZLER:  Thank you

5   for the question.

6        We recognize that children in the

7   womb are in biological development from six

8   weeks -- or even earlier.  All they need is

9   nourishment and a safe place to live and

10  they're going to grow to ripe old

11  adulthood.

12       The fact that morphologically certain

13  organs have not grown or their arms aren't

14  as visible doesn't change the fact they're

15  living and distinct as human beings.

16       If the lady would like to make an

17  amendment to clarify that language, I would

18  welcome it.

19       REPRESENTATIVE HUTCHINSON:  Well, as

20  written, an early infant in the womb at six

21  weeks does not have any of these things:

22  Unique fingerprints or -- they may have

23  genetics, but this would be incorrect is

24  what I'm saying.

25       REPRESENTATIVE SETZLER:  Children



```
 1   develop in the womb -- before children are

 2   born and they come out the birth canal,

 3   they have fingerprints.  All their organ

 4   systems are formed.  Their bones are

 5   formed.  They have brain activity.  They

 6   feel pain.

 7        I won't be able to show a video today

 8   that shows infants inside reacting to

 9   stimuli, but we recognize that's true.

10   This is simply stating that basic fact we

11   would all recognize.

12        MADAM CHAIR:  Go ahead.

13        REPRESENTATIVE HUTCHINSON:  So if

14   early infants in the womb at six weeks

15   gestational age do not have unique

16   fingerprints, so it's like the basis of

17   what you're saying is flawed.  So I'm

18   having a difficult time following that.

19        MADAM CHAIR:  Thank you.  I'm going

20   to move on.  Hold that.

21        Representative Schofield.

22        REPRESENTATIVE SCHOFIELD:  Thank you,

23   Madam Chair.  And I do realize this is a

24   very -- you're very passionate about that.

25   But so am I as a mom.
```



1      How many times have you actually

2  carried a baby?

3      REPRESENTATIVE SETZLER:  As a male, I

4  could talk about my wife's miscarriages, I

5  could talk about the kids we've had.  We've

6  been blessed with four, but we've had more.

7  We've lost some.  So that's --

8      REPRESENTATIVE SCHOFIELD:  And that

9  was a decision that you and your wife made,

10  correctly -- am I correct?

11      REPRESENTATIVE SETZLER:  I mean, we

12  could speculate whether all the children

13  came on order or whether it was through the

14  magic of being married, things happened.

15      REPRESENTATIVE SCHOFIELD:  But you

16  had the conversation as to what was going

17  on with her body, was between you and her.

18  You didn't come and ask the body to vote

19  and to intervene with those.

20      REPRESENTATIVE SETZLER:  I will tell

21  you with all of our children, we recognized

22  that when my wife became pregnant, we had a

23  living distinct child under our care that

24  had the same value as a child that was out

25  to here when she was extremely pregnant or



Page 62

1   that was in the hospital with us after

2   birthing that we have in high school.

3        I would tell you in some ways, they

4   probably felt more like human beings in the

5   womb than they do as 20 year olds.  But,

6   you know, I think we both saw the value of

7   the child with great care as soon as she

8   became pregnant.

9        REPRESENTATIVE SCHOFIELD:  Thank you.

10  Just two more quick ones.

11       While I respect that, what I'm just

12  struggling with is the right for you to

13  tell a woman what to do and how to do it.

14       But on that note, I want to move to

15  the bill.  So I have a question about the

16  physical -- you know, is there -- and you

17  talked about the tax codes and the

18  consensus -- the census.  So I just really

19  wanted to know if we have a physical note

20  since we're going to claim this fetus on

21  our tax returns or do I have to change my

22  withholdings if there are -- if I lose a

23  child or there's a miscarriage or something

24  like that, am I going to be found guilty of

25  tax fraud for not reporting --



Page 63

1          REPRESENTATIVE SETZLER:  No, no.

2    Appreciate the question.

3          There are tragedies that happen among

4    us.  If a family had a six month old child

5    that mom delivered six months ago and by

6    some tragedy, they lose the child, the last

7    thing they're thinking about is the tax

8    status to be sure.  I think we can agree on

9    that.

10          But if you have a child over the

11   course of a tax year, let's say -- heaven

12   forbid that happened in 2018, someone lost

13   a child in July of '18 who was six months

14   old.  Mom, dad, the child.  They would have

15   three write-offs for their taxes for the

16   year 2018 because they had a child during

17   that year.

18          All we're saying is if a child is in

19   the womb, we recognize the humanity of the

20   child.  They would have a write-off if the

21   child is eight months in utero or eight

22   months --

23          MADAM CHAIR:  Okay.

24          REPRESENTATIVE SETZLER:  -- it would

25   be treated the same way.



1          MADAM CHAIR:  Okay.  Representative,

2    I do have a question about that.  Having

3    gotten this bill late in the session, I

4    didn't have a chance to ask for a physical

5    note because it takes much longer.  But,

6    you know, how does someone -- I mean, since

7    a lot of people don't know they're pregnant

8    until well into, you know, eight to 10

9    weeks and sometimes the first trimester, if

10   their menstrual periods are very un-regular

11   and they miss them for several months, they

12   really don't have any way of knowing.

13          And so people hate paying income tax

14   and how would the state have a way of

15   verifying about a pregnancy that early on?

16   I'm just asking how you think we would

17   verify this.  Or if this part of the law is

18   enforceable?  I'm asking for clarification.

19          REPRESENTATIVE SETZLER:  Thank you

20   for the question, Madam Chair.

21          The same way if a young woman wants

22   to apply for Medicaid, she can't just take

23   the pregnancy test that you get at the drug

24   store.  She has to go down and have a

25   medically verified pregnancy test.  When



Page 65

```
1   the medically verified pregnancy test

2   happens, then you're able to apply for

3   Medicaid if you need services.  The same

4   thing would apply here.

5           And I think -- and, Madam Chair, my

6   goal would be that we not -- it's a pretty

7   straightforward thing with respect to the

8   Department of Revenue promulgating rules to

9   support this.  I try as a legislator not to

10  write regs in bills.  But I think the same

11  standard of a medically verified pregnancy

12  test would apply here just like it does for

13  thousands of people every year that are

14  under our Medicaid system.

15          MADAM CHAIR:  That makes me even more

16  concerned about a note because somebody has

17  to pay for that.

18          And then I had another question --

19  and this is for clarification for myself.

20  I thought that -- and it's about lines 131

21  to 133.  This is for clarification.

22          I thought that the 14th Amendment

23  said that the protections are for the born

24  and the naturalized citizens of our

25  country.  I think if you look at the 14th
```



1    Amendment, it said born.

2         REPRESENTATIVE SETZLER:  No, ma'am.

3    I mean, if you think about the -- I can

4    pull that out if you need me to, Madam

5    Chair.  I'd be happy to.  What the 14th

6    Amendment accrues to is persons.

7         MADAM CHAIR:  Okay.  But then it gets

8    onto the other state -- okay.  As Betsy

9    clarifies that for me because, you know, I

10   didn't have -- I have no internet

11   connection at my house where I live and so

12   at night I have no way of looking up

13   something like that and didn't happen to

14   have a copy of the Constitution right at

15   hand.  So that was why I wanted to clarify

16   it.

17        The other thing is we're going to

18   include an unborn child in our state

19   population basis?

20        REPRESENTATIVE SETZLER:  Many of our

21   state population counts are driven by the

22   census.  Our voting, all those things are

23   driven by census numbers.  What this does,

24   it allows us to include unborn persons or

25   unborn human beings in our counts.



Page 67

1        For example, if the state makes

2   allocations based on population, we

3   recognize even the areas with the highest

4   birth rates have around one percent,

5   one-and-a-half percent of births per year.

6   We're talking about small numbers.

7        But if the state wants to reflect in

8   its policies whether it's apportioning of

9   dollars across hospitals -- for high-need

10  hospitals, we recognize that children in

11  utero have high medical costs relevant to

12  others.  And it's -- it's part -- they're

13  patients within our medical system, that if

14  we wanted to use that, this gives us the

15  ability as a state to do that.

16       It doesn't apply to areas that are

17  only -- that only use census data.  But it

18  does allow us as a state to do that in

19  those practical circumstances.

20       MADAM CHAIR:  And I just have a

21  question about how that would be enforced.

22  And the reason is because, you know, I did

23  the non-shackling bill of pregnant women

24  which is now on its way over to the Senate.

25       And one of the things that the



Page 68

```
 1   sheriffs and everybody, when they're

 2   talking to work that out was -- especially

 3   in that first trimester when we say we're

 4   not going to shackle pregnant women.  And I

 5   had to put in there second and third

 6   trimester to make it where -- because it's

 7   not so obvious in that first trimester.

 8        So the same thing about determining

 9   this is what I was asking.

10        Betsy, did you find it?

11            (Off-the-record comments)

12        MADAM CHAIR:  So it doesn't define

13   born or unborn?  Okay.  Thank you.

14        REPRESENTATIVE SETZLER:  And, Madam

15   Chair, to your point.  38 states -- in 1868

16   when the 14th Amendment was passed, 38

17   states and territories outlawed abortion

18   completely.  The idea that it was some -- I

19   think for so many years it was assumed

20   abortion wasn't going to be legal that they

21   didn't even think of mentioning it, I would

22   argue.

23        MADAM CHAIR:  I'm just trying to get

24   clarification about how those would be

25   enforced and I stand corrected on the 14th
```



1    Amendment.

2         You misspoke?  Okay.

3         REPRESENTATIVE SETZLER:  With respect

4    to the naturalization of citizens.

5         MADAM CHAIR:  Okay.  This is section

6    one:  All persons born or naturalized in

7    the United States and subject to the

8    jurisdiction thereof are citizens of the

9    United States and the state wherein they

10   reside.

11        REPRESENTATIVE SETZLER:  But then it

12   goes on to talk about equal -- no one

13   should be deprived equal protection under

14   our laws.  So that's --

15        MADAM CHAIR:  Yeah, I'm not a

16   constitutional -- I just was questioning

17   that because I thought that it went -- I

18   knew we'd have to have constitutional

19   lawyers and I don't think either one of us

20   are constitutional lawyers.

21        Representative Beverly.

22        REPRESENTATIVE BEVERLY:  Thank you,

23   Madam Chair.

24        To your point on the 14th Amendment,

25   today as you look at me, you consider me a



1 whole person, I suspect.

2      Throughout our history, we have

3 grappled with the what the idea of humanity

4 is.

5      Are you familiar with the

6 Three-Fifths Compromise?

7      REPRESENTATIVE SETZLER:

8 Unfortunately.  Yes, sir.

9      REPRESENTATIVE BEVERLY:  And that

10 happened in 1787 where the state

11 legislators tried to figure out how do you

12 qualify a black life.  And for the purposes

13 of census and taxation, they said, well,

14 guess what we'll do.  The same 38 states,

15 the convention said we'll qualify black

16 folk as three-fifths of a person.

17      We've always struggled with this

18 stuff.  A hundred years later, the 14th

19 Amendment comes along.  It gives people an

20 opportunity to reset what they believe a

21 life is.  Okay?  And that's what we're

22 talking about today.

23      And in that consideration, what was

24 the idea around slaves at that time?  Do

25 you remember?



1          REPRESENTATIVE SETZLER:  Sir?

2          REPRESENTATIVE BEVERLY:  Slaves.

3    People of color.  What did they consider a

4    person according to the 14th Amendment?

5    Did they ratify, did they get rid of the

6    Three-Fifths Compromise?

7          REPRESENTATIVE SETZLER:  I will tell

8    you, we knew all along -- I think we all

9    know -- it's almost absurd to even talk

10   about now.  But we all know that people of

11   color were full human beings and always

12   were.  The laws of our nation didn't

13   reflect that.  In 1857, the Dred Scott v

14   Sanford decision said that people of color

15   are not persons.  They were property.

16         We know that a Supreme -- in fact, it

17   was a 7-2 Supreme Court decision.  A 7 to 2

18   decision of the U.S. Supreme Court in 1857

19   said Dred Scott was property.  He wasn't a

20   person.

21         117 years later in a 7 to 2 decision

22   of the United States Supreme Court, the

23   United States Supreme Court said children

24   in the womb are not persons, they're just

25   lumps of tissue, they're medical things to

 1    be accommodated.

 2        But the same Supreme Court by a 7 to

 3    2 decision that didn't recognize Dred Scott

 4    didn't recognize the humanity of the child

 5    in the womb and it's our opportunity to fix

 6    that and I would love you to join me.

 7        REPRESENTATIVE BEVERLY:  So here's

 8    the thing.  And that goes beyond the scope

 9    of what I'm trying to establish.  What I'm

10    trying to establish is that we will grapple

11    with humanity where life begins and who is

12    a person and who is not.  And at the core

13    of this is not the moral judgment of a

14    bunch of legislators to determine what the

15    autonomy is of a person or to determine

16    what they want to do with that life.  We

17    all have -- each one of us have been given

18    inalienable rights.  We have those rights.

19    And today, you're trying to define what

20    those are.

21        And just like 250 years ago, they

22    said that the guy sitting here, James

23    Beverly, my ancestors was three-fifths of a

24    person and they were completely wrong.

25    Today, I think you're on a slippery slope



1  trying to determine as a legislator where

2  life begins.

3          REPRESENTATIVE SETZLER:  How can you

4  -- can you help me through this bill fully

5  recognize them so it's not three-fifths of

6  a person but is a full person?  Because

7  that's what I'm trying to do.  I thank you

8  for that.

9          REPRESENTATIVE BEVERLY:  Yeah, thank

10  you.  And so I think that, Madam Chair --

11  and if you just give me liberty --

12          MADAM CHAIR:  Okay.

13          REPRESENTATIVE BEVERLY:  -- just one

14  other statement is I'd be happy to have

15  that conversation with you and I would move

16  to table this if you're willing to, to

17  table this and have an actual real

18  conversation around this issue.

19          And so at the appropriate time, I'd

20  move to table this bill and let's see where

21  we go.

22          MADAM CHAIR:  I'm not recognizing you

23  for that motion at this time.

24          Thank you, Representative Beverly.

25          REPRESENTATIVE SETZLER:  Mr. Beverly,



Page 74

1    I'd love to have that conversation --

2         MADAM CHAIR:  Can we move on, please.

3         Representative Petrea.

4         REPRESENTATIVE PETREA:  Yes.  I was

5    just going to speak briefly.  Thank you,

6    Madam Chair.

7         I just wanted to speak briefly.  I'm

8    sitting here listening to the dialogue with

9    Representative Beverly and Representative

10   SETZLER.  My understanding, sir, is -- so

11   we already have -- to the question:  We

12   already have limits on abortion in this

13   state.

14        As I was trying to make sure I

15   understood earlier, we already have an

16   understanding that we limit abortion at 20

17   weeks.  That is an arbitrary position,

18   right?  It's just 20 weeks.  There is no

19   science behind that.

20        What I see you trying to do here is

21   take some degree of science by saying life

22   begins with a heartbeat and -- and, yes, it

23   shifts that delineation.  But it does based

24   on science.  Is that not true?

25        REPRESENTATIVE SETZLER:  It is.  And



1    to your point, you know, the whole idea --
2    and I think the opponents will come and
3    talk about the idea of viability, that --
4    even in the Roe decision and subsequent
5    decisions, they talk about viabilities
6    being the standard after which the
7    legislature can prohibit abortion.
8          And they sort of landed on this
9    nebulous idea of viability being somehow
10   able to live outside the womb.  We know
11   that's a medical fiction.  A child at 24
12   weeks gestation age, 40 weeks.  Heck, a
13   child at six months old can't, without
14   adult help, live on their own.  It requires
15   people to care for them.
16         The threshold medically for a viable
17   pregnancy -- the point at which 95 percent
18   of all pregnancies will be carried to term
19   successfully is the heartbeat.
20         Again, the American College of
21   Obstetrics and Gynecology says the
22   definition of viable inter uterine
23   gestation is the heartbeat.
24         So we see medically at end of life as
25   we talked about, if a coroner was trying to



1   decide if someone is alive or dead, if they

2   have a heartbeat without life support,

3   they've alive.

4       This is the medically scientifically

5   appropriate threshold at which a viability

6   should be applied.

7       And I appreciate the question.

8       MADAM CHAIR:  I'm going to take a

9   couple of more questions and then I'm going

10  to end it and go to public.

11      Representative Henson.

12      REPRESENTATIVE HENSON:  Thank you,

13  Madam Chair.

14      I have several questions --

15      MADAM CHAIR:  No --

16      REPRESENTATIVE HENSON:  -- I'm going

17  to make two of them, just two.  I'll make

18  it real quick.

19      If this bill was to pass, where is

20  the physical note for advising women who

21  can be pregnant that the law in Georgia has

22  changed?  Because I don't expect it to be a

23  billboard on 285.

24      REPRESENTATIVE SETZLER:  Thank you

25  for the question.



Page 77

1        We have -- when this legislature

2   passed the Women's Right to Know Act back

3   in 2005, we put in place a number of

4   existing -- requirements that are under

5   existing law, that as physicians consult

6   women about their options about the

7   possibility of abortion, there's materials

8   that before an abortion can be performed,

9   that they have to provide.  There's a

10  website that speaks to that.

11       So our existing law prescribes

12  information for women that are considering

13  abortion.  Many women who were considering

14  abortion in 2019 or 2020, weren't

15  considering it in 2005.

16       REPRESENTATIVE HENSON:  Well, that's

17  not where I'm going because you're assuming

18  that she has gone to the doctor.  I'm

19  talking about someone who is four weeks

20  pregnant that hasn't gone to a doctor, that

21  might not know she's pregnant because many

22  women don't realize until they are six or

23  eight weeks pregnant that they're pregnant.

24  Especially if they're not hoping to be

25  pregnant, they're not thinking they are.



Page 78

1          So who is going to advise them?   I

2     mean, how do you ask a young child -- a

3     young 13 or 14 year old or even someone

4     that's in college that if they get

5     pregnant, they have to remain pregnant?

6     And what are they supposed to do with the

7     baby afterwards?

8          And don't talk to me about foster

9     care in Georgia where we have 14,000

10    children waiting to get into a foster home.

11    So what are we going to do with all these

12    children that we're now forcing women to

13    carry?

14          REPRESENTATIVE SETZLER:   Appreciate

15    the lady's question.

16          There were two.  The first question I

17    think answered itself with respect to

18    physicians in Georgia are the only ones

19    that are allowed to perform abortions.

20    Mid-level practitioners don't do it.  It's

21    a physician.

22          And the notification provisions we

23    have under existing law would apply to

24    this.  It really has no -- this bill has no

25    impact on that.



1          The lady's second question is -- I

2    think it was one of unwanted children.

3          REPRESENTATIVE HENSON:  If I don't

4    want a child, what am I supposed to do for

5    seven or eight or nine months --

6          MADAM CHAIR:  Representative Henson.

7    Excuse me, sir.  Can you sit down, please?

8          REPRESENTATIVE HENSON:  I'm sorry.  I

9    believe very strongly that a bunch of men

10   should not be dictating to me about my

11   body.  And if I was to become pregnant,

12   what I have to do.  Not supposed to do, but

13   have to do.

14         REPRESENTATIVE SETZLER:  Appreciate

15   the lady's question.  I can speak to it.

16         MADAM CHAIR:  Thank you,

17   Representative Henson.

18         You know, I said I was going to take

19   a couple of more questions.  I've had my

20   two.  We really do need to move on.

21         So, Representative Hutchinson, can

22   you do okay with a wave?

23         REPRESENTATIVE HUTCHINSON:  Yes.

24         MADAM CHAIR:  Okay.  And,

25   Representative Sharp, can you get by with a



Page 80

1    wave or do you have a really short one?

2         REPRESENTATIVE SHARP:  It will be

3    real short.

4         MADAM CHAIR:  Okay.  And that's it.

5    That's the last one.

6         REPRESENTATIVE SHARP:  All right.

7    Thank you, Chairman.  Thank you for

8    presenting this.

9         When we look at the IRS situation

10   where you said that a person is considered

11   a whole person.  Let's just say a young

12   lady gets pregnant in June.  She's

13   pregnant.  It's verified by a doctor.

14        Have you looked into how they would

15   have some type of Social Security number in

16   this situation?  The whole process on that

17   end?  Because if she claims that child as

18   soon as she can, maybe in February, get

19   money, $4,000 or whatever it is, and then

20   that -- something happens with that

21   pregnancy and the baby dies, what happens

22   at that point?

23        REPRESENTATIVE SETZLER:  Appreciate

24   the question.  And, again, just for

25   clarity.  This is not going to affect



1    federal taxes so there's not an issue as

2    far as federal taxes goes.

3         The dollar amount we're talking about

4    is a maximum of $172.50.  That's a full tax

5    write-off for a child.  So I'm not touting

6    this as a big windfall.  It's really not

7    that much money.  But I do think it's

8    important to recognize it.

9         But as I answered the lady's question

10   earlier, if a family tragically lost a six

11   month old or any month old during a tax --

12   during a single tax year, they're not

13   thinking about a tax write-off.  But when

14   they do do their taxes, they had a child

15   during that tax year, even though the child

16   passed away, that child counts as a member

17   of the family.  It would be no different

18   under this.

19        MADAM CHAIR:  All right.  Thank you

20   very much.  We're going to go to the

21   speaking list.  We have 30 minutes on each

22   side.  That's an hour.  We're going to keep

23   time and I'm going to go back and forth.

24        I'm going to start with against

25   because we've been listening to the pro.



1       So, Representative Dreyer, if you're

2   still here.

3       REPRESENTATIVE DREYER:  Madam Chair,

4   thank you very much.  And there are going

5   to be, I believe six representatives that

6   have signed up to speak against this bill.

7       For the purposes of maximizing

8   testimony for the committee like the Chair

9   requested, we each have a doctor that's

10  going to come up with us and we'll proceed

11  in order.  We will keep our time to five

12  minutes so the whole presentation can be 30

13  minutes and we can hopefully provide the

14  most useful information to the committee.

15      MADAM CHAIR:  Well, I need to go back

16  and forth.  So can you handle that?

17      REPRESENTATIVE DREYER:  We can

18  certainly handle that.

19      MADAM CHAIR:  Okay.

20      REPRESENTATIVE DREYER:  Thank you

21  very much.

22      As my doctor that's with me makes

23  their way up here, I do want to say that --

24  and it was flagged earlier -- there is not

25  a physical note.  And in addition to



1   notification provisions, this is going to

2   provide a tax deduction.  We have no idea

3   how much this tax deduction is going to

4   cost.

5        There will also be criminal

6   enforcement costs that are going to go with

7   that.  We have no idea how much that's

8   going to cost.  And there will be two tiers

9   of constitutional challenges with this.

10       First, the challenge under the

11  current U.S. Supreme Court law.  But,

12  secondly, this bill provides standing for

13  individuals to continually sue the State of

14  Georgia over the provisions in this bill.

15       So we're going to have massive costs.

16  We have no idea what they are.  And in my

17  mind, that would on its own, justify

18  tabling so that these uncertainties could

19  be arrived at.

20       Would you introduce yourself.

21       DR. SCOTT:  Yes.  I'm Dr. Al Scott.

22  I am not familiar -- that familiar with the

23  substitute bill so I'm going to address

24  House Bill 481.

25       Good afternoon, Madam Chair and



1    members of the committee.

2        My name is Al Scott and I have the

3    honor of serving as the incoming president

4    for the Georgia OBGYN Society.

5        The OBGYN Society is a state medical

6    association for OBGYN physicians.  Today, I

7    proudly represent more than 1,000 OBGYNs

8    from all over Georgia.

9        As a member of the Georgia OBGYN

10   Society and a practicing obstetrician for

11   more than 30 years, I rise today to voice

12   the society's strong opposition to House

13   Bill 481.  House Bill 481 proposes banning

14   abortion after detection of a primitive

15   heartbeat which occurs as early as six

16   weeks gestation.

17       It should be noted that what it is

18   detected via vaginal ultrasound as early as

19   six weeks gestation is not a heart, but a

20   collection of tissue that will eventually

21   form a heart.

22       The bill does not allow for exception

23   due to rape and the substitution bill is

24   slightly -- has slightly changed that.  But

25   the original bill did not allow exceptions



Page 85

1  due to rape, incest or medically futile

2  pregnancy.

3       This means that if a child is

4  determined to have an anencephaly, a

5  condition that is not detected until 18 to

6  22 weeks gestation and is associated with

7  malformation or no formation of the brain,

8  the mother would be required to carry the

9  child to term and deliver the baby.

10      Further, an amniocentesis is a test

11  typically performed at 15 to 18 weeks of

12  pregnancy.  This test can indicate certain

13  birth defects.  Cells in the amniotic fluid

14  can be tested for chromosomal disorders and

15  genetic problems such as cystic fibrosis

16  and Tay-Sachs disease.

17      This bill is an unnecessary political

18  interference in the practice of medicine.

19  Nearly 50 years ago and as recently as

20  2016, the United States Supreme Court has

21  affirmed that women have a constitutional

22  right to abortion.  The bill bans abortion

23  long before the point of viability.

24      Regardless of what the State of

25  Georgia prints in law, whether a fetus is



Page 86

1    viable is a medical determination and

2    occurs much later in pregnancy.

3         This bill violates the constitution

4    and will serve as an outright ban on

5    abortion for most women in Georgia as more

6    than 80 counties do not have an

7    obstetrician and will prohibit healthcare

8    providers from providing ethical, necessary

9    care to their patients.

10        Safe, legal abortion is a necessary

11   component of women's healthcare.  Many

12   factors might influence and necessitate a

13   woman's decision to have an abortion

14   including contraceptive failure, barriers

15   to contraceptive use and access, fetal

16   anomalies, illnesses during pregnancy and

17   more.

18        Women often are unaware they are

19   pregnant prior to six weeks and surgical

20   abortion before six weeks may be difficult

21   or impossible due to limitations of

22   ultrasound imaging so early in pregnancy.

23        Decreasing women's access to abortion

24   will likely increase negative health

25   outcomes and complications including



Page 87

1    maternal and infant mortality.  Georgia

2    already has the worst maternal mortality

3    rate in the nation and the State has

4    invested funds to reverse -- reversing that

5    disturbing trend.

6        The legislation proposed -- this

7    legislation proposed to turn back the clock

8    to the time before Roe v Wade, a time when

9    women seeking to terminate a pregnancy were

10   forced to resort to self-induced abortions

11   which often resulted in serious

12   complications and death.

13       Like all medical matters, decisions

14   regarding abortion should be made by

15   patients in consultation with their

16   healthcare providers and without due

17   interference by outside parties.

18       Like all patients, women obtaining

19   abortions are entitled to privacy, dignity,

20   respect and support.

21       Just a little bit more, Madam Chair.

22       Many factors influence or necessitate

23   a woman's decision to have an abortion.

24   They include but are not limited to

25   contraceptive failure, barriers to



```
 1   contraceptive use and access, rape, incest,

 2   intimate partner violence, fetal anomalies,

 3   illness during pregnancy and exposure to

 4   teratogenic medications.

 5        This bill indefensibly jeopardizes

 6   patient's health by requiring patients to

 7   wait and see if a condition deteriorates

 8   before permitting medically indicated

 9   treatment.  Physicians cannot always

10   predict what course medical conditions or

11   complications will take or how quickly they

12   may lead to health problems, severe injury

13   or even death.

14        This bill could place doctors in the

15   untenable position of denying needed

16   services to women whose pregnancies

17   threaten their health.

18        In summary, House Bill 481 is a bad

19   public policy.  Bills such as these have

20   already been deemed unconstitutional.  But

21   more importantly, this bill will increase

22   suffering of women who are being forced to

23   carry a pregnancy to full term.  A

24   pregnancy she may not want through no fault

25   of her own simply because she lives in one
```



1  of Georgia's 80 counties that does not have

2  an obstetrician.

3      Instead of talking about ways to

4  force women to remain pregnant, we should

5  be talking about ways to improve access to

6  healthcare and reducing maternal mortality,

7  which is a conversation the state most

8  desperately needs.

9      Thank you for the opportunity to

10 speak today, Madam Chair.  I'm happy to

11 answer any questions the committee might

12 have.

13     MADAM CHAIR:  Unless somebody has a

14 pressing question which doesn't go against

15 the time.  Okay.

16     Representative Beverly.

17     REPRESENTATIVE BEVERLY:  Just for a

18 point of clarification, questions will not

19 be counted against us --

20     MADAM CHAIR:  No, sir.  They won't.

21     REPRESENTATIVE BEVERLY:  And could

22 you after each speaker let us know what the

23 balance of our time is if you don't mind so

24 that we would have a better understanding

25 of which way to go?



Page 90

```
 1          MADAM CHAIR:  Okay.  You have 22

 2    minutes left.

 3          REPRESENTATIVE BEVERLY:  Thank you.

 4          MADAM CHAIR:  All right.  On the

 5    other side, do you -- okay.

 6          Can you identify who you are --

 7          REPRESENTATIVE SETZLER:  Madam Chair,

 8    I'd like to recognize Dr. Kathy Aultman.

 9          Dr. Aultman, would you want to

10    present from here or --

11          MADAM CHAIR:  Thank you, Doctor.  For

12    representing the OBGYNs.

13          DR. AULTMAN:  Chairman Cooper and

14    committee members, thank you for inviting

15    me to participate in this hearing today in

16    favor of HB 481.

17          Thirty years ago, I would have agreed

18    with my colleague.  My name is Dr. Kathy

19    Aultman and I'm speaking on behalf of the

20    Charlotte Mosier Institute as to the

21    medical facts that were presented in this

22    bill.  The rest of my testimony is based on

23    my experience as an abortionist and an

24    OBGYN doctor as well as my own personal

25    experience.
```



1          I've also written a -- I have a

2    written testimony which I would like to

3    submit with documentation.

4          I'm a retired Board-certified OBGYN

5    and Fellow of ACOG with over 35 years

6    experience.  I've been an advocate for

7    women and their health issues for my entire

8    career.  I was co-founder and co-director

9    of the First Rate Treatment Center in

10   Jacksonville, Florida and performed sexual

11   assault exams on women and children as a

12   medical examiner.

13         I served as the Medical Director for

14   Planned Parenthood of Jacksonville, on the

15   Ethics Commission of the Christian Medical

16   and Dental Associations, and on the Board

17   of Community Health Outreach which provides

18   free medical care and food to the poor.

19         I've testified extensively at the

20   state and federal level on a variety of

21   pro-life issues including the heartbeat

22   bills in Iowa and Ohio and before the U.S.

23   House Sub-Committee on the Heartbeat Bill.

24         I've performed first trimester and

25   second trimester abortions and treated the



Page 92

```
 1   complications of abortions.  I've taken

 2   care of women and their babies throughout

 3   normal and abnormal pregnancies and treated

 4   the complications.  I have had an abortion

 5   and two vaginal births.

 6        When I entered medical school, I

 7   believed that the availability of abortion

 8   on demand was solely an issue of women's

 9   rights.  I felt no more compassion for the

10   fetus than I did for the chick embryos I

11   dissected in college.  I continued to do

12   abortions without reservation even while

13   pregnant.

14        But after my delivery, I made the

15   connection between fetus and baby.  The

16   fact that the baby was unwanted was no

17   longer enough justification for me to kill

18   it.  Although I could no longer do

19   abortions; however, I continued to believe

20   that abortion was a woman's right.

21        My views changed during my practice

22   as I saw young women who did amazingly well

23   after deciding to keep their unplanned

24   pregnancies in contrast to those were

25   struggling with the emotional and physical
```



Page 93

1    complications of abortion.  That wasn't

2    consistent with the feminist rhetoric I had

3    embraced.

4         My opinion also changed as I watched

5    children grow up in my church who were

6    almost aborted, including one with Down

7    Syndrome.  I realized that those precious

8    little people wouldn't be here if their

9    mothers had aborted them.

10        Abortion is damaging to women.  The

11   physical and psychological risks of

12   abortion are well-documented but are

13   woefully under-reported.  A woman cannot

14   remain unscathed after killing her child.

15   At some point, usually after childbirth or

16   the inability to get pregnant, the

17   realization of what she did hits her.

18        It wasn't until after I had my first

19   child that I regretted my own abortion.  I

20   wish there had been a heartbeat bill back

21   then or that it had not been so terribly

22   easy to get an abortion.

23        We have convinced our young women

24   that an unplanned pregnancy is the worst

25   thing that can happen to them and that



1   their right to reproductive freedom is more

2   important than their baby's right to live.

3   Because we can't see who they will become,

4   we feel justified in sacrificing the lives

5   of babies in the womb for the convenience

6   of those that we can see.

7         I support this bill because it uses

8   the heartbeat, the best indicator of the

9   viability of a pregnancy and a very

10  concrete sign of life that people can

11  identify with to determine when the fetus

12  should be protected rather than the

13  viability of the fetus outside the womb,

14  which is dependent upon the technology

15  available and the willingness of medical

16  personnel to treat.

17        Although it's rarely necessary to

18  abort a baby to save the mother or to

19  protect her health, there is a safeguard in

20  this bill to protect the life of the mother

21  and to prevent a serious risk of

22  substantial and irreversible impairment of

23  a major bodily function.

24        Scientists understand that a human

25  life begins at conception and that



1   development doesn't stop at birth.  The

2   cardiovascular system is the first organ

3   system to reach a functional state.  The

4   heart begins to beat at three weeks and one

5   to two days post-fertilization.  Blood

6   flows begin in the fourth week

7   post-fertilization or the sixth week of

8   gestation.  And the heartbeat can be

9   detected on vaginal ultrasonography.

10          Transvaginal ultrasound can detect

11  the heartbeat between six to seven weeks

12  gestation as opposed to seven to eight

13  weeks by transabdominal ultrasound.  The

14  small hand-held Doppler that providers use

15  in their offices is the least sensitive and

16  although it can sometimes pick up the

17  heartbeat at eight to nine weeks gestation,

18  it may not be detected until 12 weeks

19  gestation.

20          If present, the heartbeat is the best

21  indicator of a viable pregnancy.  Once a

22  heartbeat is identified, there's a very

23  strong likelihood that the pregnancy is

24  viable and will continue to term.

25          I want to thank those of you who have



Page 96

1    supported this bill for your vital efforts

2    to protect those who have no voice and

3    cannot protect themselves.

4         Thank you.

5         MADAM CHAIR:  Thank you very much for

6    your time.

7         You're going to need to cut it to

8    about three minutes because I left somebody

9    -- I had a wrong sign.  I've got to get to

10   somebody else before your 30 minutes is up.

11        Go.  Who is going next?

12        MS. KAUSCHE:  Thank you, Madam Chair.

13   My name is Angelika Kausche, Representative

14   for House Bill 650 and I'm yielding my time

15   to Dr. Melissa Kottke.

16        MADAM CHAIR:  Okay.

17        DR. KOTTKE:  Good afternoon, Madam

18   Chair and members of the committee.

19        My name is Dr. Melissa Kottke and I'm

20   a member of the Advisory Board of the

21   Georgia OBGYN Society, the state medical

22   association for OBGYN physicians.

23        I'm an assistant professor in the

24   OBGYN Department in the Emory School of

25   Medicine and have been practicing



Page 97

1    obstetrics and gynecology here in Georgia

2    at Emory and at Grady for 13 years.

3         I'm here today to speak as a member

4    of the Georgia OBGYN Society, as a member

5    of the American College of Obstetricians

6    and Gynecologists in strong opposition to

7    House Bill 481.

8         The members of the OBGYN Society,

9    ACOG and myself have dedicated our careers

10   and our lives to secure healthy futures for

11   our patients and their families by

12   providing high quality evidence-based

13   healthcare.

14        The Georgia OBGYN Society and leading

15   national medical organizations like ACOG

16   and others support the availability of

17   safe, high quality reproductive health

18   services for all women and is committed to

19   protecting safe, legal access to abortion

20   as a necessary component to women's

21   healthcare.

22        House Bill 481 is bad policy for

23   Georgia's women and Georgia OBGYN

24   physicians for several reasons.

25        First and fundamentally, House Bill



1    481 is built on a foundation of false and

2    misleading statements and scientific

3    inaccuracies.  For these reasons alone, it

4    should not be considered.

5         Representative Setzler, I appreciate

6    and agree with your assertion that -- I

7    believe you said we should trust our

8    doctors.  This bill does exactly the

9    opposite.  House Bill 481 takes medical

10   decisions out of the hands of my patients

11   and me and instead puts medical decisions

12   into the hands of politicians.

13        Not only does this compromise the

14   integrity of the patient-physician

15   relationship.  It is extremely dangerous

16   for lawmakers to presume that they are

17   better equipped than women and their

18   healthcare provider to judge what's

19   appropriate medical care.  Or as this bill

20   does, proposes to create a new medical

21   definition.

22        Next, House Bill 481 would lead to

23   worse healthcare for women in Georgia.  In

24   the everyday care of patients, I see time

25   and time again that the real world context



1    and the real life medical situations of my

2    patients are complex and are nuanced.

3    There are enumerable situations that happen

4    in real life that are not reflected in

5    House Bill 481.

6          For example, our team recently had a

7    female patient, a mother of three, who was

8    diagnosed with breast cancer early in her

9    pregnancy.  Breast cancer is one of the

10   more common cancers diagnosed during

11   pregnancy and these tumors grow actually in

12   response to the hormones of pregnancy.

13         It's difficult to call this an

14   emergency and completely unethical not to

15   offer her an abortion if she would like to

16   focus on treating her disease and giving

17   her the best chance at long-term survival.

18         Indeed, there are many medical

19   conditions that put a woman at increased

20   risk for adverse health outcomes during

21   pregnancy.  These conditions may not

22   present impending death for the woman, but

23   they can undoubtedly cause her harm.

24         House Bill 481 indefensibly

25   jeopardizes patients' health by requiring



 1   physicians to wait and see if a condition

 2   deteriorates.  You know, we don't have a

 3   crystal ball and I can't tell you if one

 4   mother is going to get sick or at the speed

 5   at which she's going to get sick.  Things

 6   can change very, very quickly in the world

 7   of OBGYN.  That's the reality of working in

 8   this field.

 9        This bill would place doctors in the

10   very difficult position of denying services

11   to women who need them during pregnancies

12   if the pregnancies threaten their health.

13        They would feel the need to wait for

14   a higher blood pressure.  Wait for a higher

15   fever.  Really got to justify this one.

16   Bleed a little bit more is what we're

17   asking physicians to do.

18        Imagine this was happening to your

19   mother or your wife and I, as your

20   physician, came out to greet you in the

21   waiting area of the hospital and said, you

22   know what, I'm really, really worried about

23   her and it's my medical opinion that this

24   pregnancy is causing what we're seeing.

25   And I'm sorry, she's just not sick enough



1    yet and I can't do anything for you.

2          Next, we have seen time and time

3    again that where abortion is illegal or

4    highly restricted, women resort to unsafe

5    means to end unwanted pregnancies.  This

6    can include things like self-inflicted

7    abdominal and bodily trauma, ingestion of

8    dangerous chemicals, self-medication with a

9    variety of drugs, and reliance on

10   unqualified abortion providers.

11         In comparison, legal abortion is

12   incredibly safe.  States that have more

13   strict abortion restrictions have worse

14   maternal and child health indicators.  And

15   this disproportionately affects people who

16   are poor and women of color.

17         Finally, House Bill 481 unduly

18   punishes women's health physicians for

19   providing critical care.  This bill would

20   criminalize me for being an OBGYN.

21   Criminalize me for providing evidence-based

22   high quality medical care.  In addition to

23   finding that personally and professionally

24   unacceptable, I believe this will have a

25   devastating impact on the state's already



1    inadequate physician work force.

2          Currently there are 80 counties in

3    Georgia without an obstetrician.  That's

4    over half, over half.  And we have one of

5    the worse maternal mortality rates in the

6    country.  I do not believe that those two

7    things happening are a coincidence.

8          Bills like House Bill 481 act as a

9    deterrent for OBGYNs to practice in the

10   State of Georgia and the dearth of

11   obstetrical services will worsen.

12         Who would want to come to this state

13   in a practice that is hostile to the actual

14   practice of medicine?  Who would want to

15   come to Georgia where you might get put in

16   jail for doing your job?  House Bill 481

17   will worsen our provider shortage.  It will

18   worsen access to obstetrical care and no

19   doubt will worsen our maternal mortality

20   and morbidity rates along with it.

21         We can't allow this.  The Georgia

22   OBGYN Society urges the committee to vote

23   no on House Bill 481.

24         MADAM CHAIR:  Thank you very much.

25         You have 16 minutes left.



1        Do you have somebody you want to

2    choose since I have this overwhelming

3    number of people?

4        Okay.  If you will identify yourself

5    and if you're with an association or

6    whatever.

7        They can present from the place

8    there.

9        MS. GUY:  Thank you distinguished

10   members.  I was not planning on crying, of

11   course; but it's hard.

12       I cannot thank you enough for being

13   here and for the hard work that you each

14   put in --

15       MADAM CHAIR:  And you are?

16       MS. RACHEL GUY:  Rachel Guy.  Sorry.

17       MADAM CHAIR:  And you're just

18   testifying for yourself?

19       Okay, Rachel.  We're not going to

20   jump over here and make it hard for you.

21   Just be calm and it's okay.  Thank you.

22       MS. GUY:  But thank you all.  I know

23   that each of you have taken time out of

24   your day.  I know that this is a, quote,

25   loaded subject and I cannot thank you



1    enough for hearing this.

2          I wanted to ask that you would use

3    the power that the Lord has given you and

4    entrusted to you to save babies like

5    myself.  You see, over 20 years ago, three

6    doctors told my parents to abort me.  They

7    said I was incompatible with life.  They

8    said I would not live long.  They said if I

9    did live, I would have no quality of life.

10   I would be blind, I would be deaf, I would

11   have mental struggles.

12         My parents said our child has value

13   regardless of if our child is blind, is

14   deaf, has mental struggles.

15         No parent reqrets choosing life and I

16   think about all the families.  There were

17   three specific doctors who told my parents

18   you need to abort.  One doctor said the

19   only test we will offer you is an autopsy.

20   All three of them washed their hands of my

21   life.

22         And I'm asking you, not only on

23   behalf of hearing my story but on the

24   behalf of countless children who their only

25   crime, their only crime is that they're



1    sick and they're in utero.  And I ask that

2    we fight for these children.  These

3    children deserve rights.  These children

4    are patients.  These children are patients

5    of doctors and these precious children

6    deserve the right to life.

7         I think about precious children who

8    have disabilities who are outside the womb

9    and doctors fight, fight the good fight.

10   They care for these precious children

11   because they are their patients.

12        But when they are inside the womb,

13   there is somehow this justification to

14   preemptively take their life and to

15   eugenically target them to believe that

16   somehow they're not valuable based on their

17   disability.  When, in fact, when they're

18   outside the womb, we cheer them on for the

19   ability that they have despite the

20   disability.

21        And I ask that we see the ability

22   that these precious children have inside of

23   the womb and we do not discriminate against

24   them based on our disability.

25        Thank you.



1       MADAM CHAIR:  Thank you for coming to

2   testify.

3       You have 22 minutes left.

4       Thank you very much for coming and

5   testifying.

6       Okay.  Next?

7       REPRESENTATIVE CANNON:  My name is

8   Park Cannon and I am proud to represent the

9   district including Grady Hospital and this

10  capital.

11      I am disheartened that this committee

12  time and agenda has been covert.  The

13  sponsor has been sticking to talking points

14  and has not addressed the true dangers of

15  this bill and has evaded very specific

16  questions.

17      I stand here today confident in my

18  decision to terminate my pregnancy when I

19  was sexually assaulted in 2010.  As a

20  member of the LGBTQ community, there are

21  many people who believe they can "rape us

22  straight".  I do not deserve to live in a

23  world where people believe I deserve to

24  feel pain because of my sexual orientation.

25      Many of you know I now help women in



1   English, Espanol and Puertogese who are

2   determining this decision.  Today I bring

3   to you my concerns with this bill.  I have

4   amendments I have given to members on the

5   committee.  I'm happy to share them with

6   anyone.  I have reached out to every

7   sponsor on this bill to speak with them

8   about my concerns.

9        Including fetuses of six weeks in the

10  census is impossible as this bill calls.

11  Women make up 52 percent of the state

12  population so even if half of those women

13  were pregnant, there would be a major new

14  set of numbers for us to calculate.  There

15  is no way for us to do this.  It is a

16  flawed idea.  It begs that women who are

17  pregnant can ride in the HOV lane and it

18  asks if we use life insurance to do this.

19        Opening physician records to law

20  enforcement is not only terrifying, but

21  there is nowhere else in the code where

22  this exists.  I want to make it clear that

23  heartbeat is not the indication of

24  viability by reading testimony from a

25  constituent who couldn't be here today.



1          My first son, we have a perfectly

2     wonderful ultrasound photos showing a nice

3     healthy heart beating fetus that we used to

4     share the news with everyone.  At the time

5     even during gestation, any brain matter he

6     grew just floated out there with the top

7     part of the skull not holding onto it.  As

8     it was floating, the amniotic fluid burned

9     away at it.

10          At that time, the law of termination

11     was set at 24 weeks in Georgia and now

12     we're at 20 weeks.

13          I yield the rest of my time to Dr.

14     Roche, a doctor from Emory.

15          DR. ROCHE:  Good afternoon.  I

16     appreciate the opportunity to speak.  I've

17     devoted most of the 50 years of my

18     professional life to preventing maternal

19     deaths from abortion in Georgia, United

20     States and internationally.

21          Internationally, 56 million women a

22     year get an abortion.  46,000 die.

23          The situation in Georgia.  In 1969

24     when I was first assigned by CDC to the

25     State Health Department was to evaluate



1  Georgia's law decriminalizing abortion

2  which occurred April 1, 1968.

3       I reviewed the death certificates for

4  the previous 20 years and noticed that most

5  of the deaths were older rural

6  African-American women.  Those who had been

7  getting safe abortions during the short

8  time period that this restrictive law was

9  in place were younger, white Atlanta women.

10      Margie Pitts Hames, an Atlanta

11  attorney, used that evidence of inequity as

12  part of her argument to take -- to sue the

13  State of Georgia and take it to the Supreme

14  Court which ended up being Doe v Bolton

15  decision.  And I wish that were the end of

16  maternal deaths from abortion in Georgia.

17      12 years later, I was again working

18  in the State of Georgia and I was asked to

19  investigate the death of a young woman,

20  third year of college, African-American,

21  who had been -- made an appointment to

22  terminate her pregnancy, been to the

23  facility, was deterred by protestors.  Went

24  back to her residence, undid a coat hanger

25  and inserted it into her cervix and uterus,



1    perforated her uterus and subsequently

2    died.

3         I saw the track marks at the Fulton

4    County Medical Examiner's office and I read

5    her medical report, her social history and

6    why she hadn't informed her parents.

7         I think restrictive bills, however

8    they're formulated, are particularly

9    disadvantageous to minority populations and

10   particularly to African-Americans based on

11   this evidence.

12        Thank you.

13        MADAM CHAIR:  You have 12 minutes

14   left.

15        Who would you like to go?

16        Okay.  Ms. Nicely?

17        MS. NICELY:  Yes.

18        MADAM CHAIR:  Okay.  If you'd tell me

19   what you do or --

20        MS. NICELY:  Yes.  Daphne Nicely.

21   I'm the Executive Director of Atlanta

22   Morning Center and I'm not here taking a

23   position on the legislation but to provide

24   information regarding my observations and

25   experience.



1      I'm previously the executive director

2  of a pregnancy center.  Pregnancy centers

3  offer viable service in the community,

4  providing limited medical services as well

5  as material assistance and educational

6  assistance for mothers as well.

7      What Atlanta Morning Center does is

8  not a pregnancy center.  It actually

9  answers some of the questions that our

10  esteemed committee members have asked

11  today.  But we provide prenatal through

12  post-partum care and under-served

13  communities to underprivileged women, those

14  that are socio-economically depressed,

15  impoverished, medically indigent or do not

16  have insurance, we provide the medical

17  services at no charge.

18      Not only do we provide our medical

19  services at no charge, but we do not accept

20  government funding; nor, in fact, even

21  apply for it.  When I was the executive

22  director of Atlanta Pregnancy Resource

23  Center, we did not take advantage of the

24  opportunity to accept the Georgia

25  Alternatives to Parenting and pregnancy



Page 112

1  grant and we do not intend to do that now.

2       So this is a way that is fiscally

3  responsible.  We provide these services

4  with funding through individuals and

5  churches and other organizations.  We

6  partner with the community to offer

7  additional services, fatherhood program,

8  abortion recovery services, parenting

9  classes, couples classes and other things

10  that are available.

11       The maternal mortality rate in

12  Georgia isn't one of the worst.  It is the

13  worst in the nation.  As a matter of fact,

14  the United States is third of all developed

15  nations in the world.  We're doing an

16  atrocious job when it comes to the health

17  of our pregnant women.  But it doesn't end

18  there.

19       We're 41st for Low Risk C-Sections.

20  42nd for premature births.  42nd for

21  prenatal care started before the third

22  trimester.  45th for low birth weight

23  babies.  46th for infant mortality as well

24  as neonatal mortality.  48th for uninsured

25  women.  And last in maternal mortality and



1   that's only with Rhode Island and Alaska

2   not reporting.

3        As Executive Director of Atlanta

4   Morning Center, it's our desire to have a

5   positive and life-affirming impact on

6   maternal, fetal and pregnancy health,

7   childbirth and throughout the post-partum

8   period.

9        I would like to also add that I have

10  chaperoned or witnessed hundreds if not

11  thousands of ultrasounds professionally as

12  well as my own.  I've had 12 pregnancies,

13  11 of those miscarried.  But not once have

14  I been able to determine how or the manner

15  of conception of the child.

16       Thank you for your time and your

17  service.  And if anyone has any questions,

18  I'd be happy to answer them.

19       MADAM CHAIR:  Representative

20  Mitchell.

21       REPRESENTATIVE MITCHELL:  That raises

22  a very interesting point of not being able

23  to determine how conception starts.  This

24  bill contemplates a political exception for

25  rape and/or incest.



1          I would wonder how in the world would

2    you be able to determine that the pregnancy

3    came about as a rape or incest.  Even

4    proving that in this day and age, as you

5    know, is difficult as well as most rapes go

6    under-reported.  And I'm sure having a

7    pregnancy as a result of family members

8    probably is equally as unreported if not

9    more so.

10         And I was wondering how would you be

11   able to determine that?

12         Representative Setzler:  If the

13   gentleman wants to help us pass a bill that

14   does not have that exception that can

15   protect all life, I would join you in that.

16         That's certainly my policy.  I think

17   the concern is how do we protect many.  I

18   think Ms. Nicely would agree, we need to

19   protect all.  The idea of having exceptions

20   is not really the prototype or the ideal.

21         REPRESENTATIVE MITCHELL:  I'd love

22   it, too.  I think Representative Beverly

23   made a suggestion earlier that we table the

24   bill and so we can sit down and work out

25   those differences.  I'd love to do that, to



1    be honest with you.

2        Representative Setzler:  But I'd like

3    Ms. Nicely to speak to your question about

4    the value of a life.

5        MS. NICELY:  Yes, I believe that all

6    life is precious and would hope that it

7    would not have any exceptions.

8        MADAM CHAIR:  Sorry.  Did I miss a

9    question?

10       Okay.  You have 19 and a half left on

11   your minutes.  Sorry.

12       All right.  Next?

13       REPRESENTATIVE SHANNON:  I'm

14   Representative Shannon and I appreciate the

15   doctor sharing her abortion story and now

16   I'll share mine.

17       I had an abortion almost 20 years

18   ago.  I did not regret the decision then

19   and I do not regret it today.

20       We can talk about the -- we can talk

21   about our differences and values about

22   whether or not you think a woman should

23   have the right to choose.  But if the

24   sponsor has done any research on this bill,

25   he knows that in other states where they've



1  passed restrictive abortion bans, it has

2  always resulted in a pitting of the doctor

3  -- a pitting between the doctor and the

4  patient, which has resulted in doctors

5  having to turn in their patients.  And,

6  therefore, you see patients lie about --

7  lie about their health needs and what has

8  gone on with their healthcare.

9       And we have even seen women in

10 Georgia criminalized and taken to jail

11 because they attempted pregnancies in areas

12 where they did not have access to OBGYNs

13 and so we've already seen those issues.

14      We can all agree that we have a

15 shortage of specialists.  We all know that.

16 We do agree on those points.  We would not

17 want to pass a bill like this which would

18 have the unintended consequences of driving

19 more doctors out of the state.

20      I yield the rest of my time to Dr.

21 Krystal Redmond.

22      DR. REDMOND:  Good afternoon.  Thank

23 you for allowing me to speak.

24      Thank you, Representative Shannon.

25      Again, my name is Dr. Krystal



Page 117

1    Redmond.  I'm a public health physician in

2    the State of Georgia.  I'm here on behalf

3    of Spark Reproductive Justice Now.  We're a

4    reproductive justice organization in

5    Georgia as well as on behalf of the

6    Reproductive Health Rights and Justice

7    Coalition in Georgia.

8         In considering Georgia's extreme

9    inferior and detrimental health crises,

10   especially amongst black women and queer

11   and trans folks, we should be here to

12   discuss proactive ways of advancing our

13   healthcare systems, practices and outcomes.

14   Rather our fellow legislators are playing

15   politics with our wombs in Georgia.

16        We are here to discuss inserting

17   government in our family's personal and

18   private life decisions.

19        I am sure that this Health and

20   Service -- excuse me -- Health and Human

21   Service Committee is aware of Georgia's

22   current status of our health report cards.

23   However, let me go over a few statistics so

24   I can make sure we're all on the same page.

25        First and foremost and most



Page 118

1    importantly, we have not expanded Medicaid

2    and our rural hospitals are closing at a

3    rapid rate, which typically the first

4    service to go is our labor and delivery

5    ward.  We have biomedical inequities and

6    limited to zero access to comprehensive

7    healthcare for marginalized groups in the

8    State of Georgia.

9         The CDC has issued a pandemic warning

10   due to our astronomical HIV rates and it's

11   compatible rates to Third World countries

12   as some of my colleagues have stated.

13        We are in a maternal health crisis,

14   specifically for black women who are three

15   to four times more likely to die due to

16   pregnancy-related issues than white women.

17        Again, as our colleagues have said,

18   we are fifth -- 50th -- excuse me -- in the

19   nation -- in our country in negative black

20   maternal health outcomes and 48th for women

21   overall.

22        Our current healthcare laws are

23   outdated and are not supported by

24   evidence-based medical knowledge and modern

25   science such as our HIV criminalization



Page 119

1    laws and we have no uniform comprehensive

2    sexual education program in the State of

3    Georgia.

4         I can continue on with this list and

5    lay out our healthcare landscape, but we're

6    here for specifically House Bill 481.

7    Georgians deserve policies and systems and

8    structural barriers to adequate

9    reproductive and comprehensive care and

10   provide universal and meaningful access to

11   quality healthcare.

12        And as a public health doctor and

13   former director of our family planning

14   division for the Georgia Department of

15   Public Health, I would love more than

16   anything to be standing here today to

17   discuss how we can strategically work to

18   inform and improve all of the factors I

19   just mentioned.  But instead we are here to

20   discuss this bill that is designated to

21   attack and hurt Georgians and worsen our

22   healthcare outcomes.

23        So, again, let's talk about it.  This

24   blatantly unconstitutional bill is an

25   attempt to ban Georgians from having the



1  ability to receive abortion care, even

2  banning abortions in the very early stages

3  of pregnancy as early as six weeks and

4  before many people know they are even

5  pregnant.

6       This bill is cruel, misinformed and

7  dangerous.  Georgians are tired of our

8  government politicizing very personal and

9  private decisions that should be made by

10 individuals in consultation with their

11 physicians and their families.

12 Additionally, providers who, like myself,

13 also vote and are tired of legislators

14 interfering with our provider-patient

15 relationship which, in effect, hinders our

16 quality of care we can administer.

17      Besides the bill not only

18 criminalizing abortion before most people

19 know they are pregnant, there are other

20 alarming factors such as there is no

21 exception with the amendments here to rape,

22 incest or medical anomalies.  So if you can

23 detect a fetal heartbeat but there is still

24 another anomaly which makes the fetus

25 incompatible with life, the patient will



1    still be forced to carry to term and endure

2    mental anguish as well as to be put at risk

3    for sepsis and infections.

4        This bill does not consider if the

5    patient has been diagnosed with a terminal

6    or chronic medical condition.  It also does

7    not consider the differentiation between a

8    medical and surgical abortion and a

9    spontaneous abortion, also known as

10   miscarriage.  So in the event a person who

11   was to experience a miscarriage and was in

12   need of medical intervention, that provider

13   is now at risk of criminalizing --

14   criminalization -- excuse me -- and

15   prosecution just for providing needed care.

16       Or the patient would be at risk of

17   infection and sepsis again because the

18   miscarriage is incomplete and tissue from

19   the pregnancy still remains in the uterus.

20       This bill creates concern in the

21   medical community around potential

22   prosecution solely for doing our job and as

23   a result will push OBGYNs and other medical

24   professionals outside of Georgia as some of

25   my colleagues have stated.  And, as I



 1    mentioned in my opening statement, we

 2    cannot afford any additional negative hits

 3    on our healthcare outcomes based on lack of

 4    providers in our state.

 5         This bill will require pregnancies to

 6    be counted in state populations as well as

 7    state income tax purposes.  So my question

 8    to this committee is:  Who will be

 9    providing the State of Georgia with each

10    patient's medical records and will this

11    affect any type of HIPAA violations.

12         Last, medically performing an

13    abortion at or before six weeks puts our

14    patients at risk of complications and is

15    perilous to perform at that point as the

16    embryo is difficult to detect on the

17    ultrasound which makes it difficult to

18    detect the person is pregnant as well as

19    obtaining confirmation that the pregnancy

20    was successfully terminated.

21         This is exactly the reason why

22    legislators who do not have medical

23    backgrounds should not be making decisions

24    on policies around medical practices as

25    evidence-based best medical practices not



Page 123

1    being considered in these policies.

2         Lastly, we know that this is

3    unconstitutional under current Supreme

4    Court precedent which this bill is

5    specifically challenging.  Why should

6    Georgians pay to implement and defend a

7    clearly unconstitutional attack on our

8    bodies and our pocketbooks?  The decision

9    about whether and when to start or grow our

10   families should only be made when the

11   person is in consultation with family and

12   provider.

13        When people can make decisions that

14   are best for their lives, families thrive

15   and we build communities where each of us

16   can participate with dignity and equity.

17   Bodily autonomy is a human right and a

18   tenet of reproductive justice.  The

19   government should not interfere in these

20   personal decisions.  It's time lawmakers

21   that call themselves, quote, unquote,

22   pro-life, spend their energy focusing on

23   the very real problems Georgians face such

24   as, like my colleague said, 79 to 80

25   counties that have no OBGYN and our



1   maternal mortality rates which no one --

2   which are the worst in our nation.

3       And, again and lastly, the author of

4   this bill has said trust doctors and

5   doctors are saying no to this bill.

6       Thank you.  And I'll accept any

7   questions.

8       MADAM CHAIR:  Questions?  They have

9   five minutes left.

10      Wait, we've got a question.

11      REPRESENTATIVE SCHOFIELD:  Well, just

12  to your point.  I found out that the ACLU

13  would -- that rape and incest provisions

14  would likely require a court order.  Can

15  you tell me if you're aware of that?

16      REPRESENTATIVE SETZLER:  Do you need

17  more detail?

18      REPRESENTATIVE SCHOFIELD:  Well,

19  obviously we don't know if the embryo at

20  conception is at a certain point and if

21  there's a rape and an incest, how do we

22  prove and wouldn't that require that there

23  would be a court order mandated for us to

24  even prove that?

25      REPRESENTATIVE SETZLER:  In the



1    statute, we require that.  In the statute

2    if you read the bill and I can point you --

3         REPRESENTATIVE SCHOFIELD:  Oh, I read

4    the bill.

5         REPRESENTATIVE SETZLER:  -- let me

6    point you to page six of the bill.

7         And once again, if the ladies would

8    look, the result of rape or incest which an

9    official police report has been filed

10   alleging the offense of rape or incest.

11        So I feel like this gives a very

12   broad berth.  If the lady would prefer a

13   court order, then we could entertain your

14   amendment to do that.  I think from my

15   vantage point, I think it's probably more

16   accommodating to someone if they file a

17   police report which is an official

18   statement, then they would be cleared to

19   follow through this.

20        I agree inserting a court order in

21   there is a policy question.  If the lady

22   thinks that's to her likings, then I would

23   entertain that debate.

24        REPRESENTATIVE SCHOFIELD:  But to my

25   colleague's point that rapes are not even



Page 126

1    ever reported, so...

2         REPRESENTATIVE SETZLER:  I think the

3    goal here is that if there is a police

4    report filed, the threshold would be

5    satisfied.

6         REPRESENTATIVE DRENNER:  Thank you,

7    Madam Chair.

8         Chairman Setzler, I have also been

9    looking at lines 163 through 166 that my

10   colleague just brought up, and it strikes

11   me that the Me Too Movement began in 2017.

12   So you had a lot of women that perhaps had

13   been raped -- we've not heard about incest

14   yet -- waited a long period of time to come

15   forward.

16        I'm disturbed by this official police

17   report.  When you -- how do you address

18   that in your line of thinking?  What

19   factors do you think forces a woman to see

20   an abortion?

21        REPRESENTATIVE SETZLER:  Well, those

22   are maybe different questions.  Do you want

23   me to answer what leads a woman to seek an

24   abortion or do you want to speak to the

25   police report question?



Page 127

1          REPRESENTATIVE DRENNER:  Both, if you
2     don't mind.
3          REPRESENTATIVE SETZLER:  Okay.  Let
4     me say first of all, all children in the
5     womb are human beings.  They are worthy of
6     protection.  And we talk about the issue
7     that was raised -- to address your point.
8     The issue was raised about this bill being
9     a cruel bill.
10          Every child that's aborted is either
11     chemically aborted or they're pulled apart
12     piece by piece from inside their mother.
13     In fact, the medical practice requires that
14     when children are aborted and pulled apart,
15     whether it's through suction or through
16     instruments, the doctor has to reassemble
17     all their body parts to make sure all the
18     parts have been assembled outside to make
19     sure everything has been evacuated from the
20     womb.
21          That's what is happening to every
22     single child.  30,000 children a year,
23     that's happening to.  That is the most
24     brutal cruelty of anything that happens
25     legally in this state under us as the



1   General Assembly.

2          So to your point, I'm sensitive to --

3   I'm very sensitive to women who are in

4   crisis circumstances.  Ms. Nicely talked

5   about that she dedicates her life to

6   supporting these women --

7          MADAM CHAIR:  Wait a minute.

8          Representative Setzler, if what you

9   described is the way it happens, I agree

10  with you that's cruel.  But it's not more

11  cruel than anything that's ever happening

12  to any of our children in our state.

13         We just had children starved, left in

14  a cage to where their arms would not go out

15  and then the families put them out like

16  this and striped them to a tube to try to

17  -- so that when the authorities couldn't do

18  it -- and starved to death and then buried

19  in a backyard.

20         So, you know, I would take exception

21  to that about the cruelty.  Okay?

22         REPRESENTATIVE SETZLER:  All of these

23  are horrible --

24         MADAM CHAIR:  Horrible stories.  But

25  horrible things are happening to Georgia



Page 129

1  children.  Okay.  Horrible things.  I'm

2  sorry.  I'm passionate about what's

3  happening.  Okay.

4       Are you through, Representative

5  Drenner?

6       REPRESENTATIVE SETZLER:  In answer to

7  your question very briefly, Madam Chair.

8  It's the difficulty of that circumstance

9  that you're outlining.  Members have come

10  to me and said because of the difficulty of

11  that circumstance, let's try to bring this

12  legislature together in a bipartisan way

13  and let's recognize that if we're going to

14  have a prohibition for abortion at a point

15  of fetal heartbeat -- members have come to

16  me and said, Representative Setzler, can we

17  give them to 20 weeks.  And I weigh the

18  value of these precious human lives which

19  we know are human and worthy of protection

20  and the sentiment among our body and in

21  weighing that out, I've tried to recognize

22  that in this amendment because of the

23  seriousness and the circumstances you're

24  talking about.

25       Right now, under this they would have



1    the same 20 weeks under this bill they have

2    today.  That would not change.  So women

3    who are raped today have 20 weeks to make

4    this decision.  That would not change under

5    this bill because of the circumstances you

6    raise.

7         MADAM CHAIR:  Two more questions.

8         Representative Mitchell.

9         REPRESENTATIVE MITCHELL:  Thank you,

10   Madam Chair.  I'll be very quick.  It just

11   illuminated a line 164 through 166.  Let me

12   just ask that the author, my good friend,

13   Chairman Setzler, to -- let me make sure I

14   understand this.

15        To take advantage of the political

16   exception, you have to allege that you've

17   either been raped or been impregnated by a

18   family member and file a police report.

19   And, therefore, you can take advantage of

20   the political exception.

21        Is that correct?

22        REPRESENTATIVE SETZLER:  Again, I

23   challenge the gentleman's premise.  It's

24   not a political exception.

25        And I don't think we can -- I don't



Page 131

1    want to accuse the gentleman -- I'm sure

2    you're not trivializing this.  We're not

3    creating a circumstance where people can

4    just go down there and make a false

5    statement.  We're -- this exists for women

6    who have been through the horror of a rape

7    and there's nothing -- that's not

8    trivialized and that's not -- we're not

9    giving them the ability to skip down there

10   and do anything trivial.  This is a very

11   serious circumstance.

12        We've provided a mechanism that in

13   filing an official police report, they can

14   have access to what I believe is a bad

15   decision.  But I'm trying to make this an

16   issue that we can come together in a

17   bipartisan way.

18        REPRESENTATIVE MITCHELL:  Right.  If

19   I may, Madam Chair, further.

20        You started out as proposing a bill

21   of how scientific it was.  I heard no

22   differentiation between the scientific

23   difference of a person being impregnated by

24   -- any different than being incest or --

25   so, therefore, in order to get more people



Page 132

1    to vote for the bill, political

2    considerations, we put this in, which I

3    think on its face makes it flawed.

4            REPRESENTATIVE SETZLER:  Again, to

5    your point.  If you can help lead this

6    General Assembly to a point where we

7    recognize all children, I'd have you join

8    me -- I'd love to have you join me in

9    leading that.  I think the question is in

10   the balance of things -- the question

11   Representative Drenner raised is what's

12   best --

13           REPRESENTATIVE MITCHELL:  I agree.

14           REPRESENTATIVE SETZLER:  -- in this

15   very imperfect world we live in.

16           REPRESENTATIVE MITCHELL:  Thank you,

17   Madam Chair.

18           MADAM CHAIR:  Representative Henson.

19   Short and sweet.

20           REPRESENTATIVE HENSON:

21   Representative Setzler, I'm very concerned

22   about forcing a woman to file a police

23   report against a relative or a boyfriend

24   where something, as someone earlier

25   testified, it could be someone you know



1    that got rough one night or something

2    happened and you end up pregnant.  A woman

3    ends up pregnant.  Not you, of course.

4         Because at that point, you start

5    investigations.  You know, we could

6    continue on with that.  But a police

7    report.

8         And, here's my other question with

9    the police report.  Filing it is one thing.

10   But at one point, a woman could say I was

11   raped.  But does the investigation have to

12   prove it in order for her to get an

13   abortion?  Do the police have to

14   investigate before she gets an abortion to

15   prove it really was a rape?  I mean, when

16   you're giving those as the only two

17   exceptions --

18        REPRESENTATIVE SETZLER:  Ma'am, I

19   don't know which side of the question

20   you're arguing on.  If you're arguing to

21   require a police investigation to be

22   completed before the woman has an abortion,

23   then let's debate -- is that what you're

24   suggesting?

25        REPRESENTATIVE HENSON:  Well, I'm



1    asking you if that's what is supposed to

2    happen.  I mean, you have no time frame in

3    this.  You're just saying, you know, a

4    police report must be filed.  And I'm

5    trying to find out at what point I file a

6    police report.

7         I get raped.  I file a police report.

8    Now, do I have to deal with the police and

9    everything else or can I go forward -- if I

10    find out --

11         REPRESENTATIVE SETZLER:  Yes, you

12    can.  Under this bill, you file the police

13    report, it's an official statement.  Then

14    you can go forward.  And then if you want

15    to raise the threshold, you want to make it

16    more -- if you want to put additional

17    police requirements to finish -- to

18    complete investigations, if you want to

19    pile that on, if you want to offer that as

20    an amendment, then this committee -- the

21    Chair would probably take -- what I sense

22    though in respect to the lady is you're

23    trying to -- you're trying to sharp shoot

24    this and create sort of an attack on it

25    without there being a substantive



1    recommendation.

2        The question is as we balance these

3    things out, I don't believe -- if we do

4    this, if there's a consensus in this body

5    to provide a woman between heartbeat and 20

6    weeks an opportunity to have an abortion if

7    she was raped, if you want to make it more

8    rigorous and have more things have to

9    happen, then you can offer that.

10       REPRESENTATIVE HENSON:  No, I just

11   was asking --

12       REPRESENTATIVE SETZLER:  I'm trying

13   to achieve a bipartisan consensus on this

14   in a way that we can all be very proud of.

15       REPRESENTATIVE HENSON:  You know, you

16   keep talking about bipartisan and I really

17   wish you'd stop using the expression

18   bipartisan because it might not be a

19   political bipartisan of

20   Republican-Democrat, but there is a real

21   partisan split between those who support

22   your position and those that are supportive

23   of my position.  A real split there.

24       MADAM CHAIR:  Thank you,

25   Representative Henson.



1          Representative Newton, let's keep

2     them short and sweet.

3          REPRESENTATIVE NEWTON:  Short and

4     sweet.  We've got the bill sitting before

5     us in this incredibly difficult situation

6     we're talking about about rape.  Is there

7     anything in this bill that would prohibit

8     the morning after pill or Plan B?

9          REPRESENTATIVE SETZLER:  Appreciate

10    the question.

11         Once again, I believe that -- we

12    talked about my stance on life.  This does

13    not prohibit the morning after pill and

14    this would not prohibit any chemical

15    abortion from the time the woman becomes

16    pregnant, conception until there is the

17    presence of the heartbeat.

18         So if there is a woman that was raped

19    and she wanted to take Plan B as a -- or

20    the morning after --

21         REPRESENTATIVE NEWTON:  Require no

22    reporting of anything.

23         REPRESENTATIVE SETZLER:  Require no

24    reporting.  That's completely available.

25         REPRESENTATIVE NEWTON:  Thank you.



Page 137

1      MADAM CHAIR:  Okay.  Representative
2  Hutchinson.
3      REPRESENTATIVE HUTCHINSON:  Thank
4  you, Madam Chair.
5      I have a question about the same
6  section.  For the exception of incest, can
7  you explain to me how a woman would prove
8  she was the victim of incest.
9      REPRESENTATIVE SETZLER:  Yeah.  I --
10  this is a question that was brought to me
11  by some of our members.  Incest is still a
12  crime in Georgia and it's a very delicate,
13  sensitive issue.
14      I'd love to get the members' thoughts
15  about whether this stays in or comes out.
16  If the lady thinks this is a better law
17  with incest coming out, then we can discuss
18  that.  It's a question that when it's
19  raised, it can be a very delicate
20  circumstance.
21      And I had some people urge me to
22  include it as part of trying to find the
23  kind of balance we're trying to seek.  But
24  if the lady would like to take it out, I'd
25  be -- I'd leave it to the wisdom of the

Page 138

1    committee to entertain that as an

2    amendment.

3         REPRESENTATIVE HUTCHINSON:  I think

4    taking it out would make things more

5    difficult, I would think.  Because if a

6    woman is a victim of incest, the only way

7    to definitively prove would be a DNA test.

8    And that cannot be done before six weeks

9    without a significant danger to the mother.

10        REPRESENTATIVE SETZLER:  And, again,

11   it's my belief that if a woman is to the

12   point of filing a report, then that's --

13   they've crossed the legal threshold to make

14   sure it's not just a flippant statement,

15   but they've crossed the legal -- if it

16   gives rise to crossing the legal threshold,

17   I think that's perhaps the right balance.

18        MADAM CHAIR:  Representative Sharper.

19        REPRESENTATIVE SHARPER:  Thank you,

20   Madam Chair.

21        I just wanted to go on record as

22   saying that I think that the bill that we

23   have here in front of us, that is those are

24   the only exceptions, you know, for

25   abortion, that we're going to have a lot of



```
 1   people in Georgia that are going to be

 2   investigated and falsely accused, I

 3   believe, because there's no other out.  So

 4   that's why -- you know, you're saying

 5   you're looking to work with everybody, I

 6   think we need to table this so we can come

 7   up with something that would be better, you

 8   know, for our citizens.  I just wanted to

 9   go on the record that this bill is not

10   ready to go forth and be voted on.

11        MADAM CHAIR:  Representative Bennett.

12        REPRESENTATIVE BENNETT:  Thank you,

13   Madam Chair.  And I'll be brief.  And you

14   may have already addressed this.  I did

15   have to step out for a moment.  I

16   apologize.

17        Are there any provisions in this bill

18   to -- that covers a mother who may be

19   diagnosed with cancer or any type of severe

20   condition that may require some drugs or

21   treatment that would endanger the embryo?

22        REPRESENTATIVE SETZLER:  I thank the

23   lady for the question.

24        If you would -- if I could direct

25   your attention to lines 156 through 162 of
```



1    the bill.  If in the doctor's reasonable

2    medical judgment -- many think that that

3    gives doctors too much flexibility.  We

4    could debate that.  I think we've -- but in

5    the doctor's reasonable medical judgment if

6    they believe that the abortion is necessary

7    to avert the death of the pregnant woman,

8    if it's an ectopic pregnancy, there is a

9    pregnancy that -- if becoming pregnant, the

10   child was lodged in her fallopian tubes and

11   that could lead to her death, then we allow

12   for that as an exception.

13        Likewise, if it would lead to the

14   impairment of a major bodily function or

15   organ, organ failure, then that is provided

16   for on lines 156 through 162.

17        And, again, I think it becomes a

18   circumstance of making the decision around

19   lives.  Some mothers may choose to risk it.

20   But we do provide women that opportunity if

21   their life is in jeopardy, that they have

22   that exception.

23        REPRESENTATIVE BENNETT:  Madam Chair,

24   just a follow-up, please, briefly?

25        MADAM CHAIR:  Okay.  Yes.



Page 141

1          REPRESENTATIVE BENNETT:  So I'm

2     imaging that if a woman knowingly has

3     cancer or any other type of condition that

4     requires some type of medical treatment

5     that has already proven to be adversely

6     impact their embryo, does the mother have

7     to continue on until they find out that

8     that has impacted or created an issue or

9     problem with the infant -- or fetus?

10         REPRESENTATIVE SETZLER:  Again, I

11    will say this:  It's my belief there are

12    circumstances where oncologists are able to

13    treat women that have cancer that are

14    pregnant without losing the child.

15         But what we do provide here is if the

16    child is going to -- if the presence of the

17    -- the woman being pregnant, if the

18    presence of the child in her womb is going

19    to lead to her death, we do give physicians

20    an option to take the child -- take the

21    child's life in abortion if that's --

22         REPRESENTATIVE BENNETT:  That's a

23    slippery slope and didn't quite answer my

24    question.  But I yield.  That's okay.

25         REPRESENTATIVE SETZLER:  I'm trying



1  to.  I'm not sure I understand it, but --

2       MADAM CHAIR:  Representative Frye has

3  not asked a question.  Representative

4  Mitchell, I'm going to skip you since you

5  have.

6       Representative Frye, you're the last

7  question on this one.

8       REPRESENTATIVE FRYE:  Thank you,

9  Madam Chair.

10      I have three real quick ones.

11      MADAM CHAIR:  Okay.  Go quickly.

12      REPRESENTATIVE FRYE:  Very quickly.

13      How many women are pregnant at any

14  given time in this state?

15      REPRESENTATIVE SETZLER:  We have

16  about 130,000 births a year in Georgia,

17  plus or minus.

18      REPRESENTATIVE FRYE:  Okay.  If you

19  look at lines 131 through 133, I'm just

20  trying to figure out exactly what that

21  means "any stage of development".  I'm not

22  a doctor.  You know that.  You know me.

23      What's that earliest stage of

24  development that's allowable.

25      Under this legislation that gives



Page 143

1    rights to maybe a cluster of cells?  Is

2    that what we're doing here?

3         REPRESENTATIVE SETZLER:  What we're

4    doing here is if a woman finds that she's

5    pregnant and has a medically confirmed

6    pregnancy test -- not from the drugstore

7    but medically confirmed -- then we know

8    that she's got a living, distinct human

9    growing inside of her and we recognize

10   that, she immediately begins incurring

11   healthcare costs.  She's taking prenatal

12   vitamins.  She's going to the doctor more.

13   Those things happen.

14        So we recognize it as soon as she has

15   a medically verified pregnancy.

16        REPRESENTATIVE FRYE:  Okay.  But I

17   want to point out that it does say "any

18   stage of development", not medically

19   verified as far as the legislation is

20   concerned.

21        REPRESENTATIVE SETZLER:  That's

22   correct.  And, again, as you talk about,

23   you know, what we put in statute and what

24   we leave to rule-making.  The medical

25   verification of a pregnancy is nowhere in



1  our statues with respect to public

2  benefits.  That's in rule making about who

3  can do that, under what circumstances.

4      But we're trying to provide just the

5  appropriate amount of detail here.

6      REPRESENTATIVE FRYE:  One last

7  question.

8      In lines 289, 290 and 291, will there

9  be instituted a standard behavior for any

10  female who is pregnant with a heartbeat in

11  order that they're not getting charged with

12  a crime for a miscarriage or any activity

13  that they may engage in?

14      I think what this section does is

15  turn our women in the population who are

16  pregnant into literal incubators where we

17  sit them up in a certain spot for fear that

18  if they go running, if they're biking,

19  seven weeks pregnant, something goes wrong,

20  can't they be held liable for a crime

21  according to this legislation?

22      REPRESENTATIVE SETZLER:  Thank you

23  for the question.

24      What this does is, this simply -- it

25  moves the threshold for homicide.  Homicide



1    being a civil finding of -- it's -- you

2    think about a wrongful death case.  If

3    there's a homicide that leads to a death,

4    that gives rise to like a wrongful death

5    circumstance.

6          Currently the standard is at

7    quickening.  And quickening is somewhere,

8    15, 18 weeks depending on the

9    circumstances.  That's when the woman can

10    feel the baby sort of kicking around.  That

11    goes back hundreds of years in the English

12    common law tradition.  That when there is

13    movement of the child inside that can be

14    recognized, that's when these full legal

15    rights accrued from a civil perspective.

16          That's our existing law today.  What

17    this does is it moves it from this sort of

18    hard to define quickening standard which

19    isn't written in code, it's in case law,

20    and defines it as when you've got the

21    heartbeat, then those rights attach.

22          It's sort of quickening 2.0.  They

23    couldn't see the heartbeat beating 200

24    years ago in the 18th Century when this

25    became standard and even earlier.  It just



1    -- it puts it in code that heartbeat is the

2    threshold and not quickening.  So it moves

3    it from 15 weeks to somewhere in the six to

4    eight range depending on the detection.

5         MADAM CHAIR:  All right.  We're going

6    to go to the last -- Setzler's group, who

7    do you want to speak?

8         REPRESENTATIVE SETZLER:  I think I'd

9    just call for Ms. Hobbs.

10        MS. HOBBS:  Hello everyone.  My name

11   is Heather Hobbs.  I'm with Save the One.

12   We are a global organization with over 600

13   plus women who have come to us who

14   conceived in rape.  And all of those women

15   who have come forward were also advised to

16   abort by their doctors.

17        They come to us specifically because

18   we advertise and post:  We're here for you.

19   We want to talk to you.  We want to help

20   you.  And I'd really encourage you to check

21   out our organization.

22        Three of my four children -- I've got

23   four already -- three of them were

24   recommended for abortion.  And as I've

25   watched all of you today, I keep hearing



1    about the cases of rape.  And when I was 19

2    years old, my first child was conceived in

3    rape.  I was raised to be pro-choice.  I

4    thought I was pro-choice.  I thought I was

5    for women's rights.  I thought it was

6    reproductive healthcare.

7         I had that child that I conceived

8    from rape who my doctor told me to abort

9    and that it was a justifiable, ethical

10   reason to abort.

11        My second and third children --

12   excuse me -- my second and third child,

13   they were said to be a threat to my life.

14   My son, Tristen, who is now five, i had

15   late diagnosed gallstones and acute

16   pancreatitis that caused me to go into

17   sepsis repeatedly.  They were blaming the

18   pregnancy and said you can just have

19   another one.

20        My third child, Giddeon, at 24 and 25

21   weeks, he was diagnosed with Meconium

22   Pseudocyst.  They said he had zero percent

23   chance of survival and that he was a threat

24   to my life.

25        You can imagine as a mother hearing



1   this three separate occasions was very

2   difficult.   And by the time I had got to

3   Giddeon, I was very hurt and outraged.

4   Each of these amazing three children has

5   value.   They are a person with value just

6   like you or I.

7          I want to speak on behalf of HB 481

8   maintaining not discriminating against

9   those who have been conceived in rape.

10  Many people who are for abortion claim it's

11  barbaric to force a woman who has conceived

12  in rape to carry a child, the child of a

13  rapist.

14         But I am telling you today that my

15  child is not the child of a rapist.   She is

16  a child of a rape survivor and because of

17  her, she offered me healing and hope and

18  strength.   Having an abortion would have

19  been a second trauma to my body.

20         Can you imagine a woman who has

21  recently been raped which is already a

22  brutal and horrific thing, and now we have

23  asked her -- the doctor has advised her to

24  have an abortion.

25         And think about what an abortion



Page 149

1   entails.   Think about what she is going to

2   have to be awake and aware, aware of this

3   situation where they are going into a very

4   sensitive recently traumatized area of her

5   body.   Can you imagine the second trauma

6   that would be?

7        I find it horrific that we are, as a

8   society, discriminating against babies and

9   punishing them for another person's

10  actions.   If your biological father raped

11  someone right now and we sent the police to

12  your home.   They knocked on your door.

13  They arrested you and they gave you the

14  death penalty.

15       You got the death penalty for what

16  another person did.   Would that be fair?

17  It wouldn't be.   We would all be outraged.

18  We would all be upset.   And I am so

19  disappointed and hurt to see children like

20  my daughter or like my two sons that are

21  exploited with being unworthy of life, that

22  they are less than human, they don't

23  matter.

24       Do not exploit children like mine,

25  please.   I beg of you.   Don't advocate for



1   these false beliefs that is in some way

2   helping women like me to have an abortion,

3   to give them an abortion when it's only

4   that trauma, especially -- especially in

5   cases of rape.  Imagine enduring that

6   dangerous invasive procedure.

7         Rapists, child molesters and sex

8   traffickers love abortion.  It enables them

9   to continue perpetrating again and again.

10  Our network of women grieve at how

11  continually we are saying that they're the

12  exception, that they're devalued and they

13  don't matter.  We are sending the message

14  to these people that they're not worthy of

15  life or deserving to be here.  Exceptions

16  deny the right to life and deny equal

17  protection.

18        I know that you guys touched on the

19  14th Amendment and I know that we discussed

20  that no state shall deny a person equal

21  protection of the laws, deprive a person --

22  excuse me -- deprive a person of right to

23  life without due process.

24        I also wanted to take a moment

25  because there is something that -- I



1    believe it was Representative Mitchell said

2    that I agreed with about the lack of

3    scientific difference between a child

4    conceived in rape and a child that's not.

5    That really struck me.  There is no

6    difference.  These are children.  These are

7    precious babies.

8         So I know that I'm running out of

9    time here.  I wanted to summarize by saying

10   I really hope to raise my children in a

11   country that does not discriminate babies

12   based upon race, gender, disability or way

13   of conception.  I am urging you to please

14   pass on HB 481 without exceptions so that

15   we do not send the message to our people

16   groups that their lives are worth less than

17   anyone else.

18        Thank you.

19        MADAM CHAIR:  Representative Petrea,

20   you had a question?

21        REPRESENTATIVE PETREA:  Yes, Madam

22   Chair.

23        I just wanted to say to the lady, we

24   appreciate very much.  We can tell how

25   heartfelt this is to you.  And to everyone,



1    I just wanted to call -- something just

2    struck me as I was sitting here because

3    everybody here is passionate about this.

4    And to both sides, I want to say this:  It

5    has struck me, we're talking about human

6    beings.

7         Recently on the Georgia coast, we

8    sentenced a man to 21 months in jail for

9    stealing turtle eggs.  Turtle eggs.

10   Embryos of turtles.  We sentenced that man

11   to 21 months in jail.

12        And today, we're talking about --

13   regardless of which side we're on.  I saw

14   that loud and clear as I was listening.

15   We're talking about human beings and so I

16   appreciate that you're here and others are

17   here and that we're having this

18   conversation because it is an important

19   discussion and that's what I -- it's an

20   important discussion.  Far more important

21   than anything else we could be discussing

22   today.  So thank you for being here.

23        MADAM CHAIR:  Thank you.  Okay.

24   Representative Hutchinson, last question on

25   this and we'll go --



1          REPRESENTATIVE HUTCHINSON:  I just

2     wanted to commend the young lady for her

3     story and for your organization and for the

4     services that you provide.  And I am so

5     happy that you were able to have that

6     choice to raise your children.

7          But as a professional social worker

8     for the last 20 plus years, I can tell you

9     that you have skills that not everyone has.

10    Not everyone has the coping skills that you

11    have.  Not everyone can handle the

12    situation that you are in.

13         That's why I'm glad that you had your

14    choice and I'm glad that women have their

15    choice just in case they can't handle what

16    you did.  That's it.

17         MS. HOBBS:  For clarification, so

18    you're saying still that it's okay to kill

19    an innocent human --

20         MADAM CHAIR:  I don't think you need

21    to ask that question.  Thank you.

22         And I do want to say to some of the

23    people that have testified, we are terribly

24    lacking in physicians to take care of women

25    across this state.  And regardless of which



```
 1   side you're on, I would like to say that

 2   when doctors tell -- and as a healthcare

 3   professional and a husband who is a

 4   physician -- when they tell women that they

 5   think it would be best to abort, they're

 6   doing it not out of malice.  On the best of

 7   their medical knowledge.  Do some people

 8   survive and have a healthy baby?  Yes, they

 9   do.  But there are other women when they

10   decide not to abort, who die because of

11   septicemia and the things it caused.

12          So I just want to make sure that we

13   are not sending a message out across our

14   state that we think all doctors when they

15   make such a recommendation are doing it on

16   a fact that they want somebody to have an

17   abortion.  They're doing it based on the

18   best medical knowledge.

19          And I, for one, appreciate every

20   physician in this state.

21          Are there some bad doctors?  Yes.

22   But 99 percent of them are there to help

23   patients and do the very best they can.

24   And that even includes you, Mark, a person

25   that's on my committee.  So you're in the
```



1    99 percent.  You're welcome.  Just wanted

2    to make that perfectly clear along this

3    way.

4         Okay.  I'm going to -- there is five

5    minutes left on the against and I had

6    somebody that gave me a piece of paper to

7    sign him up and I didn't do it.  So I'm

8    going to take that time and give that time

9    to John Walraven or part of it or whatever.

10   I'm sorry.  We've had a lot from our reps,

11   but...

12        And y'all have 13.5 minutes left.

13        MR. WALRAVEN:  Thanks, Madam Chair

14   and members of the committee.  I'm John

15   Walraven.  I represent Georgia Reproductive

16   Endocrinologists.  And I want to thank all

17   the physicians who decided to come up here

18   today and testify.

19        I'm going to scrap everything pretty

20   much I was going to talk about tonight and

21   just get to the point.  First of all, I

22   want to say that everybody in this room who

23   has been here for any amount of time that

24   has ever interacted with Ed Setzler know

25   that the representative is coming into this



1    debate with a pure heart and the best

2    intentions and only has really just

3    truthfully the very -- the most pure

4    reasons for doing what he's doing.  And

5    that is absolutely true.

6         One thing I would like to just point

7    out to the committee is that in the

8    beginning of this calendar year, we had

9    some atrocious abortion-related bills

10   introduced in Virginia and New York.

11        The very idea that we would be

12   looking at trying -- in the United States

13   to try to codify the ability to terminate a

14   delivery is just -- I mean, it's

15   unspeakable.

16        The hardest part to accept of that

17   whole thing was the representative -- the

18   delegate rather in Virginia who opined that

19   what a physician would be charged with

20   doing would be to take that delivered child

21   and keep it comfortable until it died.

22        And Georgia prevented that from being

23   able to happen with House Bill 954 a few

24   years ago because we made changes to that

25   bill as it went through the process to



1   where if a baby was going to be delivered

2   with a fetal anomaly like no heart, no

3   lungs, no brain, the baby wasn't going to

4   live, we allowed an exception to that

5   abortion bill -- to that abortion law of 20

6   weeks.  20 weeks which is based on science.

7        The notion that there was fetal pain,

8   that there were pain receptors.  It's

9   debatable amongst the people in this room,

10  but there was a basis for the rule.  That

11  wise decision to prevent a baby within the

12  borders of this state to be delivered and

13  rest comfortably until they expired is

14  being repealed in House Bill 481.

15       We call it the Medically Futile

16  Pregnancy Exception.  Not that the

17  pregnancy is futile.  No life is futile.

18  But there is only so much medicine can do.

19  You can't put a brain in a baby.  You can't

20  rebuild lungs.

21       As a physician testified on the

22  Senate side in that debate through tears,

23  she's a neonatologist, she said the good

24  Lord just didn't make these babies where we

25  could stick a trach down a 20-weeker's



1   throat.

2       Those babies in this bill will not be

3   eligible for abortion.  The mother will

4   carry that dying fetus all the way to term

5   and deliver it if this bill becomes law

6   until it rests comfortably and expires.

7       We're better than that.  Please, this

8   committee, I would ask you to reinstate the

9   Medically Futile Exception that Georgia has

10   in its law.

11       Georgia's Reproductive

12   Endocrinologists come down here and testify

13   on these things when facts are flawed and

14   science can back up the flaws.  And the

15   sponsor of the bill said he wasn't going to

16   spend much time on the findings; but the

17   findings are very, very important.

18       The findings are what tells the

19   United States, puts them on notice that we

20   are about to violate our constitution and

21   these are the grounds that we assert,

22   judge, your honor, ladies and gentlemen of

23   the jury.  So at a minimum, they have to be

24   bullet proof.

25       This is not the time to be political



1  or to just fudge a little bit.  This bill

2  contains falsehoods that can be easily

3  disproven just using a simple web search.

4  There are claims about the human race that

5  are simply untrue.  You've heard testimony

6  tonight from doctors at six weeks after

7  fertilization, a human being does not have

8  a heart.  A human being has tissues that

9  are going to form a heart.  It will happen

10  sometime around eight weeks, but it's not

11  six weeks.  The heart has not formed and

12  what has not formed cannot beat.

13       At line 45, there is a notion that a

14  human being needs nourishment and a safe

15  environment to grow to full adulthood.

16  Anybody who has been a parent knows you

17  need more than food and safety to become a

18  full grown adult and it doesn't take a

19  lawyer to make that argument to the judge.

20       This bill seeks to amend the Georgia

21  Constitution with a state statute.  We are

22  trying to find with 91 votes in this House

23  that a fetus is worthy of recognition as a

24  natural person.  Can't change the

25  constitution with a general law.



1    The bill states at line 80 that the
2    presence of a fetal heartbeat has become
3    the standard in establishing viability of
4    pregnancy.  That is absolutely false.  A
5    fetus without a brain or lungs or with a
6    birth defect that has not been detected yet
7    is not a viable pregnancy.
8        And, Dr. Newton, you're right.  It's
9    a sign of life.  A heartbeat is a sign of
10   life, but it's not a dispositive you're
11   alive or you're dead kind of bright line
12   like the bill wants you to believe.
13       MADAM CHAIR:  You need to bring it to
14   a close, Mr. Walraven.
15       MR. WALRAVEN:  Yes, yes.  Yes, Madam
16   Chair.
17       It's been talked about about the tax
18   implications of this bill.  This thing
19   could have gone to Ways and Means and had a
20   physical note.  That's a major conflict to
21   pass tax law in the findings.  It's
22   actually not even in the bill.  It's in the
23   findings.
24       And there is a real exposure here to
25   pregnant women who do have cancer and a



1    patient who is going through in vitro

2    fertilization.  The standard of care is to

3    have six or seven embryos in the womb.

4    Only one, maybe two are going to implant.

5    Is that going to be five abortions and if

6    it is, you know...

7         Thank you very much, Madam Chair.

8    Sorry for running over.

9         I'll take any questions if you have

10   any.

11        MADAM CHAIR:  No, we're not going to

12   take any questions right now.  I'm going to

13   yield time and give the other side an extra

14   minute and a half because he ran over.

15        MS. ROBBINS:  Thank you, Madam Chair.

16   My name is Jane Robbins.

17        I wanted to address a narrow issue.

18   Several speakers have made references to

19   the claim that this bill is

20   unconstitutional, suggesting that there is

21   no point in passing it because it will be

22   struck down.

23        I address my remarks narrowly to this

24   claim --

25        MADAM CHAIR:  And you are?



1        MS. ROBBINS:   Jane Robbins.

2        MADAM CHAIR:  No, a lawyer --

3        MS. ROBBINS:   I'm a lawyer.  I'm a

4   lawyer.  In this session, I'm representing

5   Concerned Women for America.

6        MADAM CHAIR:   Okay.

7        MS. ROBBINS:   It is certainly true

8   that lawyers for big abortion have quickly

9   filed lawsuits against the heartbeat bills

10  that have been passed in other states and

11  the Supreme Court has not yet taken any of

12  these cases to resolve the issue.   But

13  there are multiple reasons that this kind

14  of statute should be considered

15  constitutional and reasons that could very

16  well lead the Supreme Court to this

17  conclusion.

18       One reason, according to Supreme

19  Court precedent, the states have a

20  substantial interest in protecting unborn

21  human life.  The Eighth Circuit calls it a

22  profound interest in protecting unborn

23  human life.

24       The second reason is that medical

25  science tells us much more about this life



1    now than was available to the courts in Roe

2    and Casey.  The most recent of those was

3    1992 and a lot has happened since then.

4        This is one reason that it's

5    constitutionally appropriate for issues of

6    when unborn life should be protected to be

7    resolved by the people of the state through

8    their legislators and not by a court.

9        This is what the Eighth Circuit said

10   about this.  Quote:  To substitute the

11   court's own preference to that of the

12   legislature is not, underline not, the

13   proper role of the court.

14       The third reason, removing this

15   decision from the legislature means that

16   elected representatives cannot take into

17   consideration advances in medical science.

18   So you have a decision that is there for

19   decades and is completely outdated such as

20   Roe versus Wade.

21       And number four, the facts of Roe

22   versus Wade and the Casey decision have

23   come out now -- or Roe and Doe versus

24   Bolton have come out now.  We realize now

25   what was going on in those cases.  We



Page 164

1  realize that the plaintiffs in those cases

2  actually flipped and they were sorry they

3  were ever involved.  They were sorry they

4  were dragooned into this and they became

5  very pro-life.

6        We understand now what really happens

7  with abortion is not that you've got the

8  woman sitting with her kindly family

9  physician.  Usually -- I'm sure that

10  happens.  But generally speaking, you have

11  women going to abortion clinics and their

12  baby will be killed by an abortionist that

13  she has never seen before and she will

14  never see again.  There's not a

15  relationship there.

16        And we know much more now about the

17  physical and psychological effects of

18  abortion on women than they knew back in

19  1973.

20        So finally I would just emphasize a

21  federalism point.  I helped write a book

22  about this so I may as well put it in.

23        As Abraham Lincoln noted:  The

24  founders never intended that all important

25  policies that govern our lives should be



```
 1   made by nine unelected men and women who

 2   wear robes.

 3        By passing this bill, Georgia can

 4   join multiple other states that are

 5   reclaiming their constitutional autonomy in

 6   this area.  Courts, including the Supreme

 7   Court, do not act in a vacuum.  The

 8   justices and other judges are aware of

 9   what's going on in the country.  They see

10   what's happening in various states.  They

11   see what laws states are passing.

12        So I urge you to let Georgia join the

13   other states that have made a bold move to

14   say that under the constitution, this is

15   our role.  It is not yours.  The 11th

16   Circuit and other courts might very well

17   come to that conclusion.

18        Justice Roberts said once that the

19   states need to start acting like the

20   sovereign entities that they are and I

21   think this is a great opportunity to do

22   that.

23        Thank you.

24        MADAM CHAIR:  I have one question in

25   searching this and has been a concern of
```



Page 166

1    mine.  So far all of the states that have

2    passed a bill with, you know, lower times,

3    all those have been --

4          Excuse me, Representative.  I was

5    trying to ask a question.  Okay.

6          --  have struck down so far the ones

7    passed by the states.

8          MS. ROBBINS:  Most of the cases are

9    still pending.  The only --

10          MADAM CHAIR:  Well, they're going up.

11   But on the first level, they have been

12   struck down.

13          MS. ROBBINS:  On the first level

14   because district court -- the only district

15   courts that have considered it so far has

16   said, well, we hate it, but we're bound by

17   Roe versus Wade and by Casey.

18          What we're saying is that this

19   question is a novel question.  The Supreme

20   Court has never considered this.  And the

21   11th Circuit might certainly say we think

22   that this is constitutional and then it

23   goes up to the Supreme Court and they

24   decide.

25          MADAM CHAIR:  Wait a minute.  When



1   you're saying that they haven't -- it's

2   novel.  What's novel about ours that's so

3   different from the others?  I mean, I'm

4   just trying to understand.

5        MS. ROBBINS:  It would be a novel

6   question in Supreme Court jurisprudence.

7   The Supreme Court has not ruled on whether

8   a human life with a heartbeat is

9   protectable.

10       MADAM CHAIR:  Okay.  But any of those

11  other cases, if they got there before our

12  case would be a chance for them to rule on

13  that, too.  Correct?  That's what I'm

14  asking.

15       MS. ROBBINS:  Well, it would be

16  although it would be great if Georgia -- if

17  all the cases were considered together when

18  they get there.

19       MADAM CHAIR:  Okay.  I was just

20  trying to clarify that.

21       REPRESENTATIVE SETZLER:  And also,

22  Madam Chair, when you think about this

23  bill, there are questions we put before the

24  court of the humanity of the child in the

25  womb that's outside of the abortion



1    context.  You know, in the Roe decision, we

2    are -- as we do often in the judiciary

3    committees, when a court ruling comes down,

4    we respond to that with legislation of the

5    bill with our implied consent notice.

6          The way this has been structured is

7    following the prescription of our courts.

8    So we believe we are putting a different

9    thing before the courts that the other

10   states didn't.  I think that's an important

11   distinction.

12         MADAM CHAIR:  Okay.  Thank you.

13         Okay.  You still have 11 minutes.

14   You can use it or you can have somebody

15   else speak.

16         REPRESENTATIVE SPETZLER:  Madam

17   Chair, we do have more speakers.  If it's

18   the pleasure of the committee to act on

19   this, I'd just ask the chair lady how she'd

20   like to act.

21         MADAM CHAIR:  Okay.  I think,

22   Representative -- okay.  I would like to

23   use that time since it's getting late and I

24   am trying to give both sides a fair

25   hearing.



Page 169

1        I think there may be amendments made

2    and I want to make sure that everybody on

3    the committee has had their say.  We may be

4    here a while.

5        REPRESENTATIVE SPETZLER:  And if it

6    please the Chair, Madam Chair, the reason

7    the substitute was brought was the

8    expectation was to bring a bill that

9    accommodated concerns that were brought to

10   me.  So I would, you know, just ask members

11   to consider that as we consider amendments.

12       MADAM CHAIR:  Okay.  But it didn't

13   include all of the concerns that were

14   brought to you, if I understand correctly.

15   Some.

16       REPRESENTATIVE SPETZLER:  Madam

17   Chair, the substantial concerns brought to

18   me are addressed in the substitute.  Yes,

19   ma'am.

20       MADAM CHAIR:  All right.

21   Representative Lott, do you have --

22       REPRESENTATIVE LOTT:  At the

23   appropriate time, Madam Chair, I'd make a

24   motion.

25       MADAM CHAIR:  Okay.  I'll take it



1  now.

2        REPRESENTATIVE LOTT:  I make a motion

3  do pass.

4        MADAM CHAIR:  Wait a minute.  I have

5  a motion and a second to do pass.

6        Now is the time for a discussion and

7  amendments.

8        Representative Mitchell.

9        REPRESENTATIVE MITCHELL:  Madam

10 Chair, I think the last several speakers

11 have been very, very compelling.  I think

12 that what has been mentioned is the

13 terrible -- and I know it's no fault of the

14 author --

15       MADAM CHAIR:  Wait a minute.  Wait a

16 minute.

17            (Off-the-record comments)

18       MADAM CHAIR:  Okay.  I'm sorry,

19 Representative Mitchell.  Go ahead.

20       REPRESENTATIVE MITCHELL:  Okay.

21       The terrible contradictory

22 juxtaposition that we place women in.  And

23 when we think about it, what we're saying

24 with line 164 through 166 is that if a

25 woman makes the conscious choice to become

1    pregnant -- or an act that causes a

2    pregnancy, she cannot have an abortion.

3        But if some man abuses her or takes

4    advantage of her, then she would be allowed

5    to have an abortion.

6        And for the other reasons that was

7    just put -- when we talk about the

8    medically futile exception.  Madam Chair,

9    I'm going to move that we table this bill

10   so that we can further perfect it and bring

11   forth the kind of legislation that I know

12   the author would rather have.

13       MADAM CHAIR:  Betsy, what's the

14   posture on that?  We already have a motion

15   to move --

16           (Off-the-record comments)

17       MADAM CHAIR:  Okay.  I'm going to

18   recognize that motion.

19       Do you have a second?

20       Okay.  Can we forego discussion

21   because we know what it is unless somebody

22   is passionate.  Okay.

23       REPRESENTATIVE SPETZLER:  Was the

24   motion to table?

25       MADAM CHAIR:  Yes.



1          REPRESENTATIVE SPETZLER:  I would

2   oppose that motion.

3          MADAM CHAIR:  Well, I assumed that.

4   But it's okay that you made it.

5          Sorry.  It's not good to assume

6   anything.  But anyway --

7          All right.  Everyone in favor of

8   tabling the motion, raise your hand.

9          Okay.  Everyone opposed to tabling

10  the motion.

11         Okay.  The motion fails.  Sorry.

12         Now, we are in the posture -- because

13  I feel like people have amendments.  All

14  right?  And rather than discussion for the

15  sake of time, does anybody have an

16  amendment they'd like to make?

17         Representative Beverly, is that your

18  mike that's on?

19         REPRESENTATIVE BEVERLY:  Yes, it is.

20         MADAM CHAIR:  Okay.  And you have an

21  amendment?

22         REPRESENTATIVE BEVERLY:  Yeah, I have

23  several amendments and I'd like to draw

24  your attention to if the gentleman yield to

25  -- if we first go to line 11, that we

1  strike line 11 and insert in lieu thereof,

2  the following starting with perform

3  abortions to determine the existence of a

4  -- insert the word "functioning" human

5  heart.

6      So the amendment would say or insert

7  the word "functioning".  Human heart before

8  performing.

9      MADAM CHAIR:  Heart or heartbeat?

10     REPRESENTATIVE BEVERLY:  Heartbeat.

11 Heartbeat.  Heartbeat.

12     MADAM CHAIR:  Okay.  We have an

13 amendment.  Do I hear a second on the

14 amendment?

15     Okay.  Any discussion on that

16 amendment before we vote?

17     Okay.  Representative Newton?

18     REPRESENTATIVE NEWTON:  Yes, I would

19 question the motion.  What's detectable on

20 an ultrasound, which is how this bill

21 approaches determining it are routinely

22 reported as the initials "FHT", Fetal Heart

23 Tones.  It's the same up until 40 weeks

24 gestation.  It's always reported the same.

25 It's a very accepted definition.  It's



1  clearly visible.  Functioning -- obviously,

2  the cells are smaller than a functioning

3  one at 40 weeks or at two weeks post.  But

4  I would just oppose the amendment for that

5  reason.  It's a clear definition right now

6  of fetal heart tones medically when the

7  heart is beating.

8       MADAM CHAIR:  Yes?

9       REPRESENTATIVE MITCHELL:  Madam

10 Chair, because he addressed, can I address

11 the concern that I have?

12      MADAM CHAIR:  Yes.

13      REPRESENTATIVE MITCHELL:  And that is

14 is that I understand, Doctor, that they are

15 a collection of cells within the cavity of

16 the heart -- within a space.  But as we've

17 heard expert testimony today, it is not a

18 functioning heart at that particular time.

19 You're picking up the tones, the intonation

20 of a flow that's going through that

21 particular group of cells.  And so

22 functioning determines a different level or

23 different quality or different criteria for

24 saying what a heartbeat is.

25      MADAM CHAIR:  Well, Representative, I



1  think that wouldn't the correct -- if you'd

2  like to correct your amendment, I think it

3  would be of a functioning heart.

4      REPRESENTATIVE MITCHELL:  Yes.

5      MADAM CHAIR:  Instead of a heartbeat.

6  Would you like to correct it to that?

7      REPRESENTATIVE MITCHELL:  Yes.

8      MADAM CHAIR:  It would be more

9  technically correct, I think what you're

10 trying to get at.

11     REPRESENTATIVE MITCHELL:  Yes, ma'am.

12     MADAM CHAIR:  Okay.  So the amendment

13 would be, "With the existence of a

14 functioning human heart".  Right?  We've

15 had discussion.

16     Everyone in favor of the amendment,

17 raise your hand.

18     Everyone opposed.

19     That amendment fails.

20     REPRESENTATIVE MITCHELL:  For the

21 sake of time, most of mine will go along

22 the same lines and so I'll just waive the

23 rest of my amendments as long as we have a

24 roll call vote, I certainly would

25 appreciate that.



1        MADAM CHAIR:  Right.  You mean by
2    name?
3        REPRESENTATIVE MITCHELL:  Yes.
4        MADAM CHAIR:  Okay.  All right.
5        Other amendments.
6        So I would like to make one as Chair.
7        Excuse me, John, can you come up
8    again and tell me -- I'd like to have the
9    one that you mentioned that was left out.
10        MR. WALRAVEN:  Madam Chair, I believe
11    you would be referring to the medically
12    futile pregnancy exception that is in the
13    existing code?
14        MADAM CHAIR:  Yes.
15        MR. WALRAVEN:  Then, Betsy, I would
16    ask for your counsel on this as well.
17            (Off-the-record comments)
18        MR. WALRAVEN:  It would be from the
19    word "unless" on 153 through the number one
20    on 154?  Would that be the first one?
21            (Off-the record comments)
22        MADAM CHAIR:  All right.  So it could
23    be in?
24        And I will tell the committee, you
25    know, I realize the difference.  And it was

```
 1    the discussion when we passed it the last

 2    time.  Some women certainly have the

 3    ability and the stamina and the emotional

 4    stability to carry a child that has a brain

 5    -- an anencephaly -- thank you.  I'm

 6    forgetting that.  The brain looks like it's

 7    been cut in half.  It's sliced off at the

 8    back of the head.  There's no skull around

 9    it.  And the brain, what little that there

10    is, hangs out in a sac.

11         That is incompatible with life and

12    some women have the stability, like I say,

13    the emotional stability to carry that baby

14    to term.  To go to the grocery store and

15    they're six months pregnant and have

16    somebody say, oh, what is it, is it a boy

17    or a girl.  And, you know, what do they

18    say?  Yeah, it's a boy but it has a brain

19    that's hanging out in a sac and not going

20    to function.

21         There are others that doing that

22    would literally put them under psychiatric

23    care.

24         If a child has no kidneys, you know,

25    they cannot live.  They live because the
```



1    mother is carrying them and the functions

2    are that way.

3         So that is why that exemption was put

4    in.  I would ask this committee to trust me

5    enough.  I'm just a member on this right

6    now asking you to understand what that can

7    do to women because I have to catch myself

8    when somebody is far along at seven or

9    eight months asking, you know, whether it's

10   a boy or girl and how they're doing and

11   that's not always a good type of question

12   to ask when you don't really know the

13   circumstances.

14        So what I would ask that we would

15   make that amendment to do and add that one

16   exception in the correct places and let

17   Betsy put it throughout where it needed to

18   be added.

19        Representative Newton.

20        REPRESENTATIVE NEWTON:  Thank you,

21   Madam Chair.  I know the goal is a

22   compassionate goal.  Is that -- and I don't

23   know if Betsy could tell us -- we don't

24   have the language -- 31-9B-1, which is the

25   definition of medically futile.



1          With regard to one of the earlier

2     testimonies there was a discussion about

3     disability that might follow birth.  And I

4     think we heard from a couple of people that

5     what was -- is medically futile a very

6     tight definition.

7          MADAM CHAIR:  It's very different.

8          REPRESENTATIVE NEWTON:  I didn't know

9     if we had the wording.  Incompatible with

10    life would allow -- is that what it

11    essentially is?

12         MADAM CHAIR:  It did not include

13    disabilities.

14         REPRESENTATIVE SETZLER:  Could I get

15    two more minutes of the time we didn't

16    expend to speak to this a minute by chance?

17         MADAM CHAIR:  Sure.

18         REPRESENTATIVE SETZLER:  I'd like to

19    yield my time to Ms. Rachel Guy.  She was

20    one of our --

21         MADAM CHAIR:  You can speak to the

22    amendment.  If you want to speak to the

23    amendment.

24         REPRESENTATIVE SETZLER:  Thank you,

25    Madam Chair.  I --



1          MADAM CHAIR:  It's not for disabled

2     children or anything like that.  We made

3     sure -- and just to make sure and clear

4     last time or for Down Syndrome or anything

5     like that.  It was incompatibility with

6     life.

7          MS. GUY:  You can't make the

8     statement of being incompatible with life

9     when you're alive in the womb.  If we are

10    claiming that we're incompatible with life

11    based on birth and so, therefore, if the

12    child dies after birth, we are as alive

13    inside the womb as we are outside.  And so

14    to claim that we are incompatible with life

15    inside the womb is a fallacy.  It's not

16    true because we are alive in the womb and

17    children deserve the value and the right,

18    not only of life but of the continuation of

19    life.

20         MADAM CHAIR:  I know you're very

21    passionate about this, but I would disagree

22    with you in that a child like this is

23    living not because of their own body

24    function but because of their mother's body

25    function and they're really not -- but I'm



Page 181

1    not going to get into it with you.

2         Medical futile means that in

3    reasonable medical judgement this unborn

4    child has a profound immediate congenital

5    and chromosome abnormality that is

6    incompatible with sustaining life after

7    birth.

8         REPRESENTATIVE SPETZLER:  And, Madam

9    Chair, I would just -- I appreciate your

10   consideration.  I would say there were

11   three doctors that told her parents that

12   she was --

13        MADAM CHAIR:  Right.  Doctors can

14   make mistakes.  Okay.

15        Representative Sharper.

16        REPRESENTATIVE SHARPER:  Thank you,

17   Chair.  I have possibly one amendment.

18        MADAM CHAIR:  Wait a minute.  We

19   haven't voted on the one I proposed.

20        REPRESENTATIVE SHARPER:  Oh, okay.

21   Go ahead.

22        MADAM CHAIR:  I would propose that

23   amendment that we put that into and make

24   that an exception.

25        Do I have a second on the amendment?



Page 182

```
1        Thank you.  We have a second.
2        And the amendment would make and
3    include incompatible -- what is it again,
4    Betsy?
5        Medical futile -- restore the medical
6    futile exception.
7        Any further discussion?
8        If not, everyone in favor of the
9    amendment, raise your hand.
10       Thank you.
11       Anyone opposed, do likewise.
12       Thank you to the committee for that
13   amendment.
14       Going forward, Representative
15   Sharper.
16       REPRESENTATIVE SHARPER:  Thank you,
17   Chairman.
18       Just for the record, maybe get strike
19   down or not, but if we can look at by
20   striking on line 154, if we can say by
21   striking a human heartbeat and inserting a
22   functioning human heart and the pregnant
23   woman wants to carry the baby to term or
24   continue the pregnancy.
25       MADAM CHAIR:  One more time.
```



1          REPRESENTATIVE SHARPER:   Right here

2    -- okay, on line 154, by striking a human

3    heartbeat and inserting, "a functioning

4    human heart and the pregnant woman wants to

5    carry the baby to term or continue the

6    pregnancy".

7          MADAM CHAIR:   I think we have an

8    objection to that.   Okay?   I will take a

9    vote on it.   All right.

10         Everyone in favor of the amendment as

11   Representative Sharper proposed, show of

12   hands.   Everyone in favor.

13         Everyone opposed.

14         Other amendments.

15         Representative Bennett.   Oh,

16   Representative Schofield.

17         REPRESENTATIVE SCHOFIELD:   Thank you,

18   Madam Chair.

19         So I'd just like to make an amendment

20   on line 164 through 166 to remove the

21   official police report.   And we talked a

22   lot about it.   You seemed open earlier so

23   I'd like to make a motion to remove that.

24         MADAM CHAIR:   Okay.   What would the

25   amendment, how would it read?



1         REPRESENTATIVE SCHOFIELD:   I'd like

2    to strike that whole section.

3         MADAM CHAIR:   Which one?

4         REPRESENTATIVE SCHOFIELD:   164

5    through 166.

6         MADAM CHAIR:   Okay.   The amendment is

7    to strike line 164 to 166.   Do we have

8    discussion on that amendment?

9         REPRESENTATIVE SPETZLER:   Madam

10   Chair, it's a policy question.   I don't

11   think it's accomplishing exactly what the

12   lady is asking for.   That policy question

13   would make it such that there's no rape or

14   incest exception, which I think I'd be

15   friendly to if the committee could move

16   that way.

17        But I just -- I mean, it would make

18   the ability to have exception for rape or

19   incest would be removed.   It's not just the

20   -- you'd be removing the rape and incest

21   exception altogether.

22        REPRESENTATIVE SCHOFIELD:   Okay.

23   Well, maybe that's not what I've got.   No,

24   strike that.

25        REPRESENTATIVE SPETZLER:   I would

1    accept that as a friendly amendment.

2         REPRESENTATIVE SCHOFIELD:  No, that's

3    not -- we changed that.

4         MADAM CHAIR:  Are you withdrawing the

5    amendment?

6         REPRESENTATIVE SCHOFIELD:  I'm

7    withdrawing that one.

8         MADAM CHAIR:  Thank you for that

9    clarification, Representative Setzler.

10         (Off-the-record comments)

11         MADAM CHAIR:  I'm not going to

12    recognize you for that.

13         UNIDENTIFIED SPEAKER:  Madam Chair,

14    I'd call the question.

15         MADAM CHAIR:  All right.  I've got to

16    call the question.

17         Everybody in favor of calling the

18    question, raise your hand.

19         All right.  Everyone opposed.

20         Okay.  At this point, I've tried to

21    give everybody and every side the ability

22    -- as you can see, this is a question

23    that's very divisive and it's very close.

24    And I have tried to listen to both sides.

25    But I think obviously because of the way



Page 186

1  things go, I think we're down to the

2  decision.  We know how the amendments are

3  going to go.  It's a late hour and I am

4  going to make the decision to go ahead and

5  call the question and move with it as

6  Chairman.

7       REPRESENTATIVE BEVERLY:  Is it not

8  true that you have to have a two-thirds

9  vote to have a -- to call a question in the

10 middle of a debate.

11      MADAM CHAIR:  Do you know...

12      REPRESENTATIVE BEVERLY:  And by the

13 virtue of it being 16-14, that that would

14 be out of order.

15      MADAM CHAIR:  Representative, you

16 know, I do not know and I will ask Betsy.

17 I'm afraid I've never been asked that one

18 and do not remember it from my rules.

19          (Off-the-record comments)

20      MADAM CHAIR:  It's under Robert's

21 Rules of Order and the House rules.

22      REPRESENTATIVE SETZLER:  Madam Chair,

23 I would say that at some point if

24 amendments were dragging on in a way that

25 was not substantively underlying subject



1   matter, I think you could call some

2   non-germane and call the question.  I do

3   think there's a point of that.  I don't

4   think -- people could keep debate going on

5   indefinitely.

6           MADAM CHAIR:  Right.  And I really

7   don't think that's what they were trying to

8   do.  I mean, I'm trying to be as fair about

9   this as I can possibly be, Representative

10  Setzler.

11          (Inaudible comments from unidentified

12  speaker)

13          MADAM CHAIR:  All right.  Can I ask

14  from the side that's doing amendments, how

15  many more amendments did you have?

16          REPRESENTATIVE SCHOFIELD:  10.

17          MADAM CHAIR:  How many?

18          REPRESENTATIVE SCHOFIELD:  10.

19          MADAM CHAIR:  That does require --

20  Betsy says it requires two-thirds from what

21  she can tell.  So we're going to honor --

22  Betsy is our legal counsel and I will honor

23  her decision.

24          Thank you.

25          UNIDENTIFIED SPEAKER:  Parliamentary,



 1    Madam Chair.

 2         I'd ask the legislative counsel to

 3    reference the last sentence on Rule Number

 4    12.  Reserve the right not to entertain any

 5    amendment, substitution or motion.

 6         Doesn't that give her the right not

 7    to recognize Representative Beverly's

 8    motion?

 9         I'm sorry?

10         (Inaudible comments)

11         UNIDENTIFIED SPEAKER:  I'm looking at

12    the committee rules.

13         MADAM CHAIR:  You know, the House

14    Rules override --

15         UNIDENTIFIED SPEAKER:  They do not.

16         MADAM CHAIR:  Okay.  Okay.  No, let's

17    just move this back.  This is a divisive

18    issue.  You know, I am willing to spend the

19    time to let both sides have their say.  So

20    I'm going to move forward with this and let

21    them have their say.  It doesn't need to be

22    any more divisive than it already is.

23    People are very divided on this and

24    everybody is entitled to how they believe.

25    This is the legislative process.



1       So I'm sorry if you have dinner

2   plans.  If you're supposed to go let your

3   dog out like mine.  Whatever the reason is,

4   we are going to do this.  If I think that a

5   suggestion is non-germane or ridiculous, I

6   will rule not to recognize it.  But given

7   reasonable amendments put forward, we will

8   go through the process.

9       All right.  Representative Schofield.

10      The committee will please pay

11  attention to the proposed rules -- or

12  amendments as they come forward.

13      The quicker we move through them, the

14  quicker we can get out of here.

15      REPRESENTATIVE SCHOFIELD:  Everybody

16  should have a copy over there.

17      Thank you, Madam Chair.

18      So lines 12 through 16 and inserting

19  in lieu of thereof, the following:

20  Abortion to provide for the reporting of

21  certain information by physicians to

22  provide for legislative findings, to

23  provide for related matters.  And then

24  there's a two.

25      So we want to insert in lieu thereof



1    of the following by striking line 11 and

2    inserting in lieu of the following thereof.

3         REPRESENTATIVE SETZLER:  Object.

4         MADAM CHAIR:  So you're just striking

5    line 11?

6         REPRESENTATIVE SETZLER:  Yes.

7         MADAM CHAIR:  So how would it read?

8         REPRESENTATIVE SCHOFIELD:  Okay.  It

9    will read:  Performing Abortions.  To

10   determine the existence of a functioning

11   human heart before performing -- okay.  We

12   want to take out by striking line 11.

13        We want to take that line out and

14   inserting in lieu of the following:

15   Performing abortions to determine the

16   existence of a functioning human heart

17   before performing an...

18        So I -- you know, I may have to take

19   a minute because this is not --

20        Beverly, help me out here.

21          (Off-the-record comments)

22        REPRESENTATIVE SCHOFIELD:  So the

23   next one would be -- and I apologize -- by

24   striking line 66 through 68 and inserting

25   in lieu thereof of the following just on



1   nine just reserved -- adding the word

2   reserved.  Do you see it?

3        MADAM CHAIR:  All right.  How would

4   it read?

5        REPRESENTATIVE SCHOFIELD:  Okay.  66

6   through 68 --

7        MADAM CHAIR:  To strike in total 66

8   through 68?

9        REPRESENTATIVE SCHOFIELD:  Yes.  Just

10  the word reserve.

11       MADAM CHAIR:  Just wants to put

12  reserved.

13       Okay.  The amendment is to strike all

14  of line 66 and 68 and put reserved.  That

15  is the proposed amendment.

16       Anyone in favor of that amendment,

17  raise your hand.

18       All opposed, raise your hand.

19       All right.  The next one?

20       REPRESENTATIVE MITCHELL:  Madam

21  Chair?

22       MADAM CHAIR:  Yes.

23       REPRESENTATIVE MITCHELL:  While she's

24  getting her amendments together, I have a

25  friendly amendment for the author.

1          MADAM CHAIR:  All right.  What is the

2   friendly amendment?

3          REPRESENTATIVE MITCHELL:  My friendly

4   amendment that the author said he would

5   approve is if we would eliminate in total

6   lines 164 through 166.

7          MADAM CHAIR:  I'm not going to

8   recognize you for that amendment.  Sorry.

9          Representative Hutchinson, do you

10  have an amendment?

11         REPRESENTATIVE HUTCHINSON:  I do.

12         MADAM CHAIR:  All right.

13  Representative Hutchinson, what's your

14  amendment?

15         REPRESENTATIVE HUTCHINSON:  On line

16  three where it says that a child at any

17  stage of development that is carried in the

18  womb, instead of shall be.  May.

19         MADAM CHAIR:  Oh, may be included --

20  okay.  The amendment is on line three, that

21  at the end --

22             (Off-the record comments)

23         MADAM CHAIR:  Okay.  At line three

24  and 129.

25         Okay.  Guys, can we have everybody



1   quiet in the room?  And that includes

2   legislators unless they're conferring with

3   each other.

4        Okay.  So I can hear.

5        We have an amendment -- thank you for

6   that.

7        We have an amendment on the end of

8   line three, it would say instead of shall,

9   the last words are "shall be" and it would

10   say "may be".  And it would need to be

11   changed on 132.

12        Betsy, read how it would be.

13        MS. HOWERTON:  So it would say:

14   Unless otherwise provided by law.  And

15   you'd have including an unborn child at any

16   stage of development who is carried in the

17   womb may be included in state population --

18        MADAM CHAIR:  Okay.  What it would be

19   to explain that amendment would be that it

20   wouldn't be a must that you had to claim an

21   unborn child in, you know, a census from

22   the state or state statistics.

23        REPRESENTATIVE SETZLER:  Madam Chair,

24   I will say it is -- it's written:  Unless

25   otherwise provided by law, the



Page 194

1  circumstances where that's not appropriate

2  that law already provides for how it's

3  done, the census and otherwise would be

4  those exceptions.  That's already addressed

5  in this.  The shall is only in those

6  circumstances where it's -- it would -- the

7  state has the ability --

8       MADAM CHAIR:  Not done it.  I know.

9  So that is still up for consideration.

10      Everyone in favor of that amendment,

11  raise your hand.

12      Representative Henson.

13      REPRESENTATIVE HENSON:  Are we

14  talking about this being included in the

15  census?  Because then would we be the only

16  state in the nation counting unborn

17  embryos?

18      REPRESENTATIVE SETZLER:  Madam Chair,

19  to the lady's question.  That's why it says

20  unless otherwise provided by law.

21      REPRESENTATIVE HENSON:  That's what

22  I'm asking.  So therefore, we'd have a

23  higher count than we should actually have.

24      REPRESENTATIVE SETZLER:  I'm going to

25  answer your question.  It does not -- this



1  does not apply to the U.S. Census data.

2  State's provide all kind of data to the

3  U.S. Census Bureau, a subset of which they

4  use for their census numbers.  This would

5  not affect our census numbers at all

6  because our census numbers are driven by

7  the U.S. Census Bureau's standards.

8       In circumstances when we use the U.S.

9  Census Bureau standards and apply those to

10  Georgia, voting and a whole number of other

11  circumstances, this wouldn't change that at

12  all.  This just would be extra data we

13  collect as a state and in circumstances

14  that are not provided and prescribed by

15  other code of law, we would use this in

16  those circumstances only.

17       MADAM CHAIR:  All right.  So we've

18  had that explanation.

19       Everybody in favor of the amendment,

20  raise your hand.

21       Everyone opposed, do likewise.

22       Thank you.

23       All right.  Do you have an amendment?

24  Is it ready to go?  I mean, we are not

25  going to be able to sit here and come up



Page 196

1   with amendments all night.

2         Representative Jones.

3         REPRESENTATIVE JONES:  Yes.  Thank

4   you, Madam Chair.

5         On line 131, by striking the word

6   "shall" and inserting the word "may".

7         MADAM CHAIR:  We just did that one.

8         REPRESENTATIVE JONES:  You just did

9   that one?

10        MADAM CHAIR:  We just did that one.

11        REPRESENTATIVE JONES:  Oh, I'm sorry.

12        MADAM CHAIR:  And it failed.

13        REPRESENTATIVE JONES:  Okay.

14        MADAM CHAIR:  And one of the reasons

15  I'm allowing this, so the committee knows,

16  is because this was -- we were late in

17  saying we were going to hear this bill and

18  people really didn't have time to pre-make

19  amendments and I am trying to be as fair to

20  both sides as I possibly can be because

21  both sides of our aisle, Democrat or

22  Republican, whether you agree with them on

23  this issue or not, deserve on this very

24  important issue to have their say and to

25  try to make their amendments.  And then



1   it's up to the committee to deal with those

2   amendments as they wish.

3          All right.  Does anybody else have an

4   amendment?

5          Okay.  Representative Frye.

6          REPRESENTATIVE FRYE:  Thank you,

7   Madam Chair.

8          Lines 260.  This would be an

9   amendment for the points one, two and

10  three.  I don't know how to quickly

11  articulate it, but I'd like for the

12  committee to consider striking -- or adding

13  the presence of a functioning human heart

14  in place of the presence of a human

15  heartbeat on line 260 as well as line 263,

16  as well as line 267.

17         MADAM CHAIR:  I think we did it on

18  one particular place.  Right?

19         So we only -- this is a new

20  amendment.  We only did it for one

21  particular place the last time.  So the

22  amendment is up again on lines 263 and 267

23  to replace heartbeat and insert with a

24  functioning heart.

25         Everyone in favor of this amendment,



1    raise your hand.

2         Everyone opposed.

3         The amendment fails.

4         Are there any other amendments before

5    we vote on the bill?

6         Okay.  We have a motion and a second

7    to move the substitute to House Bill 481 as

8    amended, with the one amendment that I

9    made.  That is the question.

10        We have asked for a roll call vote.

11   Do you still want that, Representative?

12        I don't know why.  You just get the

13   pictures from Representative (inaudible)

14   and you'll be able to tell.

15        Is your camera ready, sir?

16        Everybody smile for the camera.

17        All right.  We're going to do the

18   roll call.  We're starting now.

19        We're moving on the motion to hear

20   again, to pass -- for the passage of the

21   substitute to House Bill 481 as amended.

22        Start the roll call.

23        THE ASSISTANT:  Newton.

24        REPRESENTATIVE NEWTON:  Yes.

25        THE ASSISTANT:  Barr.



1    REPRESENTATIVE BARR:  Yes.

2    THE ASSISTANT:  Grinders.

3    REPRESENTATIVE GRINDERS:  Yes.

4    THE ASSISTANT:  Beverly.

5    REPRESENTATIVE BEVERLY:  No.

6    THE ASSISTANT:  Bennett.

7    REPRESENTATIVE BENNETT:  No.

8    THE ASSISTANT:  Cheokas.

9    REPRESENTATIVE CHEOKAS:  No.

10   THE ASSISTANT:  Dempsey.

11   REPRESENTATIVE DEMPSEY:  Yes.

12   THE ASSISTANT:  Douglas.

13   REPRESENTATIVE DOUGLAS:  No.

14   THE ASSISTANT:  Drenner.

15   REPRESENTATIVE DRENNER:  No.

16   THE ASSISTANT:  Frye.

17   REPRESENTATIVE FRYE:  No.

18   THE ASSISTANT:  Gaines.

19   REPRESENTATIVE GAINES:  Yes.

20   THE ASSISTANT:  Gordon.

21   REPRESENTATIVE GORDON:  No.

22   THE ASSISTANT:  Hatchett.

23   REPRESENTATIVE HATCHETT:  Yes.

24   THE ASSISTANT:  Hawkins.

25   REPRESENTATIVE HATCHETT:  Yes.



1    THE ASSISTANT:  Henson.

2    REPRESENTATIVE HENSON:  No.

3    THE ASSISTANT:  Hogan.

4    REPRESENTATIVE HOGAN:  Yes.

5    THE ASSISTANT:  Howard.

6    REPRESENTATIVE HOWARD:  No.

7    THE ASSISTANT:  Hutchinson.

8    REPRESENTATIVE HUTCHINSON:  No.

9    THE ASSISTANT:  Jaspers.

10    REPRESENTATIVE JASPERS:  Yes.

11    THE ASSISTANT:  Jones.

12    REPRESENTATIVE JONES:  No.

13    THE ASSISTANT:  Kelley.

14    REPRESENTATIVE KELLEY:  Yes.

15    THE ASSISTANT:  LaHood.

16    REPRESENTATIVE LAHOOD:  Yes.

17    THE ASSISTANT:  Lott.

18    REPRESENTATIVE LOTT:  Yes.

19    THE ASSISTANT:  Mathiak.

20    REPRESENTATIVE MATHIAK:  Yes.

21    THE ASSISTANT:  Mitchell.

22    REPRESENTATIVE MITCHELL:  No.

23    THE ASSISTANT:  Parsons.

24    REPRESENTATIVE PARSONS:  Yes.

25    THE ASSISTANT:  Petrea.



1          REPRESENTATIVE PETREA:  Yeah.

2          THE ASSISTANT:  Pruett.

3          REPRESENTATIVE PRUETT:  Yes.

4          THE ASSISTANT:  Schofield.

5          REPRESENTATIVE SCHOFIELD:  No.

6          THE ASSISTANT:  Sharper.

7          REPRESENTATIVE SHARPER:  No.

8          THE ASSISTANT:  Silcox.

9          REPRESENTATIVE SILCOX:  (Inaudible).

10         THE ASSISTANT:  Stephens.  Stephens

11    is absent.

12         Stephenson.

13         REPRESENTATIVE STEPHENSON:  No.

14         THE ASSISTANT:  Tankersley.

15         REPRESENTATIVE TANKERSLEY:  Yes.

16         Nos are 14.  Yays are 17.

17         MADAM CHAIR:  The substitute to House

18    Bill 481 as amended passes.

19         Don't everybody leave.  We have to go

20    back to the Tanner bill.

21         So thank you for everybody's patience

22    with us and letting us try to give

23    everybody, you know, say to this.

24         Can we move back to Representative

25    Tanner's bill?

1           (Brief pause)

2           (Upon resuming).

3      MADAM CHAIR:  Representative Lott, do

4  you have a motion?

5      REPRESENTATIVE LOTT:  Madam Chair, I

6  make a motion to table House Bill 546 that

7  was on for today.

8      MADAM CHAIR:  Okay.  And,

9  Representative Kelley, you have a question?

10      REPRESENTATIVE KELLEY:  Madam Chair,

11  I'd just like to ask the Governor's floor

12  leader by tabling this bill, does that mean

13  the Governor is going to support the

14  measure that this House just passed?

15      REPRESENTATIVE LOTT:  It is my

16  understanding that the Governor of the

17  State of Georgia is very much and

18  unapologetically pro-life and this bill is

19  certainly that.

20      MADAM CHAIR:  The one that just

21  passed.

22      REPRESENTATIVE LOTT:  The one that

23  just passed.

24      MADAM CHAIR:  Okay.

25      Representative Hawkins, did you have



1    a question for Representative Lott?

2          REPRESENTATIVE HAWKINS:  Not really.

3    Just a statement, quick statement.

4          MADAM CHAIR:  Go ahead.

5          REPRESENTATIVE HAWKINS:  I would like

6    to thank the committee and the people in

7    the audience.  I have a grandson that's

8    probably six weeks old now and he's trying

9    to cling to life and we're making the

10   decision to let six week old children live.

11   Thank you.

12         MADAM CHAIR:  Representative Beverly

13   has a question for Representative Lott.

14         REPRESENTATIVE BEVERLY:  Just -- no,

15   on the general lady's motion, I wanted to

16   go ahead and second that to table 546.

17         MADAM CHAIR:  Oh, good.

18         REPRESENTATIVE BEVERLY:  Yes, I

19   wanted to second to table 546.

20         MADAM CHAIR:  Okay.  We have a motion

21   to -- and a second to table 546.  Is there

22   any further discussion on that?

23         All right.  Everybody in favor of

24   tabling 546.

25         Can I have just ayes this time?



1    Everybody in favor say aye.

2        Anyone opposed?

3        Okay.  The ayes have it.  The bill is

4    tabled.

5        Okay.  Back to -- okay.  House Bill

6    514, Representative Tanner's bill.

7        Will you please go to the page that

8    was left out and please look...

9        Okay.  We need to have order.  Excuse

10   me.  Excuse me.  Everybody that's in the

11   room as you leave, please cease your

12   discussions.  We are still in session and

13   we need to be able to hear so we can finish

14   our work.

15       Thank you very much.

16       There are people that are very

17   interested in this bill.

18       Okay.  Everybody has page two.

19   That's what was missing and you will see

20   that basically it talks about the people

21   that are going to be appointed or types of

22   individuals and where -- their backgrounds,

23   where they come from and represent that are

24   going to be on the commission.

25       Do I have any questions about that?



1    Okay.  Representative Beverly.

2         REPRESENTATIVE BEVERLY:  At the

3    appropriate time, I'd make a motion to do

4    pass.

5         MADAM CHAIR:  I've got one question.

6    I'll come back to you for that.

7         Representative Hogan.

8         REPRESENTATIVE HOGAN:  I'd like to

9    second that whenever the appropriate time.

10        MADAM CHAIR:  Okay.  Well, I have no

11   other red buttons at this point so why

12   don't we -- Representative Beverly.

13        REPRESENTATIVE BEVERLY:   Motion do

14   pass.

15        MADAM CHAIR:  A motion on a do pass

16   to House Bill 514 and a second from

17   Representative Hogan.

18        Do I have any further discussion?

19        Okay.  Hearing no further discussion,

20   everyone in the favor of the passage of the

21   substitute to House Bill 514, say aye.

22        Anyone opposed, no.

23        That ayes have it.  Thank you very

24   much.

25        I appreciate the committee and I



```
 1    appreciate everybody that was waiting to

 2    hear the final on that bill.  Thank you for

 3    your patience.

 4

 5              (Proceedings concluded)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1   STATE OF GEORGIA

2   COUNTY OF MUSCOGEE

3

4                  C E R T I F I C A T E

5

6        The foregoing transcript of the proceedings was

7   prepared by me from the electronic media provided to

8   me by Elizabeth Gallo Court Reporting, and I certify

9   that it is a true and correct transcript to the best

10  of my ability of the proceedings.

11

12              This 6th day of June, 2019.

13

14                         _____

15                         Judy K. McNeill
                           Certified Court Reporter
16                         No. B-1611

17

18

19

20

21

22

23

24

25