# EXHIBIT C

1        STATE  OF  GEORGIA  GENERAL  ASSEMBLY

2         THIRTY-SECOND  LEGISLATIVE  DAY

3

4

5

6            2019-2020  REGULAR  SESSION
              Thursday,  March  14th,  2019
7             Georgia  State  Capitol

8

9

10

11    BEFORE  THE  SENATE  STANDING  COMMITTEE  ON
              SCIENCE  AND  TECHNOLOGY
12

13

14     Senator  Renee  S.  Unterman,  Chairperson
              Senator  Greg  Dolezal
15           Senator  Lee  Anderson
         Senator  William  T.  Ligon  Jr.
16          Senator  Jennifer  Jordan
             Senator  Valencia  Seay
17

18          Transcript  of  Hearings

19

20

21

22      Reported  from  electronic  media  by
       Elizabeth  R.  Hollingsworth,  CCR  B-1319
23

24

25



1                              INDEX

2     HOUSE BILL                                        PAGE

3     HB 341    Crimes and offenses; reproduction      6
                of recorded material; update
4               terminology
                Presented by Representative Dollar
5
      HB 197    Office of Planning and Budget;        10
6               provide for the establishment of
                the Strategic Integrated Data System
7               Presented by Representative Dempsey

8     HB 481    Living Infants Fairness and           25
                Equality (LIFE) Act
9               Presented by Representative Setzler

10    (End of Index)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



 1               March 14, 2019

 2                 3:05 p.m.

 3          CHAIRPERSON UNTERMAN:  I'd like to

 4     first of all welcome you to the State Capitol.

 5     And especially if you've never been to the State

 6     Capitol, we welcome you to the State Capitol.

 7               This is the Science & Technology

 8     Committee meeting.  Today's Thursday, March 14th.

 9     And let the record reflect, it's about 3:05 p.m.

10     There's three bills on the calendar.

11               And before we start, I'd like to ask

12     Senator Ligon to have a moment of prayer.

13               (Whereupon a prayer was given.)

14          CHAIRPERSON UNTERMAN:  So with that,

15     let me just read a couple of things.  I know we

16     have a lot of visitors.  They may not have been to

17     the State Capitol before.  If you don't know where

18     the restrooms are, they're downstairs on the third

19     floor.

20               The purpose of today's meeting is to

21     thoughtfully review and consider House Bill 481 on

22     behalf of the Senate and more importantly on

23     behalf of the citizens of the State of Georgia.

24               I certainly appreciate the passion on

25     both sides of this issue, but this committee needs



1    an environment that is conducive to thoughtful

2    consideration of House Bill 481 and two other

3    bills that are on the calendar.

4            As a result, displaced disruptions and

5    outbursts within this room will not be tolerated.

6    I trust that everyone understands what is

7    acceptable conduct in this type of environment and

8    will act accordingly.  Specifically, there will be

9    no applause, boos, or hisses.  There will also not

10   be any loud conversations or any other conduct

11   which may disturb the proceedings.

12           Cell phones are permitted, but they

13   either must be turned off or placed on silent

14   mode.  I know that's always a predicament, so

15   please turn your cell phones off.  Phone calls

16   shall not be initiated or answered during the

17   meeting.  Texting and emailing on a cell phone are

18   permitted provided it is done silently.

19           To everyone who was not able to be

20   accommodated in this room or able to make it to

21   the Capitol today, you can live stream these

22   meetings at Senate.ga.gov by clicking on the

23   Committee Live broadcast link on the main webpage,

24   and then clicking on the Science & Technology

25   meeting.  It will take you to a page to view the

1    meeting.

2             Our nonpartisan Senate Twitter account

3    is also live tweeting.  This meeting is sending

4    out the live stream link as I speak.  Their

5    account is at Georgia Senate Press.  Lastly, the

6    TVs in the hall outside this room are streaming

7    the meeting.

8             Then I have some words for when we get

9    to that bill, but we're not to that particular

10   bill just yet.

11            So with that, let's get started on the

12   very first bill.  I know Representative Dollar

13   said he had an engagement that he had to get to.

14            Representative Dollar, you want to come

15   up to the podium?

16            REPRESENTATIVE DOLLAR:  Would you like

17   me here or here, Madam Chair?

18            CHAIRPERSON UNTERMAN:  Right up there

19   at the podium, please.

20            And first of all, you have House Bill

21   341.  And we are working off of LC --

22            Can everyone hear me?

23            We're working off of LC 28 9140.  And

24   you have the research.  This bill passed the House

25   vote 162 to 3.

1              So Representative Dollar, the floor is

2    yours.

3              REPRESENTATIVE DOLLAR:  Pardon?

4              CHAIRPERSON UNTERMAN:  The floor is

5    yours.

6              REPRESENTATIVE DOLLAR:  Thank you,

7    Madam Chair.

8              House Bill 341 is a simple measure.  If

9    it looks familiar to the committee, that's because

10   this bill actually passed last year.  It's one of

11   about a half a dozen that ran out of time on day

12   40.

13             And what it does is it expands

14   Georgia's piracy law for copyrighted material to

15   include electronic storage devices.  Currently if

16   you go and, you know, copy a movie or audio

17   recording on a disk and sell that, that's illegal.

18   But to do so on an electronic storage device,

19   we're talking about a hard drive, thumb drive,

20   type of these things, it's not covered under

21   current state law.  This does seek to expand that,

22   and it mirrors federal law.

23             CHAIRPERSON UNTERMAN:  Okay.  Is there

24   any questions for Representative Dollar?

25             Is there anyone in the room who signed



1  up to testify for or against this bill?

2          Let the record reflect no one is

3  acknowledging that they're here for or against the

4  bill.

5          Any questions for the author of the

6  bill?

7          No questions.

8          I'll entertain a motion on LC 28 9140.

9  Is there a motion?

10          (Motion by Senator Jordan, Seconded.

11          by Senator Anderson.)

12          CHAIRPERSON UNTERMAN:  There's a motion

13  by Senator Jordan, and it's seconded by Senator

14  Anderson.  Any other further discussion?

15          All in favor, say aye.

16          All opposed?

17          (Motion carries.)

18          CHAIRPERSON UNTERMAN:  The motion

19  carries.  Thank you very much.

20          And who's carrying your bill?

21          REPRESENTATIVE DOLLAR:  I was actually

22  going to see if you had -- if this committee

23  conducted it where you requested somebody.  I

24  don't have a Senate carrier yet, but I can get

25  that for you immediately.

1           CHAIRPERSON UNTERMAN:  Okay.  All

2    right.  We'll get it assigned for you.  Thank you

3    very much, and we sure do appreciate what --

4           REPRESENTATIVE DOLLAR:  Okay.  Thank

5    you, Lady Chair, for accommodating me.

6           CHAIRPERSON UNTERMAN:  Thank you.

7    You're welcome.  Have a good flight.

8           Okay.  With that, Representative

9    Dempsey?

10          Thank you.

11          CHAIRPERSON UNTERMAN:  I can barely see

12   you.

13          REPRESENTATIVE DEMPSEY:  Hey.

14          CHAIRPERSON UNTERMAN:  Okay.  We

15   have --

16          REPRESENTATIVE DEMPSEY:  Good

17   afternoon.

18          I'm going to tell y'all, it's very loud

19   over here.  So I don't know if you-all are able to

20   hear me.

21          CHAIRPERSON UNTERMAN:  Can you hear us?

22          REPRESENTATIVE DEMPSEY:  I can hear

23   y'all a little bit, a little bit.  But as long as

24   you can hear me, that's what matters.

25          CHAIRPERSON UNTERMAN:  Okay.  Wait just

1    a minute.

2              All right.  So we have House Bill 197,

3    and we're working off of Representative Dempsey's

4    Bill LC 33 7770S.

5              REPRESENTATIVE DEMPSEY:  That is

6    correct.

7              CHAIRPERSON UNTERMAN:  This bill passed

8    the House 140 to 28.

9              And before you begin, Representative

10   Dempsey, I just want to say thank you.  We have

11   been working on data analytics in the Senate for

12   three years now with Senator Hufstetler.  It's

13   been our honor to work on this bill.  We're glad

14   you got it through the House this time.

15             This bill has actually, I think, been

16   through the Senate in a different version, but we

17   have been working on it diligently, and we look

18   forward to continue working on it.

19             So with that, you have the floor.

20   Thank you very much.

21             REPRESENTATIVE DEMPSEY:  Well, and I

22   thank you for your work on that, Chairman

23   Unterman.

24             Last year we had both -- we had a House

25   and a Senate bill that both passed out but didn't

 1    connect and make it over to either side.  So this
 2    is a very impactful way, I think, for all of us to
 3    be engaged in changing how we do business.  It's
 4    impactful for Georgia.  It's impactful for the
 5    people we serve.
 6              As we -- I don't know.  As I asked when
 7    I presented the bill on the floor, how many of you
 8    have ever tried to collect data, to try to get
 9    some information out of one of our agencies to
10    affect a measure you're standing before or if
11    you're working on our budget, and it takes a
12    little while?  Because most of our data is static.
13    It's not up to date, operating in realtime as it
14    really needs to be to help us do our very best as
15    we are elected to do.
16              This will create GDAC, the Georgia Data
17    Analytic Center, to be held as a central
18    repository in the Office of Planning & Budget, in
19    OPB.  They have been very engaged in this
20    conversation, are ready to catch this and begin to
21    do it as soon as we can send it their way.
22              Kelly Farr and I have talked frequently
23    about it, and he has even made a brand-new hire to
24    help with the work of monitoring data.  An expert,
25    Chavis Paulk, is already employed here in our



1    state.

2                So the principle on this is very

3    simple.  It will enhance legislative policy

4    decision-making and budgeting through actionable

5    insight using the State of Georgia's, our, very

6    own data that exists today.

7                Our agencies have data.  There are many

8    repositories and many collections of different

9    measures.  But this will allow us to have a

10   central place where we feed in the exact questions

11   and exact information and control it.

12               Just to deal with some of the ways, it

13   will be timely and accurate access to that data.

14   Cross-agency policy mandates that they participate

15   when the need is desired to identify and

16   performance of cost metrics to understand what is

17   going on, and it gives us a true vision for our

18   future.

19               I know there's much that y'all have on

20   your minds.  If you want to go through the bill,

21   I'll be glad to go through that.  If not, it's

22   your pleasure.

23               CHAIRPERSON UNTERMAN:  Just give us a

24   brief overview.  That would be fine.

25               REPRESENTATIVE DEMPSEY:  Just a brief

1    overview.  So if you look at there and as you

2    begin on the first page beginning around line 12,

3    certainly go through the definitions that exist to

4    clarify.

5              About line 47, you will see the

6    definition of the project.  And right here, this

7    is very important.  This will be a hybrid system.

8    Some of the information that is not used

9    frequently will be stored in the Cloud.  But

10   because the Cloud is expensive to pull that data

11   out of it, you pay for it every time.  So for us

12   to be responsible and cost-effective as well, that

13   which needs to be moved around frequently will be

14   left available for us.

15             If you flip over on the third page to

16   line 63, this defines the oversight and the

17   policies where it will be established and vested.

18             If you turn then to Page 4, it

19   continues to go through those policies.  And at

20   the bottom of the page on line 127, it gives the

21   authority to the Attorney General's office to

22   review when there is need for that.

23             Also on 142, it begins to talk about

24   reporting and the reports that will be made so

25   that we are sure that everything is being done

1    responsibly.

2                Line 156, as you move toward the end of

3    the bill, it refers to our funding sources.  There

4    are many ways that we can do through this: through

5    pulling down grants, some of which we are already

6    missing right now because we do not have this

7    realtime actionable data to actually deal with.

8                One example of that is in the opioid

9    crisis particularly.  There are opportunities that

10   we have missed for federal grants because we could

11   not do it quickly and with the substantiated

12   evidence.  It will be about analytics and

13   data-driven solutions as we move forward.

14               We're missing projects right now.

15   We're also dealing with challenges, particularly

16   in our foster care system.  Director Rollins is

17   here.  And in the '19 amended budget that was

18   recently signed, there was money directed in there

19   to help him particularly to deal with the data

20   that allows him to function in a much better way

21   to protect and preserve our children and create

22   the best environments that we possibly can.

23               I would entertain any questions that

24   you may have.

25               CHAIRPERSON UNTERMAN:  Well, since

1   Director Rollins is here, we'd love to have you

2   come up and tell us a little bit about your budget

3   items and how you expect to implement any of these

4   processes.  That would be great.

5             DIRECTOR ROLLINS:  Well, one of the

6   most exciting things --

7             CHAIRPERSON UNTERMAN:  And if --

8             Let me just interject.

9             DIRECTOR ROLLINS:  Oh, sure.

10            CHAIRPERSON UNTERMAN:  If you're here

11  to speak for or against House Bill 197, we'll put

12  some --

13            Did anyone sign up?  No one signed up.

14            Okay.  Go ahead.

15            DIRECTOR ROLLINS:  Thank you.

16            So one of the most exciting things

17  going around nationwide right now is the use of

18  good data that is already present in many state

19  systems to improve our ability to triage child

20  abuse allegations.

21            So we have the potential.  In fact,

22  they're in discussions right now with the

23  Department of Public Health and their vital

24  records, with the Department of Education, and

25  with the Department of Community Supervision about



1  how we might pull data when we receive an

2  allegation of child abuse and neglect to better

3  understand the family's history, to better

4  understand what that family's needs may be, and to

5  better determine whether this is something we need

6  to react to immediately; but also so that we can

7  do things like find family, find what we

8  might -- what our staff might encounter if they go

9  out into the field, for example, if a person is

10  under felony supervision.

11          And so in this particular first round

12  that Chairman Dempsey and you were very kind to

13  help us out with, we are going to be working with

14  our team to put together a project to really at

15  least start off with birth records, probably

16  Department of Community Supervision records, and

17  hopefully educational records to see how we can

18  pull those into our system.

19          We receive about 150,000 -- 140-,

20  50,000 complaints of child abuse each year.  To be

21  able to prioritize and triage those cases better,

22  we need quick access to data.  It is something

23  that I -- I participated in a webinar put on by

24  the American Public Health Services Association

25  this week, and other states are already doing



1    this.  And I'm very excited about Georgia being on

2    the cutting edge of that work.

3          So thank you.

4          CHAIRPERSON UNTERMAN:  Is there any

5    questions for the director?  Any questions?

6          Senator Dolezal, you're three?

7          SENATOR DOLEZAL:  Yes.

8          CHAIRPERSON UNTERMAN:  Senator Dolezal?

9          SENATOR DOLEZAL:  Thank you, Director,

10   for being here.

11         Can you walk me through maybe a

12   specific example of how you have to get data now

13   versus how you would get data if this were to be

14   passed?

15         DIRECTOR ROLLINS:  So let me tell you

16   what Florida is doing and what we have to do.  So

17   Florida right now has a system.  It's called

18   Chronicity.  And they are able to really pull in

19   within about seven hours of receiving a call a

20   good bit of data on the birth record of each

21   child.

22         As y'all may know, a birth record from

23   DPH contains much more than the child's name, date

24   of birth, and parents.  It contains information

25   regarding whether the child was born premature,

1    whether there are certain health conditions,

2    perhaps something about where the family was

3    living.

4            Right now to obtain a birth

5    certificate, our agency -- we get a case in, and

6    we literally -- we go online, and we ask DPH for a

7    birth certificate, and we get it in the mail.

8            And so if we can develop a system

9    whereby we can identify data that would be helpful

10   after we receive the allegation of child abuse and

11   neglect, if we can pull up some relevant data that

12   helps us better understand who that child is and

13   maybe what that child's past circumstances are,

14   then we'll be able to more appropriately triage

15   the case.  Determine perhaps if there's a father

16   in the picture.  Determine whether or not -- you

17   know, sometimes we don't know where children are.

18   We need to track them down.

19           So the more that we can pull in,

20   especially from the birth record, if we can

21   automate that, the better off we'll be.  And we're

22   already in discussions with DPH about that.

23           SENATOR DOLEZAL:  Thank you.

24           CHAIRPERSON UNTERMAN:  Okay.  Any other

25   questions for Director Rollins?



1          We appreciate you staying this

2    afternoon.

3          DIRECTOR ROLLINS:  Yes, ma'am.  May I

4    slip out the back door?

5          CHAIRPERSON UNTERMAN:  Yes, you can.

6    You're welcome to.  You want to get your books,

7    whatever you've got?

8          Okay.  Representative Dempsey, I don't

9    see anyone who signed up in favor or against the

10   bill.  Let's see if we have questions.

11         Does the committee have questions for

12   Representative Dempsey about the bill, any of the

13   lines on the bill?

14         No questions.

15         Let the record reflect there was no one

16   here for or against the bill except Director

17   Rollins, and I think that was purposeful on your

18   behalf.  You didn't want to bring a crowd, but I

19   know there is a lot of people that support this

20   bill.

21         So with that, any other discussion

22   before we are ready to vote on this bill?

23         No other discussion.

24         I'll entertain a motion on LC 33 7770S.

25         (Motion by Senator Anderson.)



Page 19

1          CHAIRPERSON UNTERMAN:   Senator Anderson

2    makes a motion.   Is there a second?

3          (Seconded by Senator Seay.)

4          CHAIRPERSON UNTERMAN:   Senator Seay

5    seconds.

6          Any other discussion?

7          All in favor, say aye.

8          All opposed?

9          (Motion carries.)

10         CHAIRPERSON UNTERMAN:   The motion

11   carries.   Thank you.

12         And --

13         REPRESENTATIVE DEMPSEY:   I believe you

14   have agreed, as I understand, to carry this bill,

15   and I'm so grateful for that.

16         Together I think each and every one of

17   us that are privileged to actually have the

18   opportunity to vote on this are going to make an

19   impactful way on how in the future we not only can

20   legislate and write policy and appropriate, but we

21   will be able to help save lives and direct our

22   state on a much better path.

23         Thank you for your vote.

24         CHAIRPERSON UNTERMAN:   Thank you.

25         If y'all want to go out through Senator



1     Mullis's office, you're welcome to.

2              Okay.  With that --

3         (Whereupon off-the-record discussion

4         ensued.)

5              CHAIRPERSON UNTERMAN:  Okay.  Before we

6     get started on House Bill 481, I was just going to

7     ask the police officers, law enforcement -- I'm

8     not sure.  It's hard to hear in here -- is there

9     any way that it could be a little bit quieter out

10    there?  I don't know if --

11             Senator Dolezal, can you hear good?

12             SENATOR DOLEZAL:  I'm okay.

13             CHAIRPERSON UNTERMAN:  You're good?

14    Okay.

15             I didn't know if, you know, the noise

16    outside is coming in here, and it's hard to hear.

17    At least it is -- I'm a little bit older.  It's

18    hard to hear.

19             All right.  So with that, just for the

20    committee announcements.  I'm not planning on

21    having a vote today.  But what I wanted ask from

22    the committee -- I just got the committee

23    substitute from Representative Setzler.  I gave it

24    to the minority party at the same time I got it.

25    We were putting it in the folder.

1              So what I would like to ask -- I know
2     we're out tomorrow for committee work and being in
3     our districts.  If you have amendments this
4     weekend, I'm asking you to get those to me this
5     weekend in preparation for next week so that I can
6     review them.
7              And if you don't -- I know you can't go
8     to legislative counsel.  If you just want to write
9     them out and email them to me, that will be fine.
10    I don't need -- I don't necessarily need the exact
11    language, but I do need what your intentions are.
12    And then on Monday, if I have your exact language,
13    that would be good.
14             So today I'm anticipating that this
15    meeting will be about three hours long.  We have
16    set it up one hour for testimony from those in
17    opposition and one hour for testimony for those in
18    favor.  And then I've allocated an hour for
19    committee discussion.  I'm not sure that we're
20    going to need that, but I just wanted everyone to
21    know that you're going to be here for a while.
22    And we have plenty of water, and we'll probably
23    take a break for a restroom break in between
24    those.
25             So I'm going to go ahead and start out.



1    And, Representative Setzler, if you'll go up and

2    give us an introduction to your substitute.  We're

3    working on House Bill 481.  And correct me if I'm

4    wrong, but I believe we have a substitute.  And

5    what is your LC number on your substitute?

6                    REPRESENTATIVE SETZLER:  Sure.  The LC

7    is 22 9335S.

8                    CHAIRPERSON UNTERMAN:  Yes.  That's

9    what we have distributed in your folders.  So let

10   the record reflect that we're working off of House

11   Bill 481 as a substitute LC 28 9335S.

12                   And, Representative Setzler, I

13   appreciate you working with me.  If you'll just go

14   to the podium and present your bill.

15                   REPRESENTATIVE SETZLER:  Thank you,

16   Madam Chair, Ladies and Gentlemen of the

17   Committee.  Madam Chair, if I could, before we

18   begin our present --

19                   CHAIRPERSON UNTERMAN:  I don't mean to

20   interrupt you.  I think the people outside signed

21   up.

22                   So, Senator Harrell, if you could put

23   these in the back if anyone in the room wants to

24   sign up.

25                   UNIDENTIFIED PERSON:  (Inaudible.)

1    Thank you.

2            CHAIRPERSON UNTERMAN:  Thank you.

3            If anyone in the room wants to sign up.

4            REPRESENTATIVE SETZLER:  And, Madam

5    Chair, if it please the Chair, is there a way that

6    I could influence the people speaking on behalf of

7    the bill from a sign-up perspective?

8            I had a list of folks for that that

9    were not signing up here, but I wanted to see if I

10   could have some influence of sort of the order in

11   which they speak.  Would that be possible?  Or

12   it's just obviously the Chair's call on that.

13           CHAIRPERSON UNTERMAN:  We'll wait till

14   we get to that point and see how many people sign

15   up.  I'm not sure how many people are signing.  I

16   do know that we're going to have one hour for and

17   one hour against.

18           REPRESENTATIVE SETZLER:  Okay.

19           CHAIRPERSON UNTERMAN:  We're not going

20   over that hour.  So however many people there are,

21   you need to divide up the time.

22           REPRESENTATIVE SETZLER:  Yes.  That's

23   precisely why I wanted to be able to allocate that

24   time smartly in a way that's most effective to the

25   committee.



1          CHAIRPERSON UNTERMAN:  Sure.  Sure.

2     Okay.  We'll see how many people sign up, and then

3     that way we'll know how long.

4               We want everyone to have the

5     opportunity to be able to speak.

6               REPRESENTATIVE SETZLER:  And I would

7     say, Madam Chair, my folks -- there's not a person

8     that I brought to speak on behalf that's in the

9     room right now.  They're all stuck outside.  So if

10    there's a way we could facilitate that.  I do have

11    one person that I designated, one of the highway

12    patrolmen.

13             CHAIRPERSON UNTERMAN:  Okay.

14             REPRESENTATIVE SETZLER:  But I don't

15    know how to physically even get them in the room

16    right now.

17             CHAIRPERSON UNTERMAN:  Okay.

18             REPRESENTATIVE SETZLER:  So as it

19    please the Chair, we could work through that.

20             CHAIRPERSON UNTERMAN:  We'll get there.

21             REPRESENTATIVE SETZLER:  I appreciate

22    it.

23             CHAIRPERSON UNTERMAN:  We'll get there.

24             REPRESENTATIVE SETZLER:  Madam Chair

25    and Members of the Committee, I appreciate your

1    consideration of House Bill 481 today.

2              As you well know, this is an important

3    question before the committee, and I appreciate

4    the lady's indulgence in being able to make the

5    initial presentation.

6              House Bill 481 is a bill that's

7    anchored in solid science, solid law, and what I

8    believe to be the commonsense values of regular

9    Georgians.  What I want to do today is walk

10   through some of the scientific and legal

11   underpinnings of it and then walk members of the

12   committee through the way the bill works to

13   accomplish its ends.

14             That's what HB 481 does, is it, as

15   states have the ability to do, recognizes the

16   humanity of the child in utero more expansively

17   than the minimum standards required of federal

18   law.

19             There's been a lot of discussion in the

20   media about what this bill does and what it

21   doesn't do.  But what it does principally is it

22   recognizes a whole class of people that have not

23   been recognized fully by law -- fully under

24   Georgia law.

25             As we recognize in our compound



1 republic with the Federal Constitution, the

2 Federal Constitution sets a minimum baseline by

3 which people's rights are protected.  In fact, as

4 we know, in 1868 when the Fourteenth Amendment of

5 the Constitution was passed, it was passed

6 specifically to give rights to an entire class of

7 people that had never been recognized with rights

8 before.  It was able to expand rights to those

9 that have been recognized as human beings but not

10 given full legal status under the law.

11          What HB 481 does is it recognizes that

12 states have the ability to recognize rights more

13 expansively, more generously than the minimum

14 standards that apply under federal law.  And

15 that's exactly what HP 481 does.  It's tailored

16 narrowly for that purpose, and it does some very

17 specific things I'd like to walk you and the

18 committee through today.

19          Madam Chair, as we recognize from the

20 beginning of our nation, life is the paramount

21 right.  Our State Constitution recognizes that the

22 protection of person and property is the paramount

23 duty of government.  Our State Constitution says

24 that very clearly.

25          And consistent with that State



1    Constitution, HB 481 recognizes that there's an

2    entire class of living distinct people that are

3    distinct from their mothers.  They have their own

4    blood type.  They have their own circulatory

5    system.  They have their own heartbeats and but

6    for nourishment and a safe place to live, can grow

7    to full adulthood like the rest of us.

8              And what HB 481 does is it recognizes

9    that we know biologically from the moment of

10   conception you have a growing human being.  But

11   then at the point of a -- the point of a

12   heartbeat, you've got the threshold that

13   throughout law we recognize as a legally and

14   scientifically significant threshold.  Page 2 of

15   the bill, Section 2, really walks through those

16   legislative findings.

17             One thing I would like to recognize is,

18   is that as we talk about the science of this,

19   science tells us that human beings beginning at

20   conception are living and distinct human beings.

21   The American College of Obstetrics and Gynecology

22   recognized in the 2015 guidelines that the

23   standard for a viable intrauterine gestation, as

24   it's called, is heartbeat; that you know a

25   pregnancy is viable at that point; and at that



1  point, you have a 95-percent likelihood of the
2  pregnancy going forward to birth and to life as we
3  recognize it here in Georgia today.
4          Furthermore, again, science tells us
5  and law tells us that since the early 1980s, the
6  Uniform Determination of Death Act, UDDA --
7  promulgated by the American Bar Association,
8  recognized by the American Medical Association --
9  establishes that there are three criteria, three
10  test points, by which life exists: if a person has
11  a heartbeat, has respiratory activity, or has
12  brain activity.  If one of those three exists
13  without life support, the person is alive.
14          So heaven forbid somebody here were
15  driving home today, and they had an accident, and
16  there was a question whether they're alive or not.
17  Determinations of life are made today that if
18  respiratory activity, brain activity, or heartbeat
19  exists, then the person's alive.  So in every
20  other context in life, we recognize legally and
21  scientifically a person's alive if they have a
22  beating heart.
23          Why would we treat it differently in
24  the womb?  This bill simply recognizes what
25  science tells us.  This bill simply recognizes



1   what law has told us since the late 1970s and

2   early 1980s, that a beating heart represents life.

3   That Uniform Determination of Death Act, we talk

4   about it in a death context typically.  But as we

5   look at it very clearly and distinctly in this

6   life context, we recognize that in more than 35

7   states and under federal law, that is the standard

8   by which life is established.

9           And what we do in HB 481 is we

10  recognize that science and law tell -- what

11  science and law tells us; that the threshold of

12  having a human heartbeat is the threshold by which

13  life is recognized.  And this bill simply seeks to

14  recognize that life fully under state law.

15          When we consider our ability to

16  recognize, Madam Chair and Members of the

17  Committee, life more expansively than the federal

18  law requires, we need not look for it.  We

19  recognize that under Georgia law, our Fourth

20  Amendment privacy protections.  We have more

21  protections of being secure in our persons of

22  privacy from unreasonable search and seizures than

23  the minimum standard applied under federal law.

24  There's a number of contexts we can apply.

25          Furthermore, we think about states



1  being able to expand rights and recognize rights

2  more expansively.  We need look no further than

3  the state of Massachusetts which almost two

4  decades ago recognized same-sex marriage.  The

5  franchise of marriage.  The minimum standard was

6  that people of opposite sexes would be recognized

7  in all states as being married.

8           Massachusetts recognized that more

9  expansively.  They said people of the same sex can

10  be recognized in the Commonwealth of Massachusetts

11  as being married.  They have the ability to

12  recognize that franchise more generously, and

13  that's the same legal tradition we're operating

14  under here.

15           So in that tradition -- and that's even

16  applied, Madam Chair, not just in those couple

17  cases.  There's case after case after case in the

18  history of our republic where states are able to

19  more expansively recognize rights.  And what HB

20  481 does, it follows in that tradition.

21           In fact, there are even some

22  circumstances -- if you go back to the case of

23  Pruneyard v Robins, 1980 case from California,

24  that a privacy interest was asserted by people in

25  California; that the United States Supreme Court



1    said, you don't have that privacy interest.

2    Nowhere in law has that been established for you

3    as a resident of California.

4              In California, the legislature acted.

5    And after the legislative enactment, they

6    recognized that right specifically.  And then

7    after that, it was challenged again; and it was

8    recognized by the US Supreme Court.  Initially no

9    right existed, the legislature acted, and that

10   right was then recognized as a more expansive

11   right granted by the State of California to their

12   citizens.  It's that exact same structure we're

13   walking through here in HB 481.

14              We talk about the scientific

15   significance and solidity of HB 481.  This is also

16   legally substantial in solid bill.  It's very

17   interesting, Madam Chair.  There will be people

18   that come behind me that talk about the -- as they

19   attack the validity of the bill, they're going to

20   talk about constitutionality.  They're going to

21   talk about a whole number of things.

22              One thing I want to recognize, I don't

23   have -- we don't have the ability to go through

24   all the cases related to the abortion question

25   today perhaps, but I'm happy to have that



1    discussion as it pleases the committee.

2           One thing that was said in 1973 in the

3    Roe versus Wade decision -- a couple things were

4    said.  One of the things that was said was in the

5    dicta.  You can read this in the opinion.  One of

6    the justices said to the plaintiff's counsel that

7    was actually bringing the case, he said, Counsel,

8    don't you recognize that if the state establishes

9    the personhood of the human being, your entire

10   case crumbles?

11          And the response of the plaintiff's

12   attorney who was actually bringing the case on the

13   pro-abortion side of the case said, I recognize

14   that.

15          If the state recognizes the person of a

16   human being, the entire Roe case crumbles.  I say

17   that with a full stop.

18          What we're doing here is we're

19   recognizing the human beings that are

20   scientifically distinct from their mothers as

21   their own persons.  We're recognizing them under

22   law not just as human but as a person under

23   Georgia law.  That's what HB 481 does.  It follows

24   the recommendation -- it follows the process that

25   our federal courts have given us to be able to



1    establish the right of the child in the womb more

2    expansively.

3              Madam Chair, furthermore, before we get

4    into the details, I think the commonsense

5    understanding of Georgians also informs us of

6    this.  And when you think about when life begins,

7    you think about inside the womb as this human

8    being develops.  You know, what are the legal

9    thresholds?  What are the significant biological

10   thresholds that would guide us?

11             Going back to Roe and Casey and other

12   decisions, the opinions themselves tell us the

13   idea that viability of the child being able to

14   live outside the womb is in the words of the

15   opinions themselves somewhat of a dubious

16   standard.  There was really no other standard they

17   understood in 1973.

18             We'll have testimony later today, Madam

19   Chair, that talks about that ultrasonography and

20   the ability to see life in the womb in 1973 was

21   not within the practice of obstetrics.  It was

22   over in the radiology lab.  The obstetricians

23   didn't have the tools we have today.  But with the

24   emerging understanding of the distinct living

25   human beings that we're talking about here, we're



1   going to lay the groundwork for you in this

2   process, Madam Chair, to recognize fully to

3   recognition is approximate.

4           Madam Chair, I won't go through the

5   legislative findings in Section 2 anymore.  But if

6   it pleases the Chair, if there are some questions

7   at this point, I'll be glad to take them, or we

8   can walk through the provisions of the bill.

9           CHAIRPERSON UNTERMAN:  Let's go ahead

10  and walk through the bill.

11          REPRESENTATIVE SETZLER:  Thank you,

12  Madam Chair.

13          If I could direct your attention to

14  beginning on line 61, subsection 1-2-1, the bill

15  recognizes what we know biologically and what

16  people know in common sense that the human

17  being -- that human life begins in the womb.  And

18  we recognize natural persons as including an

19  unborn child.

20          We provide some definitions here that

21  we think are very medically appropriate for the

22  bill.  We talk about -- in fact, we provide in

23  this bill in a way that was asked in the House and

24  then provided in this Senate substitute by the

25  request of members on both sides, the question we



1    define:  Detectable human heartbeat.  We define

2    unborn child clearly.  We don't reference other

3    parts of the code.

4            And we recognize that for state-based

5    population determinations -- whether it's the

6    Department of Community Affairs allocating

7    resources across fast-growing counties or

8    whether it's hospitals, whether it's

9    disproportionate-share hospitals, hospitals that

10   are balancing scarce resources, we recognize that

11   obstetricians treat not just the mother, but they

12   treat two patients; and that children in these

13   circumstances should be treated on statewide

14   population counts.

15           Madam Chair, this in no way affects our

16   census counts.  This in no way affects voting.  It

17   doesn't do that.  This is just for those purposes

18   in which the State makes these population-based

19   allocations because we know that for our voting

20   process and many things even defined in State law,

21   we follow the census count rules by the US Census

22   Bureau, and that would not be changed under this

23   bill.  You can see on line 67, "Unless otherwise

24   provided by law ..."  Other law provisions would

25   still prevail.  But in those circumstances in



1    which there are not specific provisions to the

2    contrary, this standard would apply with respect

3    to those population counts.  Because we know --

4    for example, in our healthcare system, we know

5    that the child in utero is really, truly as a

6    separate patient.

7              The unborn child definition, just to be

8    very clear, again, includes children in any stage

9    of development that's carried in the womb.  Most

10   of the legal benefits apply at heartbeat.  What

11   we're doing here, though, is we recognize an

12   unborn child is at any stage in development in the

13   womb.  It doesn't apply to extracorporeal embryos.

14   It doesn't apply to IVF clinics.  This is a child

15   in the womb that's growing inside their mother.

16   That's the definition of an unborn child here.  We

17   think that's appropriate.  And, again, Madam

18   Chair, before we move on from this, the

19   definition, again, of unborn child is consistent

20   with your bill, Senate Bill 77 from 2006 as it

21   applies in 16-5-80.

22             Madam Chair, again, as we walk through

23   the bill, I want you to understand, we believe

24   that it's appropriate scientifically and medically

25   that we recognize the humanity of the child



1    beginning at inception.  But with respect to the

2    legal rights contemplated in this bill, I want to

3    be very clear.  The legal rights and any

4    restrictions contemplated in this bill, those

5    apply with the presence of a human heartbeat.

6            We recognize in the early beginnings of

7    life that sometimes it's unclear whether a

8    pregnancy is going to be viable.  Sometimes women

9    spontaneously lose their children.  And before the

10   heartbeat's present, that happens with enough

11   regularity that we believe that even though it is

12   a growing human being, we're not going to -- we

13   don't allow full -- under this bill, full -- the

14   legal status of the child to apply.

15           The legal status is going to apply with

16   respect to any restrictions and tax benefits and

17   other benefits at heartbeat because that's a

18   definable, measurable threshold that we think's

19   important to make sure that we can administer

20   this.  We can manage it appropriately.  And we're

21   not just -- we don't want the ambiguity of the

22   earliest life to cloud our first priority to the

23   State which is to be a state of laws that's

24   well-managed and that is able to effectuate the

25   policy in HB 481 effectively.  So the threshold



1    for all legal protection is here, and any

2    restrictions will apply at the point of a

3    detectable human heartbeat.

4              Madam Chair, on line 4, we define

5    medical emergency.  Medical emergency is defined

6    as it is under our current code.  House Bill 954

7    in 2012 defined that clearly.  We bring that

8    definition over as we do the definition of a

9    medically fetal pregnancy for medical futility.

10             Spontaneous abortion is defined here

11   again.  We want to provide clarity and solidity in

12   the law.  And at the Chair's behest and the

13   request of members on both sides of the building,

14   we provided these definitions so there's no

15   question exactly what we're talking about, and

16   it's legally and medically sound.

17             Madam Chair, lines 109 through 113 is

18   the operative part of the abortion provisions.  It

19   says no abortion shall be authorized or performed

20   if the unborn child has a detectable heartbeat.

21   The provisions on that are -- of a detectable

22   heartbeat are over in the Medical Practice Act in

23   Title 31, 31-9B-2.  And there are some relatively

24   minor changes that are required because we already

25   have the duty for doctors to perform -- to



1  ascertain the week of gestational age before an

2  abortion is performed in our state.  This just has

3  the determination of a fetal heartbeat.

4              One thing, Madam Chair, we're very

5  careful to do in this bill, we give very broad

6  berth and very broad discretion to the practice of

7  medicine in this.  We as a general assembly have

8  always done that.  We're not defining a standard

9  of care here.  We're not talking about what kind

10  of ultrasound instruments are used.  We're not

11  defining these things in statute because this

12  state has always, and I think rightfully, gives

13  broad discretion to physicians to use their

14  medical judgment within the confines of law that

15  we define.  And I think that's -- I think you'll

16  see that as you study the bill.

17              The prohibition of abortion with the

18  presence of a human heartbeat, however, has a few

19  exceptions.  I will tell you that from the

20  perspective of the bill, we went to some real

21  lengths to create a bill around which we can get

22  consensus.

23              We recognize that no matter the manner

24  of conception -- whether a child's conceived in a

25  loving family, conceived in an unplanned way,



1  conceived in rape -- those children are all

2  equally innocent before the law and have the same

3  value.  What we're wrestling with in this, though,

4  the fact that there was an exception here for

5  cases in which a woman is raped, is we're trying

6  to recognize the emotional complexity of that.

7  We're trying to recognize the difficulty of the

8  situation of a woman who's trapped in that

9  unintended and unwelcome circumstance and weigh

10  this out.

11          I'd love to have a bill, Madam Chair,

12  and I'd love us to have a state that there could

13  be consensus among all Georgians that all lives

14  are worthy of full legal protection from abortion.

15  I think this recognizes the difficulty of this

16  question.  This recognizes the strong opinions of

17  us at this debate and seeks to land in a place

18  that there's a circumstance where a woman's been

19  raped or a child is conceived in incest, that

20  there is a provision that would allow abortion to

21  continue up to our current standard.

22          Madam Chair, abortions after 20 weeks

23  are not -- even for rape and incest are not

24  allowable under our state law.  This doesn't

25  change that.  That 20-week threshold remains.  But



1    the point of fetal heartbeat, there would be an

2    exception for children conceived in rape and

3    incest.

4              Also, Madam Chair, consistent with our

5    federal courts and our existing law, there is a

6    provision that if a physician determines in their

7    reasonable medical judgment that a medical

8    emergency exists, then that would be an

9    opportunity for the physician to perform an

10   abortion.  Medical emergency is defined rigorously

11   in seven lines at the top of the page because we

12   think it's very important to provide clarity

13   there, but it also provides broad discretion to

14   physicians in making that determination.

15             Lastly on lines 126 to 127, there's a

16   provision for if a physician determines that a

17   pregnancy is medically futile, that abortion, as

18   it's allowable under our current law, would be

19   allowable.  It defines medical futility in this.

20   Again, I've got some misgivings about this, but,

21   again, Madam Chair, in the interest of providing a

22   bill that we can move towards consensus.

23             My heart would be to get a bipartisan

24   bill.  That may or may not happen.  But I think

25   the provisions here put us in a place that I



Page 42

1   believe we can look and say we've listened to all

2   sides.  We're trying to find a middle ground

3   that's appropriate but that protects life in the

4   womb with a human heartbeat, I think, as science,

5   law, and common sense would suggest.

6              Madam Chair, going down to the middle

7   of Page 5, line 152, one change that's recognized

8   in this bill that's changed from the House

9   version, based on some folks that brought this to

10  me about providing law enforcement officials

11  broadly the ability to have access to records, we

12  do limit it back to district attorneys in this

13  bill.

14             We do broaden it to district attorneys

15  both where the abortion is performed or the woman

16  on whom the abortion is performed lives because we

17  believe there may be an interest from a

18  perspective of a district attorney, whether a

19  woman's at home taking a medical abortion.  It

20  provides the mechanism to keep that within the

21  realm of district attorneys but, again, based on

22  the feedback we got from other members.

23             Line 154 provides access to civil

24  action if there's been a violation of law in the

25  performance of the abortion.

1                    And then, Madam Chair, at your

2     behest -- and I appreciate your leadership on this

3     and the leadership of others -- beginning on line

4     158, there's some affirmative defenses for medical

5     practitioners who accidentally cause the loss of

6     the life of a child.  I think we'd do well to make

7     sure that unintended consequences are clearly

8     protected under the law.  I don't know that it's

9     absolutely necessary to have this.  But at the

10    lady's request and the request of some members, I

11    think we'd do well to clarify that with reasonable

12    limitations.

13                   We also, Madam Chair, clarify on lines

14    172 and 173 that if a woman seeks an abortion

15    based on the honest belief that she has a medical

16    emergency, that she's in no way going to be

17    subject to any kind of prosecution.  Again,

18    there's broad protections for women seeking

19    abortions -- protections from prosecution -- but

20    this provides another recognition of that here in

21    the bill.

22                   Madam Chair, Section 5, I'd like to

23    direct the members' attention to.  At the request

24    of members candidly on both sides of the political

25    aisle, the question was raised about women being



1   supported during their pregnancy.  I think it's a

2   very fair question, something that this

3   legislature, I think, has been very generous to.

4           Under our current structure, we

5   recognize women who are pregnant for prenatal care

6   and childbirth services.  We provide public

7   funding for that through Medicaid at more than two

8   times the threshold in which other adults receive

9   Medicaid because we recognize and have long

10  recognized the value of the child in the womb.

11  What this does, it takes it a step further, Madam

12  Chair.  Section 5 recognized that there were some

13  limitations -- and I'll speak to the reasonable

14  limitations in a moment -- that a woman who

15  conceives and the child reaches the threshold of

16  having a detectable heartbeat, the woman can

17  pursue a child support action from the father.

18          The question was raised, again, by

19  people on both sides of the aisle, and I think we

20  recognize that the dads are part of the picture

21  here, and the dads ought to be present.  And what

22  we do with this, Madam Chair, though, we

23  limit -- we recognize that the cost of carrying

24  a child in utero might be less -- typically it

25  would be less than carrying a child that's going



1    to school and so forth.  So we limit it.

2              The maximum amount would be direct

3    medical and pregnancy-related expenses so that

4    there couldn't be some kind of windfall.  We

5    wouldn't want to have, you know, people conceiving

6    a child with a very wealthy father and able to

7    draw more dollars down during pregnancy than

8    perhaps was appropriate for their direct medical

9    expenses.  We think that limitation strikes the

10   balance to support women in their pregnancy.  I

11   appreciate the Chair's direction on helping us try

12   to find that balance.  And I think it's something

13   that even the folks that may not like other parts

14   of this bill can recognize is a feature that

15   supports women in a very appropriate way.

16             Madam Chair, Section 6 recognizes that

17   today under law, at the point of quickening,

18   somewhere in the 15-, 16-, 17-week range, that if

19   there's a -- in the civil setting, if there's the

20   death of a child, the full value of the life of

21   the child is available upon quickening.  What that

22   means, that goes all the way back to the English

23   common law.  Quickening means that the mom can

24   feel the child moving around inside of her.  And

25   if we're at that threshold, the full value of the



1    life of the child can be recovered in a civil

2    setting.

3            This recognizes that threshold -- the

4    legally significant threshold of the presence of a

5    heartbeat again.  Again, you might consider that

6    "Quickening 2.0."  We know what's happening inside

7    of the mother.  We know you have a beating heart.

8    We know you've got circulatory activity with the

9    blood system.  We think that's the appropriate

10   legal threshold by which the full value of the

11   life of the child, again, consistent throughout

12   our laws.

13           Madam Chair, Sections 7 and 8, I'm glad

14   to speak to the specific provisions of it.  What

15   it really does is it gets into our Woman's Right

16   to Know Act and simply puts in the language the

17   "presence of a detectable human heartbeat" next to

18   the current structure that deals with weeks of

19   gestation.  That language really tracks all the

20   way down through Section 11.  So 7, 8, 9, 10, and

21   11 really just track and add the language into

22   that existing code.  But, again, if there's some

23   question, I'm glad to address it, Madam Chair.

24           From a policy perspective, Section 12,

25   that's something that we recognize in the House.

1   We recognize that a member of the human community

2   and expecting parents incur costs.  We recognize

3   if we're establishing the legal significance of

4   the child, that upon the establishment of a

5   heartbeat, that we have a new member of our human

6   community and ought to have tax status.

7           So this simply recognizes if mom and

8   dad become pregnant in December of 2018 with their

9   first child, then for their 2018 taxes, they would

10  have three family members with respect to

11  exemptions rather than two.  It, again, provides a

12  legally significant threshold being a human

13  heartbeat.  This is a modest amount of money, but

14  it recognizes the cost of parenting.  As we do in

15  our tax code, I think it's consistent, modest, and

16  appropriate as we address this proposition, Madam

17  Chair.

18          With that, the last couple sections of

19  the bill just deal with the severability clause,

20  the effective date this would become if acted upon

21  by this general assembly on January 1st of 2020.

22          With that, Madam Chair, glad to stand

23  for questions.

24          CHAIRPERSON UNTERMAN:  Okay.  Let me

25  just ask you, on Section 12, did you ask for a



 1    fiscal note?

 2              REPRESENTATIVE SETZLER:  What we're

 3    doing, Madam Chair, since we knew there were going

 4    to be some new version of it, I'm asking for a

 5    fiscal today on this version.

 6              I have talked to the Department of

 7    Revenue.  I've talked to our Ways and Means

 8    Chairman of the House.  I could give an estimate

 9    where I think we are.  I don't want to be -- I

10    don't want to try to play the fiscal office.

11              I do believe when you look at the

12    universe of children that are born, then you look

13    at the fact that children that are conceived

14    January, February, March, April, they're going to

15    be conceived in the first year and born in the

16    same year.  There would be no tax benefit.

17              That's really people conceived in the

18    last half, six, eight -- six, seven, eight months

19    of the year.  That limits the cost.  There's a

20    number of families that don't file income taxes

21    based on where their income was.  There's also

22    folks that from a tax perspective take a standard

23    deduction.

24              So as you whittle that down, we think

25    we're somewhere in the 7-, 8-, maybe



Page 49

1    $9-million-a-year range for this.  But all those

2    dollars are going directly back to young families

3    that have kids on the way.  And, again, now that

4    we've got an LC version, I think with some

5    stability, we're already in that process of

6    finalizing that.

7              CHAIRPERSON UNTERMAN:  Did they give

8    you any indication of when they would have it?

9              REPRESENTATIVE SETZLER:  I'll express

10   the Chair's interest in getting that back ASAP.

11             CHAIRPERSON UNTERMAN:  Thank you.

12             All right.  Could you give us -- before

13   we start to ask questions -- your list of those

14   speakers.  And perhaps we can --

15             REPRESENTATIVE SETZLER:  Madam Chair,

16   I've got a -- I've given a list to Mr. Cole Muzio

17   out front.  I can write them down.  If he can --

18   I've asked him to kind of get our folk together.

19   I can --

20             CHAIRPERSON UNTERMAN:  Can you tell him

21   to get in touch with Mr. Cook?

22             REPRESENTATIVE SETZLER:  Okay.  I can

23   name most of them now if that helps you.

24             CHAIRPERSON UNTERMAN:  No.  Well, no,

25   it really doesn't.  Who did you give it to?

1          Oh, to you?

2          UNIDENTIFIED PERSON:  Yes.  He's right

3     outside now.  I can get him.

4          CHAIRPERSON UNTERMAN:  Okay.  If y'all

5     just get out there and get them lined up.

6          So let's let the senators ask the

7     author of the bill any questions that you might

8     have as a precursor.

9          Did Senator Dolezal leave?

10          He's coming back?  Okay.

11          Is there anyone who has any questions

12     for the author?  Y'all's lights aren't turning on.

13     Just raise your hand.

14          Senator Jordan?

15          SENATOR JORDAN:  Thank you.

16          CHAIRPERSON UNTERMAN:  What number are

17     you?

18          SENATOR JORDAN:  I'm number nine.

19          CHAIRPERSON UNTERMAN:  Okay.  Thank

20     you.

21          SENATOR JORDAN:  Thank you, Madam

22     Chair.

23          Representative Setzler, the guarantee

24     of due process under the US Constitution exists to

25     prevent unwarranted governmental interference for

1   personal decision in life; isn't that correct?

2            REPRESENTATIVE SETZLER:  It is -- that

3   is among the purposes.  The due process is that

4   we -- again, if you follow that, it's all in

5   furtherance of us fully recognizing our

6   affirmative rights.

7            SENATOR JORDAN:  Exactly.

8            And a woman's ability to decide whether

9   to have children or not involve the most personal

10  choices a person may make in a lifetime, choices

11  central to personal dignity and autonomy and that

12  are central to the liberty protected by the

13  Fourteenth Amendment; correct?

14           REPRESENTATIVE SETZLER:  Ma'am, I think

15  if you follow the court decisions on the abortion

16  question, I think there's been established in our

17  federal courts a liberty interest of the mother,

18  liberty -- privacy interest of the mother that the

19  court's giving great deference to.  And that's

20  what we're balancing with this bill is we're

21  balancing the liberty interest of the mother,

22  which I think we recognize the courts -- the

23  federal courts have established -- with the life

24  interest of the child.

25           And this bill seeks to recon -- seeks



1  to address those, not ignore them.  Take them on

2  in a meaningful, direct, and appropriate way and

3  strike that balance as I think the courts would

4  expect us to.

5           And I think where this bill addresses

6  it, it strikes the balance in place perhaps

7  different than some would choose to strike it, but

8  this does -- this bill seeks to recognize the life

9  interest of the child, the privacy interest of the

10 mother.

11          For example, the question of rape and

12 incest, those are all things that are incident to

13 this privacy interest of the mother we recognize;

14 and how we balance that is what this bill is

15 seeking to achieve, the appropriate balance.

16          SENATOR JORDAN:  And I was glad to see

17 in the committee substitute that you're now using

18 the Georgia constitutional language because you're

19 aware that the Federal Constitution, the

20 Fourteenth Amendment applies to people that are

21 born; correct?

22          REPRESENTATIVE SETZLER:  Actually, if

23 we could speak to that.  I appreciate that.  The

24 Federal Constitution -- and if someone's -- I

25 didn't bring one with me, but I did look this up



 1    on questioning earlier.  If someone's got one

 2    here, I can look it up on a phone.

 3              SENATOR JORDAN:  I have the language of

 4    the Fourteenth Amendment.

 5              REPRESENTATIVE SETZLER:  We're going to

 6    go there.

 7                   I appreciate that, ma'am.

 8                   If the lady would indulge me.

 9                   The Fourteenth Amendment, the birth

10    provision -- and, again, I think it's an

11    appropriate thing to get into.

12                   "All persons born or naturalized in the

13    United States, and subject to the jurisdiction

14    thereof, are citizens ... [in] the state [in

15    which] they reside."  So the birth component links

16    to citizenship.  Okay?  "No state shall make or

17    enforce any law ..."  It goes on.

18                   So as you follow this down, the birth

19    component deals with citizenship.  But,

20    furthermore, it says, "... nor shall any state

21    deprive any person" -- not birth -- "person of

22    life, liberty, or property, without due process of

23    law ..."  So the due process provisions in the

24    Fourteenth Amendment tie to personhood, not to

25    birth.

1           Furthermore, "... nor deny to any

2    person within its jurisdiction the equal

3    protection of the laws."  That is right at the

4    heart of this question to the lady from North

5    Atlanta.  Personhood ties to equal protection and

6    due process.  Birth ties to citizenship.

7           SENATOR JORDAN:  But now I'm confused

8    because the whole -- your whole argument has been

9    Pruneyard gives Georgia -- the State of Georgia

10   the ability to go further than the Federal

11   Constitution with respect to the protections that

12   we may provide our citizens.  That was your

13   argument earlier; correct?

14          REPRESENTATIVE SETZLER:  Pruneyard is

15   just one example of many.  I cited that as an

16   example.  We could align a whole number of cases

17   where states recognize rights more expansively.

18          SENATOR JORDAN:  And with respect to

19   Pruneyard, you kept saying that the US Supreme

20   Court allowed a legislative act to then basically

21   trump or provide more rights than the US

22   Constitution.

23          But, in fact, what they were talking

24   about dealt with the State Constitution in and of

25   itself; correct?



1          REPRESENTATIVE SETZLER:  Well, let me

2    draw the distinction.  I appreciate the question.

3          Again, Pruneyard is one of many cases.

4    I think you would agree that states can more

5    expansively recognize rights than the Federal

6    Constitution does.  Would the lady agree with that

7    as a proposition?

8          SENATOR JORDAN:  No, I would not.  Not

9    with respect to this case.

10         REPRESENTATIVE SETZLER:  Okay.  Not

11   with respect to this case.  Would you recognize it

12   in another context?  In a privacy context?

13         We have Fourth Amendment protections

14   here in our state that the federal government

15   doesn't recognize.  For example, at the federal

16   level, taking DNA upon arrest is a process.  We

17   limit that to felony arrest.  We used to limit it

18   only to people that were incarcerated in prison --

19   not jail, but prison -- because we recognize the

20   privacy interest more expansively than the minimum

21   requirement of federal law.  So as we look across

22   our Constitution, there's many, many circumstances

23   where that happens.

24         Pruneyard is simply one case where I

25   think it was interesting, and I raise it, because



1  a Californian asserted a right as being more

2  expansive than what was recognized at the federal

3  level, and the Supreme Court says, you don't have

4  it because it's not been given to you by the

5  state.  The state then acted.

6          Our Constitution is consistent with

7  HB 481, the paramount right to life that's

8  contemplated there.  We're simply fleshing that

9  out in statute in something that's already in the

10  Constitution.

11          Pruneyard -- in something that's really

12  a difference without a distinction -- they had to

13  put in place a state constitutional enactment to

14  get it because the Constitution didn't specify it

15  for them.  Well, once that enactment went in

16  place, the federal courts recognized California

17  had acted to that appropriate state process, and

18  that right was recognized more expansively than

19  the minimum requirements of federal law.  That's

20  the reason we use that as one of many examples.

21          SENATOR JORDAN:  Representative, I'm

22  not going to argue Pruneyard with you, but I'm

23  just trying to get to the point.  My understanding

24  is that really what you're trying to do is to now

25  recognize unborn children as natural persons in



1    the state, which is something that has not been

2    done previously under any statute and/or

3    constitutional case law; isn't that correct?

4                    REPRESENTATIVE SETZLER:  I would agree

5    with that.  And that's precisely why this is a

6    novel question.  No state has put before a federal

7    court the question before us today.  States have

8    the opportunity -- in fact, again, in the Roe

9    decision, they said, listen.  If a state

10   establishes personhood, the entire Roe logic

11   collapses.  Plaintiff's counsel recognized that

12   verbally in the discussion.

13                   So we are -- that is precisely the

14   point, Senator.  We're putting a novel question

15   before our courts.  And, again, in the line of the

16   Fourteenth Amendment, we're recognizing a right of

17   an entire class of persons that's not been

18   recognized before.

19                   But by HP 481 consistent with the

20   paramount right that's already spelled out in our

21   Constitution, we're fleshing that out in detail

22   and providing it in the four corners of this bill.

23                   SENATOR JORDAN:  In terms of the

24   personhood, though, the whole point in Roe was

25   that, yes, it would collapse if they could



1    establish it.  But that's the point.

2              The court actually said in Roe that the

3    litigants could not come back and actually provide

4    any case law or any decision that would indicate

5    that a fetus could be considered a person under

6    the Fourteenth Amendment; is that not correct?

7              REPRESENTATIVE SETZLER:  In the state

8    of Texas in 1973, that's exactly right.  In the

9    state of Texas in 1973, the court said, you

10   haven't been able to do this.

11             In fact, as you follow the logic of the

12   Roe court, it says, for example, you didn't

13   recognize children -- unborn children in the

14   statewide population counts, specifically really

15   with the guidance of the Roe court.  That's why we

16   provide the section of the bill that does exactly

17   that.

18             SENATOR JORDAN:  But with respect --

19             REPRESENTATIVE SETZLER:  And if I

20   could, furthermore, we talk about tax status.  And

21   we're providing tax status beginning, again, at

22   the legally appropriate threshold of heartbeat.

23   We're providing tax status to kids because they

24   are natural persons.

25             Furthermore, with respect to child



1    support, we think it's important to provide that

2    same status because it's good for women, and it's

3    also legally and scientifically supported.

4              SENATOR JORDAN:  In terms of the tax

5    status -- let's get back to that a little bit.

6    Now, what are you going to do about all the

7    miscarriages?  Because I'll get to claim that;

8    right?

9              REPRESENTATIVE SETZLER:  Well, I

10   appreciate the lady's question.

11              You think about circumstances today,

12   you know, the way we define children today in our

13   tax code.  If there was a family that had a child

14   that was born in August and tragically died in

15   November, what would we do?

16              If this was November of 2019, a

17   child -- three-month-old child's died, that

18   family, although they take no joy in it, on their

19   2018 tax return, it's mom and dad and this child

20   that's died.  They have three members of their

21   family for that year.

22              It's exactly the same as we treat it

23   under existing code today.  If she lost her -- if

24   it's established at the point of -- with a fetal

25   heartbeat and you lose them at some point later in

1   pregnancy, it's exactly like the tragedy of losing

2   a child today that's crying in a nursery.

3            SENATOR JORDAN:  So I just want to make

4   sure that your fiscal note is taking that into

5   consideration in terms of the percentages of these

6   pregnancies that end in miscarriages after the

7   point in time when they actually hear a heartbeat

8   or that it can be detectable.

9            REPRESENTATIVE SETZLER:  True.

10           SENATOR JORDAN:  Because I don't think

11  that your numbers really take that into account.

12           REPRESENTATIVE SETZLER:  Again, to the

13  lady's question, I appreciate that.

14           One of the reasons we use heartbeat as

15  the legally significant threshold is because at

16  the point of fetal heartbeat, you have a 95

17  percent chance of the child being carried through

18  to term, just statistically.  So we have a high

19  confidence at that point that the pregnancy is

20  going to carry forward, and that the child's going

21  to make it.  Another reason why I think it's a

22  stronger threshold than to try to do it before

23  heartbeat.

24           SENATOR JORDAN:  With respect to

25  that -- I've seen the 95 percent number thrown

1    out -- where is that from?

2              REPRESENTATIVE SETZLER:  I could cite

3    that for you.  I got that from the medical

4    literature.  I can find it for you.

5              SENATOR JORDAN:  Okay.  Because I've

6    never seen that.  And, in fact, it's not

7    consistent with any experience I've ever had or

8    any consistency with any other woman that I know

9    has ever had.

10             Now, in terms of --

11             REPRESENTATIVE SETZLER:  And, ma'am --

12             SENATOR JORDAN:  -- the definition of

13   the unborn child, I know that you feel very

14   convicted about this.  But there are some specific

15   things in the statute and the language.  The

16   language now or at least the definition of unborn

17   child is actually inconsistent now, the new in the

18   sub with existing law.  Do you understand that?

19             REPRESENTATIVE SETZLER:  I don't think

20   it is.

21             SENATOR JORDAN:  Well, Section --

22             REPRESENTATIVE SETZLER:  I will tell

23   you this, ma'am -- Senator.  I don't doubt that

24   there are places across our code with lots of

25   definitions.  The definitions change.

1            One reason we put it in Title 1 is so

2     that it can be applied broadly across the code.

3     This definition -- which I recognize there's more

4     than one definition in our code.  This definition

5     of unborn child was picked out of 16-5-80 because

6     it's a clearly spoken definition.  It uses terms

7     people understand.

8            If there's another part of our code

9     where unborn child is defined that I need to pick

10    up and amend it to the bill, another section that

11    we could offer to make sure all the definitions

12    are the same, I'm friendly to do that, Senator.

13            SENATOR JORDAN:  Representative, it's

14    in the code that you're trying to actually amend

15    with this bill.  If you look at 31-9a-2(7),

16    "'Unborn child' or 'fetus' means a member of the

17    species homo sapiens from fertilization until

18    birth."

19            So with respect to this definition, it

20    doesn't then require that the fertilized egg be in

21    a uterus.  All it requires is that there be

22    fertilization, which, of course, would apply to

23    zygotes or embryos -- frozen embryos in fertility

24    clinics and the like.  You would agree with that?

25            REPRESENTATIVE SETZLER:  I would agree



1   that the definition of fertilization that doesn't

2   have the carried-in-the-womb provision would lead

3   to that, which is precisely why this bill defines

4   a child from which biological development or

5   fertilized egg that's carried in the womb as a

6   provision and implanted at conception.  So I'd

7   appreciate --

8              And if the Senator could find other

9   examples where it's appropriate, I would be glad

10  to make those changes so we have consensus across

11  the hall.

12             SENATOR JORDAN:  Just a couple more

13  questions.

14             CHAIRPERSON UNTERMAN:  Yes.  I think

15  you're --

16             SENATOR JORDAN:  I know.  I know.

17             CHAIRPERSON UNTERMAN:  I think Senator

18  Seay's got some questions.  I know --

19             SENATOR SEAY:  Well, I'll rest my time

20  to the Senator because I think she's established a

21  lot my answers in hers.  So I'm good.

22             CHAIRPERSON UNTERMAN:  Okay.  Well,

23  there's other senators.  If you could --

24             SENATOR JORDAN:  I'm going to be quick.

25             SENATOR SEAY:  (Inaudible.)



1          CHAIRPERSON UNTERMAN:  -- have about

2    five more minutes.

3          SENATOR JORDAN:  Great.

4          You talked about the Uniform

5    Determination of Death Act; correct?

6          REPRESENTATIVE SETZLER:  Yes, ma'am.

7          SENATOR JORDAN:  But you always keep

8    citing to the UDDA.  Why don't you actually cite

9    to the code provision itself where it's enacted

10   under Georgia law?

11         REPRESENTATIVE SETZLER:  Well, to

12   answer your question, what we're trying to do

13   here, Senator, is we're trying to find in utero

14   what are key legally significant thresholds?  What

15   are scientifically significant thresholds and

16   legally significant thresholds?

17         I think it's important.  I think if we

18   were -- if we took an intellectually honest look

19   at this, that if the presence of a human heartbeat

20   is a legally significant threshold for life

21   outside of the womb, it should be a legally

22   significant threshold for life inside of the womb.

23         I would certainly posit that, and I

24   think there could be debate about it.  But I think

25   that's part of this discussion.  So that's a



Page 65
1 national standard, and I think it's something that
2 we'd do well to follow.
3           SENATOR JORDAN:  Representative, again,
4 I really just want to look at the law as it exists
5 now because --
6           REPRESENTATIVE SETZLER:  In Georgia or
7 at the federal level?
8           SENATOR JORDAN:  In Georgia.
9           REPRESENTATIVE SETZLER:  Okay.
10           SENATOR JORDAN:  It's a model act,
11 meaning we took model language, and then we enact
12 it here in the state; correct?
13           REPRESENTATIVE SETZLER:  That's often
14 what happens.  Sometimes there's modifications, as
15 you know.
16           SENATOR JORDAN:  And that's exactly
17 what's happened here; correct?  Have you read our
18 Uniform Determination of Death Act?
19           REPRESENTATIVE SETZLER:  I have.  I
20 can't -- I probably can't recite it as well as the
21 lady can because you've got it in front of you,
22 but I'm glad to discuss that with you.
23           SENATOR JORDAN:  Well, it's 31-10-16,
24 and you've misrepresented some of the indications
25 in terms of determinations of death which you then

1   have extrapolated to determinations of life.

2          REPRESENTATIVE SETZLER:  What are those

3   determinations there?

4          SENATOR JORDAN:  Well, one is "(1)

5   irreversible cessation of circulatory and

6   respiratory function" together.  So it's not just

7   if there's a heartbeat, then you are alive in

8   Georgia.  That's actually not what the UDDA says

9   at the model level or at the State level.

10          REPRESENTATIVE SETZLER:  So the lady's

11  question -- so your point is, would you suggest

12  that we clarify in that code section that any of

13  those three would be a threshold?  Or do you

14  recognize that the threshold of a human heartbeat

15  is a core component of life?

16          SENATOR JORDAN:  I'll tell you what I

17  can agree to.  I can agree to what the

18  Constitution requires as it has been interpreted

19  by the United States Supreme Court, which does but

20  previability and post-viability.

21          And with respect to the fetal heartbeat

22  or fetal cardiac activity that you've pointed out,

23  that without functioning respiratory or

24  respiratory function under our law doesn't

25  indicate that you are alive.

1              REPRESENTATIVE SETZLER:  I will tell

2      you too, though, if you think about this -- and,

3      again, I don't want to get too far out there on

4      the medical threshold, that I'm not -- we've got

5      some other experts that can speak to that.

6              I will tell you this, that there is a

7      distinction when you overlay life support on top

8      of this.  It does make it a -- it creates a

9      circumstance where in many cases -- I think the

10     Senator would recognize, when you have people on

11     life support, what are the thresholds for

12     determining living or not living on life support?

13             And the point I'm making with respect

14     to not on life support is perhaps a simpler point;

15     that if there's a beating heart and respiratory

16     activity is temporarily stopped, that a person

17     would be deemed to be alive.  And I think we'd do

18     well to recognize the distinction between life

19     support circumstances, which UDDA contemplates,

20     and the simplicity of what I believe is a solid

21     foundation for law that if there's a beating

22     heart, it's worthy of legal protection.

23             Whether or not -- we could debate the

24     UDDA piece, how it applies in Georgia, how it

25     applies with life support, how it applies

 1  nationally.  But I do believe it's an important

 2  threshold that's underlined in this bill, that

 3  whether we acted wisely in 1985 or whether that's

 4  intended to overlay with life support.

 5          The bottom line here -- and it is a

 6  policy question, the lady's question -- HP 481

 7  recognizes that -- and anyone that would support

 8  481 recognizes that if there's a beating human

 9  heartbeat, they would receive full legal

10  protection under our laws.  And I think that's an

11  appropriate place to land.  It may be a policy

12  question.

13          SENATOR JORDAN:  And one final

14  question.  You indicate that part of the reason

15  that this is necessary is because our developments

16  in terms of technology, ultrasonography you

17  indicated, correct, which is what you indicate can

18  detect the fetal embryonic activity?  True?

19          REPRESENTATIVE SETZLER:  That's not why

20  we're doing this.  No, ma'am, it's not.

21          SENATOR JORDAN:  Well, it's one of the

22  reasons you cited in a previous version of the

23  bill.  But just hold on, and then you can tell me.

24          REPRESENTATIVE SETZLER:  Okay.

25          SENATOR JORDAN:  With respect to that,



1    you would agree that the only type of

2    ultrasonography that can pick up embryonic fetal

3    cardiac activity at 5.5 weeks or 6 weeks is a

4    transvaginal ultrasound; correct?

5                REPRESENTATIVE SETZLER:  There are

6    three kinds of ultrasounds generally.  I'm

7    oversimplifying.  You have a Doppler ultrasound

8    which picks up sound.  You have a transabdominal

9    ultrasound which picks up images and sound.  It's

10   less sensitive than a transvaginal.  And then the

11   transvaginal is the most sensitive.

12                One of the reasons we give doctors

13   broad discretion to make these determinations --

14   we don't get into saying what kind of device

15   you're using.  You've got to do this -- is that --

16   we leave it up to physicians to make this

17   determination.

18                And it's -- ma'am, if I could.  We

19   allow them to operate within their standard of

20   care.

21                SENATOR JORDAN:  So this is what's

22   worrisome about that because what we know is that

23   with a Doppler, it won't pick up a lot of times,

24   determining on the girth of the woman, how the

25   baby is placed, whatever, or even the ability of



1    the person doing the ultrasound appropriately;

2    that a Doppler or on-the-abdomen ultrasound won't

3    pick up the fetal cardiac activity until about

4    12 weeks normally; correct?

5              REPRESENTATIVE SETZLER:  I've been told

6    8 to 12 weeks, yes.

7              SENATOR JORDAN:  Okay.  We know with

8    the transvaginal, it does 5.5 to 6 weeks.  At

9    least the literature indicates that.  So if I'm a

10   physician and I say, you know what?  I'm going to

11   do a Doppler on you.  And then I perform an

12   abortion because I don't get a heartbeat at

13   8 weeks, 9 weeks.  But then uh-oh, I messed up.

14   What do we do then?  I mean, is that physician

15   then going to be subject to any kind of criminal

16   liability?

17             REPRESENTATIVE SETZLER:  I appreciate

18   the question.  That is precisely the kind of

19   flexibility we give physicians in this bill.  We

20   don't establish a methodology by which that

21   determination is made.  We give physicians broad

22   discretion to make that determination.

23             So to your question, if a physician was

24   trying to -- if you believe there's a bias here, a

25   physician could potentially bias the instrument



 1    they use to make the determination.  I don't

 2    believe that's an issue.

 3           I trust our physicians within the

 4    confines of law to make a determination on whether

 5    there's a fetal heartbeat or not, and that's what

 6    we do as a general assembly.  We don't get into

 7    the -- we don't get into defining means, methods,

 8    technologies that exist in 2018 versus 2004 versus

 9    2030.  We're going to leave it to physicians to

10    make the determination, and I think that's as far

11    as we're advised to go as a legislature.

12           SENATOR JORDAN:  Well -- and the

13    problem with that is then you have a

14    constitutionally vague criminal statute that

15    won't -- regardless of all the issues we have in

16    terms of the fundamental rights of women -- won't

17    stand up to constitutional scrutiny just because

18    of the vagueness, because just what you said, in

19    terms of they can just do whatever they want.

20    Maybe they go to jail.  Maybe they don't.

21           REPRESENTATIVE SETZLER:  Would the lady

22    prefer -- and let me ask you this.  I disagree

23    with your premise.

24           SENATOR JORDAN:  And, Senator [sic]?

25    Senator [sic]?



1                    REPRESENTATIVE SETZLER:  Madam Chair,

2    can I ask a question?

3                    SENATOR JORDAN:  I would prefer --

4                    CHAIRPERSON UNTERMAN:  Sir, wait.  Wait

5    just a minute.  Ask a question and answer a

6    question.  And --

7                    SENATOR JORDAN:  I'm finished, Madam

8    Chair.

9                    CHAIRPERSON UNTERMAN:  You're finished?

10                   You want to answer the question?

11                   REPRESENTATIVE SETZLER:  I do.  I

12   disagree that it's unconstitutionally vague.  We

13   have other thresholds by which we make medical

14   determinations all the time, you know, the very

15   definition of is someone alive or dead.  We have

16   physicians, we have coroners, we have people all

17   the time in this state make these very delicate,

18   difficult decisions all the time.

19                   All of us in this room some day will

20   pass away.  That decision will be for all of us

21   some day.  And it is no simpler at the end of life

22   at a ripe old age than it is in these

23   circumstances.  But it's not unconstitutionally

24   vague in that setting, nor is it here, Senator.

25                   CHAIRPERSON UNTERMAN:  Okay.  Thank



1  you.

2           Senator Ligon, did you have any

3  questions?

4           SENATOR LIGON:  I do.

5           CHAIRPERSON UNTERMAN:  I had a question

6  about line 152 to 154.  Currently that is current

7  law, but you're adding and expanding it with where

8  the abortion occurs or the woman upon whom an

9  abortion is performed resides.  So that would be

10  where a woman lives?

11           REPRESENTATIVE SETZLER:  That's

12  correct.

13           CHAIRPERSON UNTERMAN:  And that's the

14  only addition that you're adding to it?

15           REPRESENTATIVE SETZLER:  Yes, ma'am.

16           CHAIRPERSON UNTERMAN:  The current law

17  already states that the health records would be

18  available to the district attorney?

19           REPRESENTATIVE SETZLER:  That's

20  correct.

21           CHAIRPERSON UNTERMAN:  So currently in

22  the state of Georgia, district attorneys have

23  those privileges?

24           REPRESENTATIVE SETZLER:  Currently in

25  the state -- yes, ma'am.  In the state of Georgia,

1    district attorneys in locations where abortions

2    are performed.  As you know, the vast number of

3    abortions are performed in 15 to 20 facilities

4    here in the state, and only those district

5    attorneys would be in a position to have access to

6    health records.

7              This would expand.  If there's a woman

8    from a rural area in which abortions are not

9    performed, her DA would have access to those same

10   records.  That's the only change.  That's correct.

11             CHAIRPERSON UNTERMAN:  Okay.

12             REPRESENTATIVE SETZLER:  The House

13   version took a different approach, but we listened

14   to people on both sides of the question --

15             CHAIRPERSON UNTERMAN:  Right.

16             REPRESENTATIVE SETZLER:  -- and felt

17   like this was the right balance.

18             CHAIRPERSON UNTERMAN:  Right.  I just

19   wanted to make sure that the committee understood

20   that because I didn't.  And we narrowed it.

21             Senator Ligon?

22             SENATOR LIGON:  I think the bill has

23   some affirmative defenses in there.  Could you

24   explain how those will work?

25             REPRESENTATIVE SETZLER:  Thank you,



1    Senator Ligon.

2            I would direct the committee members

3    to -- beginning on line 158, "It shall be an

4    affirmative defense to prosecution ..." for

5    licensed physicians if they're providing

6    medical treatments to a pregnant woman and

7    result in an accidental or unintentional injury

8    or death of an unborn child, it couldn't be -- it

9    couldn't -- there could be no color of law that

10   would allow that to be considered an abortion or a

11   violation of law.

12           The same thing would apply to an APRN,

13   nurse, or licensed practical nurse, if they're

14   providing healthcare within their appropriate

15   scope and there was an accidental death or injury.

16   So APRNs, pharmacists in providing drugs within

17   the practice of pharmacy, and, likewise, for

18   physician assistants.

19           Also we give another affirmative

20   defense -- and by the way, Mr. Chair [sic], for

21   those who may not be practicing attorneys, the

22   affirmative defense is a very strong position to

23   take.  If you prove by a preponderance of evidence

24   that the condition exists, then you're exempt from

25   any criminal responsibility.  So it's -- I think



1    it's a pretty strong protection here.

2              And, likewise, we do it for the woman

3    seeking an abortion.  If she reasonably believed

4    that the abortion was the only way to prevent a

5    medical emergency -- we talk about what those

6    are -- we give her an affirmative defense here.  I

7    think she already has protections under our law,

8    but this just gives another clarification of that.

9              UNIDENTIFIED PERSON:  Have you got a

10   question?

11             CHAIRPERSON UNTERMAN:  And that

12   affirmative defense was not in the original bill?

13             REPRESENTATIVE SETZLER:  None of these

14   affirmative defenses were in the original bill.  I

15   think our laws provide --

16             CHAIRPERSON UNTERMAN:  And --

17             REPRESENTATIVE SETZLER:  -- I think

18   provide these generally.  But having these

19   specified was something that the Chair and some

20   others came to me and asked me to make sure we put

21   in the bill, and I'm happy to do that.

22             CHAIRPERSON UNTERMAN:  And let me just

23   ask you:  152, 154, what's the difference in the

24   original version?

25             REPRESENTATIVE SETZLER:  Madam Chair,



Page 77

1    152, 154, the original version had these records

2    being available to law enforcement or DAs.  So it

3    contemplated a law enforcement agent being able to

4    have access to these.

5              And I think people just raised that

6    question.  Said, you know, let's -- in terms of

7    the sensitivity of the information -- DAs are

8    doing it today.  They've got the processes in

9    place that are maybe more appropriate.  And some

10   members came to me, and that was an easy thing to

11   indulge.

12             I do think from a policy perspective,

13   if a woman is in a judicial circuit with a

14   district attorney in which an abortion is not

15   performed -- I think elected district attorneys, I

16   think, should have access to that.  It's not

17   really inconsistent with other powers they already

18   have.  It just clarifies it here.

19             CHAIRPERSON UNTERMAN:  Okay.  Thank

20   you.

21             Senator Ligon, did you have a question?

22             SENATOR LIGON:  Anderson, he had one, I

23   believe.

24             CHAIRPERSON UNTERMAN:  Senator

25   Anderson?



1              SENATOR ANDERSON:  Thank you,

2    Mr. Chairman [sic].

3              Representative, in the bill, I see

4    where you've got the protection for the doctors

5    and nurses and all.  What about the hospital or

6    the clinic?  I mean, usually lawyers, if they

7    can't sue one group, they're going to go after

8    another group.

9              REPRESENTATIVE SETZLER:  Yes.

10             SENATOR ANDERSON:  So is the

11   hospitals --

12             REPRESENTATIVE SETZLER:  To the

13   Senator's question, again, I'm looking to get an

14   idea -- really an ideal bill created.  If there's

15   a legitimate need to include facilities like that,

16   I'm open to the question.

17             I mean, typically you think about the

18   responsibility accrues to the individual

19   practitioner, particularly from a criminal

20   responsibility perspective.  Civilly sometimes it

21   can be more of a -- take a different direction.

22             Criminal responsibility for an

23   institution is pretty rare unless there's

24   directors and there's sort of a conspiracy

25   component to it.  It's pretty rare for facilities



1  to have that kind of responsibility.  But if

2  there's something that we need to clean up, I'm

3  certainly open to it philosophically.

4           SENATOR ANDERSON:  Thank you.

5           REPRESENTATIVE SETZLER:  Again, I would

6  caution the Senator this, there will be -- and I

7  told Senator Ligon and the Chairlady this.  As

8  soon as you start putting affirmative defenses in

9  place, there's a whole trail of people following

10 you around the Capitol wanting their affirmative

11 defense.  I do think we need to have balance and

12 some restraint there.

13          CHAIRPERSON UNTERMAN:  Okay.  Any other

14 questions for the author?

15          SENATOR JORDAN:  I have one more to

16 follow up on.

17          REPRESENTATIVE SETZLER:  Sure.

18          CHAIRPERSON UNTERMAN:  I think Senator

19 Seay, you have one?

20          SENATOR SEAY:  Well, I just really

21 wanted to understand this income tax.  That just

22 blew me away.

23          CHAIRPERSON UNTERMAN:  Sure.

24          SENATOR SEAY:  Can you walk me through

25 the premise of that and why it's in there?

Page 80

1          REPRESENTATIVE SETZLER:  Well, I

2     appreciate the question.  I mean, if our law today

3     said -- just walk with you through a hypothetical.

4     If our law today said a child's born and doesn't

5     get status as a person for mom and dad's income

6     tax until the child is in kindergarten, for

7     example, we'd say, well, that's kind of weird.  I

8     mean, it's a child.  Why don't they get tax

9     status?  What's the difference between a

10    four-year-old and a five-year-old?

11          I think this recognizes -- if we're

12    going to recognize the humanity of the child or

13    the unborn child, that we would recognize a child

14    that's 38 weeks inside their mother, and mom and

15    dad are certainly incurring costs.  They're buying

16    paint for the nursery.  They're buying things to

17    outfit the nursery in preparation for the child's

18    arrival.

19          In many cases, mom might be -- if she's

20    having a tough pregnancy, there might be bedrest.

21    Those kinds of costs.  I think we recognize in our

22    medical system when mom and dad go to the doctor,

23    there's -- or mom and a baby go to the doctor,

24    there's two patients.  And that's part of our

25    understanding.



1          So as we establish the personhood of

2   the unborn child, again, beginning at the point of

3   fetal heartbeat, it's only natural we would do

4   that.

5          SENATOR SEAY:  So I guess from my

6   perspective, I look at seen and unseen, born and

7   unborn.  Yet you're telling us that women -- we

8   know we're the only one that can give birth.  So

9   when you start talking about taxes and now you've

10  got an expense but you've never seen it and who

11  can prove you're pregnant, I just don't get the

12  whole connection.

13         It's so much added to this bill.  It's

14  mind-boggling.  Because at the end of the day,

15  when you start talking about women and their

16  rights -- I tell people all the time I don't

17  advocate abortion, but that's your business, what

18  you do with your choice at the end of the day

19  because you've got to live with it, not you who

20  write bills.

21         REPRESENTATIVE SETZLER:  Senator, I

22  would answer your -- I appreciate the question.

23  It's a good question.

24         I would answer it this way:  I mean,

25  you think about -- Senator, when a mom goes to the

1    doctor, whether she's 9 weeks along, 15 weeks

2    along, 25 weeks along, 35 weeks along, mom's going

3    in because she and her baby need to get looked at.

4    The mom's getting medical care, and the baby's

5    getting medical care.  We recognize that.  Common

6    sense tells us that.

7            We could talk to our grandma and

8    grandpa and say, Grandma and Grandpa, what's

9    inside the woman?  They'd say, there's a baby in

10   there.  We recognize that.  What we're recognizing

11   here is, is we're finally giving them a legal

12   status.  Babies haven't been recognized as they

13   should have been for years and years and years.

14   We're doing it here.

15           We've got the ability to see what's

16   happening inside of there now.  We can't run away

17   from it scientifically.  If I showed a picture of

18   a child in the womb to a group of kindergartners

19   and said, what is this?  They'd say, that's a

20   baby.  We know it.  It's common sense.

21           So what we're trying to do is align --

22   we recognize science.  We recognize this by common

23   sense.  We're trying to make sure our laws align

24   with that.  And I would tell you, Senator -- I

25   mean, you and I have been down there a couple



1    years.  There's been some tax exemptions we've

2    voted on that are probably a whole lot less worthy

3    than mom and dad having a tax exemption for having

4    a child on the way.

5           And I think this is a commonsense

6    recognition of what we know -- what we know in our

7    common sense, what we know biologically.  And why

8    wouldn't we provide this to people?  If you have a

9    single mom that's pregnant, why shouldn't she have

10   an extra tax exemption?  She's having to make

11   extra doctor visits.  Taking more time out of

12   work.  I think it just naturally flows just like

13   the recognition if dad's contributed, that he

14   ought to be involved in helping cover those

15   healthcare costs.

16           SENATOR SEAY:  And I'll just end with

17   this because I don't want to belabor it.  It feels

18   like from a mother who has both a son and a

19   daughter, it's a vault.  And what I mean by that

20   is you're adding some money.  When you add the

21   money, it makes it better, and it doesn't for me.

22           REPRESENTATIVE SETZLER:  And I

23   appreciate it.  We're not buying people with this.

24   This is just -- it's a legal right.  When we

25   recognize things legally, we want to be



1    consistent.  That's all we're trying to do,

2    Senator.

3              SENATOR SEAY:  Be consistent on the

4    unborn.

5              SENATOR JORDAN:  Senator Jordan.  I

6    just wanted to --

7              CHAIRPERSON UNTERMAN:  In recognition

8    of all the people that are here -- we have a lot

9    of people outside that have children.  We're going

10   to be here.  And I will stay here, and I'm sure

11   Representatives Setzler will stay here.

12             So I'm going to go ahead and have

13   testimony from individuals.  And we can stay here

14   afterwards, and we will stay here afterwards, and

15   get all the senators' questions; but let's go

16   ahead.

17             Do you know how many people you have to

18   testify?

19             REPRESENTATIVE SETZLER:  I do.  I'm

20   happy to have them wait.  I'm glad --

21             CHAIRPERSON UNTERMAN:  No.  They're

22   ready.  I just want to know how many there are.

23             REPRESENTATIVE SETZLER:  Let me get my

24   list.  Again, I'm happy to have the other side

25   testify.  I can go get my folks, and they can come

1    in.  And they can talk last if it please the

2    Chair.

3                CHAIRPERSON UNTERMAN:  Okay.  There's

4    10 to 12.  So I'm going to give you three minutes

5    each.  Three minutes each.

6                REPRESENTATIVE SETZLER:  Can some have

7    more than others, Madam Chair?

8                CHAIRPERSON UNTERMAN:  No.

9    Three minutes each.

10               REPRESENTATIVE SETZLER:  Okay.

11               CHAIRPERSON UNTERMAN:  And then we'll

12   start on the list that we have here.  We

13   appreciate everyone waiting.  And there may be

14   some confusion with people coming and going, but

15   if you'll just go ahead and sit down.  And

16   Mr. Cook's going to bring the first group in.

17               REPRESENTATIVE SETZLER:  Thank you,

18   Madam Chair.

19               CHAIRPERSON UNTERMAN:  We appreciate

20   it.  And if you would -- will you be able to stay

21   afterwards after --

22               REPRESENTATIVE SETZLER:  I'm around.

23   I'll be the last one in the Capitol if you need me

24   to be, Madam Chair.

25               CHAIRPERSON UNTERMAN:  Okay.  Thank

1    you.  Thank you.  I think they saved your seat

2    right here.

3        (Whereupon off-the-record discussion

4        ensued.)

5            UNIDENTIFIED PERSON:  Are they here?

6            CHAIRPERSON UNTERMAN:  Senator Jordan,

7    go ahead and ask your question real quick while

8    we're waiting for these people.

9            Representative Setzler, answer her

10   question real quick.

11           Just two seconds.  Is it an easy

12   question?

13           SENATOR JORDAN:  Yes, it should be.

14           CHAIRPERSON UNTERMAN:  Okay.

15           SENATOR JORDAN:  Outside the context of

16   abortion, he was talking about liability and the

17   affirmative defense.  First the affirmative

18   defenses, with respect to that, talk about

19   criminal prosecutions.

20           But there was an additional -- there

21   was additional language added to Section 19-7-1

22   that basically now extends wrongful death to every

23   unborn child who has had a detectable human

24   heartbeat.

25           So regardless of abortion or that



1    context, now we are opening the doors wide with

2    respect to lawsuits, civil suits, against

3    individuals and companies if it is perceived or a

4    woman believes that somehow that person or that

5    company may have caused her miscarriage.

6                    REPRESENTATIVE SETZLER:  I wouldn't

7    characterize it as opening the door wide, Madam

8    Chair.  And to the Senator, right now --

9                    CHAIRPERSON UNTERMAN:  Go right over

10   there, please.

11                   So your question is about companies,

12   wrongful death.

13                   REPRESENTATIVE SETZLER:  I appreciate

14   that, Senator.

15                   Currently under Georgia law, this exact

16   structure exists except the threshold is about

17   15 weeks.  We recognize that when a child is

18   quick -- and that's -- again, it goes back to

19   English common law.  If a child is quick, the full

20   value of the life of the child is available in

21   recovery.

22                   All this bill does is move that

23   threshold from around 15 or 16 weeks to the point

24   in which a fetal heartbeat is detectible.  Whereas

25   depending on the instrument, as the lady said, it



1    could be 6 weeks.  It could be 8 or 10 or

2    12 weeks.  But that's what this does.  It simply

3    moves the threshold.  It doesn't change the

4    structure one bit.

5         CHAIRPERSON UNTERMAN:  Okay.  Sounds

6    like you've got that one down.

7         All right.  So if you could step up to

8    the mic.  And when you step up to the mic, state

9    your name and your address for the record.  And

10   your total time is three minutes.

11        So if you'd just step up to the

12   microphone, the first person.  Well, I think it's

13   the girl right there.  You want to state your name

14   and address?

15        SARAH ROGERS:  My name is Sarah Rogers,

16   and my address is 11 The Fairway, Woodstock,

17   Georgia 30188.

18        CHAIRPERSON UNTERMAN:  We appreciate

19   you coming.

20        SARAH ROGERS:  Thank you.

21        So first, I would say thank you for

22   taking the time to listen to me today.  And I am

23   13 years old.

24        I understand that I am younger than

25   everyone here, but I believe that there can never



1    be enough people fighting for the lives of

2    innocent fetuses.

3              Throughout conception to death, life is

4    full of development.  That development includes

5    developing fingers, going through puberty,

6    growing, and shrinking with old age.  Why would it

7    be unjust to kill a 14-year-old but not a fetus?

8    They're both going through development.  But if

9    the fetus is born, it would be inconveniencing the

10   mother's life.

11             Ellen Willis's "Putting Women Back into

12   the Abortion Debate" from 2005 is an argument that

13   supports women's rights and feminism in terms of

14   allowing all abortions to occur.  She discusses

15   abortion with the perspective that women's rights

16   are the issue, not human life.  This argument is

17   inaccurate.  Abortion is almost completely about

18   the rights of every human being.

19             People who are for abortion need to

20   know a fertilized egg with a heartbeat is just as

21   important as somebody already living, and that an

22   unborn child cannot control its need for someone

23   to rely on for survival.

24             At conception, unique DNA is created

25   with 46 chromosomes.  After the chromosomes are



1    brought together, there is no turning back.  The

2    genetic code for human life has been created, and

3    every component that makes up human life is

4    present from that point on.  A sperm and an egg

5    cannot continue to develop or live apart from each

6    other.  When they're united, they're one being and

7    can only continue to develop.

8              Each woman also has this biological

9    composition of 46 chromosomes which shows that an

10   unborn child and a mother are human.  If we are to

11   give concern to the human life of a woman, then we

12   must do the same for an unborn child.

13             Banning abortion is not a way of

14   forgetting about the significance of a woman's

15   life.  Instead banning abortion is defending the

16   significance of a new life not yet able to defend

17   itself.

18             Thank you.

19             CHAIRPERSON UNTERMAN:  Next?

20             DR. KATHI AULTMAN:  My name is

21   Dr. Kathi Aultman, and my address is 1469 Winfred

22   Drive East, Orange Park, Florida.

23             I used to be an abortionist, but I am

24   in favor of this bill.  I didn't used to think a

25   fetus was any different than a chicken really that



1  I used to dissect in college.  But as I went

2  through my practice, I began to realize that these

3  were little human beings.

4          I've been an advocate for women my

5  entire career.  I started the first -- co-started

6  the first rape treatment center in Jacksonville,

7  and I did rape treatment exams on women and

8  children.  I not only learned how to do suction

9  D&Cs, but I went on to learn how to do D&E

10  procedures, which are the dismemberment

11  procedures, on my own.  And I felt like I was

12  doing something really good for women.  I even did

13  abortions when I was pregnant because I felt so

14  strongly about it.

15          The only time I had any qualms was when

16  I realized that I was doing abortions on babies

17  the same size as those I was trying to save in the

18  NICU.  What made the difference was having a baby

19  and making that fetus/baby connection and suddenly

20  realizing that these were little people.  And the

21  fact that the baby was no longer -- was not wanted

22  was no longer enough justification for me to kill

23  it.

24          Now, I still believed in abortion

25  rights, but that changed.  As during in my



1    practice, I saw all these young girls who

2    supposedly this was going to ruin their life.

3    They were doing great.  And then I was seeing all

4    of these other women come in who had had

5    abortions, and they were seeing psychiatrists and

6    having all kinds of problems.

7              What finally convinced me was when I

8    realized that these are human beings, and I was

9    killing them.  And I had to -- I could no longer

10   justify it.

11             Women do have a choice.  They can

12   choose to continue their pregnancy.  They can

13   choose to have an illegal abortion and suffer

14   those consequences.  They can choose to give the

15   baby up for adoption.  But these little people

16   can't choose.

17             Just real quickly, in the other

18   hearing, one of the physicians said that these

19   were just a cluster of cells at this point.  And

20   that's totally incorrect.  This is a fully

21   functioning cardiovascular system.

22             Thank you.

23             CHAIRPERSON UNTERMAN:  Thank you so

24   much.  We appreciate you coming from Florida.

25   Thank you.



1          Next?

2          You don't have to -- we've got too many

3    people.  Just say what city you're from.  That

4    will be fine.  We appreciate you coming.

5          RACHEL GUY:  I'm from Marietta.

6          CHAIRPERSON UNTERMAN:  What's your

7    name?

8          RACHEL GUY:  Rachel Guy.

9          CHAIRPERSON UNTERMAN:  Guy?

10         RACHEL GUY:  Yes.

11         CHAIRPERSON UNTERMAN:  And you're from

12   Marietta?

13         RACHEL GUY:  Yes.

14         CHAIRPERSON UNTERMAN:  Thank you for

15   coming.

16         RACHEL GUY:  I would like to ask if

17   each of you could turn to pages -- or I'm sorry --

18   to lines 104 and 106.  In these particular lines,

19   they speak on medically futile pregnancies, and I

20   am that medically futile pregnancy.

21         You see, when my mom had gone in for an

22   ultrasound at 22 weeks, a technician found

23   something concerning and went and grabbed a doctor

24   in the practice.  This doctor came in frantically

25   telling my mother, you need to have an abortion.

1  Your child will die.  You will die.  And your

2  child is incompatible with life and must have a

3  chromosomal abnormality not compatible with life.

4          My mother said, we will not abort this

5  child.  This child has value.

6          And this doctor said, come back in two

7  weeks.

8          So my mom came back in two weeks.  And

9  the same scenario had occurred except at this

10  point, all my mom's amniotic fluid was missing.

11  And, again, as the physician persisted in saying,

12  you need to abort, you need to abort, you need to

13  abort, my parents said, we will not.  Our child

14  has intrinsic value.

15          This doctor said, okay.  Go talk to

16  another doctor in the practice.

17          This other doctor and my parents had a

18  conversation which was even more heartbreaking

19  than the first in the sense that the one doctor

20  was yelling at my mom to have an abortion, but

21  this doctor was calm and collective as if it was

22  normal to tell parents to kill their children.

23          And this physician proceeded to say,

24  well, you need to have an abortion.  Your child

25  will be blind and deaf and have mental struggles.



1            My parents said, even if our child is
2    blind and is deaf and does have mental struggles,
3    our child has value.  Our child's value is not
4    lost simply because they're sick.
5            The physician proceeded to say and
6    said, well, you'll have many other children.
7            My parents said, we want this child
8    because this child has value.  My parents said, we
9    will not abort.  As you know, what will you do to
10    help us?
11            This doctor said the chilling words, in
12    all my years of practice, every single parent that
13    I've told to abort has.  So all I can tell you to
14    do is to go home, wait for your baby to die, and
15    you will deliver a stillborn child.
16            My parents went home brokenhearted for
17    these precious children that were never given the
18    chance of continuation of life, to be fought for.
19    They were broken over these precious doctors who
20    truly believed that killing -- that the preemptive
21    killing of life was somehow helping women, helping
22    these children.
23            And the Lord provided three doctors who
24    fought for my life.  They fought for my life
25    because they knew that my value had not been lost

1    because I was sick.

2              And in this journey, they called my

3    Grammy and asked her to pray.  They said, please

4    pray.

5              My Grammy asked, is there a heartbeat?

6              They said, yes.

7              She said, if there's a heartbeat, there

8    is hope.

9              And I was born at 1 pound, 2 ounces,

10   and I was in the NICU for five-and-a-half months.

11             My heart is to be a voice for these

12   so-called medically futile pregnancies to show the

13   humanity, to show the face of these precious

14   children because we all deserve the right to life.

15   We all deserve the continuation of life.  And --

16             CHAIRPERSON UNTERMAN:  I think that's

17   it.  That's your time.

18             RACHEL GUY:  Okay.  Thank you.

19             CHAIRPERSON UNTERMAN:  We appreciate

20   you coming.

21             RACHEL GUY:  Thank you.

22             CHAIRPERSON UNTERMAN:  Thank you very

23   much.

24             Okay.  Next?

25             CATHERINE DAVIS:  Good afternoon,



1    Senators.   My name is Catherine Davis.   I live in

2    Stone Mountain, Georgia.

3              There have been three separate

4    occasions that our government has stripped away

5    the rights of a class of people.   The first time

6    was in the Dred Scott decision when they told Dred

7    Scott he was property.   The second time was in

8    Plessy versus Ferguson.   And the third time was in

9    Roe v. Wade.   An entire class of human beings was

10   stripped of protection under our law, under our

11   Fourteenth Amendment.   And yet we stand today

12   still trying to bring to life or keep alive a

13   procedure that takes the lives of so many.

14             But this bill really isn't a fight for

15   abortion because abortion is legal in our state

16   right now.   It's legal in the nation.   But it is a

17   fight to protect the most vulnerable among us, and

18   that is the child in the uterus.

19             Even the Supreme Court of the

20   United States in Carhart -- I'm sorry -- Gonzalez

21   v. Carhart said that as a matter of fact, that a

22   living fetus is recognized from the time of a

23   detectable heartbeat.   That's what makes us human.

24   That's what makes us alive.

25             And Georgia has a compelling interest

1   to protect the most vulnerable among us the same

2   way this nation came back and protected black

3   people during slavery by passing the Thirteenth

4   and Fourteenth Amendment and by protecting Dred

5   Scott and others with the passage of the Civil

6   Rights Act of 1964 and the Voting Rights Act of

7   1965.  This is no different in my mind.

8              And I want to urge you-all to take a

9   stand for the human beings that are in the wombs

10  of the mother.  A woman, if she wants an abortion,

11  just has to make that choice sooner, not later.

12             Thank you very much.

13             CHAIRPERSON UNTERMAN:  Thank you.

14             Next?

15             JODY DUFFY:  Good afternoon, Senators.

16  My name is Jody Duffy.  I am the director of Post

17  Abortion Treatment and Healing.  Too often --

18             CHAIRPERSON UNTERMAN:  Where do you

19  live?

20             JODY DUFFY:  I'm sorry.  I currently

21  live in Peachtree City, Georgia.

22             CHAIRPERSON UNTERMAN:  Okay.

23             JODY DUFFY:  -- the ones that are often

24  left out of this equation are those of us who have

25  had abortions.  The women who are hurt by



1  abortion.  I was just shy of my 22nd birthday, a
2  second lieutenant in the Army, and I was raped by
3  another soldier.  That happened here at a base in
4  Georgia.  I was pressured to have an abortion
5  because of my mission, because of my duty.  And so
6  I did.
7              I went on and struggled.  I struggled
8  with my duties as an officer.  I struggled with my
9  mission because, you see, the pain and the grief
10 was so propound that all I could do was think
11 about that horrific day on that table and that
12 abortion.
13             You see, the trauma of that rape was
14 just expounded by the trauma of that abortion.
15 That baby that I was carrying, just because that
16 baby was conceived in rape, did not deserve to
17 die.  And I did not deserve to go through that
18 humiliating pain and the humiliation of that
19 abortion.
20             So over the last 19 years, I have
21 worked just in the Atlanta area with hundreds of
22 women who have had abortions in the past.  We deal
23 with their pain and their grief because too often
24 these women hold this in for years and years
25 before they come forward.  They find that there is



1    a program out there that can help them with

2    healing.

3            Too often these women have suffered

4    from drug abuse, alcohol abuse.  They're trying to

5    numb the pain of their abortion experience.  I was

6    there.  I understand that.

7            Often women come forward as they're

8    going through the healing process and say, you

9    know, I just didn't have the money at the time.  I

10   was a single mom.

11           Well, there's an article in this bill,

12   Article No. 5, that talks about support for that

13   woman from the father of that child, for support

14   with medical expenses and pregnancy expenses.

15           So I do encourage you to pass this bill

16   because the provision for this support is very,

17   very important.  We're not leaving that woman to

18   hang out dry without any support.

19           And thank you very much for hearing me.

20           CHAIRPERSON UNTERMAN:  Thank you.

21           Okay.  Next?

22           JESSICA DANIEL:  Thank you, Senators.

23   My name is Jessica Daniel.  I'm from Alpharetta,

24   Georgia.

25           I am here today to represent the 99



1    percent.  We often talk about the 1 percent, the

2    abortion, the anomalies.  I am here to talk about

3    the 99 percent.

4              22 years ago I was at the culinary

5    Institute of America, the best culinary school in

6    this country.  I worked very hard to get there and

7    found out about five weeks in that I was pregnant

8    by my boyfriend who was in New Jersey.

9              I want to speak today and state that

10   humanity supersedes choice.  I made the choice to

11   have my son Isaac 21 years ago.  He is a living,

12   breathing testimony to what humanity is.  He

13   serves today by going overseas on missions.  He is

14   an amazing testimony that humanity, again,

15   supersedes choice.

16             And I urge you to support this bill.

17             Thank you.

18             CHAIRPERSON UNTERMAN:  Thank you.

19             VIRGINIA GALLOWAY:  Good afternoon.

20   I'm Virginia Galloway.  I'm with Faith and Freedom

21   Coalition, but I'm also speaking from a very

22   personal point of view this afternoon.  And I live

23   in Hiram, Georgia, by the way, if you need my

24   city.

25             So long ago right after the depression,

1    a young lady was born in a small town in

2    South Carolina.  She was the only child of her

3    parents.  And one of her parents was quite old to

4    be a parent for the first time, in his 40s.

5              And when she was seven years old, she

6    got polio.  And the polio almost killed her.  They

7    didn't know what it was at first.  It twisted her

8    back so horrendously that to this day, it's shaped

9    like an S, her backbone.

10             They told her -- she got married.  She

11   grew up.  She got married.  They told her she

12   could never have children.  When she got pregnant,

13   they told her, you can't carry this baby.  You

14   cannot have any children.  They would have so many

15   problems.

16             And so she didn't listen to the

17   doctors.  She believed that God had a purpose for

18   that child, and that was my oldest brother.  I'm

19   number three.  I have a baby sister who's number

20   four.  And she had four children.  She has about

21   20 grandchildren, a bunch of great grandchildren

22   now.  I can't even count them anymore.  And it

23   worked out.  Not easy for her, but she always knew

24   that she did the right thing.

25             Both her story and other people that



1    I've met along my path in life led me to volunteer

2    at a crisis pregnancy center for about ten years.

3    And so I got to talk to a lot of women who were

4    really struggling with difficult situations and

5    decisions.  And so I do have a heart of compassion

6    for anyone who is struggling with this issue.  I

7    mean, it's tough.  I mean, it's not easy.  I cried

8    with those people.  I still cry with those people.

9            But I will tell you one thing.  In all

10   the years that I did that, I had so many women

11   call back and say, thank God I got to talk to you.

12   And I kept my baby, and now I have this beautiful

13   baby or these beautiful babies or -- you know.

14   And it was just -- it was amazing.

15           And I will tell you something else.

16   Never once did I have anyone come back and say,

17   oh, I got an abortion.  I'm so glad I did.  No.  I

18   talked to many broken women who did get abortions.

19   And they came back, and it was just destroying

20   their lives.  So very tragic.  It's tough, but

21   we've got to do the right thing.  You know, a

22   child is a child whether it's in the womb or

23   outside of the womb, and we've got to have respect

24   for life.

25           So I would urge passage of this bill,



1  and thank you so much for your time.

2          CHAIRPERSON UNTERMAN:  Thank you.

3          Next?

4          COLE MUZIO:  Hey.  I'm Cole Muzio with

5  Family Policy Alliance of Georgia.  I'm from the

6  great city of Dacula, Georgia.

7          CHAIRPERSON UNTERMAN:  How do you spell

8  your name?  Cole?

9          COLE MUZIO:  Cole, C-o-l-e.  Last name

10  Muzio, M-u-z-i-o.

11          CHAIRPERSON UNTERMAN:  Thank you.

12  You're from Dacula?

13          COLE MUZIO:  From Dacula, yep.

14          CHAIRPERSON UNTERMAN:  Okay.  Thank

15  you.

16          COLE MUZIO:  Before I came in the room,

17  I was blessed to have the opportunity to talk to

18  one of the bravest women I know, and I've seen her

19  be brave throughout my life as she's battled

20  numerous medical issues.  I told her thank you for

21  the bravest moment that I never got to witness.

22          In the summer of 1988, I was eight

23  weeks old being carried.  And my mom was dealing

24  with medical health issues.  She was 26 years old.

25  And I can't imagine what she was going through

1   dealing with things that, you know, most people

2   don't have to deal with. And she was --

3           I'm sorry. I don't normally get

4   emotional. I don't cry. But she was told she

5   needed to abort me and deal with herself. Take

6   care of her medical issues. Put those first.

7   Manage her pregnancy. She was young enough. She

8   could move on. She could have other kids. And my

9   brave mom chose life. And I don't know that I'm

10   the best person and that people have been touched

11   by meeting me or anything like that, but I am so

12   grateful for my mom.

13           I've also had the opportunity to listen

14   to my three baby boys, to hear their heartbeats.

15   And we don't talk about how precious that sound

16   and that moment is enough. If you've heard it, it

17   is like the thundering sound of horses on a

18   concrete road. It is a powerful sound. And as

19   you hear those babies and as you see them on an

20   ultrasound, there is no denying that that is a

21   life.

22           And so today I'm speaking on behalf of

23   an organization that has certain beliefs, and we

24   hold those strongly. I'm here today to speak as a

25   father of three boys. I'm here today to speak as

1    a son of a mom who chose life.  But I'm here today

2    to speak to the thousands and the millions of

3    heartbeats that will be heard in the coming years

4    and in the coming decades and asking you in this

5    moment to choose life.

6              Again, if you've heard it, the sound is

7    undeniable.  If you've seen it, the sight is

8    undeniable.  These are babies, and they're worth

9    protecting.

10             Thank you.

11             EMILY MATSON:  Good afternoon.  My name

12   is Emily Matson.  I'm an attorney in Rome,

13   Georgia.  I'm 38 years old, and I'm grateful to

14   say that I'm a mom.  I have three children of my

15   own: ages eight, five and three.

16             And Representative Setzler has let me

17   look through this bill, and I have a fair amount

18   of experience.  I'm a civil litigator.  So when

19   you're concerned about what's going to happen to

20   this bill from a legal standpoint in the courts,

21   I'm your woman to talk about it.

22             Let me just say this:  There's a lot of

23   people present here today with this very pressing

24   question about the constitutionality of laws.

25   When you have one side that says, we think that



1    these unborn children should have rights and you

2    have another side that says, well, we think that

3    women's rights to be free from this pregnancy

4    should trump that right, what's very unfair about

5    this discussion is that there is an entire group

6    of human beings who are not here to talk about

7    their rights.

8            Last year -- I mean, last statistics we

9    have for the state of Georgia in 2017, there were

10   27,000 children aborted in our state.  Not one of

11   those children is given a chance to come in here

12   and share how they feel about the law that

13   protects my rights and all of you women's rights

14   to terminate their life.

15           The US federal courts and United States

16   Supreme Court has recognized the right of a woman

17   to choose.  It's a very important right.  We all

18   want that right.  But the court, for those of you

19   who want to know, has also said that a state does

20   have a substantial state interest in potential

21   life throughout pregnancy.

22           So the right that Roe versus Wade

23   created was not absolute.  And, in fact, the case

24   law -- I'm just going to run through this really

25   quickly.  Roe versus Wade prohibited the states



1    from restricting and set up the two-trimester

2    system and evaluation.  And Planned Parenthood

3    versus Casey said, wait.  Maybe trimester isn't

4    good.  Let's look at viability of the fetus.

5            And then in Gonzalez versus Carhart,

6    which is where the federal law prohibiting partial

7    birth abortion was tested, the state finally --

8    the federal -- the United State Supreme Court

9    said, you know, we're not going to necessarily

10   affirm all of the findings in Roe versus Wade.

11   We're going to basically assume them.

12           And Justice Ginsburg wrote a scathing

13   criticism of that and basically recognized that in

14   Gonzales versus Carhart, the court was saying,

15   this sand that Roe versus Wade was built on is not

16   quite so strong anymore.

17           Here are the differences in the Eighth

18   Circuit recently in affirming an injunction

19   against a heartbeat bill.  I cite it.  The Eighth

20   Federal District said, Supreme Court, we need help

21   with this.  You have to help us.  This must change

22   because now we're on shifting sand.  The facts

23   have changed.  Roe versus Wade assumed a decision

24   was made in consultation with a woman's private

25   physician.



1          I took a deposition of an abortion

2   doctor last summer.  He commits -- or he performs

3   7,000 abortions a year.  That's 26 abortions a

4   day.  I have a client now who had an abortion here

5   in Atlanta.  Her physician was with her for seven

6   minutes during her abortion procedure.  This

7   decision for this abortion is not in consultation

8   with a private physician.  We have evidence of

9   mental and emotional effects on women.

10          And ladies -- the two ladies that were

11  behind Roe versus Wade -- I represented Sandra

12  Cano, one of those ladies, in a guardianship over

13  her grandson -- both retracted their positions.

14          Science, as we know, is rolling back

15  the rule of viability over and over and over and

16  over.  The law that you're scared of is on

17  shifting sand.  And it's states like Georgia and

18  its representatives like with the boldness of Ed

19  Setzler who see that that's right, and they're

20  doing what's right.

21          And just as an attorney --

22          CHAIRPERSON UNTERMAN:  Time's up.

23          EMILY MATSON:  -- I would ask that you

24  vote yes on this bill as it is drafted.

25          CHAIRPERSON UNTERMAN:  Thank you.



1          Okay.  Next?

2          MIKE GRIFFIN:  Thank you, Madam Chair

3    and the Committee for the opportunity to share

4    with you.  My name is Mike Griffin.  I am the

5    public affairs representative for the Georgia

6    Baptist Mission Board.  I live in Hartwell,

7    Georgia.  And thank you for this opportunity

8    today.

9          Georgia Baptist represent over 3,500

10   churches in our state.  We represent 1.4 million

11   Georgians.  And we consider it an honor to be here

12   today to speak in favor of this legislation that

13   Representative Setzler is bringing before you.

14          I'm reminded that Ronald Reagan said it

15   best when he said it this way:  He said, we cannot

16   diminish the value of one category of human life,

17   the unborn, without diminishing the value of all

18   human life.

19          I really believe the reason today our

20   conscience has been stirred in our nation because

21   of what has happened in New York and in Virginia

22   is because of the diminishing of the value of

23   human life inside the womb has now moved to the

24   outside of the womb.  In other words, one of the

25   ways to restore the value of life on the outside

1    of the womb is to go back and to begin to protect

2    human life on the inside of the womb.

3              I really believe that our governor is

4    doing that.  I believe his stance on this is

5    important because he wants to see Georgia restore

6    that value of human life on the outside.  You do

7    that by going into the inside.

8              I'm reminded of what our president --

9    current president said just recently.  He said,

10   let us work together to build a culture that

11   cherishes innocent life.  Let us reaffirm a

12   fundamental truth:  All children born and unborn

13   are made in the holy image of God.

14             That's where we stand.  That's what the

15   word of God teaches, and Georgia Baptists stand on

16   that principle.  And we would encourage your

17   favorable support of this legislation.

18             Thank you very much.

19             CHAIRPERSON UNTERMAN:  Thank you.

20             Next.

21             JOSHUA EDMONDS:  Madam Chair, thank you

22   so much for holding this hearing today.  My name

23   is Joshua Edmonds.  I represent Georgia Life

24   Alliance.  We are the state affiliate to National

25   Right to Life here in Georgia.



1          I want to thank you so much for taking

2     the time to hear this bill.  Thank you for the due

3     diligence of allowing both sides equal opportunity

4     to share their voices, share their opinions, and

5     to hear the stories of men and women around our

6     state who are passionate about this issue.

7          This is not an easy issue for us to

8     deliberate, and we don't make light of it, and we

9     don't mitigate it down to bumper-sticker slogans

10    and rhetoric in these halls.  These are hallowed

11    halls.  And I thank you for giving it the time

12    that it so deserves.

13          I want to speak to you on behalf of

14    people who couldn't be here today, people like

15    Heather Hobbs who has a story of harrowing courage

16    in the face of purpuric endo (as said) diagnosis

17    and pregnancy via rape.  I want to speak to you on

18    behalf of women who have been told time and time

19    again, the choice for you is whether or not you

20    want to have a burial for your child or not, not

21    whether you have want to have a birth.

22          I want to speak to you on behalf of the

23    pastors I have heard from across this state who

24    are passionate about reflecting a respect for the

25    sanctity of life in our communities and in these



1    halls of the legislature and on behalf of the

2    thousands of Georgians in the state of Georgia who

3    recognize that we must do more to protect the

4    innocent and the vulnerable and the oppressed

5    whether it is preventing the mistreatment of

6    children who are disabled in medical situations or

7    of pregnant women who are in crisis or of innocent

8    children in the womb.

9         And I join my voice with theirs to call

10   on you, our lawmakers, to stand together to do

11   what's right and to stand aside from partisan

12   rhetoric, to defend those who are innocent and

13   those who are oppressed, to defend the sanctity of

14   human life, and please to vote yes on HB 481.

15        Thank you.

16        JANE ROBBINS:  Good afternoon, Madam

17   Chairman.  My name is Jane Robbins.  I am with

18   Concerned Women for America.  I live in Tucker.

19   I'm an attorney, and I wanted just to build on the

20   very good presentation Ms. -- -

21        CHAIRPERSON UNTERMAN:  I'm sorry.  I

22   didn't get your name.  What's your name again?

23        JANE ROBBINS:  Jane Robbins,

24   R-o-b-b-i-n-s.

25        CHAIRPERSON UNTERMAN:  You're from

Elizabeth Gallo
COURT REPORTING, LLC

1   Tucker?

2               JANE ROBBINS:  From Tucker, yes, ma'am.

3               CHAIRPERSON UNTERMAN:  Okay.  Thanks.

4               JANE ROBBINS:  I wanted to build on

5   Ms. Matson's presentation about some people just

6   assume that, well, this bill is going to be

7   unconstitutional.  It's going to be struck down.

8   So why bother?  And I don't think that's

9   necessarily the case.  It is certainly true that

10  big abortion will file a lawsuit.  They file

11  lawsuits against all pro-life legislation.  They

12  have plenty of money to do it, a great deal of

13  which comes from the federal taxpayer.

14              But there are multiple reasons to

15  conclude that HB 481 is constitutional and could

16  lead the Eleventh Circuit Court of Appeals and the

17  US Supreme Court to that conclusion as well.  As

18  Ms. Matson mentioned, the Supreme Court has said

19  that there's a compelling interest for the State

20  to protect unborn life.  The Eighth Circuit

21  actually goes a little further than that.  They

22  say it's a profound interest.

23              We know that medical science is so far

24  advanced now above what it was during the time of

25  Roe versus Wade, Doe versus Bolton, and the Casey



1   decision.  And it's because of these changes in

2   our scientific knowledge is one of the reasons

3   that it is constitutionally appropriate for issues

4   of unborn life to be decided by the elected

5   representatives of the people and not to be given

6   to a court.  In fact, the Eighth Circuit said to

7   substitute the court's own preference to that of

8   the legislature is not the proper role of the

9   court.

10                  Now, removing this decision from the

11  legislature gets us into a position where we are

12  now with Roe versus Wade.  We're still living with

13  horribly outdated science, and it is controlling

14  what all of our laws are in this area.  And this

15  is something that we should not be satisfied with

16  or should not accept.

17                  And we now know that the facts of Roe

18  versus Wade and Doe versus Bolton are so different

19  from what the court knew at the time.  Ms. Matson

20  talked about the plaintiffs there who were

21  manipulated, if not tricked, into doing this, and

22  they became pro-life activists for the rest of

23  their lives.  We know now that women don't have

24  their genial family doctor working with them on

25  this.  They generally will go to an abortionist



1    who they've never seen before and will never see

2    again.

3            We know that pimps and traffickers rely

4    on early abortion to keep their businesses

5    running.  We know that the abortion industry

6    targets minority women such that in New York City

7    now, there are more African-American babies

8    aborted than born.  They didn't know that then.

9    The court does know that now, and I think that

10   could make a difference.

11           So finally, I would ask you to please

12   consider state sovereignty and federalism.  As

13   Abraham Lincoln said, the founders never intended

14   that all of the important policies of our lives

15   would be determined by nine men and women in robes

16   who are unelected.  The founders thought our

17   legislators would do this, and this is your chance

18   to reassert the sovereignty and the autonomy of

19   the great state of Georgia to tell the courts that

20   this is our role.  This is not yours.  So I hope

21   that you will be bold and vote in favor of 481.

22           Thank you.

23           CHAIRPERSON UNTERMAN:  Thank you.

24           DR. KATHLEEN RAVIELE:  Madam Chairman,

25   Members of the Committee, I'm Dr. Kathleen



1    Raviele.  I'm an obstetrician/gynecologist here in

2    the Tucker area.  And I am here in favor of this

3    bill.

4                I began my training in ob-gyn in 1974,

5    Case Western Reserve University Hospitals of

6    Cleveland.  At that time, ultrasound was not

7    available in labor and delivery or in the clinics

8    or in doctors' offices.  It was in the radiology

9    department.  So for the first four years of my

10   training, I supported women having abortions.  I

11   was performing abortions.

12               And then as a chief resident after

13   having my first baby, I did a rotation in

14   radiology in ultrasound.  And for the first time,

15   I saw babies' hearts beating, babies moving.  And

16   I realized these were babies just like my baby at

17   home, and I had a change of heart.

18               I'd worked for the crisis pregnancy

19   center for ten years.  Women come to these centers

20   looking for help.  Society, the father of the

21   child, or their family is telling them, it's okay

22   to have an abortion.  But they want support, and

23   they want a reason to have the baby.

24               Over half of women having abortions are

25   minorities.  We'd made it so easy in this country



1  to have an abortion.  I've also helped many women

2  stop the process of an RU-486 abortion.  The first

3  patient I helped came back to thank me after she

4  delivered with her beautiful baby girl.  They were

5  wearing matching hair bands.  She said she didn't

6  know what she was thinking.  She went for the

7  abortion on impulse, but she could not imagine her

8  life now without her baby girl.

9          A woman came to me, and I saw from her

10  history she'd had an abortion 16 years earlier.  I

11  asked her if she'd had any regrets.  She started

12  crying and said she thought about it every day,

13  and that she and a coworker would meet at the

14  water cooler at work to talk what their children

15  might have been.  I referred her and her friend to

16  a postabortion support group.  Women do not think

17  every day about their appendectomies.  True

18  compassion is helping couples get through

19  difficult pregnancies.

20          Medical futility means you have reached

21  a point in aggressive treatment when it will no

22  longer improve the life of the person, and you

23  then provide support of care only.  It doesn't

24  mean you kill the patient.  It is not an in-utero

25  diagnosis.



1          Today because of fear of wrongful life

2     suits, OBs pressure women carrying a child with a

3     disability to abort.  I've helped several women

4     find an OB who will respect them and care for them

5     so they can have their babies.

6          Even children with trisomies deserve

7     care for the best quality of life.  Downs syndrome

8     children with cardiac anomalies have all the

9     surgery and treatments necessary for a good

10    quality of life.  Children with trisomy 13 and 18

11    are much more likely to die with surgery, but half

12    of those parents decide to take the risk and have

13    surgery.  Remember any of us could become disabled

14    through an accident or illness.

15         Not all women who have been sexually

16    assaulted choose an abortion.  One woman told me

17    that when she looked at her sweet nine-year-old

18    son conceived in a rape, she didn't see his

19    father.  She saw herself.

20         Human life from conception through all

21    the development in utero, childhood, adolescence;

22    even adolescence, adulthood, and old age, all

23    human life is sacred.  So I would urge you to

24    approve this bill without any further amendments,

25    and let's be joyful about in-utero life.



```
 1                Thank you.

 2                CHAIRPERSON UNTERMAN:  Is there anyone

 3      else?

 4                I think I'm going to start on this

 5      list.  Is Mayreli Jimenez here?

 6                (No audible response.)

 7                Let's take a break.  I think everyone

 8      is tired.  It's about 10 after 5:00.  We'll come

 9      back at 5:20.

10                Is that okay with the committee?

11                SENATOR LIGON:  That's fine.

12                CHAIRPERSON UNTERMAN:  Okay.  We'll

13      come back at 5:20.  Let's take a break.

14                (Proceedings in recess, 5:10 p.m.)

15                CHAIRPERSON UNTERMAN:  So we're going

16      to start back up.  We still have a few more on the

17      people that are in favor of House Bill 481.  So

18      I'm going to call these names up.  I believe the

19      doorkeepers have the same sheet.  And if they

20      could let the people know if they're outside, and

21      then we'll start on the next sheets.

22                So with that --

23                SENATOR SEAY:  May I ask a question?

24                CHAIRPERSON UNTERMAN:  Yes.  Yes,

25      ma'am.
```

1          SENATOR SEAY:  Just for my edification,

2    I thought we are doing an hour in favor and an

3    hour opposed?

4          CHAIRPERSON UNTERMAN:  We are.

5          SENATOR SEAY:  Oh, we didn't get to an

6    hour yet?  Are you kidding me?

7          CHAIRPERSON UNTERMAN:  We're at

8    38 minutes.  We're clocking it.

9          SENATOR SEAY:  Shut the back door.

10          CHAIRPERSON UNTERMAN:  We're clocking.

11    I mean, we've got an official timekeeper here.

12          And let me say while we're bringing

13    that up, thank you to our staff.  I think they

14    need a round of applause.  And it's not just the

15    ones that are sitting here.  There's a lot of

16    people watching on the screen that are behind the

17    scenes.  Mr. Cook's office has been phenomenal.

18    The Lieutenant Governor's Office has been

19    phenomenal.

20          And we have a long ways to go.  So

21    let's get through this list.  And let's see.

22    We're on Mayreli Jimenez.  Is she here?  Is she in

23    the hallway?  Mayreli?

24          (No audible response.)

25          Okay.  I'm not going to mark her off.

1    If she's out in the hall, she can come forward.

2              And I'm sorry if I pronounce names

3    wrong.  I have a hard name to pronounce too.  So I

4    understand what it's like not to say it right.

5              David Guldenschuh?  David Guldenschuh,

6    if you're out in the hall, if you want to come in.

7    Are those two people here?

8              UNIDENTIFIED PERSON:  He's checking.

9              CHAIRPERSON UNTERMAN:  Okay.  We'll

10   wait just a second to see if they're here.  That's

11   Mayreli and David.

12             We appreciate all our visitors here

13   today.  House Members and Senate Members, we

14   appreciate y'all coming and staying with us.

15             Is Mayreli and David not here?

16             UNIDENTIFIED PERSON:  They haven't

17   located them yet.

18             CHAIRPERSON UNTERMAN:  Okay.  Let the

19   record reflect that they are on the list, and they

20   are in favor, but they're not here right now.  If

21   they do come back, we'll let them testify.

22             So I believe there was some people that

23   have some town hall meetings.  So we will start

24   with the opposition to House Bill 481.

25             And I believe that, Representative, you

1   asked me -- you said you had a town hall.  If you

2   want to go ahead and step up to the podium and

3   state your name and your district.  We're glad to

4   have you here and glad for you to stay the whole

5   meeting.

6            REPRESENTATIVE KENNARD:  Madam Chair

7   and Members of the Committee, I am Representative

8   Gregg Kennard of District 102 which is

9   Lawrenceville and Suwanee.  I'm also your

10  constituent, Madam Chair.

11           I just wanted to say that the faith of

12  Christianity is not monolithic.  I identify as a

13  born-again Christian.  I am an ordained Christian

14  minister.  I declare that Jesus is Lord, and I

15  oppose Bill 481.  There many other members of the

16  Christian clergy and followers of Christ who all

17  over this country share the same view and oppose

18  similar legislation.

19           The Bible teaches free will and freedom

20  of choice.  I am personally pro-life.  I am an

21  adoptive parent along with my wife.  And I am

22  thankful to live in a society that respects and

23  protects my choice to be so and simultaneously

24  respects and protects the reproductive choices of

25  others.

1          HB 481, if passed, would infringe on

2     these constitutional personal liberties.  There

3     are many ways for people of faith and specifically

4     the Christian faith to process this issue and for

5     it to be consistent with their personal, spiritual

6     beliefs.  The Constitution protects all these

7     layers of our personal liberties.

8               Thank you.

9               CHAIRPERSON UNTERMAN:  Thank you very

10    much.

11              Okay.  So I believe --

12              Yes, ma'am?  Representative -- I

13    mean --

14              SENATOR SEAY:  Representative Dollar is

15    one of my delegates and members, that he said he

16    did sign up somewhere, but I didn't --

17              UNIDENTIFIED PERSON:  He signed up for

18    the --

19              SENATOR SEAY:  I just know that

20    (inaudible).

21              CHAIRPERSON UNTERMAN:  Oh, you did?

22              SENATOR SEAY:  Yes.

23              UNIDENTIFIED PERSON:  So that's that

24    one in the crowd I never got back.

25              CHAIRPERSON UNTERMAN:  Okay.  Then



1    evidently there was a list in the crowd that never

2    got back to us.  Could I ask the doorkeepers to

3    check on that?

4                SENATOR SEAY:  I just know he's one of

5    my -- he was here before I came in, and he was

6    (inaudible).

7                CHAIRPERSON UNTERMAN:  I appreciate it.

8    I didn't know.

9                Is there anyone else who did sign up on

10   another sheet?

11               UNIDENTIFIED PERSON:  There's a lady

12   right there.

13               CHAIRPERSON UNTERMAN:  You signed up on

14   another sheet?

15               UNIDENTIFIED PERSON:  I did.

16               CHAIRPERSON UNTERMAN:  Does anyone know

17   where that sheet is?  Has anybody seen a sheet

18   floating around?

19               There it is.  Okay.  Thank you.

20       (Whereupon off-the-record discussion

21       ensued.)

22               CHAIRPERSON UNTERMAN:  These are people

23   that are in favor.  That was the opposed.

24               Are those in favor?

25               UNIDENTIFIED PERSON:  One's in favor,



1    and one's opposed.

2              CHAIRPERSON UNTERMAN:  Okay.  So we had

3    38 minutes on the favor.  So we'll pick that up

4    and go back to the favor.

5              Okay.  Josh Bonner, State

6    Representative?  I'm sorry, Representative.  I'm

7    glad you spoke up.

8              REPRESENTATIVE BONNER:  No.  Thank you,

9    Madam Chair.  And I'll keep my comments brief.

10             Representative Josh Bonner.  I

11   represent District 72.

12             And as a cosponsor of House Bill 481,

13   I'm here to speak in strong support of the

14   committee substitute.  I don't presume to be able

15   to speak with the same level of knowledge that

16   Chairman Setzler presented or with the same depth

17   of emotion as some of our other presenters, but I

18   do share the same passion and frankly the same

19   sense of duty to do the one thing that in our

20   Constitution it lays out as the thing that we're

21   supposed to do.

22             In Section I, Paragraph II of the

23   Georgia Constitution, it says, "Protection to

24   person and property is the paramount duty of

25   government and shall be impartial and complete."

1    Paramount being defined as more important than

2    anything else and supreme.

3               And so I would urge my colleagues in

4    the Senate to pass the bill as amended so that we

5    can do that one thing that is more important than

6    any other thing that we do here, and that is to

7    protect life.

8               We debate and vote on a lot of

9    different kinds of bills.  Today in the House, we

10   voted on a license plate for a soccer team, which

11   is great.  But what we have the opportunity to do

12   here today is to move forward a piece of

13   legislation that does the most important thing

14   that we can do as a legislature, and that is to

15   protect life.

16              I thank you, and I appreciate your

17   favorable support of House Bill 481.

18              CHAIRPERSON UNTERMAN:  Thank you.

19   Thank you very much.

20              Okay.  I believe that I found the

21   missing sheet.  And Kimberly Hauschstader --

22              KIMBERLY HAUSCHSTADER:  Hauschstader.

23              CHAIRPERSON UNTERMAN:  Hauschstader.

24   We're glad to have you.  Thank you very much.

25              KIMBERLY HAUSCHSTADER:  Madam Chairman,



1    I thank you for the opportunity to speak today.

2    This is actually the very first time that I have

3    ever come down to the Capitol building.

4              CHAIRPERSON UNTERMAN:  We're glad to

5    have you.

6              KIMBERLY HAUSCHSTADER:  And I am --

7              CHAIRPERSON UNTERMAN:  Where are you

8    from?

9              MS. HAUSCHSTADER:  I am from Jasper,

10   Georgia, up in the mountains.

11             CHAIRPERSON UNTERMAN:  Good.  You've

12   got a long drive.

13             MS. HAUSCHSTADER:  Yeah.  I've been

14   involved with things politically, but I'm here

15   today just to speak as a citizen.

16             CHAIRPERSON UNTERMAN:  Thank you for

17   coming.

18             MS. HAUSCHSTADER:  In 1979 -- actually,

19   from '77 to 1979, I was in high school.  During

20   those years -- the culture back then became a real

21   intense drug culture.  And one of the things that

22   I recall from that period of time that has never

23   ever left me was the girls who had gotten pregnant

24   and who were walking down the halls from locking

25   their locker trying to collect money so that they



1    could have an abortion.  I don't know why that

2    stuck in my head, but it always did.

3              I remember my heart just kind of -- you

4    know, just a little tinge in my heart.  And I

5    remember what I --

6              Shortly thereafter, I was invited to go

7    with a bunch of girlfriends down to a Planned

8    Parenthood clinic because we were all thinking

9    about having sex, and we were told that they were

10   going to educate us.

11             And so when I got to that clinic, what

12   they told me was that if I wanted to have sex,

13   that I could take birth control pills, and that I

14   wouldn't get pregnant.  What they told me right

15   after that was, however, if you do get pregnant,

16   you can come back here, and we will counsel you on

17   how to have an abortion.

18             Thankfully, I had a relationship with

19   my mom at that time that I could go home, and I

20   could speak with her about it.  And I decided to

21   follow my parents' advice instead.

22             The reason I'm sharing that with you

23   today is because it's in my belief and it's been

24   my experience since 1996 when I became a counselor

25   that I have counseled with hundreds and hundreds



1   of women who when they were young made the

2   decision to have an abortion and didn't have a

3   clue what they were actually doing.

4            And we've heard it testified today, you

5   know, that a lot of times it's not until somebody

6   has a baby that they actually recognize what

7   transpires.  You know, for years and years, I was

8   pro-choice.  But as I started to counsel with

9   these women and as I started to see more and more

10  of the devastation in the lives of the people who

11  made the decision really not being educated as to

12  what they were doing or why they were doing it and

13  their lives have been ruined over it -- thank

14  you -- their lives have been ruined over it, my

15  heart changed.

16           And so I'm here today just to share my

17  experience, strength, and hope in that and to ask

18  each of you to support this bill.

19           CHAIRPERSON UNTERMAN:  Thank you.

20  Thanks for driving from Jasper.  Beautiful

21  country.

22           MS. HAUSCHSTADER:  It is.

23           CHAIRPERSON UNTERMAN:  Okay.  I think

24  that wraps up the favor.  How many minutes total

25  did they have?



1            UNIDENTIFIED PERSON:  45.

2            CHAIRPERSON UNTERMAN:  45 minutes.

3   Okay.

4            Okay.  So we'll pick back up.  Let's

5   see.  I believe I had someone else who

6   requested -- John Walraven?  John Walraven?

7       (Whereupon off-the-record discussion

8       ensued.)

9            CHAIRPERSON UNTERMAN:  Okay.  And I'm

10  going to call out the first six that are going to

11  testify.  Trinity Hundredmark Fitzpatrick, Melissa

12  Kottke, Juanita [sic] Callaway, Ann Patterson, and

13  Carrie Cwiak.  I'm not sure I pronounced that

14  right.  C-w-i-a-k.

15           So if y'all could line up on the wall,

16  I would appreciate it.

17           Mr. Walraven, you've got the floor.

18           JOHN WALRAVEN:  Thank you, Chairman

19  Unterman.  I will be very brief.  I've got

20  11-, 7-, and 8-year-old boys that are waiting for

21  me to come for first pitch of a baseball game.

22           I'm the counsel to Georgia's

23  reproductive endocrinologists, and my plea today

24  is to be in front of the Science & Technology

25  Committee here in the State Senate.  And that's

1    really because the obstetricians and gynecologists

2    that I represent have created opportunities for

3    our ob-gyns to establish much that would be

4    codified in HB 481 is not scientific fact.

5              When legislation is introduced on the

6    subject of pregnancy and its proposals violate the

7    standard of care in obstetrics, our reproductive

8    endocrinologists work to help restore these

9    standards in Georgia law.

10             When legislation states items that are

11   false and can be proven so with science, the

12   doctors will come and present it.  Today Dr. Ann

13   Patterson, a specialist in maternal fetal

14   medicine, will appear behind me -- after me

15   rather and offer testimony on House Bill 481

16   because the bill is filled with falsehoods and

17   under the threat of imprisonment will require

18   Georgia's doctors to treat patients contrary to

19   their training and education.

20             The bill contains falsehoods about the

21   human race that are just simply untrue.  Six weeks

22   from fertilization a human heart has not formed.

23   What has not formed cannot beat.  It's a really

24   good try at lines 70 and 95.  But if you look at

25   these lines -- and Dr. Patterson will tell you --



1    what is described in the bill is not cardiac

2    activity.

3            At line 234, we then update the Woman's

4    Right to Know Act, an act that I've been working

5    on since 2005.  And it now will provide

6    misinformation to Georgia's pregnant patients

7    because it will say that at six weeks, that embryo

8    in their body has a heartbeat when it doesn't.

9            This bill also seeks to amend the

10   Georgia Constitution by general law.  Finding that

11   an embryo is worthy of recognition as a natural

12   person requires an amendment to the Constitution.

13   You can't change the Constitution with 29 votes in

14   this Senate, and that's what this bill purports to

15   do.

16           This bill also violates Georgia's

17   Constitution in ways that the federal courts will

18   not hear in the new sub on these different subject

19   matters.  In this bill, you'll find subject

20   matters of taxes, torts, facility reporting,

21   informed consent, homicide, and now child support.

22           I will quickly go through survey

23   questions from Georgia's ob-gyn residents.  They

24   are here in Georgia getting their education.  "I

25   am more concerned about being sued as a

1    physician."  Yes, 76 percent.  "I am more likely

2    to stay in Georgia after finishing residency to

3    practice."  No, 88 percent.  "Georgia will become

4    a more attractive state in which to practice

5    obstetrics."  No, 88.46 percent.

6              Senators and Madam Chair, thank you

7    very much.  I'll stand for any questions if you

8    have any.

9              CHAIRPERSON UNTERMAN:  If you'll just

10   submit your survey, we'll be glad to enter it into

11   the record.

12             JOHN WALRAVEN:  I'm sorry.  I couldn't

13   hear.

14             CHAIRPERSON UNTERMAN:  If you will

15   submit your survey --

16             JOHN WALRAVEN:  I will.  Thank you.

17             CHAIRPERSON UNTERMAN:  -- to me, I will

18   disseminate it to the rest of the committee.  I

19   appreciate it.

20             JOHN WALRAVEN:  Thank you very much.

21             CHAIRPERSON UNTERMAN:  Thank you.

22             Okay.  Going back up to the top of the

23   list.  Trinity -- Trinity, you want to say your

24   name correctly because I'm sure I'm not saying it

25   right.

1          TRINITY HUNDREDMARK FITZPATRICK:  Yes.

2   Trinity Hundredmark from Atlanta, Georgia.

3          CHAIRPERSON UNTERMAN:  And it says

4   Fitzpatrick.

5          TRINITY HUNDREDMARK FITZPATRICK:  Yes.

6   That's my married name.

7          CHAIRPERSON UNTERMAN:  Okay.  All

8   right.  We're glad to have you here at the

9   Capitol.

10          TRINITY HUNDREDMARK FITZPATRICK:  Thank

11   you, Madam.

12          This is the first time that I've told

13   this story out loud in the public.  A lot of our

14   close friends know, but this is the first time

15   anybody's ever heard it out in the public sphere.

16          In the summer of 2013, we found out

17   that we were pregnant with our second child.  When

18   we found out at our first appointment that this

19   baby would be due one year to the day that my mom

20   had passed away, it felt like God had intervened

21   and given us this precious blessing to return us

22   to some level of hope and joy.  But that joy was

23   very short-lived.

24          As my ob looked at the images from our

25   anatomy scan at 19 weeks, she told us that though

1   she didn't want to cause us much concern, she was

2   very concerned about my daughter's long bones in

3   her legs.  They were measuring two weeks behind.

4   That seemed like such a silly thing to be

5   concerned about at the time.  Two weeks?  How big

6   of a deal was that?

7           I wouldn't know how big of a deal that

8   would actually be.  This was three days before

9   Thanksgiving.  The days seemed like years as we

10  waited for our appointment the Monday after

11  Thanksgiving.  My husband was confident that

12  everything was going to be okay, and I did my best

13  to adopt his optimism.

14          But it only took a few moments at the

15  perinatologist and few measurements to flash up on

16  the big screen next to the bed before I realized

17  the doctor was going to tell me the words that I

18  was dreading.  My daughter was very, very sick.

19  And not only was she very sick, but her growth

20  bone was lagging so far behind that her chest was

21  not large enough to hold and grow her lungs.

22          From all of my Googling of what short

23  long bones meant, I knew that this was the biggest

24  sign that she suffered from a lethal condition.

25  We spent the next two days researching everything

1  that we could about skeletal dysplasia because

2  that's what they told us she likely had as we

3  waited the second opinion.

4         We prayed that they were wrong, and we

5  made plans to adjust our lives to bring in a

6  little person because we were committed to trying

7  to make this work for her.  But we would never get

8  that chance because at our second appointment, we

9  learned that not only did she have one fatal

10  defect, but she had two others.  So three total

11  that were incompatible with life.  That phrase

12  will haunt me for the rest of my life.

13         They narrowed it down to two forms of

14  skeletal dysplasia, both of which would likely be

15  causing her extreme pain.  There was a good chance

16  that she would die in my belly before we made it

17  to the end of her pregnancy.  But if she didn't,

18  the extra fluid that was on her brain and her

19  large head size would make a vaginal delivery

20  nearly impossible and would likely kill her.

21         As I sat in there taking this

22  information in, I tried my best not to be sick.

23  How could this be happening?  I love this baby.

24  We want this baby.  But I wanted more for her to

25  not be in any more pain.  I wanted her to not know



1  a minute of suffering.  I only wanted her to know

2  peace.

3          And as much as I wanted to keep her

4  safe and hold her, I knew that carrying her to

5  term would only be fulfilling my own selfish

6  desires.  It would do nothing to alleviate her

7  pain, and it would do nothing to stop her

8  suffering.  And so we made the decision to allow

9  her to pass safely in my womb so that she would

10  not know any other pain.

11          When she died, a part of me died with

12  her as well.  Yet there's not an ounce of me that

13  regrets this decision.  You see, I didn't end her

14  life.  Her life was over before it even began.

15  And that decision was made by a power larger than

16  me.  The only decision that I had to make was to

17  show her compassion and to show her mercy.  And I

18  firmly believe that God chose me to be her mother

19  because he knew I would make this choice.

20          Please don't misconstrue what I'm

21  saying as saying we didn't want her.

22          CHAIRPERSON UNTERMAN:  Okay.  Your

23  time's just about up.  You want to finish?

24          TRINITY HUNDREDMARK FITZPATRICK:  Yes,

25  ma'am.



1              What I want you-all to know is that

2    these babies are loved.  They are honored every

3    year with candles and balloons and releases and

4    walks in October to remember their life.  They are

5    loved, and they were wanted.  And I'm here to

6    speak on behalf of all women that may have been in

7    my situation.

8              Thank you.

9              CHAIRPERSON UNTERMAN:  Okay.  Trinity,

10   you didn't tell us where you were from.  Where are

11   you from?

12             TRINITY HUNDREDMARK FITZPATRICK:

13   Atlanta, Georgia.

14             CHAIRPERSON UNTERMAN:  Okay.  Thank

15   you.  Appreciate you coming.

16             Okay.  Are you Melissa?

17             MELISSA KOTTKE:  I am.

18             CHAIRPERSON UNTERMAN:  Melissa, how do

19   you spell your last name?

20             MELISSA KOTTKE:  It's Kottke,

21   K-o-t-t-k-e.

22             CHAIRPERSON UNTERMAN:  Okay.  Thanks

23   for coming.

24             MELISSA KOTTKE:  Thank you.

25             Good afternoon, Madam Chair and Members

1    of the Committee.  My name is Dr. Melissa Kottke.

2    I am from Atlanta, Georgia.

3              I'm an ob-gyn physician who's practiced

4    in Georgia for over ten years, and today I want to

5    present my strong opposition as an ob-gyn to House

6    Bill 481.

7              First and fundamentally, which we've

8    already heard, House Bill 481 is built on a

9    foundation of misleading and false statements and,

10   what's troublesome to me, enormous amounts of

11   scientific inaccuracies.  For these reasons alone,

12   it should not be considered.

13             Next, in House Bill 481, lawmakers

14   actually seek to redefine medical terminology.

15   This bill plans to redefine viability.

16   Conveniently the American College of Obstetricians

17   and Gynecologists with its membership of over

18   55,000 ob-gyns across the US already has a

19   definition of viability.  So not only is this

20   shocking and inappropriate for lawmakers to

21   suggest, but it's also completely unnecessary as

22   medical experts have already done this.

23             House Bill 481 takes medical decisions

24   out of the hands of patients and their providers.

25   It is extremely dangerous for lawmakers to presume



1    that they're better equipped than a woman and her

2    healthcare provider to judge what is appropriate

3    medical care.  This compromises both the integrity

4    of the patient-physician relationship and the

5    medical practice of evidence-based care.

6              Every day as clinicians, we see real

7    world contacts and real life medical situations of

8    real people much like what we just heard, and

9    they're complex, and they're nuanced.  There are

10   enumerable situations, health conditions, and

11   complications that occur every day in pregnant

12   people.  Unfortunately, it's not always possible

13   to predict the course of a medical condition, a

14   complication, or how quickly it may lead to health

15   problems, severe injury, or even death.  This is

16   the reality of this field.

17             As such, these situations can only be

18   best managed by the patient, her provider, and the

19   best available evidence.  This bill actually seeks

20   to circumvent each of these.  The mother, the

21   doctor, and the science no longer matter.

22             This bill will put women in Georgia in

23   harm by putting a wide array of medical

24   professionals in the untenable position of denying

25   medical care to pregnant people for fear of



1  persecution.  Medical providers may not complete

2  radiologic imaging for fear of harming the unborn.

3  They may give chemotherapy.  They may defer

4  surgery for the mother in fear of being charged

5  with homicide.

6          Ob-gyns caring for common conditions in

7  pregnancy may feel the need to wait for a higher

8  blood, a higher fever, or even more blood loss.

9  Imagine if that was you and it was happening to

10 your loved one while your family was in crisis and

11 I had to greet you in the waiting room of the

12 hospital and say, I'm very worried about her.  In

13 my medical opinion, it's the pregnancy that's

14 causing what we're seeing.  But I'm sorry.  She's

15 just not sick enough yet.  So I can't help you.

16          House Bill 481 will worsen Georgia's

17 already dismal maternal and child health outcomes.

18 We've seen time and time again that maternal

19 mortality and infant mortality are higher in

20 places where abortion is illegal or highly

21 restricted.

22          CHAIRPERSON UNTERMAN:  Time to finish

23 up.

24          MELISSA KOTTKE:  One sentence.

25 Furthermore, abortion restrictions



1  disproportionally affect people who are poor,

2  young people, sexual gender minorities, and people

3  of color.  In comparison, legal abortion is

4  incredibly safe.  We can't allow this.

5          I urge you to end this committee, to

6  vote no to House Bill 481.

7          Thank you.

8          CHAIRPERSON UNTERMAN:  Thank you.

9          Okay.  Thank you.

10          How are you?

11          DR. JUAQUITA CALLAWAY:  I'm fine.

12          CHAIRPERSON UNTERMAN:  You're Juanita.

13          DR. JUAQUITA CALLAWAY:  I'm

14  Dr. Juaquita Callaway.

15          CHAIRPERSON UNTERMAN:  Juaquita?

16          DR. JUAQUITA CALLAWAY:  Yes.

17          CHAIRPERSON UNTERMAN:  Okay.

18          DR. JUAQUITA CALLAWAY:  No problem.

19          CHAIRPERSON UNTERMAN:  And where are

20  you from?

21          DR. JUAQUITA CALLAWAY:  Decatur.

22          CHAIRPERSON UNTERMAN:  Decatur?

23          DR. JUAQUITA CALLAWAY:  Yes.

24          CHAIRPERSON UNTERMAN:  Thank you so

25  much for coming.  We appreciate it.

1          DR. JUAQUITA CALLAWAY:  Yes.  And I'm

2    just eternally grateful to be here to have this

3    opportunity to speak.  This is my first time

4    coming down.

5          And I really wanted to because I want

6    to speak for a lot of women of Georgia that have

7    not been spoken for yet.  For 30 years as an

8    ob-gyn in this state, I have taken care of women

9    on all levels.

10          As I listened to the testimony of the

11    women earlier, the child whose mother kept her

12    despite being told to abort her, had I been her

13    mother's doctor, I would have advocated for her as

14    well because that's what that mother wanted.

15    Clearly she had the resources.  Clearly she had

16    the support.  But that is not true for every woman

17    in this state.  And I have seen that firsthand.

18          There is a reason that Georgia is 50 in

19    maternal mortality.  More women die from pregnancy

20    in this state than any other.  Why is that?  I

21    know why.  It's a lack of resources.  Lack of

22    healthcare.  How can we in this state, in this

23    time still have 50 percent of Georgia counties not

24    having an ob-gyn when women have to have their

25    pregnancies -- they need prenatal care to have



1  good outcomes, and these outcomes include healthy

2  babies.  We still don't have that here in Georgia;

3  although, we have committees and grant money to

4  improve it, but it's not happening.

5           My concern about this bill, and

6  although it does not make abortion illegal, it

7  puts restrictions.  And those restrictions may

8  lead to outcomes we don't want.  A woman would

9  have to do a pregnancy test every one to two weeks

10 to catch her pregnancy early.  Then she will try

11 to get an appointment before her sixth week.  That

12 may not be possible if she does not have resources

13 and insurance.

14          By the time she finds out, she may not

15 have that option in this state.  And especially if

16 she's one of these women in a state of hardship,

17 she will travel to another state, or she will have

18 an illegal abortion, or she will have a pregnancy

19 that will likely be a high-risk pregnancy and end

20 in a preterm delivery, her death, or the death of

21 her child.

22          Now, I understand the passion for

23 children, but these children come from women, from

24 mothers.  Not every woman who wants to have an

25 abortion is doing it because it's an

1    inconvenience.  She's doing this because she's

2    weighing her options for what's available for her

3    and her child, and many don't want to see the

4    suffering.  I hear it over and over.  It literally

5    brings tears to my eyes that there's nothing I can

6    do as a doctor in this state to help these women.

7                   Now, if we're doing anything, I

8    understand.  But I would also love to see that

9    support.

10                  Thank you.

11                  CHAIRPERSON UNTERMAN:  Thank you.

12   Thank you very much for your service.

13                  So Ann Patterson?

14                  DR. ANN PATTERSON:  Good afternoon,

15   Madam Chairman, Committee.  I am Dr. Ann

16   Patterson.  And for almost 30 years I have been

17   practicing --

18                  CHAIRPERSON UNTERMAN:  Where are you

19   from, ma'am?

20                  DR. ANN PATTERSON:  Duluth.

21                  CHAIRPERSON UNTERMAN:  Duluth, Georgia.

22                  DR. ANN PATTERSON:  I have been

23   practicing ob-gyn specializing in maternal fetal

24   medicine.  This is a subspecialty that deals with

25   complications of pregnancy and in the baby before



1   delivery.

2              At this time, I am past president of

3   the Georgia OBGyn Society, and I'm here

4   representing more than 1,000 physician members of

5   that society who oppose House Bill 481.

6              Access to healthcare from a woman's

7   perspective is terrible in Georgia.  If we enact

8   this, it will make it worse.  There are 80

9   counties in Georgia without an obstetrician.

10  Women have to travel a long way to even

11  find care by an obstetrician.  The mortality

12  rate -- maternal mortality rate in this state is

13  so high.  We are 50 out of the 50 states.

14              House Bill 481 proposes banning

15  abortion on the embryonic heartbeat.  Let's

16  talk about that a minute.  At six weeks, if you

17  look at the side -- the thickness of your

18  fingernail, that is the size of the fetus.  It

19  is 2 to 3 millimeters thick, not centimeters.

20              It proposes that there is a heartbeat.

21  At that point in time, sometimes on ultrasound

22  with very enhanced technology you can see motion

23  in the heart.  But those are the Purkinje fibers

24  that are developing that will eventually innervate

25  the heart, but that does not mean there's a formed



1  heart nor that there is a heartbeat.  So it is

2  misleading.

3          At eight to nine weeks, we can see a

4  heartbeat.  And that, however, can be difficult

5  because you're doing this transvaginally, and not

6  everybody is five-four and 140 pounds.  There is

7  an increasing problem with obesity in Georgia, and

8  even then it is transvaginally very difficult to

9  examine these women or find a heartbeat at that

10  stage.

11          So I want to share with you something

12  that's very, very personal in the fact that years

13  ago when I practiced at Grady, I saw many cases of

14  women who came in.  And there was an entire wing

15  of the hospital devoted to septic abortions and

16  some of the really terrible outcomes of this where

17  women, if they lived, have amputations.  The worst

18  I ever saw was a hemipelvectomy where the woman

19  was cut off above the hips, lived to go home in a

20  padded wheelchair to try to take care of her

21  family.  That is something we do not want to go

22  back to in Georgia.  And no hospital can turn away

23  a septic patient for any reason.  Ultimately, we

24  will see that if abortions are performed, they're

25  performed outside the purview of medicine.  And



1  that will provoke more septic problems that we had

2  once years ago.

3          Georgia has made a significant

4  investment in State funds to reverse the worst of

5  maternal mortality.  Senator Unterman has been

6  very proactive with that.

7          Instead of this bill, I urge the

8  committee to change the conversation.  Improve the

9  patient-physician relationship.  Promote women's

10  healthcare in Georgia.  Provide obstetricians in

11  counties where there are none.  That is where this

12  conversation really needs to go.

13          Madam Chair, thank you.  I'm happy to

14  take any questions.

15          CHAIRPERSON UNTERMAN:  Good.  Thank

16  you.  I appreciate you coming.  If you want to

17  submit your testimony --

18          DR. ANN PATTERSON:  Excuse me?

19          CHAIRPERSON UNTERMAN:  I thought you

20  were reading it.  If you want to submit it since

21  you were -- you were president of the OBGyns?

22          DR. ANN PATTERSON:  Yes, ma'am.

23          CHAIRPERSON UNTERMAN:  Okay.  If you

24  want to submit those, I'll disperse them.

25          DR. ANN PATTERSON:  Thank you.



1               CHAIRPERSON UNTERMAN:  Thank you.

2               Carrie?  Where are you from?

3               DR. CARRIE CWIAK:  Atlanta.

4               CHAIRPERSON UNTERMAN:  Atlanta?

5               DR. CARRIE CWIAK:  My name is

6    Dr. Carrie Cwiak.  I am a practicing board

7    certified obstetrician/gynecologist at Emory

8    University; a Fellow of the American College of

9    Obstetrics and Gynecologists, ACOG; and a member

10   of the Georgia OBGyn Society.  I strongly urge you

11   to oppose this bill.  It's a bad idea for Georgia.

12              A fetal heartbeat may note a viable

13   intrauterine pregnancy with 78 percent certainty

14   of survival to a full-term pregnancy.  This is not

15   the same as stating that a pregnancy with a fetal

16   heartbeat is a viable human being.  ACOG, in fact,

17   states that viability is the capacity for

18   sustained survival outside the uterus.  This is

19   why their policy statement strongly supports

20   access to abortion as part of healthcare.

21              They are joined by similar national

22   organizations like the American Medical

23   Association, the American College of Graduate

24   Medical Education, the American Academy of

25   Pediatrics, and the Society of Family Planning,



Page 151

1   whose policy statements assert the same.

2         In fact, if I see a patient during

3   prenatal care, I can't legally bill for seeing two

4   patients because I'm, in fact, seeing one patient.

5   And if I try to, her insurance carrier will tell

6   me that I'm, in fact, committing fraud.

7         A fetus born prior to viability in the

8   first or second trimester will not be able to be

9   intubated and, therefore, will not be able to have

10   even assisted respirations and will certainly not

11   be able to have respirations on its own.

12   Therefore, the fetus will not be able to survive

13   independently if delivered prior to the point of

14   viability.  That is the medical definition of

15   viability.

16         If a patient is miscarrying before this

17   time, I can neither prevent the miscarriage or

18   treat the fetus once it's delivered.  So will

19   doctors be sued if this occurs and they cannot

20   prevent it nor treat the fetus when it's delivered

21   for wrongful death?  Will they be sued?  Will

22   hospitals be sued similarly?  Will this drive up

23   medical malpractice and healthcare expenditures as

24   a result?

25         Viability also does not equate to a



1   chance of survival or quality of life for the

2   mother of the fetus.  This is best determined by a

3   provider with years of medical training.  Medical

4   and fetal indications often present later than

5   when the heartbeat is detected.

6           In particular, if you have limited

7   access to an ob-gyn, you will not have access to

8   this life-saving determination.  This will

9   disproportionately impact women in rural counties

10  where there's no ob-gyn, women of color, and women

11  of limited economic means.

12          The decision to terminate a pregnancy

13  is significant and complex made voluntarily after

14  informed consent by a patient, after careful

15  thought in consultation with her physician.  This

16  bill does not enable us to parse out the vagaries

17  of medical maternal and fetal indications that we

18  oftentimes see in pregnancy.

19          One of my patients was diagnosed at 15

20  weeks with a fetal genetic metabolic disorder.

21  Her first child was already affected by the same

22  and required a significant amount of her family's

23  time and care.  Once she and her husband found out

24  that her pregnancy -- her fetus was similarly

25  affected, they decided to terminate the pregnancy.

1   They chose to preserve the quality of life of

2   their living child rather than jeopardize that for

3   a fetus not yet living.

4            But what is the definition of medically

5   futile?  Will providers and hospitals be sued for

6   medical malpractice?

7            CHAIRPERSON UNTERMAN:  Okay.  You're

8   time's up.

9            DR. CARRIE CWIAK:  Thank you.

10           CHAIRPERSON UNTERMAN:  Do you want

11  finish your sentence?

12           DR. CARRIE CWIAK:  Oh, I was just going

13  to say, will we be sued for medical malpractice if

14  we don't meet the preponderance of evidence that's

15  decided by others?

16           Thank you.

17           CHAIRPERSON UNTERMAN:  Okay.  Thank

18  you.  We appreciate you coming.

19           Okay.  We've got another list here.

20  Preetha Nandi, Shivika Trivedi, Eva Lathrop, Roger

21  Rochat, Atsuko Koyama, Mimi Zieman.  Those people

22  line up, and then y'all go ahead and come on up.

23           The next list is Joline Milord, Laura

24  Anderson, Tiffany Hailstorks, Lisa Haddad, Bob

25  Wiskind, and Jasmine Cummings, if you'll be on

1  standby.

2          Okay.  Yes?

3          UNIDENTIFIED PERSON:  Can she provide

4  you a copy of her testimony as well?

5          CHAIRPERSON UNTERMAN:  Sure.  Be glad

6  to.

7          Preetha Nandi?  Preetha, where are you

8  from?

9          PREETHA NANDI:  I'm from Atlanta,

10 Georgia.

11          CHAIRPERSON UNTERMAN:  Good.  We're

12 glad to have you here.

13          PREETHA NANDI:  Thank you for having

14 me, Madam Chair.  And this is my colleague, Alicia

15 Kramer.  We're both medical students, and we'd

16 like to present our testimony together.

17          CHAIRPERSON UNTERMAN:  That's fine.

18          PREETHA NANDI:  Great.

19          CHAIRPERSON UNTERMAN:  Wait a minute.

20 Tell me who you are so I can mark you off.  We've

21 got Preetha and Alicia?

22          ALICIA KRAMER:  Alicia Kramer also from

23 Atlanta, Georgia.

24          CHAIRPERSON UNTERMAN:  Alicia Kramer?

25          ALICIA KRAMER:  Correct.

1              CHAIRPERSON UNTERMAN:  How do you spell

2      your name?

3              ALICIA KRAMER:  K-r-a-m-e-r.  I believe

4      I'm on a separate list.

5              CHAIRPERSON UNTERMAN:  Wait a minute.

6      I don't want to get confused.  It's late, and

7      we're all tired.  So just hold on.  We're not as

8      smart as medical students.

9              Okay.  Tell me your name again.

10             ALICIA KRAMER:  Alicia Kramer.

11             CHAIRPERSON UNTERMAN:  Alicia Kramer.

12     K-r-a-m-e-r?

13             ALICIA KRAMER:  Correct.

14             CHAIRPERSON UNTERMAN:  Alicia, where

15     are you from?

16             ALICIA KRAMER:  Atlanta.

17             CHAIRPERSON UNTERMAN:  And Preetha,

18     where are you from?

19             PREETHA NANDI:  Atlanta as well.

20             CHAIRPERSON UNTERMAN:  We're glad to

21     have y'all.

22             PREETHA NANDI:  Madam Chair, Vice

23     Chair, and Distinguished Members of the Committee

24     on Science & Technology, thank you for the

25     opportunity to appear before you today to share

1    our perspective on House Bill 481.

2              We are fourth-year medical students at

3    Emory University here in Atlanta.  Alicia and I

4    are both natives of the Southeast, and we plan to

5    practice as ob-gyn physicians in this region.

6              We believe that House Bill 418 [sic]

7    will have severe, negative consequences not only

8    for women's health in Georgia as described by our

9    colleagues but also for the already diminishing

10   physician workforce particularly in primary care

11   in this state.

12             To be clear, a restrictive practice

13   environment will deter trainees from entering

14   medical school and physicians from practicing in

15   Georgia.  Why?  This bill sends a message to

16   future healthcare providers like us that the

17   government can and will violate the privacy of the

18   clinical exam room.

19             This bill undermines our ability as

20   physicians to provide safe, quality, and

21   evidence-based medical care.  As student doctors

22   do not feel that they can freely uphold the

23   central tenets of medicine they are taught in

24   medical school, they simply will choose to

25   practice elsewhere.  And it is the people of



1    Georgia, the women of Georgia, who will suffer.

2              In a state already facing a willful

3    shortage of providers, we must attract, not deter,

4    trainees and providers to make Georgia their home.

5              ALICIA KRAMER:  Every day our patients

6    make difficult, personal decisions in consultation

7    with their doctors and their families.  These

8    decisions are and must be individualized: the

9    cancer patient deciding between surgery or

10   chemotherapy, a woman choosing when to begin

11   routine mammogram screening, a family's decision

12   to move a loved one to hospice care.

13             Regardless of our personal beliefs on

14   abortion, I think we can all agree that when any

15   one of us go to our doctor, we expect the privacy,

16   respect, and dignity of a confidential

17   consultation.

18             We expect to be offered all available

19   options so that we can make the right decision for

20   us.  We do not expect politicians to presume to

21   understand our medical needs better than we and

22   our doctors do, but this bill takes medical

23   decision-making power away from patients and puts

24   that power into the hands of government.

25             We hope this committee will consider in



1    good faith the critical importance of patient

2    autonomy and the lethal consequences of worsening

3    physician shortages.

4              We ask you, our representatives, to

5    listen to the voices of Georgia's future

6    physicians and vote against House Bill 481.

7              CHAIRPERSON UNTERMAN:  Thank you.

8    Thank you.  We appreciate y'all coming, and good

9    luck in your internships and your fellowships, if

10   you so choose.  I always love being at Grady

11   telling doctors what to do.

12             Okay.  So you're Shivila.  Did I say it

13   right?

14             DR. SHIVIKA TRIVEDI:  (No audible

15   response.)

16             CHAIRPERSON UNTERMAN:  No?  I'm sorry.

17             DR. SHIVIKA TRIVEDI:  Shivika Trivedi.

18   I'm from Atlanta.

19             CHAIRPERSON UNTERMAN:  Shivika.  You're

20   from Atlanta?

21             DR. SHIVIKA TRIVEDI:  Yes.

22             CHAIRPERSON UNTERMAN:  We're glad to

23   have you here.  Thank you very much.

24             DR. SHIVIKA TRIVEDI:  Thank you.

25             Good afternoon, everyone.  I'm a

1  practicing ob-gyn.

2          To start, the American College of

3  Obstetrics and Gynecology, Committee Opinion 385

4  states that "... conscientious refusals should be

5  limited if they constitute an imposition of

6  religious or moral beliefs on patients, negatively

7  affect a patient's health, are based on scientific

8  misinformation, or create or reenforce racial or

9  socioeconomic inequalities."

10          House Bill 481 is based on scientific

11  misinformation, imposes religious and moral

12  beliefs on the women of Georgia, and will also be

13  negatively affecting patients' health and

14  reinforcing racial and social inequalities.

15          There are countless reasons why House

16  Bill 481 is a direct attack on women's health.

17  For the next few moments, I will discuss the

18  detrimental effects of this bill from the

19  standpoint of an educator.

20          This bill would prevent current

21  resident physicians from having the opportunity to

22  learn a very important and life-saving surgical

23  skill.  The Accreditation Council for Graduate

24  Medical Education or ACGME requires that resident

25  physicians perform at least 25 surgical abortion



1    procedures prior to their graduation from

2    residency.

3              This governing body along with all

4    domestic and international dominant ob-gyn

5    organizations recognize how important this

6    surgical skill is for an ob-gyn to ensure future

7    patients are being afforded complete reproductive

8    healthcare.

9              This bill would prevent resident

10   physicians from learning how to evacuate a uterus

11   to treat miscarriage or hemorrhage.  Nearly 15

12   percent of first trimester pregnancies result in

13   miscarriage.  Some of these miscarriages are

14   incomplete and lead to life-endangering

15   hemorrhage.  Without the know-how to evacuate a

16   uterus, which comes from performing abortions

17   during residency training, these future patients

18   would likely suffer undue harm due to the gap in

19   residency training that this bill would create.

20              I currently work to train residents who

21   have committed to working in rural settings

22   specifically throughout Georgia.  They are

23   committed to addressing the shortage of ob-gyns in

24   your counties and will be caring for you, your

25   wives, sisters, daughters, and friends.  Their



1    presence in these underserved areas will hopefully

2    help to ameliorate our ranking as the number one

3    most dangerous state to be pregnant.

4              However, by passing this ban, you are

5    single-handedly under-equipping them to care for

6    your constituents.  Not only will they not be able

7    to provide the full breadth of reproductive

8    healthcare, which includes abortion services.

9    They also will not have the ability to save a

10   woman's life when she presents to a small urgent

11   care clinic, urgent care, or rural clinic

12   hemorrhaging from her miscarriage.

13             From the standpoint of an educator and

14   someone who is actively working to address the

15   ob-gyn shortage in Georgia for our constituents,

16   this bill will surely undermine the few advances

17   made in this arena.  If this bill passes, educated

18   medical students entering the noble field of

19   ob-gyn will be dissuaded from applying to

20   residency programs in Georgia.

21             Evidence has shown that medical

22   students seek abortion training during residency

23   interviews.  Moreover, the highly-educated and

24   valuable physicians we are training in Georgia

25   will not be retained.



1          This bill will create a brain drain

2    where capable providers who would have otherwise

3    remained in Georgia to treat our constituents --

4    your constituents will rather elect to practice in

5    a state where they can actually wholly care for

6    women rather that a state that dictates how and

7    when a physician should care for his or her

8    patients.

9          Thank you.

10         CHAIRPERSON UNTERMAN:  Thank you.  We

11   appreciate you coming.

12         Eva Lanthrop?  Lathrop?

13         DR. EVA LATHROP:  Hey.  Eva Lathrop.  I

14   live and practice in Atlanta.

15         CHAIRPERSON UNTERMAN:  Thanks for

16   coming to the Capitol.  Have you ever been before?

17         DR. EVA LATHROP:  I have.

18         CHAIRPERSON UNTERMAN:  Good.  We're

19   glad to have you back.

20         DR. EVA LATHROP:  Thanks.

21         I'm an obstetrician/gynecologist.  I

22   work for Emory University.  I'm here today

23   representing my own position and not that of

24   Emory.

25         But before that, for several years, my



```
 1   job was to provide obstetrics and gynecology care

 2   for women in an obstetrician shortage area in the

 3   Northwestern part of Georgia.  I loved that job,

 4   and I learned a tremendous amount while serving

 5   women from largely poor and rural parts of the

 6   state.  I brought with me an enthusiasm and energy

 7   to help improve the concerning maternal health

 8   outcomes that were in the region and remain in our

 9   state.

10           But over the years, this shifted to

11   despondence and disappointment at the lack of

12   institutional and regional policies in place

13   supporting improving maternal child health

14   outcomes.  These just weren't a priority.

15           Many of the women that we served had

16   limited access to our care for a variety of

17   reasons, but yet no policies were in place or even

18   in the pipeline to improve access to prenatal

19   care, to contraception, to the resources that we

20   needed to improve the quality and timeliness of

21   emergency obstetric care.  All of these would have

22   improved maternal health outcomes.

23           And we had restrictive policies.

24   Specifically we had essentially an institutional

25   ban on abortion that for all intents and purposes
```

1    is akin to House Bill 481 which was harmful to

2    women and families.

3            For a number of reasons but not only

4    because of restricted policies, but in part

5    because of them, I eventually left this position.

6    I left for these restrictive policies, and I left

7    because of the lack of supportive policies for

8    maternal health that kept me from completely doing

9    my job and that kept me from providing the quality

10   of ob-gyn care that I had pledged to provide.  I

11   loved that job, and I left.

12           We can't afford to diminish the rural

13   obstetrician workforce anymore.  But restrictive

14   policies like House Bill 481 will do exactly that.

15   Restrictive policies hurt women and hurt families.

16           I have served thousands of women in an

17   ob shortage area of our state, and I left.  I left

18   a job that I loved.  And my peers and colleagues

19   who are coming up through the ranks either won't

20   go or will leave shortly after with the passage of

21   something like House Bill 481.

22           Regardless of their position on

23   abortion, physicians do not want to practice in an

24   environment that restricts their ability to

25   comprehensively care for their patients and that



1    threatens their relationship with their patients.

2              House Bill 481 will harm the workforce

3    and harm women and families in Georgia.  I believe

4    that Georgians deserve better, and I encourage you

5    to vote no on this bill.

6              Thanks.

7              CHAIRPERSON UNTERMAN:  Thank you for

8    coming.

9              DR. ROGER ROCHAT:  My name is Roger

10   Rochat, and I live in Atlanta.  And I've practiced

11   public health for over 50 years.  And I am

12   passionately committed to preventing maternal

13   deaths and in particular maternal deaths from

14   abortion.

15             I've done this in Georgia, in the

16   United States, and internationally.

17   Internationally some 56 million women obtain an

18   abortion each year.  46,000 die.  And 98 percent

19   of those are women of color in Asia and Africa.

20             In my remaining comments, I will talk

21   about Georgia.  And I will start back in 1969 when

22   the CDC assigned me to the State of Georgia to the

23   health department.  And one of the assignments was

24   to evaluate whether or not the April 1986 law --

25   1968 law on abortion would have any impact on

1   maternal mortality.

2          So I started by reviewing the maternal

3   deaths for the previous 20 years. And of those,

4   there were nearly 2,000 deaths from pregnancy, and

5   206 that were abortion deaths or about one

6   abortion death a month. 70 percent of those were

7   to African-Americans.

8          And for the last three (inaudible) for

9   which I have data on marital status, the majority

10   were married, 92, and 18 were single. But

11   distinctly only one single white woman died from

12   abortion while 17 were single African-Americans.

13   Moreover, there was some evidence of decline in

14   maternal deaths from abortion for all groups

15   except single African-Americans.

16          Following the new law, legal hospital

17   abortions occurred disproportionately among white

18   women, particularly young white women. My

19   co-authors, both obstetricians, and I concluded

20   that Georgia's 1968 law did nothing to improve

21   maternal health for black women.

22          Concurrently with my assignment, CDC

23   assigned two people to monitor what was happening

24   in Grady Hospital. And during the first 18 months

25   after the law was passed, 60 women were admitted



1    for complications of illegal abortion, and

2    physicians performed 203 legal abortions.

3              They did this for severe maternal

4    medical indications; for maternal mental

5    indications including depression with suicidal

6    tendency, schizophrenia, mental retardation; and

7    50 for fetal indications, 41 of which were for

8    rubella exposure early in pregnancy and nine for

9    rape.

10             The committee denied abortion to seven

11   people.  And I'd like to tell the stories of three

12   of them.  The first applicant was a 17-year-old

13   black single woman who was first referred to a

14   special ob clinic by a departmental faculty member

15   at nine weeks' gestation.  This applicant, a

16   senior in high school, felt very strongly that her

17   pregnancy represented a tremendous threat to her

18   plans to further her education beyond high school

19   and was determined to end the pregnancy either

20   legally or illegally.

21             She applied for a therapeutic abortion

22   on the grounds of psychiatric indications.  She

23   was denied an abortion at 11 weeks' gestation.

24   The following week she was worked up with the same

25   consultation, approved, and received a D&C at



1    another Atlanta hospital.

2            The second has an assumed name, is a

3    25-year-old white, divorced female.  This

4    applicant sought a therapeutic abortion on

5    psychiatric grounds under an assumed name in order

6    to protect her family, a very prominent Atlanta

7    name, as well as to retain custody of her two

8    small sons.  Her medical record is missing from

9    Grady's record room; therefore, her gestation is

10   missing from the lined summary.  But it is

11   remembered that she applied and was turned down

12   relatively early in her pregnancy.

13           Several days following her denial here,

14   she had an illegal abortion in Atlanta which she

15   had arranged upon becoming discouraged some time

16   during her abortion workup.

17           CHAIRPERSON UNTERMAN:  Mr. Rochat,

18   you're about just a minute over.  So we'll wrap

19   up.

20           DR. ROGER ROCHAT:  I'll do that.

21           CHAIRPERSON UNTERMAN:  That would be

22   great.

23           DR. ROGER ROCHAT:  Thank you very much.

24           21 years after Roe v. Wade and Doe v.

25   Bolton, a local African-American college student



1    made an appointment to end her pregnancy, went to

2    a clinic, was deterred by protestors, went back to

3    her residence, unwrapped a coat hanger, and

4    inserted it into her uterus, perforated the

5    uterine wall, became ill, was hospitalized.

6    Doctors tried unsuccessfully to save her life by

7    removing the infected uterus.

8              Thank you for your time.  I appreciate

9    you listening.

10             CHAIRPERSON UNTERMAN:  Thank you.  We

11   appreciate your service at the CDC and residing

12   here in this state.

13             So Atsuko?

14             DR. ATSUKO KOYAMA:  Atsuko Koyama.  Hi.

15             CHAIRPERSON UNTERMAN:  I'm not even

16   going to try that.

17             DR. ATSUKO KOYAMA:  It's all good.

18             CHAIRPERSON UNTERMAN:  Okay.  Southern

19   accent.

20             DR. ATSUKO KOYAMA:  My name is

21   Dr. Atsuko Koyama.  Thank you.  Good afternoon

22   Chairwoman Unterman and Committee Members.

23             CHAIRPERSON UNTERMAN:  And where are

24   you from?

25             DR. ATSUKO KOYAMA:  I prefer to just --

1          CHAIRPERSON UNTERMAN:  Where do you

2     live?

3          DR. ATSUKO KOYAMA:  I prefer to just

4     say Georgia for my security.

5          CHAIRPERSON UNTERMAN:  That's fine.

6          DR. ATSUKO KOYAMA:  I'm a pediatric

7     emergency medicine doctor and abortion provider

8     here in Atlanta.  And I strongly oppose HB 481,

9     which is an outright ban on abortion for women who

10    don't have the ability to travel out of state, to

11    take time off work, find childcare.

12         This bill prohibits healthcare

13    providers like myself from providing safe,

14    ethical, necessary care to women who are the most

15    vulnerable: women of color, teenagers, and

16    immigrants.

17         As an ER doctor, I am here to tell you

18    that women will continue to have abortions even if

19    this law is passed.  Jennifer came to me in my ER

20    with fever and bleeding.  She had taken a

21    medication that was from her home country that

22    started an abortion, and now she was hemorrhaging

23    and dying.  She will not be alone in our ERs if

24    this bill passes.

25         As an ER physician, I also take care of

1  girls and teens who have been raped and who are

2  victims of sex trafficking.  It is devastating

3  caring for these traumatized girls.  Some of these

4  girls who are trafficked aren't able to name their

5  trafficker making any kind of police report

6  impossible.  Forcing anyone, but especially girls

7  and teens, to tell their stories over and over

8  again in order to seek abortion services is

9  inhumane.

10          As an ER doctor, I have had the tragic

11  cases of having to pronounce death of children who

12  still have heart activity because the child's

13  heart rhythm is not sustainable with life.  I can

14  tell you that as an ER physician, there are cases

15  where a heart rhythm does not mean a person is

16  alive.  This law is not medically sound.

17          Taking care of teenagers, I also met

18  a girl -- she's 18 years old, technically an

19  adult -- tell me that her pediatrician would not

20  prescribe her birth control pills because she

21  shouldn't be having sex.  Some girls are scared to

22  tell their parents that they are having sex, let

23  alone that they may be pregnant.

24          Putting arbitrary gestational limits on

25  abortion will increase Georgia's already high



1  maternal mortality rate.  We rank number one in

2  the US.  This is not a proud distinction we should

3  be having.  Safe, legal abortion is a necessary

4  component of women's healthcare.

5           This bill saddens and angers me because

6  my patients are real people.  They deserve the

7  very best medical care unbiased by political

8  interference.  My patients deserve the right to

9  make their own medical decisions that are best for

10  themselves and their families and their

11  circumstances.

12           With our bizonally high maternal

13  mortality, teen pregnancy rates, and sexually

14  transmitted infection rates here in Georgia, it's

15  time to focus on legislation that would increase

16  access to preventive care, not ban access to

17  critical healthcare.

18           Thank you.

19           DR. MIRIAM ZIEMAN:  Good afternoon.

20  Thank you, Senators, for the opportunity to

21  testify in opposition to HB 481.  My name is

22  Dr. Miriam Zieman, and I'm a board-certified

23  ob-gyn.

24           I agree with everything said about the

25  heartbeat and viability.  I just want to add to



1    the senator who presented the bill's point that

2    ectopic pregnancies also have heartbeats, and they

3    are not viable.

4              This bill states that it, quote,

5    "provides the best opportunity for the unborn

6    child to survive."  But by approving this bill,

7    you are doing the opposite to the mother.  In your

8    proposal to grant fetuses full human rights, you

9    are negating the mother's full rights, especially

10   her right to survive pregnancy.

11             You've heard about the high maternal

12   mortality in Georgia.  It's quoted as 37 per

13   100,000 live births; whereas in the rest of the

14   US, it's 14.  And we already have a shortage of

15   ob-gyns.  Fewer ob-gyns mean less healthcare for

16   every Georgia woman regardless of age and

17   pregnancy status.

18             This bill states that, quote, "The

19   state of Georgia is applying reason and judgment

20   to the full body of modern medical science."  The

21   scientific community disagrees.  ACOG states,

22   "Safe, legal abortion is a necessary component of

23   women's healthcare."  The AMA states, "There

24   should be no unjustified government intrusion in

25   medicine."



1                    "The American Society for Reproductive

2      Medicine is strongly opposed to measures granting

3      constitutional rights or protections and

4      'personhood' status to fertilized reproductive

5      tissues."  And the American Academy of Family

6      Physicians publicly opposes the use of and the

7      concept of fetal personhood language in

8      governmental policies and legislation as it

9      infringes on the bodily autonomy of pregnant

10     persons.

11              It's because these -- the reason

12     medical scientific organizations oppose this is it

13     contradicts the five central ethical principles

14     guiding the medical profession.  Number one,

15     Justice.  It is unjust to limit women's access to

16     care.  And it is unjust that women of means will

17     always be able to access abortion by travel to

18     another state, whereas poor women will not.

19     Autonomy:  Patient choice should guide their own

20     medical treatment.  Beneficence:  There's a duty

21     to provide help and benefits to women, not harm.

22     Fidelity:  This includes the ethical principle of

23     confidentiality which is not maintained with this

24     bill.  Nonmaleficence:  Do no harm.

25              My final point is the proposed law is

1    in direct opposition to the Georgia medical

2    license code the physicians must adhere to less

3    they receive disciplinary action.  The Georgia

4    Composite Medical Board that oversees Georgia

5    licensing of physicians states, "If a physician

6    practices below the minimum standards of

7    acceptable and prevailing practice, they are

8    subject to disciplinary action."

9              As stated above, ACOG, who represents

10   standards for practice for ob-gyns, states, "Safe

11   legal abortion is a necessary component of women's

12   healthcare."  This law would force Georgia

13   physicians to practice below standards of care.

14             Thank you.

15             CHAIRPERSON UNTERMAN:  Thank you.  We

16   appreciate you coming.

17             Okay.  So we're starting on the next

18   page.  Joline Milord, Laura Anderson, Tiffany

19   Hailstorks, Lisa Haddad, Bob Wiskind, and Jasmine

20   Cummings.  If they want to all come on up, we

21   appreciate it.

22             JOLINE MILORD:  Good afternoon.  My

23   name is Joline Milord.  I live in Lithonia,

24   Georgia, now.  I'm a licensed certified nurse

25   midwife as well as a sexual assault nurse



1    examiner.  I'm here to speak on behalf of the

2    women I see and serve on a day-to-day basis.

3              The majority of women do not know that

4    they are pregnant until after a period or two are

5    even missed.  Due to changes in exercise,

6    hormones, medications, stress levels, and life in

7    general, a woman's cycle can be irregular causing

8    missed periods -- missed periods and/or light

9    spotting to be a normal occurrence.

10             The light spotting that can be found

11   with implantation bleeding can be mistaken for a

12   light period.  And until other symptoms manifest,

13   a woman typically does not know she is pregnant

14   until approximately six to eight weeks' gestation.

15             Things like the stress of studying for

16   midterms, working two jobs to provide for people,

17   abuse from a significant other, taking a new

18   medication, lack of health insurance, or finances,

19   et cetera, can cause distractions to where a woman

20   misses a period and is simply not available for a

21   quick appointment that same or even next day.

22             Making the decision to terminate a

23   pregnancy is not an easy one, and that is not one

24   that is carelessly made and executed.  No woman

25   ever gets pregnant with the intent on having an



1  abortion.  It takes thought; weighing her options

2  fully; discussion with partners, family, friends,

3  clergy, and/or even medical providers.

4          It is far from as simple as deciding

5  which movie to watch or which restaurant to go to.

6  Asking any woman to make a decision in a day's

7  time from finding out she's even pregnant to

8  making a lifelong choice is unfair and dangerous.

9  We as adults take longer to choose which movie to

10 watch or what to serve at our next dinner party.

11          Before she even knows she needs to make

12 a lifelong decision, a choice is being made for

13 her.  With the earliest fetal anomaly risk

14 testing, even being safely performed not until

15 about 10 to 14 weeks, a family is forced to carry

16 a pregnancy and a child with a potentially fatal

17 or severely low quality of life to term.

18          While the exception for rape and incest

19 is admirable, what happens to the young woman who

20 was assaulted and chooses to not take on the

21 presumable judgment of being shamed or called a

22 liar and decides to not even file a police report?

23 She is no longer given the choice to try to

24 emotionally deal with the incident and move on

25 with her life in private.  She now has to either



Page 178

1  file a police report and pray that someone

2  believes her enough to allow her a procedure or

3  carry an unwanted pregnancy and child conceived in

4  the most horrific way possible.

5              Women who are assaulted have many

6  emotional and mental things to deal with following

7  that trauma.  And the fear of long-term physical

8  repercussions and reminders from their assault is

9  high on that list.  With Georgia's large rate of

10 human sex trafficking, the risk of unreported

11 assaults resulting in unwanted pregnancies is much

12 higher raising the risk of continuing that cycle

13 of abuse.

14             With such drastic limitations on when

15 a woman can have an abortion, women and families

16 will be forced into making drastic decisions

17 early; early abortions without the opportunity

18 to fully weigh all options, women traveling to

19 less-than-safe areas or even Googling at-home

20 abortion and dying as a result.  Men will not have

21 a say in what happens with their unborn child with

22 these forced decisions.

23             CHAIRPERSON UNTERMAN:  Okay.  Let's

24 wrap up.

25             JOLINE MILORD:  Abortions are going to



1    happen whether anyone here agrees with it or not.

2    Whether women, your wives, girlfriends, sisters,

3    daughters, and/or friends survive them either

4    physically and/or mentally depends on decisions

5    that we make here today.

6            CHAIRPERSON UNTERMAN:  Thank you for

7    coming.

8            Okay.  So we are down to about how many

9    minutes?

10           There's eight minutes left.

11           LAURA ANDERSON:  I'll be quick.

12           CHAIRPERSON UNTERMAN:  And there's

13   about 14 people.

14       (Whereupon off-the-record discussion

15       ensued.)

16           CHAIRPERSON UNTERMAN:  There's 40 left,

17   and there's only about 12 minutes.

18           LAURA ANDERSON:  I'll be two minutes.

19           CHAIRPERSON UNTERMAN:  So if you could

20   do a minute, and that will give some of the people

21   behind you a chance to be able to speak.

22           LAURA ANDERSON:  I'll do my best.

23           CHAIRPERSON UNTERMAN:  Thank you.

24           LAURA ANDERSON:  Thank you.

25           So my name is Laura Anderson.  I am



1    from Atlanta.  I am a registered nurse.  I have

2    been working in one sphere or another of abortion

3    care for the past 12 years.  I currently am a

4    full-time nurse at an abortion clinic here in

5    Atlanta.

6              In the 12 years, all the women I've

7    seen are unified and motivated by their choice of

8    compassion.  They all talk about compassion for

9    the family they have, for the life that they're

10   carrying, whatever they refer to it as.  The

11   person that they rarely show compassion to is

12   themselves.

13             They are making this decision because

14   they are already mothers, or they will be mothers.

15   Statistically we have seen that women who have

16   abortions are likely to be mothers.  And that's

17   why we care about maternal mortality.

18             We at the clinic already see patients

19   who have been referred, not told by their doctors

20   you should abort, but referred for an abortion for

21   health reasons: specifically hypertension,

22   diabetes, health conditions that affect women of

23   color in rural areas.  So we see patients who have

24   not had access to care and are just finding that

25   out.



1          We also see happy outcomes.  Patients

2    who later come back with their babies to introduce

3    to us because that happens.  I have counseled

4    women about their full options, and that child is

5    10 years old now.  The unifying factor,

6    compassion.  Please don't take that away from us

7    as nurses and providers.

8          And I would also like to share many

9    more stories, but I feel that those stories are

10   not mine to tell.  The women who would have

11   abortions, who choose abortions, do not owe their

12   stories to anyone.

13         And, please, in the name of compassion

14   and science, say no to this law.

15         JASMINE CUMMINGS:  All right.  Thank

16   you-all for listening.  My name is Jasmine

17   Cummings.  I live and work in Atlanta.

18         And at 19 years old, I made a decision

19   for my health and for my life to have an abortion.

20   At about six weeks, I found out I was pregnant.

21   And upon finding out, I took the time to consider

22   all my options.  I did research, and I educated

23   myself properly.  I considered the option of

24   parenting.  I considered adopting.  And with

25   everything considered, having an abortion was the

1    best option for me.

2              If I were to be told the same news

3    right now and House Bill 481 was law, then not

4    only would I not have the time to consider all

5    these things, I wouldn't even have these options

6    because House Bill 481 dictates that at six weeks,

7    an abortion is illegal.  This limitation of my

8    options would not change my confusion, nor would

9    it change my feelings of fear, and nor would it

10   erase my sense of desperation.

11             And I truly believe that this

12   conversation is about safe and legal abortions.

13   It was not about "if."  Whether or not I would

14   have had an abortion is not on the table.  It is

15   how.  And so that is the option that we are taking

16   away from people.

17             And so I'm asking you-all to vote no

18   for House Bill 481.

19             CHAIRPERSON UNTERMAN:  Thank you.

20             DR. ROBERT WISKIND:  Robert Wiskind,

21   Atlanta, speaking on behalf of the Georgia Chapter

22   of the American Academy of Pediatrics.  I'm a

23   pediatrician.

24             The Georgia AAP represents over 1,700

25   pediatricians throughout the state.  The members



1    of the Georgia AAP have a wide variety of opinions

2    on the topic of abortion, but we are united in our

3    passion of caring for children while promoting and

4    protecting their health.  We support our

5    obstetrical colleagues in opposition to this bill.

6            For many teenagers who become pregnant,

7    their first healthcare visit is with a

8    pediatrician.  Some come to us because of

9    stomachaches or vomiting learning that they are

10   pregnant from the tests done in our office.

11   Others may suspect they are pregnant but delay

12   visiting the doctor because they don't want their

13   parents to know.  Too many are hesitant to seek

14   medical care at all because of abusive

15   relationships with family members.  Unfortunately,

16   some of these pregnant patients are still

17   children, 12 to 14 years of age.

18           HB 481 interferes with a pregnant

19   teenager's ability to make a decision about her

20   pregnancy as many do not even know that they are

21   pregnant until after the fetal heart rate can be

22   detected at six weeks.

23           Adolescents who have been sexually

24   assaulted, including by family members, are often

25   reluctant to file a police report.  This



 1   legislation would not allow an exception for these

 2   teenagers to terminate their pregnancies after

 3   six weeks.

 4          It is a physician's responsibility to

 5   review all treatment options with a patient.  For

 6   pregnant teenagers, this includes terminating the

 7   pregnancy.  HB 481 removes that option for most

 8   pregnant teenagers disrupting the shared

 9   decision-making process between these adolescents

10   and their physicians.

11          Thank you.

12          CHAIRPERSON UNTERMAN:  Thank you.

13          DR. ADRIENNE ZERTUCHE:  Madam Chair,

14   Members of the Committee, my name is Dr. Adrienne

15   Zertuche, and I am an obstetrician/gynecologist

16   from Atlanta.  And I'm the president of the

17   Georgia Maternal and Infant Health Research Group.

18   And I stand here in opposition to House Bill 481.

19          The topic of abortion has always been

20   and always will be a motive and divisive.  And I

21   stand here not today as a pro-life or a pro-choice

22   ob-gyn and not as a republican or democratic

23   constituent but as an objective, nonpartisan

24   physician/researcher.

25          I stand here today to ask the committee



1  to shift today's conversation from the polarizing

2  issue of abortion to the unifying issue of

3  maternal and infant health.  Whatever your belief

4  may be surrounding pregnancy termination, I ask

5  you to consider the implications of HB 481 for the

6  health of Georgia's mothers and babies.

7              As many of you are aware, Georgia has a

8  rural obstetric care crisis.  My research

9  demonstrates that 55 percent of the areas outside

10 of metro Atlanta have a shortage of providers that

11 care for pregnant women and deliver babies.  80

12 percent of these areas have no obstetricians

13 whatsoever.  And those care deserts have grown

14 more than 20 percent in the past eight years.

15             Furthermore, in the past 25 years, more

16 than 30 labor and delivery units in Georgia have

17 closed leading to a nearly 50-percent decline in

18 rural birthing facility access.  These provider

19 shortages and L&D closures have devastating

20 consequences.

21             My research shows that more than one in

22 four pregnant women in Georgia cannot access local

23 care and must drive more than 45 minutes both for

24 visits and while in labor to deliver their child.

25 These women are at risk for a number of pregnancy



1  complications, and they are 50 percent more likely

2  to deliver premature babies which will often

3  require extensive and expensive ICU care.

4          If House Bill 481 passes, my research

5  shows that the obstetric provider shortages will

6  worsen.  Practicing obstetricians fearful of

7  legislation that criminalizes care may flee.

8          Furthermore, current Georgia trainees

9  will go into practice elsewhere.  When surveyed,

10  46 percent of our ob-gyn residents and 32 percent

11  of our midwifery students reported they will be

12  less likely to stay in state with the passage of

13  legislative like HB 481.  Georgia has invested too

14  many resources in midwifery education residency

15  training, and we simply cannot let this happen.

16          I'd like to close my remarks today by

17  reminding the committee that Georgia has the

18  highest maternal mortality rate in the United

19  States.  A critical first step in adjusting this

20  devastating and, frankly, embarrassing statistic

21  is ensuring we have enough Georgia providers and

22  hospitals to provide pregnancy care.

23          Therefore, no matter your beliefs

24  surrounding abortion, I ask that you vote no on

25  HB 481.  I ask that you leave politics at the door



Page 187

1 and make a nonpartisan commitment to keeping rural

2 hospitals open and rural obstetricians in practice

3 so that we can continue Georgia's fight for

4 healthy mothers and healthy babies.

5       Thank you for your time.

6       CHAIRPERSON UNTERMAN:  Thank you.

7       Okay.  What's your name?

8       KELLY STATHAM HALL:  Good evening.  I'm

9 Kelly Statham Hall.

10       CHAIRPERSON UNTERMAN:  Okay.  We're not

11 going in order.

12       KELLY STATHAM HALL:  That's right.

13       CHAIRPERSON UNTERMAN:  And you know

14 it's really not fair to people who signed up, you

15 know, to jump over.  So I'm going to let you go

16 ahead, but I'm going to call out the next row.

17       And our time is actually up, but I'm

18 going to go ahead with the committee's purview to

19 go ahead and persevere and -- you know, as long as

20 you want to stay.  But I'd like to limit the

21 number of minutes from three minutes.  So let's

22 get it down to maybe a minute.

23       KELLY STATHAM HALL:  Thank you.

24       CHAIRPERSON UNTERMAN:  What's your name

25 again?



1          KELLY STATHAM HALL:  Thank you, Madam

2    Chairman.  My name is Kelly Hall.  I am a faculty

3    member in the School of Public Health at Emory

4    University, and I am also a nurse practitioner.

5    And my Ph.D. is in maternal child health and

6    epidemiology.  And I'm here to express my own

7    views today.

8               So my research program as well as my

9    expertise in the body of scientific evidence on

10   the impact of lack of access to abortion care is

11   informed by my clinical work.  But I have -- my

12   research has shown in the most rigorous scientific

13   literature including that which has been reviewed

14   by the American Psychological Association and the

15   Royal College of Psychiatrists has shown that lack

16   of access to abortion, family planning, and

17   restrictive abortion policies contribute to higher

18   rates of adverse maternal child health outcomes

19   including maternal mortality which we've heard

20   about but also with higher rates of depression,

21   anxiety, suicidal ideation, substance use,

22   violence, child maltreatment, child abuse, child

23   homicide, and even has implications for our HIV

24   epidemic.

25               These are the very same public health



1   issues, some of which have been acknowledged by

2   our state as crisis in epidemics, in fact, that

3   have been discussed at this very hearing today and

4   which have bipartisan support in our Georgia's

5   policy priorities.

6           CHAIRPERSON UNTERMAN:  Okay.  Thank you

7   very much.

8           KELLY STATHAM HALL:  Thank you.

9           CHAIRPERSON UNTERMAN:  Appreciate it.

10          All right.  Tiffany Hailstorks?

11          UNIDENTIFIED PERSON:  (Inaudible) Sean

12  Young (inaudible).

13          DR. TIFFANY HAILSTORKS:  Hello.

14          CHAIRPERSON UNTERMAN:  Yes.  They've

15  been jumping around.  I don't know who's on the

16  list anymore.  They've been jumping around,

17  skipping.

18          But we're going to start going in order

19  because you're getting my records -- these are

20  records for the committee, and we have to keep

21  them straight.

22          So what was the name?

23          UNIDENTIFIED PERSON:  Sean Young?

24          CHAIRPERSON UNTERMAN:  Sean Young.  Can

25  you look for that one?

1              Okay.  What's your name?

2              DR. TIFFANY HAILSTORKS:  Hi.  I'm

3     Dr. Tiffany Hailstorks, and I'm a practicing

4     ob-gyn in Atlanta.

5              CHAIRPERSON UNTERMAN:  Thank you.

6              DR. TIFFANY HAILSTORKS:  I'm here today

7     to tell you why this bill is harmful to women.

8     This bill effectively bans abortion for virtually

9     all patients in Georgia as it will ban abortion

10    before many patients even know that they are

11    pregnant.

12              Bans on abortion obstruct the

13    patient-provider relationship, the sanctity of

14    which is a cornerstone of medical care in our

15    country, and they take away a patient's right to

16    make their own medical decisions.

17              The decision to terminate a pregnancy

18    is multifaceted.  As a physician, I know that

19    once a patient has made the decision to end a

20    pregnancy, they need access to compassionate and

21    expert healthcare in their community.

22              When abortion is not an option, women

23    and their babies suffer.  States with more

24    abortion restrictions tend to have poorer health

25    outcomes for women and children than other states



1    including higher rates of maternal and infant

2    mortality.

3                I take care of many women with complex

4    medical problems who need medically-indicated

5    terminations of pregnancy.  I want to tell you

6    about a patient that I will refer to as Michelle.

7    Michelle has a history of congestive heart

8    failure.  This heart condition developed after the

9    delivery of her last child.  She sees a

10   cardiologist regularly because of her coexisting

11   condition.

12               She's now 15 weeks' pregnant and

13   advised by her provider that continuing the

14   pregnancy could potentially worsen her heart

15   problem.  She is counseled that her risk of

16   mortality is as high as 50 percent.

17               How would we help Michelle if this ban

18   passes?  Are we expected to refer her to another

19   state for care?  It is unethical to counsel her

20   about all her pregnancy options and risks and then

21   only offer her management that may potentially

22   worsen her condition and increase her morbidity

23   and mortality.  It is even more dangerous to

24   restrict her choice because she lives in a state

25   that denies her the option to choose.



1            As a provider, it is my job to counsel

2    her about her options and manage her care in a way

3    to help optimize her health.  How can this be done

4    with harmful restrictions like this ban?

5            CHAIRPERSON UNTERMAN:  Okay.  Thank you

6    very much.

7            DR. TIFFANY HAILSTORKS:  Thank you.

8            CHAIRPERSON UNTERMAN:  All right.  So

9    Lisa Haddad.  And if Sean Young is outside -- if

10   Sean Young is outside, come into the room, please.

11           Lisa Haddad?

12           And, Tiffany, are you from Emory?

13           UNIDENTIFIED PERSON:  Yes, she is.

14           DR. LISA HADDAD:  Thank you for this

15   opportunity to present to you today.  My name is

16   Dr. Lisa Haddad.  I'm an associate professor of

17   obstetrics and gynecology at Emory University

18   School of Medicine.  I'm speaking to you today on

19   my behalf against HB 481 as an obstetric provider

20   in Georgia for the last ten years as well as a

21   mother of three children who delivered all in

22   Georgia.

23           Women become pregnant sometimes as they

24   planned but other times due to contraceptive

25   failures, rape, and incest.  Women have abortions

1   for many reasons that we've heard of.

2              Abortion is one of the safest

3   procedures in healthcare.  Undoubtedly abortion is

4   safer than continuing a pregnancy.  Pregnancy

5   cannot be trivialized.  It is more than an

6   inconvenience.

7              HB 481 will affect maternal mortality,

8   but this is only the tip of the iceberg.  The

9   proposed intent of the bill states that human life

10  is precious.  I agree.  I honor the life of women

11  in front of me.  Pregnancy has risks that we

12  undertake willingly when we choose to parent.

13             We are here so speak out because we

14  believe that patients deserve safe and appropriate

15  medical care.  Restricting a woman's choice is not

16  constitutional and will cause our patients and

17  families to suffer.

18             I encourage you to vote no on the bill.

19             Thank you.

20             CHAIRPERSON UNTERMAN:  Okay.  Thanks.

21             Is Sean Young here?

22             Good.  Thank you for coming.  Where are

23  you from?

24             SEAN YOUNG:  I'm from Atlanta.

25             CHAIRPERSON UNTERMAN:  Good.  We're



1    glad to have you here.

2            SEAN YOUNG:  Thank you.

3            My name is Sean Young, and I'm the

4    legal director of the ACLU of Georgia.  The ACLU

5    of Georgia opposes HB 481 because the government

6    should never criminalize the most intimate

7    decision women and couples can make and flies in

8    the face of nearly 50 years of Supreme Court

9    precedent.  Eight other states have had similar

10   abortion bans struck down, and the same thing is

11   going to happen here.

12           HB 481 is unconstitutional because it

13   bans abortions months before the point of

14   viability.  It's undisputed scientifically --

15   indisputable that a 6-week embryo cannot

16   reasonably survive outside of a woman's uterus.

17   Even the supporters of the bill don't make that

18   claim because they can't.

19           This bill attempts to redefine

20   viability by saying it's just when six weeks

21   happens, but courts are going to see through that

22   in a second.  When courts declare this law

23   unconstitutional, it will cost Georgia taxpayers

24   hundreds of thousands if not millions of dollars

25   in legal fees and put them on the hook.  Georgia



1   taxpayers do not want to see their taxes wasted on

2   defending unconstitutional bills.

3            And the last point is this:  The

4   affirmative defense that the chairman talks about

5   that a woman can defend herself by saying she

6   reasonably thought that there was a medical

7   emergency -- affirmative defenses are raised after

8   a lawsuit is brought.  They're raised after a

9   woman is prosecuted, handcuffed, jailed, and

10  indicted.

11           And then you're going to have a jury

12  potentially of all men deliberating over whether a

13  woman was being, quote, "reasonable" when she

14  makes the most personal and some of the most

15  difficult decisions in her life.  That is the kind

16  of dystopian landscape that this bill is bringing

17  about.

18           This committee should trust Georgia's

19  women and couples who make these deeply personal

20  and sometimes difficult choices.

21           Please vote no on HB 481.

22           CHAIRPERSON UNTERMAN:  Thank you.  We

23  appreciate you coming to the Capitol.

24           Okay.  So next on the list is Adrienne

25  Zertuche.  No?



1          UNIDENTIFIED PERSON:  She already went.

2          CHAIRPERSON UNTERMAN:  Okay.  Sorry.

3     Y'all are --

4          Julia Combs, Martha Brewer, Kelly Hall.

5          UNIDENTIFIED PERSON:  She went already.

6          CHAIRPERSON UNTERMAN:  Kelly Hall's

7     gone.

8          Liza Clark and Deborah Gonzalez.

9          So you're Julia?

10          DR. JULIA COMBS:  I'm Dr. Julia Combs.

11     I live and practice in Atlanta.

12          CHAIRPERSON UNTERMAN:  Thank you for

13     coming.

14          DR. JULIA COMBS:  Thank you.

15          There's no greater joy for a doctor

16     than to bring a baby into this world, but there

17     is no greater heartache than having to tell a

18     mother-to-be that something is tragically wrong

19     with her pregnancy.

20          I've had the privilege of being

21     licensed to practice ob-gyn in Atlanta for

22     14 years.  Four years spent at Emory and at Grady

23     and the last ten at Piedmont Atlanta Hospital.  I

24     care very deeply about my job, my patients, and a

25     woman's autonomy surrounding her health and her

1    body.

2              I stand here today to express my

3    adamant opposition to House Bill 481 and to

4    provide information to you that will help you to

5    see the potentially devastating, far-reaching

6    implications should this piece of legislation

7    pass.

8              House Bill 481 is a cruel assault on

9    women facing the most difficult decision of their

10   lives.  There is no way to share a career's worth

11   of devastating pregnancy diagnoses that I have had

12   to counsel patients through.

13             Given that, I do wish to share a few

14   real-life scenarios that I do not think that

15   anyone who supports this bill is considering.  We

16   have discussed several of these, so I'm just going

17   to skip over to the end.

18             House Bill 481 ignores the medical

19   realities of pregnancy.  Very, very few women find

20   out that they are pregnant prior to six weeks.  It

21   ignores the medical reality of problems in

22   pregnancy.  Most fetal anomalies that might be

23   considered incompatible with life are not

24   discovered often until 18 to 20 weeks.

25             I cherish each time I am part of



1    introducing a baby boy or girl to her proud

2    parents.  I cannot fathom how this proposed bill

3    will help women facing a crisis in their most

4    sacred role.

5              To quote a professional association,

6    the American College of Obstetrics And Gynecology,

7    when restrictions are placed on abortion access,

8    women's health suffers.

9              Thank you.

10             CHAIRPERSON UNTERMAN:  Thanks for

11   coming to the Capitol.

12             Martha Brewer?  She's not here?

13             (No audible response.)

14             Liza Clark?

15             Is Martha Brewer coming back?

16             UNIDENTIFIED PERSON:  No.

17             CHAIRPERSON UNTERMAN:  Thank you.

18             She was opposed --

19             DR. ELIZABETH CLARK:  Madam Chair --

20             CHAIRPERSON UNTERMAN:  -- obviously.

21             Okay.  So you're Ms. Clark?

22             DR. ELIZABETH CLARK:  Yes.

23             CHAIRPERSON UNTERMAN:  And where are

24   you from?

25             DR. ELIZABETH CLARK:  I'm Dr. Elizabeth



1    Clark, and I think my name is written as Lizzie on

2    there.

3              CHAIRPERSON UNTERMAN:  Yes.

4              DR. ELIZABETH CLARK:  I'm from Atlanta.

5              Madam Chairman, Members of the

6    Committee, thank you so much for the opportunity.

7              My name is Elizabeth, and I am an

8    ob-gyn practicing at Emory University.  I'm a

9    junior fellow of ACOG, and I ask you to oppose

10   this bill.

11             I grew up here in Atlanta, and I was so

12   happy to return after years of training in

13   Seattle, Peru, and in New Mexico, to come back

14   home to serve the women of Georgia.

15             I've been so happy here and so

16   privileged to teach medical students and residents

17   to care for women in labor and delivery and to

18   provide full-spectrum care for women of Georgia.

19             When I was applying to residency

20   programs, I knew that I wanted every available

21   skill to be able to treat my patients.  And so I

22   chose programs only that provided full-spectrum

23   care and would provide me with training on medical

24   management of termination of pregnancy and

25   surgical skills.



1          I want to share with you the reasons

2     why I might leave.  If my patients know that this

3     bill is passed, what do I say to them?  What do I

4     say to them when they ask me for my medical

5     judgment and this bill has passed and I have to

6     hold my tongue?

7          I have to tell her that she's compelled

8     to continue an unwanted or dangerous pregnancy

9     because of the well of a group of elected people

10    with no medical training.  It compels me to

11    explain that the Georgia law protects a fetus the

12    size of my thumb at the cost of her liberty and

13    well-being.

14          The law would have a chilling effect on

15    the integrity of the patient-doctor relationship

16    and is not reflective of the needs and values of

17    Georgia.  Medical care mandated by politics is not

18    the standard of care that Georgia women deserve.

19    They deserve safe, compassionate, evidence-based

20    care which I urge you to protect today.

21          Thank you for your time.

22          CHAIRPERSON UNTERMAN:  Okay.  Our

23    batteries are running out, so we're going to take

24    a ten-minute break.

25          And there are -- we're going to count

1    up how many are left, and then I'm going to leave

2    it up to the people of how many minutes they would

3    like based on how many are left.

4              So we'll take a ten-minute break and

5    check out these batteries.  Thank you very much.

6              (Proceedings in recess.)

7              CHAIRPERSON UNTERMAN:  I'll call the

8    meeting back to order.  If everyone could please

9    sit back down.  There's a couple of chairs in here

10   if people from the outside want to come in.

11             The plan is -- there's 11 people left.

12   One person came back that did not hear their name

13   called.  Let her testify, and then we'll have

14   Representative Setzler come back up.

15             The goal is to be out of here at 7:30.

16   So if y'all could maintain order out there in the

17   hall so that we can hear, I would appreciate it.

18   The evening's getting late.

19             The people that come up, I'm going to

20   give you one minute.  One minute, and then let's

21   move on.

22             Deborah Gonzalez?

23             DEBORAH GONZALEZ:  Good evening.  My

24   name is Deborah Gonzalez.  I am the former

25   representative of House District 117 in Athens and

1   an attorney.  Thank you so much for having this

2   public hearing on HB 481 and giving us the

3   opportunity to make a few brief comments.

4            Yesterday I was pleased to deliver to

5   my own senator Bill Cowsert a letter signed by

6   over 300 of his District 46 constituents who

7   requested that he consider voting no.  I say this

8   because earlier today the author of the bill said

9   that there was consensus.  I think as we look at

10  this room and we look outside in the hallways,

11  consensus is anything but.

12           Personally, I have two main concerns

13  about this bill, both as an attorney and as a

14  woman.  Every story that was told today earlier in

15  testimony all presented what was a woman's choice

16  to have that child.  But at the core of each

17  story, it was a choice.  And that is all that we

18  are asking, that every woman has that same choice.

19           The unintended consequences that may

20  result from this passing in effect restricts

21  women's rights to make their own decisions

22  regarding their health and the health of their

23  families.

24           One of my goals as a representative was

25  to understand the language of the bill which we



1 were presented with and what was the bill trying

2 to resolve.  Let me repeat what has already been

3 stated.  This bill will not prevent abortions.

4 What it will do is drive them underground where

5 they are dangerous and deadly.  If we talk about

6 protecting the sanctity of life and children, then

7 the question becomes whose life and what children?

8          We are told we need to protect a

9 vulnerable class: the unborn.  But I tell you

10 there is another vulnerable class here: women.

11 And we need to take them into account.  If we want

12 healthy children, we need to cherish their

13 mothers.  We do not need to criminalize them.

14          I ask you to be diligent in your review

15 of the legal language.  I ask you to review again

16 and heed the request of your constituents and the

17 women throughout our great state of Georgia.

18          The taking of a right that is so

19 fundamental to a person's autonomy should not be

20 undertaken lightly.

21          Thank you, and I ask you for your vote

22 of no on HB 481.

23          CHAIRPERSON UNTERMAN:  Thank you.  It

24 was good to see you, and I appreciate your help in

25 Oconee County when we were over there.  Yes.  That



1    was a good event for sex trafficking.

2              So is Mayreli Jimenez here?  She came

3    in the room a while ago.  Mayreli, if you're in

4    the hall --

5              So we'll go to the next one while we're

6    waiting on her.  Laura Price?  Laura Price and

7    then V.J. Williams.  Laura Price and V.J.

8    Williams.

9              Are you Laura Price?

10             LAURA PRICE:  I am Laura Price.  I'm

11   from Kennesaw.

12             CHAIRPERSON UNTERMAN:  Thank you for

13   coming.

14             LAURA PRICE:  Thank you.  This is the

15   first time I've been to the Capitol.

16             CHAIRPERSON UNTERMAN:  Isn't it pretty?

17             LAURA PRICE:  It is.  It is.

18             CHAIRPERSON UNTERMAN:  And you're from

19   Kennesaw you said?

20             LAURA PRICE:  I'm from Kennesaw, yes,

21   ma'am.

22             CHAIRPERSON UNTERMAN:  Thank you for

23   coming.  We appreciate it.

24             LAURA PRICE:  So this is a rather

25   personal story.  I've never spoken to it.  There's

1  going to be friends and family that are going to

2  be a little surprised of what I have to say today,

3  but I think that it's important.

4          I've been pregnant six times.  I have

5  two children.  And some of the doctors spoke today

6  about some of their patients who were having

7  trouble and have had to make difficult decisions.

8          Not to get into too much medical

9  detail, but I have a clotting disorder.  And when

10  I got pregnant with my third child, which was

11  my -- sorry.  I've got to do a little math --

12  fifth pregnancy, what happened was -- is that my

13  body didn't recognize that it was a baby.  It was

14  basically something that was killing me, for lack

15  of a better term.  And I started to develop blood

16  clots.

17          I was hospitalized eight times.  I

18  spent quite a few days in the ICU, over four

19  times.  So the baby was viable, had a heartbeat.

20  There was nothing wrong with the baby, but it was

21  killing me.

22          Under this bill, the baby is viable.

23  There's nothing wrong with the baby, but there was

24  something with me.  So under this bill, I wouldn't

25  be here.  I would be dead.  I wouldn't be here to

1    enjoy my children.  They would have no mother.  So

2    that's a variable we don't think about, and that's

3    what's important.  A name to a face.  I wouldn't

4    be here.  I would be dead.

5              And that's my time.  Thank you very

6    much.

7              CHAIRPERSON UNTERMAN:  Okay.  Thank

8    you.  We appreciate you coming to the Capitol.

9              So is Mayreli here?  Mayreli, is she

10   here?

11             (No audible response.)

12             Okay.  V.J. Williams?

13             V.J. WILLIAMS:  I'm V.J.  I was forced

14   to have a child at the age of 19.  Now my child is

15   currently incarcerated in the correction system.

16             I wanted an abortion, but I was denied

17   an abortion.  I wanted to go to college and be a

18   medical student, but that was dictated by other

19   people.

20             I had a right to make my own decisions,

21   but today I see here that women aren't allowed to

22   make their decisions.  The decision-making is in

23   the hands of the government; but the government is

24   not there with the woman feeling her pain, feeling

25   her life, feeling her challenges, feeling her

1   hopes and her dreams.  She is forced to be a

2   mother.  Forced motherhood:  Forced slavery.

3            We put so much precedence on the woman,

4   but I don't see much on many laws dictating what a

5   man should do with his penis.  Does a man have a

6   right to stick it in when, where, and how he wants

7   to stick it in?  And what is the regulation that

8   bars him from doing that?  I see no law.  I see no

9   law protecting a woman from the penis.

10           CHAIRPERSON UNTERMAN:  Okay.  Your

11  time's just about up.

12           V.J. WILLIAMS:  Thank you.

13           CHAIRPERSON UNTERMAN:  All right.

14  Carol Hays, Lola Roden, and Gloria Tatum, are they

15  here?  Any of those people here?

16      (Whereupon off-the-record discussion

17      ensued.)

18           CHAIRPERSON UNTERMAN:  Gloria Tatum?

19           GLORIA TATUM:  This is not what I

20  wrote.  This is going to be a little bit

21  different.

22           Over the past 40 or 50 years, I have

23  seen so many oppressive laws being put on women's

24  bodies, to control women's lives, to criminalize

25  women, to put women in jail; but what I haven't



1    seen is laws on men's bodies.

2         And if you are really serious about

3    wanting to limit abortions, to make them rare and

4    infrequent, then you're going to have to put some

5    laws on men's bodies.

6         I would suggest instead of what you

7    have now, you go back to the drawing board and

8    draw up a male reproductive accountability bill on

9    their reproductive organs because no woman has

10   ever gotten pregnant by herself.

11        And some of the same officials that

12   would support this bill will deny food stamps to

13   needy children, will deny women healthcare,

14   education, housing.  They only care about the

15   fetus.  But once that fetus is born, they don't

16   care about it.  They will give it nothing.  They

17   call the women, you know, welfare queens if they

18   want to feed their children.  So I'm saying we're

19   not going back to 1950.

20        And I just really pray and hope that a

21   woman -- that women replace the men that are

22   supporting this.

23             CHAIRPERSON UNTERMAN:  Okay.

24   Ms. Tatum, where are you from?

25             GLORIA TATUM:  I am from wonderful



1   downtown Decatur, Georgia.

2           CHAIRPERSON UNTERMAN:  Thank you,

3   ma'am.  I can tell we've got the same accent.

4           Okay.  Is Lola Roden here?  Is she here

5   still?

6           (No audible response.)

7           Okay.  I think we're making progress.

8           Scott Young?  Scott Young still here?

9   Scott Young?  If you're in the hallway --

10          REPRESENTATIVE SEAY:  We already heard

11  from -- Sean Young?

12          CHAIRPERSON UNTERMAN:  No.  It's a

13  different one.

14          REPRESENTATIVE SEAY:  Oh, okay.

15          CHAIRPERSON UNTERMAN:  Laura Price?

16          I think she spoke already.  They kind

17  of jumped out of order.

18          Okay.  I think there's one person left.

19  Waiting on her to come back.

20          So Representative Setzler, if you want

21  to go back up to the podium, I think there was a

22  couple of questions.  I think -- how long of

23  testimony do we have?  How many hours?

24          UNIDENTIFIED PERSON:  Hour and

25  22 minutes.

1          CHAIRPERSON UNTERMAN:   Hour and 22

2    minutes for the opposition and 48 --

3          UNIDENTIFIED PERSON:   And 45 minutes

4    for the (inaudible).

5          CHAIRPERSON UNTERMAN:   45 minutes for

6    the pro.

7          SENATOR JORDAN:   Madam Chair?

8          CHAIRPERSON UNTERMAN:   Yes.

9          SENATOR JORDAN:   While I appreciate the

10   ability to follow up with the sponsor, I believe

11   that the obstetricians, the pediatricians, members

12   of the American Medical Association, and MAG and

13   the women in this room and outside of this room

14   have answered all of my questions and have

15   provided the answers I need with respect to the

16   lack of scientific validity of this bill.

17          So thank you.

18          CHAIRPERSON UNTERMAN:   Okay.

19          SENATOR JORDAN:   I have no questions.

20          CHAIRPERSON UNTERMAN:   Okay.   All

21   right.   I'm going to wait just a minute for

22   Ms. Vargus to come back.

23          And, Representative Setzler, do you

24   have any rebuttal that you'd like to offer?

25          REPRESENTATIVE SETZLER:   Yes, ma'am.

1    I'd love to be able to go through -- I took some

2    detailed notes.

3              Our obstetricians could literally spend

4    a half hour picking apart much of what was said.

5    I will simply say that that's going to be provided

6    to the Chair for part of the committee record.

7              I would say one of the things that I

8    was really disappointed to hear in the hour and

9    22 minutes of testimony is --

10             CHAIRPERSON UNTERMAN:  Excuse me just a

11   minute.

12             I think we found the missing person.

13             You want to come on up?

14             I'm sorry, Representative.  I just want

15   to give everybody a chance.  And if you want to

16   just speak for two minutes, I'd like to hear your

17   story.

18             MAYRELI JIMENEZ:  Thank you.  Good

19   afternoon.  I appreciate the opportunity you've

20   given me today.

21             I think what we're talking about today

22   goes way beyond defending women's rights.

23             CHAIRPERSON UNTERMAN:  Do you want to

24   just state your name first and where you live?

25             MAYRELI JIMENEZ:  My name is Mayreli



1    Jimenez, and I am here today as a citizen and as

2    somebody that is a true testimony of what this

3    bill represents today.

4            I want to go into a little -- but

5    before I give you my testimony -- and say that

6    today it's way beyond the rights of woman.  I have

7    actually been the founder of a woman's movement in

8    Venezuela, and I have always fought for women.

9            But today it's not about choice.  It's

10    about preserving life.  I've always been a

11    defender of human rights.  And the most sacred

12    life that we have is the right to life.

13            And I'm going to give you a little bit

14    of my testimony.  I was actually one of the babies

15    that they considered nonviable.  My mother was

16    six months in, and she had preeclampsia.  Those

17    young women at the time used to smoke a lot, very

18    fashion at the time.

19            And actually the ob-gyn was my uncle

20    who actually delivered her.  And he said to her,

21    look.  Your life is at risk.  I as your ob-gyn,

22    I'm not a person to decide for you, but you will

23    die if you have this baby.  But most importantly,

24    this baby is going to be like a monster.  Her head

25    is going to be this big.  She's going to be tiny



1    with a big head.  She's not going to be viable.

2    Actually when I was born, they called me

3    Thumbelina because of that.  And I tell people

4    this:  I might not be perfect, but I certainly do

5    not look like a monster.

6               So I tell women today, I know that you

7    have a position clinically.  If we preserve a bald

8    eagle egg the way we do, why wouldn't we not

9    preserve a child, an innocent child?  That's the

10   most important.  When I talk about defending life,

11   I'm talking about defending an innocent child.

12              So if it's about choice, fine.  We have

13   the choice about our bodies.  We have the choice

14   about our life.  Do we -- and I leave this

15   reflection to all of you.  Do we have the choice

16   to take somebody else's life?  Whether you believe

17   in God, whether you believe that we're here

18   because of science, or you believe that we're here

19   because of nature, you do not have that right.

20              And as women, we have a responsibility.

21   Once we have that child in us, whether they're

22   viable or not, that's still a life.  And that's

23   why I wanted to leave this testimony here.  Tell

24   you that I'm a true testimony of that.

25              And also we have to be careful when we



1  allow -- we say we cannot have abortions.  I also

2  have another testimony, which she's not here, but

3  I would like to talk about her.  And it's my

4  sister.  She used to be a (inaudible) student from

5  the state of Georgia.

6              She was 15 years old.  And she went to

7  a parenthood clinic taken by her boyfriend who

8  performed an abortion with somebody else's

9  license.  And she's also a true testimony of what

10 this does with doctors.  It open a spectrum of

11 saying how my body can be viable or not just

12 because I want to do something.

13             So these women that are 15, 16, 14,

14 that this is a triviality -- and you can look at

15 me that way -- it's real.

16             So thank you for the opportunity.

17             CHAIRPERSON UNTERMAN:  Thank you.

18             MAYRELI JIMENEZ:  Thank you.

19             CHAIRPERSON UNTERMAN:  We appreciate

20 you coming to the Capitol.  Thank you very much.

21             Okay.  So, Representative Setzler, if

22 you'll come back up and finish up your rebuttal.

23 And I'm sorry to interrupt you, but the Capitol

24 for some of these people who have never been here

25 before, they don't know where to go --



1                    REPRESENTATIVE SETZLER:  Yes, ma'am.

2                    CHAIRPERSON UNTERMAN:  -- and it's

3       confusing.

4                    REPRESENTATIVE SETZLER:  Madam Chair, I

5       appreciate the presentation.

6                    There's a lot I could do.  If it's the

7       Chair's pleasure, I could go point by point

8       through the remarks, or I could summarize them

9       very briefly as is the lady's pleasure.

10                    CHAIRPERSON UNTERMAN:  Whatever you

11      feel comfortable with, I think you should

12      disseminate your information and do a good job of

13      it.  So --

14                    REPRESENTATIVE SETZLER:  Sure.  Okay.

15                    CHAIRPERSON UNTERMAN:  -- go over what

16      you've got.

17                    REPRESENTATIVE SETZLER:  Madam Chair,

18      one thing that was -- again, there's been

19      passionate testimony on both sides.

20                    One thing I've been disappointed to

21      hear in the last hour and 22 minutes is a

22      one-sided conversation.  This bill seeks to strike

23      the balance between protecting the liberty

24      interest of pregnant mother's and the fundamental

25      life of the child.  And one thing that I didn't

1    hear in the last hour and 22 minutes is what

2    abortion is.

3              Now, I don't want to be histrionic.  I

4    certainly don't want to be given over to

5    hyperbole.  But what we're talking about, Madam

6    Chair, is something I can't even show on a screen

7    in polite company.

8              If I passed out pictures in this room

9    of the products of abortion, if I passed out

10   pictures of what abortion is, I'd get boos and

11   hisses.  I'd get boos and hisses because the

12   reality of what we're talking about is so ugly, it

13   falls outside of the range of a polite

14   conversation, Madam Chair.

15             We're trying in this bill to strike a

16   balance that listens to the women that came and

17   talked about their severe fetal anomalies.  We

18   know those children are innocent, but we hear the

19   testimony that we heard over the last hour and 22

20   minutes and have a provision in this bill that

21   allows those most severe medically futile

22   pregnancies to be -- as is existing law today --

23   terminated.

24             I have some misgivings with that

25   morally, but I think hearing the totality of the

 1    evidence in an effort to try to bring a consensus

 2    bill that the people of goodwill can get around,

 3    that's what we've done in this bill.

 4              I heard some discussion about -- and I

 5    won't go through these points point by point.  But

 6    what I want to say is the balance we're trying to

 7    strike is representing the women's liberty

 8    interest and the value of this helpless, defensive

 9    child.

10              The act of abortion -- some of the

11    obstetricians came up here and talked about

12    wanting access to the full range of, quote,

13    "women's care procedures."  What they mean is --

14    and, Madam Chair, forgive me.  People in this room

15    forgive me.  We're talking about going inside of a

16    mother and pulling babies apart limb from limb

17    outside of their mothers and collecting an

18    inventory of body parts to the right side and

19    making sure that all the skull pieces are there,

20    the body pieces are there, and assembling them to

21    make sure that the abortion procedure is complete.

22    That's what we're talking about on abortions

23    after, you know -- and, again, I can absolutely

24    fill the blanks in.  Is it after 13 weeks?

25    15 weeks?  20 weeks?  That's what we're talking



1    about here, Madam Chair.

2          This bill recognizes that 14-, 15-,

3    16-, 17-, 18-week abortions -- that's what we're

4    looking at.  And, ma'am, we're trying to -- and

5    I'm just going after people that are perhaps on

6    the other side of the question.  We're trying to

7    strike a balance to protect the humanity of this

8    innocent child who's completely innocent; that

9    100 percent, 100 percent had no vote in this

10   process.

11          There's a lot of debate about whether

12   women could choose or not choose, and we recognize

13   that.  We wrestle with this issue in this bill.

14   We torture over that because it's a careful

15   balance we want to strike.

16          But when you've got a child that's

17   living distinct from their mother, has a human

18   heartbeat, has a circulatory system, and is by so

19   many standards part of our human community.  This

20   bill recognizes that it's not only about the

21   woman.  It is about the very difficult decision

22   that the woman faces and the fundamental life of

23   this defenseless child, 27,000 of whom last year

24   in Georgia had no choice, had no choice and no

25   voice but were destroyed and weren't even brought



1    into the world.  That's the balance we're trying

2    to strike, Madam Chairman.

3         I would say I appreciate the opponents

4    of this bill still really candidly confirmed for

5    me, Madam Chair, that the definition on line 70

6    and 71 of this bill, "'Detectable human heartbeat'

7    means an embryonic or fetal cardiac activity or

8    the steady and repetitive rhythmic contraction of

9    the heart within the gestational sac," that

10   definition is scientifically sound and is the

11   basis on which this bill is founded.

12        We do have an interest to accommodate

13   the liberty interest of the mother, and this bill

14   takes great lengths to do exactly that.  But what

15   we have a paramount duty to do under our State's

16   Constitution is protect the fundamental right to

17   life of our citizens, particularly those that are

18   most defenseless among us.  And that is squarely

19   what HB 481 does and does with detail,

20   consideration, care, and balance that I think this

21   general assembly can be proud of, Madam Chair.

22        CHAIRPERSON UNTERMAN:  Okay.  Is there

23   any questions?

24        Do you know, Mr. Setzler, when

25   you -- I mean, Representative Setzler, did they



1    tell you when you would have the fiscal note?  Did

2    they tell you when?

3             REPRESENTATIVE SETZLER:  I'll talk to

4    the Chair about that afterwards.

5             CHAIRPERSON UNTERMAN:  Okay.

6             REPRESENTATIVE SETZLER:  We're trying

7    to manage that process.  That can potentially play

8    out over the weekend, but I'll address that with

9    Madam Chair.

10             CHAIRPERSON UNTERMAN:  All right.  So

11    we're going to wrap up.

12             Representative Setzler, we appreciate

13    your time and energy in helping us understand the

14    bill.

15             I'd just like to say for those that are

16    still watching that I appreciate the behavior and

17    how well the meeting has gone.  I think we've all

18    done a very good job.  I think everyone has been

19    given the opportunity to voice their opinions.

20             If there's anyone out there that has

21    anything they would like submitted into the

22    record, if you'll send it to my office to

23    Ms. Vargus, we'll enter it into the record.

24             For those professionals that testified

25    and had scientific studies or references to any

1    journals and they'd like those disseminated, we'll

2    be glad of those.

3              I will be here off and on tomorrow at

4    the Capitol.  I have some appointments in the

5    district, but I'm always available to the

6    committee members if you have suggestions.

7              And is there anything else we need to

8    talk about before the committee?

9              REPRESENTATIVE SETZLER:  Madam Chair,

10   if I could, one thing I did share with you

11   electronically, and you can share it with all the

12   committee members, the question from Senator

13   Jordan about the likelihood at the point of

14   heartbeat --

15             CHAIRPERSON UNTERMAN:  Yes.

16             REPRESENTATIVE SETZLER:  -- six to

17   seven weeks --

18             CHAIRPERSON UNTERMAN:  Yes.

19             REPRESENTATIVE SETZLER:  -- the

20   likelihood of carrying through to term, the

21   95 percent, I shared those statistics with you

22   electronically.

23             CHAIRPERSON UNTERMAN:  And you had that

24   journal reference?

25             REPRESENTATIVE SETZLER:  I do.  It's in



Page 222

1   literature.  It's in electronic form online.  I

2   shared that with the Chair.

3            CHAIRPERSON UNTERMAN:  Okay.  All

4   right.  Sounds good.

5            Anything else from legislative counsel?

6            (No audible response.)

7            I just want to thank the staff for

8   staying here.  It means a lot to all of us, and it

9   means a lot to the citizens of Georgia.

10           So with that, I appreciate most

11  importantly law enforcement.  You've done a great

12  job today.  We couldn't live without you.  We love

13  you.

14           I guess with that, meeting's adjourned.

15  Thank you very much.

16           (Proceedings adjourned.)

17

18

19

20

21

22

23

24

25



1                COURT REPORTER CERTIFICATE

2    STATE OF GEORGIA:

3    COUNTY OF CHEROKEE:

4

5         I hereby certify that the foregoing

6    transcript was taken down from electronic

7    media, as stated in the caption, and the

8    proceedings were reduced to typewriting

9    under my direction and control; that the

10   foregoing pages represent a true, complete,

11   and correct transcript of the evidence given

12   upon said hearing; and I further certify

13   that I am not of kin or counsel to the

14   parties in the case; am not in the employ

15   of counsel for any of said parties; nor

16   am I in any way interested in the result

17   of said case.

18        This, the 7th day of June, 2019.

19

20

21

22   _____

23        Elizabeth R. Hollingsworth, CCR B-1319

24

25

