# EXHIBIT F

1        HOUSE OF REPRESENTATIVES

2      DAY 39 OF LEGISLATIVE SESSIONS

3            MARCH 29, 2019

4

5

6

7

8

9        TRANSCRIPT OF HEARINGS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Reported from electronic media by

25      Judy K. McNeill, CCR B-1611



Page 2

1          CHAIRPERSON RALSTON:   The Chair

2     recognizes Chairman Setzler for a motion.

3          CHAIRMAN SETZLER:   Mr. Speaker, I'd

4     like to make a motion to agree to the

5     Senate Substitute to House Bill 481.

6          CHAIRPERSON RALSTON:   Chairman

7     Setzler has moved that this House agree to

8     the Senate Substitute to House Bill 481.

9          The Clerk will read the caption.

10     THE CLERK:   House Bill 481 by

11     Representative Setzler of the 35th, Lott of

12     the 122nd, Taylor of the 173rd and others

13     to be entitled an Act to amend Chapter 2 of

14     Title 1 of the Official Code of Georgia

15     Annotated relating to persons and their

16     rights; to amend Article 5 of Chapter 12,

17     Title 16 of the Official Code of Georgia

18     relating to abortion.

19          CHAIRPERSON RALSTON:   The Chair

20     recognize Chairman Setzler to explain the

21     Senate Substitute to House Bill 481.

22          CHAIRMAN SETZLER:   Thank you, Mr.

23     Speaker.

24          Ladies and gentlemen of the House, I

25     bring before you today the Senate



Page 3

```
 1    Substitute to House Bill 481.  This was a
 2    measure we debated at some length in the
 3    House and as a result of the -- many of the
 4    questions that were asked here, both of
 5    House members, of the Governor and others,
 6    we addressed in Senate Committee a
 7    substitute that addressed many of those
 8    concerns and questions and makes House Bill
 9    481 an even better bill than what we passed
10    out of the House the first time.
11         We're working off LC version 28
12    9335S.  That's the actual version that the
13    Senate passed.  And what that does it --
14    again, there were some questions about
15    providing an extra level of protection, a
16    belt and suspenders if you will, to ensure
17    that accidental deaths from a series of
18    medical procedures from doctors, nurses,
19    physician assistants and pharmacists could
20    in no way be conceived -- be construed to
21    criminalize the activity of this bill.
22         We provided that affirmative defense.
23    We did the same thing for women seeking
24    emergency abortions.
25         Again, those protections aren't
```



1   needed specifically by law.  But, again, an

2   affirmative defense is yet another layer of

3   protection to make sure there can be no

4   misconstruing of any criminal

5   responsibility for those circumstances.

6        We provided a lot of definitions.

7   Again, we fleshed out in detail definitions

8   including abortion, detectable human

9   heartbeat, medically futile, medical

10  emergency.

11       Many of these things existed in law,

12  but to put them in the code section so

13  they're abundantly clear in the operative

14  code section we added those definitions in.

15       There was a question about law

16  enforcement.  We limited the access to

17  records to district attorneys as is in

18  existing law and clarified that it's -- the

19  records wouldn't just be limited to

20  facility records but records that were

21  appropriate.

22       In no way could this ever violate

23  HIPAA.  I'm sure there will be some

24  questions about that.  But we have no

25  ability under our law to do anything that



 1   would violate HIPAA privacy protections.

 2   This simply allows access to records that

 3   are relative to the abortion and the

 4   appropriate -- for DA's to have access to.

 5       One thing this bill does -- and I

 6   would tell you substantively -- listening

 7   to members from both bodies speak on this

 8   question, I am proud to say that the

 9   questions were raised about what are we

10   doing for mothers that are in these

11   difficult circumstances.

12       One thing the Senate substitute does

13   -- and I'm very proud and I think this body

14   can be very proud of is that women who find

15   themselves pregnant can now, under this

16   bill, have access to child support from the

17   father.

18       I say again, we recognize that

19   oftentimes women, as they go through

20   pregnancy, incur costs.  In some cases if

21   they have a difficult pregnancy, there may

22   be time out of work, bed rest or other

23   direct medical expenses and we allow that a

24   woman can pursue child support from the

25   father for doing that.  We recognize that



1    it's common today that with simple blood

2    tests, we can establish paternity as early

3    as eight to 10 weeks.  And if a woman

4    should choose to pursue child support from

5    the father, it makes sure that we're

6    providing that in this bill.  Something I

7    think we can be very, very proud of as a

8    General Assembly.

9         We're also very clear in this

10   proposition that human heartbeat is the

11   threshold by which any of these benefits

12   would apply.  And I want to just say there

13   was some questions about that earlier on so

14   we were abundantly clear that all the

15   benefits and any of the restrictions that

16   are applicable here apply at the point of a

17   detectable human heartbeat.

18        We simplified the Legislative

19   findings.  Many members in this body in the

20   House Health Committee had questions about

21   the legislative findings we had.  So taking

22   the feedback from members of both parties

23   in committee, we simplified those.  What

24   was formerly three pages of legislative

25   findings was simplified to clarify the



1    status of the child in the womb being a

2    person and the constitutional provisions

3    that establish that.

4        But we simplified that and really

5    addressed many of the concerns we got from

6    both parties in committee.  We have

7    legislative findings that are solid and

8    candidly more simple.

9        And then lastly, Mr. Speaker,

10   clarified as well that pregnancies -- an

11   ectopic pregnancy or a miscarried pregnancy

12   where a child died of natural causes, the

13   removing an ectopic pregnancy or child that

14   died of natural causes could never be

15   construed as being an abortion.

16       So those are clean-up measures.  And,

17   again, Mr. Speaker, I think they -- that

18   they reflect the common sense sentiment of

19   Georgians.

20       And, ladies and gentlemen, as I

21   present to you this Senate Substitute House

22   Bill 481, I would like to once again just

23   say our intention, Mr. Speaker, is to

24   balance the interests of the mother and the

25   child.



1        There's been lots of feedback in this

2   discussion about women's concerns and we've

3   listened to those.  And this bill though

4   recognizes the fundamental life of a child

5   in the womb is worthy of full legal

6   protection and balances that basic right to

7   life with the very difficult situation

8   women find themselves in in pregnancies and

9   I think this bill is something we can be

10  very proud of, that balances those two

11  interests as well as this General Assembly

12  possibly can.

13        With that, Mr. Speaker, I'll be glad

14  to take questions.

15        CHAIRPERSON RALSTON:  The Chair

16  recognizes Representative Erica Thomas to

17  your left for a question.

18        REPRESENTATIVE THOMAS:  Does the

19  gentleman yield?

20        CHAIRMAN SETZLER:  Yes, ma'am.

21        REPRESENTATIVE THOMAS:  Is it not

22  true that a vote of yes to this bill will

23  put the burden on the State of Georgia to

24  determine paternity of a fetus while the

25  fetus is still in the woman's uterus?



1    CHAIRMAN SETZLER:  No, that's not

2    true.  The burden is not on the State of

3    Georgia.  In fact, as I alluded to earlier,

4    current medical technology that's common

5    allows a blood test to be taken.

6        We know that a child as early as

7    eight to 10 weeks through the DNA that mix

8    -- the child's DNA that mixes in with the

9    mother's blood can allow paternity to be

10   established at eight to 10 weeks gestation

11   age today.

12       So if a woman should choose to have

13   to establish paternity, in many cases you

14   may know paternity is not an issue.

15   There's not a dispute about who the father

16   is.  But only in those cases where it was

17   in dispute and the woman wanted to

18   establish that for purposes of pursuing

19   child support, those mechanisms happen with

20   a relatively simple medical test and that

21   puts no duty on the State of Georgia to do

22   that.

23       REPRESENTATIVE THOMAS:  Does the

24   gentleman further yield?

25       CHAIRMAN SETZLER:  Sure.



1    REPRESENTATIVE THOMAS:  So just to

2    clarify, you're saying that the woman would

3    have to pay for the paternity test and not

4    the State of Georgia.

5    CHAIRMAN SETZLER:  If -- if a

6    paternity was in dispute, the -- and the

7    woman wanted to pursue a child support

8    payment for direct medical expenses

9    associated with her pregnancy from the

10   father, then she could pursue that through

11   the typical means where paternity is

12   established.

13   There is no duty on the State of

14   Georgia that has to be established in any

15   number of circumstances, but that would

16   certainly be a mother's right to do that.

17   CHAIRPERSON RALSTON:  The Chair

18   recognizes the minority leader, Leader

19   Trammel, to your left for a question.

20   MINORITY LEADER TRAMMEL:  Does the

21   gentleman yield?

22   CHAIRMAN SETZLER:  Yes, sir, I do.

23   MINORITY LEADER TRAMMEL:  Isn't it

24   true that passage of this bill will subject

25   women who have a miscarriage to the



1    possibility of being investigated by law

2    enforcement, having their health records

3    exposed to the district attorney and law

4    enforcement officials in what would be one

5    of the most difficult private devastating

6    times that a woman could ever face?

7         CHAIRMAN SETZLER:  Well, to the

8    gentleman's question -- let me recognize

9    the sensitivity of those situations.  I

10   don't want to be too glib in my answer.

11        I will direct members to look in the

12   bill.  The bill does not do those things.

13   I would say in the spirit of your question,

14   this is a very difficult set of

15   circumstances and for that reason,

16   legislators, attorneys from our Governor's

17   office have worked to make sure that all

18   these circumstances are addressed because

19   of the nature of these kinds of concerns.

20        I mean, I can direct members to the

21   substitute to the point you asked about a

22   miscarriage.  If a woman has a miscarriage,

23   removing a miscarried pregnancy, a child

24   that's died in the womb is written in the

25   definition out of the definition of



Page 12

1  abortion.  And I can point members to the

2  place in the bill where that's addressed.

3      Line 93 of the bill is very clear.

4  In fact, it's not even necessary to

5  determine that because current law

6  establishes it.  But out of an abundance of

7  caution in the Senate Substitute, 93 --

8  line 93 says:  Removing a dead unborn child

9  caused by spontaneous abortion is not

10  included in the definition of an abortion.

11      We were very careful to make sure we

12  included that.  So there would be zero

13  criminal responsibility for that.

14      So appreciate the sensitivity of the

15  gentleman of the circumstances.  There is

16  no criminal responsibility that's expanded

17  here for anything related to a miscarriage.

18      CHAIRPERSON RALSTON:  The Chair

19  recognizes Chairman Beverly to your left

20  for a question.

21      CHAIRMAN BEVERLY:  Does the gentleman

22  yield?

23      CHAIRMAN SETZLER:  I do.

24      CHAIRMAN BEVERLY:  If I could draw

25  your attention to line 256 to 259.



1    CHAIRMAN SETZLER:  Yes, sir.

2    CHAIRMAN BEVERLY:  Thank you.  Is it

3  not true that under this -- a vote for yes

4  for 481 will subject a physician to a civil

5  action of wrongful death or the criminal

6  act of homicide in the first or second

7  degree?  It does not establish who has

8  standing to bring about that action and the

9  only way to determine who the punitive

10  father is is to test the DNA of a fetus and

11  this bill does not address that.

12    And in so doing, the Medical

13  Association of Georgia, the Georgia Academy

14  of Family Physicians, the American College

15  of Obstetricians and Gynecologists have all

16  opposed House Bill 481.

17    CHAIRMAN SETZLER:  I think I heard --

18  to the Chairman, my friend, I think I heard

19  three questions in there.  I'll try to

20  address them in order.

21    The way this bill operates does

22  nothing to expand the criminal

23  responsibility of physicians.

24    Currently under current law, Code

25  Section 16-12-140, if a doctor performs an



1 abortion outside of the provisions laid out

2 under law, they are subject to prosecution

3 under criminal abortion.

4        This changes nothing in that.  It

5 changes nothing there.  The suggestion that

6 something more severe like murder doesn't

7 exist.  It's -- again, we can have sort of

8 a judiciary committee discussion.

9        Under the principles of lenity

10 because of the way abortion is defined,

11 anything outside of that definition would

12 be prosecuted as a criminal abortion and

13 that doesn't change our law in any way by

14 virtue of the way this bill operates.

15        So if that's been alleged to you,

16 they've given you bad facts.

17        CHAIRMAN BEVERLY:  Does the gentleman

18 further yield just as a follow-up?

19        CHAIRMAN SETZLER:  Sure.

20        CHAIRMAN BEVERLY:  For point of

21 clarity.  So in the event that there's an

22 abortion and you're trying to establish who

23 has standing to bring about this suit, if

24 there's a question of who the father is,

25 who the punitive father is, that this bill



1   does not address that, you would have to go

2   about doing a DNA test on a fetus to

3   determine who the punitive father is to

4   establish who has the right to bring about

5   this suit in the code section.  And this

6   bill does not do that.

7       CHAIRMAN SETZLER:  No, sir.  It's --

8   let me direct -- let me find the line in

9   the bill that talks about the civil action.

10      Let me tell the members, too -- and

11  many of you don't live in the world of

12  civil practice.  If there's any violation

13  of the law that's committed against a

14  person, they have standing -- it's called a

15  tort.  If there's a duty that's violated,

16  there's a tort and they have access to a

17  civil action.

18      Under our existing law, women upon

19  whom an abortion is performed in violation

20  of the law have a civil action against the

21  physician.  The challenge is as they look

22  at -- there have been courts that

23  construed, well, is it a regulatory

24  interest that the law be followed or is the

25  woman's individual interest.



1          Most courts are going to recognize

2     the woman has a direct interest.  This bill

3     simply clarifies that if an abortion is

4     performed on a woman in violation of the

5     law, that she has standing to bring a civil

6     action.  It doesn't change the existing law

7     but clarifies so there is no dispute that

8     she has standing that if a law is broken in

9     performance of an abortion on her.

10          CHAIRMAN BEVERLY:  And just for point

11     -- just one question if you'd just indulge

12     just one other time.

13          When you establish the fact that the

14     father has rights now within the space, the

15     father does have -- the potential -- the

16     potential father has the ability to have

17     standing to bring about this -- to bring

18     about wrongful death.

19          And so in that case, how do you

20     determine who the father is when the fetus

21     has been aborted?  And this bill does not

22     address that.

23          CHAIRMAN SETZLER:  Well, what this

24     bill does address is it addresses the fact

25     that a mother clearly has standing.  And,



1   again, I don't want to follow down rabbit

2   trails that don't apply.  But I appreciate

3   the gentleman's question and I think we've

4   been very clear that the woman does have

5   standing and no one can dispute that.  I

6   think that's appropriate.

7       CHAIRPERSON RALSTON:  The Chair

8   recognizes Representative Kendrick to your

9   left for a question.

10      REPRESENTATIVE KENDRICK:  Thank you,

11  Mr. Speaker.

12      Does the gentleman yield?

13      CHAIRMAN SETZLER:  Yes, ma'am.

14      REPRESENTATIVE KENDRICK:  Is it not

15  true that the reason we're bringing this

16  bill before the floor today is because this

17  is an attempt to overturn existing law, Roe

18  v Wade, which makes abortion illegal by

19  bringing this issue before the United

20  States Supreme Court?

21      CHAIRMAN SETZLER:  To the lady's

22  question about Roe versus Wade, I think

23  this bill is written for a number of

24  reasons.  And our first interest is we've

25  got living distinct human beings in the



1    state that are living inside their mothers

2    that are being lost every day.

3         I mean -- and I'm going to answer

4    your question, but I do want to say this as

5    sort of an antecedent to the answer.

6         We recognize the basic rights -- the

7    basic humanity that these children are

8    being robbed every -- 27,000 times every

9    year in Georgia.  We, as the General

10   Assembly, are voting to recognize does that

11   child's rights -- should they be recognized

12   or should they not be recognized.

13        We recognize that for the history of

14   our country, states can expand rights more

15   expansively than the minimum standard that

16   the federal government requires.  So we're

17   more expansively recognizing rights of

18   children in the womb.

19        For example, during -- before the

20   passage of the 19th Amendment, many states

21   recognized women's right to vote before it

22   was required of all states.  We're more

23   expansively recognizing the right of a

24   child in ways the federal government

25   doesn't mandate that we do.



1       But we, as a state, again, per our

2  constitution with a paramount duty of

3  government is the protection of life, we're

4  doing that here.

5       And in doing that, to your question

6  about Roe versus Wade, we were actually

7  following the Roe versus Wade opinion.  In

8  fact, in the oral arguments of the Roe v

9  Wade opinion, in written -- in the written

10  opinion itself, it says if a state ever

11  establishes the personhood of the unborn

12  child, the logic of the Roe case collapses.

13       In fact, the pro-abortion plaintiff's

14  counsel recognized that in oral argument.

15  It's written in the opinion.  So we're

16  following the Roe v Wade case that says if

17  the state ever establishes the personhood

18  of the child, the pro-abortion protections

19  that overwrite the child's right to life

20  collapse.

21       We, as a state, are doing that.  It's

22  the constitutionally appropriate way the

23  Roe opinion gives us and that is precisely

24  why we're doing it the right way because we

25  recognize the right of a child should be



1    more expansively recognized in the State of

2    Georgia.

3         REPRESENTATIVE KENDRICK:  Does the

4    gentleman further yield?

5         CHAIRMAN SETZLER:  Yes, ma'am.

6         REPRESENTATIVE KENDRICK:  Is it not

7    true that on March 7th on crossover day

8    immediately upon adjournment, that Governor

9    Kemp in a press conference stated that if

10   HB 481, this bill passed, that he expected

11   that the bill would, in fact, be litigated

12   in court?

13        CHAIRMAN SETZLER:  I think there are

14   many cases that are litigated.  I think

15   there will be -- I predict that if we

16   should pass this bill and it be signed into

17   law by the Governor, I predict somebody

18   will sue.  I think everybody here

19   recognizes someone will sue over this.  The

20   question is have we operated in the

21   constitutionally sound way where we as a

22   state can recognize the life interest of

23   these helpless children.

24        We've taken great lengths to follow

25   the way the Roe opinion lays out that the



1    state can recognize the life of the child

2    in a way that changes the status and allows

3    states to do this.  So I don't doubt

4    someone will litigate this, but I think we

5    can be proud we're doing this in a way that

6    puts us on the most sound possible

7    constitutional footing for our laws to be

8    upheld.

9        CHAIRPERSON RALSTON:  The Chair

10   recognizes Representative Alexander to your

11   left for a question.

12       REPRESENTATIVE ALEXANDER:  Thank you,

13   Mr. Speaker.

14       Does the gentleman yield?

15       CHAIRMAN SETZLER:  Yes, ma'am.

16       REPRESENTATIVE ALEXANDER:  Is it not

17   true that a vote of yes for this bill could

18   result in constituents being interrogated

19   by law enforcement to determine if a woman

20   had a medical emergency to allow for

21   abortion to be performed?

22       CHAIRMAN SETZLER:  Representative

23   Alexander, I appreciate the question.

24       This really hasn't changed since the

25   House version, but I will address it in the



1    substitute.

2        On line 119 and 120 of the bill, it

3    gives the sole discretion to the physician

4    to make the determination if a medical

5    emergency exists.  In fact, even though

6    it's written in current law, we

7    re-established the definition of medical

8    emergency from line 97 to 103 of the bill

9    so it's crystal clear what a medical

10   emergency can be.

11       But it is the sole discretion of

12   physicians in making that determination in

13   Georgia.  As we alluded to in Senate

14   debate, this General Assembly has always

15   given broad discretion to physicians to

16   make determinations.  In fact, many people

17   who would be on the -- considered the

18   pro-life side would say we've given too

19   much discretion to physicians.  But this

20   General Assembly has always given broad

21   discretion to physicians to make these

22   kinds of determinations.

23       So it is the sole discretion of a

24   physician that these conditions exist

25   because we want to recognize that if



1  there's a medical emergency that could

2  cause the life or irreparable harm to a

3  woman, that -- in weighing that out,

4  sometimes abortion does the least harm is

5  the appropriate response.

6      I would further say to the lady, we

7  also provide, as I alluded to earlier, the

8  affirmative defense that no woman can be

9  exposed criminally as a result of medical

10  emergency.  So we provided extra protection

11  for the woman in particular because we

12  recognize the difficulty of the situations.

13      But, no, as a matter of fact, the

14  physician has the sole discretion to

15  establish medical emergency.

16      REPRESENTATIVE ALEXANDER:  Does the

17  gentleman further yield?

18      CHAIRMAN SETZLER:  Yes, ma'am.

19      REPRESENTATIVE ALEXANDER:  Is it not

20  true that a vote for this bill could

21  criminalize in vitro fertilization and hurt

22  families who want to have a baby?

23      CHAIRMAN SETZLER:  To your question,

24  there's no way that can happen.  In fact,

25  if you look at the definition, the



 1  definition is qualified by "in the womb".

 2  In vitro fertilization -- I know there have

 3  been some states before that have looked at

 4  trying to create the personhood status for

 5  a child in an IVF clinic.

 6       This bill does not do that.  This is

 7  only for children that are in the womb and

 8  has nothing to do with IVF clinics.  In

 9  fact, we specifically and carefully made

10  sure that it could not have that effect in

11  how we drew the bill.

12       CHAIRPERSON RALSTON:  The Chair

13  recognizes Representative Bentley to your

14  left for a question.

15       REPRESENTATIVE BENTLEY:  Thank you,

16  Mr. Speaker.

17       Does the gentleman yield?

18       CHAIRMAN SETZLER:  Yes, ma'am.

19       REPRESENTATIVE BENTLEY:  Is it not

20  true that I represent four very, very rural

21  counties that do not have a OBGYN located

22  in those counties?

23       CHAIRMAN SETZLER:  If the lady so

24  states.

25       REPRESENTATIVE BENTLEY:  And is it



1  not further true that women in those

2  counties that I represent that do not have

3  an OBGYN located in their county would have

4  to travel very far to discover if they are

5  indeed pregnant and may not find that out

6  to be after six weeks?

7      CHAIRMAN SETZLER:  Well, to the

8  lady's question, I mean, I think the -- I

9  don't want to get into a class about

10 women's cycles.  But as we go there, you

11 know, typically a woman is on a 28, 30 days

12 cycle.

13     If, in fact, the restriction accrues

14 at six to seven weeks when the heartbeat

15 typically exists, you've got about a

16 two-week period from when a woman would

17 expect to have her cycle in which she would

18 generally be able to pursue and have an

19 abortion.

20     I think the issue -- the concern here

21 as we've talked about, as we've tried to

22 weigh this life interest of the child, you

23 know, we recognize life begins at

24 conception and is worthy of protection.  In

25 fact, our laws today protect a child from



1  feticide, not to the point of heartbeat but

2  our laws -- our existing law in Georgia

3  today, 16-5-80, provides up to life in

4  prison for a person that attacks a woman

5  and kills her child in utero beginning at

6  conception.  Not at heartbeat because we

7  recognize, even beginning at conception

8  under our existing law, the value of this

9  child.

10      As we try to balance this, we looked

11  at, hey, where do we strike the balance

12  between protecting the life of this child

13  and the interest of the mother that you

14  raised.  And I think as has been shown

15  earlier, pregnancy tests women are able to

16  take themselves have been rated as being

17  very accurate.  So it's not true that women

18  don't have any ability to know whether or

19  not they're pregnant before six weeks.

20      In certain circumstances, to have a

21  third party medically verified pregnancy

22  test taken based on how they schedule and

23  those kinds of things, some of those things

24  could exist.  But it's not true that a

25  woman can't know that she's pregnant.  And



1  we are trying to weigh these things out in

2  an appropriate way.

3     REPRESENTATIVE BENTLEY:  Does the

4  gentleman further yield?

5     CHAIRMAN SETZLER:  Yes, ma'am.

6     REPRESENTATIVE BENTLEY:  Well, maybe

7  I need to rephrase it.

8     During the development of this

9  legislation, was there any discussion about

10  rural Georgia and these communities that do

11  not have an OBGYN in them such as in my

12  entire district, all four counties, there

13  is no OBGYN in those communities.

14     So I guess my question is was there

15  any discussion about the rural communities

16  and the fact that we don't have those type

17  of medical services for women to be able to

18  officially find out that they are pregnant

19  past six weeks?

20     CHAIRMAN SETZLER:  Yes, ma'am.  If I

21  could direct you to line 172 to 173 of the

22  bill.  172 and 173 of the bill provides

23  this affirmative defense that if a woman

24  sought an abortion she reasonably believed

25  that was a result -- I'm sorry.  Let me



1    read it very clearly.

2         A woman sought an abortion because

3    she reasonably believed that an abortion

4    was the only way to prevent a medical

5    emergency, that affirmative defense -- one

6    of the reasons that exists is because if a

7    woman were in a place where she didn't have

8    an immediate access to a doctor, she

9    believed that a medical emergency was

10   ongoing right then, we wanted to provide

11   that defense.

12        If she felt the only way to save her

13   life was to terminate the life of her

14   child, she should have this as an

15   affirmative defense from prosecution

16   because we recognize every person doesn't

17   have immediate access and we wanted to

18   provide this extra belt and suspenders, if

19   you will, to make sure she couldn't be

20   prosecuted for that.

21        So that was really written directly

22   because of rural Georgia.

23        REPRESENTATIVE BEVERLY:  And my last

24   question -- does the gentleman further

25   yield?



1          CHAIRMAN SETZLER:  Yes, ma'am.

2          REPRESENTATIVE BEVERLY:  Is it not

3     true that I was not here on the day of the

4     debate on this legislation previously

5     because I was at the hospital with my

6     husband for the entire week; therefore, I

7     wanted to be here today to really expound

8     on the need for rural Georgia and the fact

9     there's no OBGYNs in rural Georgia.  Is

10    that not true, sir?

11         CHAIRMAN SETZLER:  That's true.  And

12    to the lady's question, you remember the

13    debate perhaps yesterday on the budget.  I

14    was asking that Chairman England, you know,

15    how many additional positions are we

16    providing in our medical schools for

17    physicians.

18         I believe the gentleman actually

19    quoted a number of additional OBGYN slots

20    we're providing in our schools and I'm

21    proud of that.  I think it's something we

22    can all be proud of as a General Assembly.

23    And those issues are related directly to

24    that.  I think it's something we recognize

25    we want to address across the state.



1          REPRESENTATIVE BEVERLY:   Thank you.

2          CHAIRMAN SETZLER:   Thank you.

3          CHAIRPERSON RALSTON:   The Chair

4    recognizes Representative Vernon Jones to

5    your left for a question.

6          REPRESENTATIVE JONES:   Will my good

7    friend from Cobb County yield, please?

8          CHAIRMAN SETZLER:  Yes, sir.  Sure

9    will.

10          REPRESENTATIVE JONES:  Isn't it true,

11   Mr. Representative, that you and I do agree

12   on a lot of the issues?

13          CHAIRMAN SETZLER:  We do.

14          REPRESENTATIVE JONES:  Is it not

15   further true that you and I have never

16   experienced what a cycle is personally.

17          CHAIRMAN SETZLER:  Personally,

18   correct.

19          REPRESENTATIVE JONES:  Is it not

20   further true that this really has become a

21   political issue within your own party where

22   some members don't want to vote for this

23   and some members are just really torn on

24   this piece of legislation.  Is that not

25   true?



1          CHAIRMAN SETZLER:  I think it's -- I

2    would characterize it differently.  I think

3    members broadly recognize the rightness of

4    this.  I think the difficulty has come from

5    the vitriol of the other side of this

6    question and that's -- I'm not talking to

7    the members here.  I'm talking about in the

8    hallway and around the state, the ugliness

9    that's come against people that are trying

10   to represent and protect the rights of

11   these helpless children, the ugliness of

12   that is unsettling to members.

13          And I think I'm on the record of even

14   having said that.  I mean, as a citizen

15   legislator, it's not every day people get

16   in our face and shout things at us.  It's

17   not every day we get emails that are just

18   as stark and as attacking as these are.  I

19   think that's the sense in which members,

20   perhaps the majority party have felt sort

21   of an unease about this.

22          But I think the policy of this is a

23   solid policy that I think honestly could be

24   -- should be a bipartisan issue.  I know

25   there are members of both parties in this



1    chamber that recognize this bill is right

2    and worthy of support.

3         REPRESENTATIVE JONES:  If I could

4    bring the gentleman back home.  Is it not

5    true within your own party members in this

6    body have -- some have a difficult time

7    voting for this.  Even some of them walked

8    on the bill.  Is that not true?

9         CHAIRMAN SETZLER:  Well, again,

10   Representative Jones, I'm not going to

11   speculate on people's -- on politics,

12   people's -- I want to focus on the four

13   corners of a very serious bill.

14        I've indulged you to answer the

15   question about the ugliness that's come at

16   a number of our members that's been very

17   unsettling and created a level of

18   discomfort.  But the substance of this bill

19   is solid and I think it's something that

20   people in both parties can be supportive of

21   because we balance the interest of women in

22   very difficult circumstances with the basic

23   right to life of a child that our laws do

24   not adequately protect.

25        And that's the four corners of this



1  bill and I would like to -- if it please

2  the gentleman, I'd like to leave it there

3  if we could.

4       REPRESENTATIVE JONES:  Okay.  Since

5  the gentleman would like to leave it there,

6  I just want to ask the gentleman one

7  further question if the gentleman doesn't

8  mind.

9       CHAIRMAN SETZLER:  Yes, sir.

10      REPRESENTATIVE JONES:  Is it not true

11  that if your members -- or some of your

12  members vote for this bill and in 2020,

13  your party loses, there's going to be a new

14  speaker of the house here -- maybe Vernon

15  Jones -- and if there is a new speaker --

16  don't underestimate -- and if there's a new

17  speaker, many of your party will lose

18  power.  Many of you -- all of you would

19  lose your chairmanships, staff be changed.

20  It would be a complete overhaul.

21      Isn't that not true if you all lose

22  based on this bill, that this body is going

23  to change over?

24      CHAIRMAN SETZLER:  I disagree with

25  the gentleman's premise.  I think Georgians



1   recognize the rightness of this.  There is
2   certainly dissent, but this is not a
3   political issue.  This is not -- we're not
4   doing this for political reasons.
5        We're doing this because it's right.
6   The co-sponsor of the bill, the people that
7   support this bill said to me:  Ed, there
8   may be some blow-back from a quarter --
9   some quarter of Georgians, some ugliness.
10  But we're doing this because it's the right
11  thing.  And I and those that supported it
12  before and will support it today are proud
13  to stand on the substance.
14       CHAIRPERSON RALSTON:  The Chair
15  recognizes Representative LaRicca to your
16  right for a question.
17       REPRESENTATIVE LARICCA:  Thank you,
18  Mr. Speaker.  Does the gentleman yield?
19       CHAIRMAN SETZLER:  Yes, sir.
20       REPRESENTATIVE LARICCA:  Is it not
21  true that in addition to what this bill
22  does to help with some financial assistance
23  for the expecting mothers, that last year
24  we passed a measure through this body, the
25  adoption bill, that would also help with



1   financial assistance to expecting mothers

2   that were putting their children up for

3   adoption from the adopting parents?

4        CHAIRMAN SETZLER:  To the gentleman's

5   question:  This body -- I believe it was

6   the 2017 session, we passed an historic

7   adoption bill.  And what the adoption bill

8   did, for those of you who weren't here when

9   we passed it, was to create conditions in

10  which pregnant mothers who were going to be

11  giving their kids up for adoption can

12  receive more adequate compensation during

13  their pregnancy to make it viable to carry

14  the child to term and give it up for

15  adoption.

16       REPRESENTATIVE LARICCA:  Will the

17  gentleman further yield?

18       CHAIRMAN SETZLER:  Yes, sir.

19       REPRESENTATIVE LARICCA:  Is it not

20  true that the current governor has said

21  many, many times, unlike what one of our

22  colleagues just mentioned, that we put

23  people and lives over politics and we'll

24  take whatever comes after us to protect

25  life?



Page 36

```
 1        CHAIRMAN SETZLER:   I thank the

 2   gentleman for that.

 3        CHAIRPERSON RALSTON:   The Chair

 4   recognizes Representative Lott to your

 5   right for a question.

 6        REPRESENTATIVE LOTT:   Does the

 7   gentleman yield?

 8        CHAIRMAN SETZLER:  Yes, ma'am.

 9        REPRESENTATIVE LOTT:   Is it not true

10   that I have recently been inundated with

11   phone calls, texts and emails from my

12   constituents in District 122, Columbia

13   County, Georgia in full support of this

14   legislation?

15        CHAIRMAN SETZLER:  Yes, ma'am.   I

16   believe that's the case.  I've experienced

17   the same thing to the lady and I will tell

18   you that folks from across the practice of

19   medicine -- I've got letters from nurses,

20   people with nursing degrees and master's in

21   public health, obstetricians, doctors from

22   all over the state that said, listen, the

23   associations sort of put these letters out

24   but we doctors and people in my entire

25   practice all support this bill.
```



1        They recognize it's good policy and

2   that's been the overwhelming sense that

3   I've gotten from my constituents as well.

4        REPRESENTATIVE LOTT:  Does the

5   gentleman yield again?

6        CHAIRMAN SETZLER:  Yes, ma'am.

7        REPRESENTATIVE LOTT:  Is it not true

8   that just this week, I had an opportunity

9   to speak for the first time with a

10  constituent that was in opposition to this

11  legislation and in our conversation, she

12  was not aware that this bill had any

13  exceptions by her reading in the media or

14  the newspapers.

15       And in our conversation -- again, and

16  I would ask for your -- you to clarify and

17  make certain that I was correct that this

18  bill bans abortions of convenience, but

19  does allow for abortions in the case of the

20  mother's life, the child being medically

21  futile and in the cases of rape and incest.

22  Is that correct, sir?

23       CHAIRMAN SETZLER:  That's correct.

24       REPRESENTATIVE LOTT:  Thank you for

25  your time and thank you for this bill.  And



1   my community thanks you.

2       CHAIRPERSON RALSTON:  Representative

3   Lott, you are not questioning the veracity

4   of the new media now, are you?

5       The Chair recognizes Representative

6   Bonner to your right for a question.

7       REPRESENTATIVE BONNER:  Thank you,

8   Mr. Speaker.

9       Does the gentleman yield?

10      CHAIRMAN SETZLER:  Yes, sir.

11      REPRESENTATIVE BONNER:  Is it not

12  true that the end result of an abortion

13  procedure is the death of an innocent human

14  being?

15      CHAIRMAN SETZLER:  Unfortunately,

16  that's the case.  You know, we recognize in

17  this bill -- I think you know that there's

18  some very difficult circumstances that

19  we're trying to balance here.  But in one

20  hundred percent of abortions, a living

21  distinct human being with their own blood

22  type, their own DNA, distinct from the

23  mother is destroyed.

24      I will tell you that the reality of

25  abortion, as we alluded to earlier, is so



1    grisly and so gruesome, we can't even show

2    it on the board.

3         I mean, anything we do here, we ought

4    to be able to talk about and display.  I

5    can't show it on the board in this House

6    because it's so grisly and so otherwise

7    unfathomable.

8         The answer is yes, every abortion

9    represents the death of an innocent child.

10        REPRESENTATIVE BONNER:  And is it

11   further not true that this bill recognizes

12   the personhood of the unborn child and

13   affirms that the State of Georgia will

14   protect the lives of our children

15   regardless of geography?

16        CHAIRMAN SETZLER:  It does.

17        REPRESENTATIVE BONNER:  Thank you for

18   the bill.

19        CHAIRPERSON RALSTON:  The Chair

20   recognizes Representative Newton to your

21   right for a question.

22        REPRESENTATIVE NEWTON:  Thank you,

23   Mr. Speaker.

24        Will the gentleman yield?

25        CHAIRMAN SETZLER:  Yes, sir.



1        REPRESENTATIVE NEWTON:  Isn't it true

2   that there are nearly 30,000 abortions a

3   year in Georgia?

4        CHAIRMAN SETZLER:  Ones we know

5   about.  We recognize there are abortions

6   happening in doctor's offices that go

7   unreported in our state.  But of just the

8   ones we know about in clinics, hospitals

9   and ASC's, it's nearly 30,000.

10       REPRESENTATIVE NEWTON:  Will the

11  gentleman further yield?

12       CHAIRMAN SETZLER:  Yes, sir.

13       REPRESENTATIVE NEWTON:  So isn't it

14  also true as a medical doctor that I

15  understand that in 15,000 of those a year,

16  over 40 times a day, when the challenging

17  decision about abortion is being

18  considered, that there is two women

19  involved.

20       There's the woman who is pregnant

21  maybe with an unwanted pregnancy.  But

22  there's also a daughter involved.  Isn't

23  that true?

24       CHAIRMAN SETZLER:  About 50 percent

25  of the time, as I understand.



1          REPRESENTATIVE NEWTON:  Will the

2     gentleman further yield?

3          CHAIRMAN SETZLER:  Yes, sir.

4          REPRESENTATIVE NEWTON:  So isn't it

5     true that while this bill will not -- if 40

6     adoptions on young women are being done a

7     day on young daughters, that this bill

8     won't ban all of them.  It does allow

9     exceptions that Representative Lott

10    mentioned.  It does allow other exceptions

11    up to six to seven weeks.

12         But isn't it true that this bill at

13    the point that that young woman has a

14    heartbeat in the womb, along with the

15    mother who also has a heartbeat, that this

16    bill will carefully balance the value of

17    the life of that unborn woman along with

18    the life of the mother and try to do the

19    best we can through both adoption as was

20    mentioned and other situations?

21         CHAIRMAN SETZLER:  I think the

22    gentleman knows of what you speak as a

23    medical doctor.  This bill does exactly

24    that.

25         REPRESENTATIVE NEWTON:  Thank you,



1    sir.

2         CHAIRPERSON RALSTON:  You have no

3    further questions.

4         CHAIRMAN SETZLER:  Mr. Speaker, I

5    appreciate your time.  Appreciate the

6    serious consideration of this body.  It's

7    been a serious discussion both in the House

8    and the Senate.

9         And, again, for the reasons we've

10   discussed before, I would urge your

11   favorable support for House Bill 481.

12        CHAIRPERSON RALSTON:  On the

13   gentleman's motion that the House agree to

14   the Senate Substitute to House Bill 481,

15   all those in favor will vote aye.  Those

16   opposed will vote no.  And the Clerk will

17   unlock the machines.

18             (Brief pause)

19             (Upon resuming)

20        CHAIRPERSON RALSTON:  Have all

21   members voted?

22        Have all members voted?

23        Have all members now voted?

24        If so, the Clerk will lock the

25   machines.



Page 43

1       On the gentleman's motion, the ayes

2   are 92.  The nays are 78.

3       This House has agreed to the Senate

4   Substitute of House Bill 481.

5       For what purpose does the Minority

6   Leader of the House rise?

7       MINORITY LEADER:  To make a motion.

8       Pursuant to Rule 143, I would move

9   reconsideration over the House's action on

10  House Bill 481.

11      CHAIRPERSON RALSTON:  The gentleman

12  has that right and the time to do that is

13  now.

14      All those in favor of reconsidering

15  the House's action in giving a

16  constitutional majority to House Bill 481

17  will vote aye.  Those opposed will vote no

18  and the Clerk will unlock the machines.

19          (Brief pause)

20          (Upon resuming)

21      CHAIRPERSON RALSTON:  Have all

22  members voted?

23      Have all members voted?

24      If so, the Clerk will lock the

25  machines.



Page 44

1       On the gentleman's motion, the ayes

2   are 79.  The nays are 91.

3       This House has chosen not to

4   reconsider its action in giving a

5   constitutional majority to House Bill 481

6   to the Senate Substitute.

7       What purpose does Chairman Darlene

8   Taylor rise?

9       CHAIRMAN TAYLOR:  Parliamentary

10  inquiry.

11      CHAIRPERSON RALSTON:  State your

12  inquiry.

13      CHAIRMAN TAYLOR:  Mr. Speaker, isn't

14  it true that this House has carried

15  resolutions and bills concerning bullying?

16      CHAIRPERSON RALSTON:  It has.

17      CHAIRMAN TAYLOR:  And further, isn't

18  that what the members of this House have

19  been subjected to over this bill?  And if

20  it's not right for children or anyone else,

21  it should apply to us as the members of

22  this House.

23      That kind of action is not tolerable.

24  Every person in this House has the right to

25  vote how their heart is and I think it's



1    despicable the way some people have acted.

2         Is it not true?

3         CHAIRPERSON RALSTON:  I know the lady

4    feels that to be true.

5         The Chair will point out the members

6    of the body here in the chamber have been

7    very respectful this afternoon and I am

8    appreciative of that.

9         The Chair recognizes the Chairman of

10   the Rules Committee for an announcement.

11        RULES COMMITTEE CHAIRMAN:  Rules

12   Committee 341, right now for 15 minutes.

13        CHAIRPERSON RALSTON:  The House will

14   be in recess until 3:30.

15

16

17             (Proceedings concluded)

18

19

20

21

22

23

24

25



1    STATE OF GEORGIA

2    COUNTY OF MUSCOGEE

3

4                    C E R T I F I C A T E

5

6        The foregoing transcript of the proceedings was

7    prepared by me from the electronic media provided to

8    me by Elizabeth Gallo Court Reporting, and I certify

9    that it is a true and correct transcript to the best

10   of my ability of the proceedings.

11

12            This 6th day of June, 2019.

13

14

15                    _____

16                    Judy K. McNeill
                       Certified Court Reporter
17                    No. B-1611

18

19

20

21

22

23

24

25

