# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

SISTERSONG WOMEN OF COLOR
REPRODUCTIVE JUSTICE
COLLECTIVE, on behalf of itself and
its members, *et al.*,

        *Plaintiffs*,

   v.

BRIAN KEMP, Governor of the State
of Georgia, in his official capacity, *et
al.*,

        *Defendants*.

No. 1:19-cv-02973-SCJ

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Defendants Brian Kemp, Christopher M. Carr, Kathleen Toomey, the Members of the Georgia Composite Medical Board, LaSharn Hughes, Julia Slater, Daniel Porter, and Meg Heap (all sued in their official capacities) respectfully submit this response in opposition to Plaintiffs' motion for a preliminary injunction.

## INTRODUCTION

The Supreme Court has long held that States have a "legitimate and substantial" interest in promoting, preserving, and protecting the "life of the unborn." *Gonzales v. Carhart*, 550 U.S. 124, 145, 158 (2007). That is, "the

State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child …" *Id.* at 158; *see also Planned Parenthood of S.E. Pennsylvania v. Casey*, 505 U.S. 833, 870 (1992) ("[T]he State has a legitimate interest in promoting the life or potential life of the unborn."). Moreover, it is well-settled that "a fetus is a living organism within the womb, *whether or not it is viable outside the womb*." *Gonzales*, 550 U.S. at 126 (emphasis added). Accordingly, a State may properly recognize that an unborn child is alive even before "viability" and—consistent with its power to protect unborn life—may prohibit the killing of that child by restricting certain types of pre-viability abortions. *See Casey*, 505 U.S. at 873 (lower federal courts may not impose a "rigid prohibition on all previability regulation aimed at the protection of fetal life.").

On May 7, 2019, Governor Brian Kemp signed into law House Bill 481, the Living Infants Fairness and Equality Act ("LIFE Act"), which generally prohibits elective abortions after the detection of a fetal heartbeat, subject to several enumerated exceptions. The Act's primary objective is to advance Georgia's interest in protecting the life of the unborn, an objective the Act pursues through restrictions on abortion, as well as other tax and child support provisions designed to promote the well-being of unborn children.

Nearly two months after the Act was signed into law, Plaintiffs brought this suit to enjoin the entire statute, arguing that it violates the substantive due process and void-for-vagueness doctrines. Plaintiffs then waited several more weeks before filing this motion for a preliminary injunction.

Plaintiffs' motion should be denied. *First*, Plaintiffs cannot show that they are likely to succeed on the merits. Because "the key elements" of federal abortion precedent "are not found in the text of the Constitution," abortion doctrine is perpetually in flux, making "the bounds of the inquiry … essentially indeterminate." *Webster v. Reprod. Health Services*, 492 U.S. 490, 518 (1989) (plurality). Indeed, "[o]ver the past couple of decades the Supreme Court has issued several decisions drawing and redrawing the contours" of its own precedent. *W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1317 (11th Cir. 2018). In particular, the Supreme Court has repeatedly recognized the States' legitimate and substantial interest in protecting the life of the unborn, but the Court has offered little guidance on the precise contours of that interest.

The LIFE Act is designed to advance Georgia's powerful interest in protecting the life of the unborn, and the Act is closely tailored to advancing that interest. Once a heartbeat is detected, 95-98% of unborn children will survive until birth absent affirmative intervention to terminate their lives. The Act thus reflects a reasonable policy judgment that after a heartbeat is detected, abortions should be permitted only in limited circumstances. The Act also advances other significant state interests in protecting maternal health (since abortifacients and early abortions are much safer than later-term abortions), encouraging mothers to choose childbirth over abortion, and safeguarding the integrity of the medical profession from the coarsening effect of brutal and inhumane abortion procedures.

3

Plaintiffs also fail to show a likelihood that they will prevail on their alternative claim that the Act is void for vagueness. That claim focuses not on the abortion-related provisions of the Act but on how its definition of "natural person" will purportedly affect *other* statutes not at issue here. Plaintiffs lack standing to litigate those arguments and, in all events, their void-for-vagueness challenge disregards basic features about the operation of those laws and does not come close to meeting the criteria for facially invalidating a state law.

*Second*, a preliminary injunction is premature. Because the issues raised in Plaintiffs' preliminary injunction motion will substantially overlap with the merits, this Court can and should resolve the entire case through a single merits hearing. *See* Fed. R. Civ. P. 65(a)(2). Consolidating the injunction with a trial on the merits will promote efficiency and judicial economy. The issues in this case are primarily legal, and the limited factual or expert issues can be resolved on an expedited time frame in advance of a merits hearing in October or November. This means there is still time to reach a final judgment in advance of the Act's effective date of January 1, 2020. In short, a preliminary injunction is unnecessary at this point.

*Finally*, at the very least, Plaintiffs' requested injunction is grossly overbroad. Even though their challenge focuses solely on the Act's abortion-related provisions, they seek a preliminary injunction that would enjoin the *entire* Act, including important provisions regarding child support, income tax deductions, and remedies for crime victims. There is no basis for

4

enjoining anything beyond the Act's limitations on abortion, especially in light of its severability clause.

## BACKGROUND

The LIFE Act prohibits "using, prescribing, or administering any instrument, substance, device, or other means with the purpose to terminate a pregnancy with knowledge that termination will, with reasonable likelihood, cause the death of an unborn child" who possesses a "detectable human heartbeat." H.B. 481 §4(a)(1), (b). The Act defines an "unborn child" as "a member of the species Homo sapiens at any stage of development who is carried in the womb." *Id.* at §3(e)(2). It further defines a "detectable human heartbeat" as "embryonic or fetal cardiac activity or the steady and repetitive rhythmic contraction of the heart within the gestational sac." *Id.* at §3(e)(1). In addition to its abortion provisions, the Act seeks to promote the well-being of unborn children by allowing parents to claim their unborn children as dependent minors for income tax purposes, and by ensuring that alimony and child support obligations extend to such children. *Id.* at §5, §12.

The LIFE Act has been inaccurately labeled as a "six-week abortion ban," including by Plaintiffs. *See* Pls.' Mem. Supp. Mot. Prelim. Inj. ["Pls.' Mem."]. In fact, the Act permits abortionists to comply with the law by using a trans-abdominal ultrasound, which has a less-than-50% chance of detecting

a heartbeat before 9 weeks lmp[1], and may not do so until 12 weeks.[2] *See, e.g.*, ECF No. 24-5, Ga. Gen. Assembly, Standing Comm. on Sci. and Tech., 2019-2020 Reg. Sess., 69-70 (Mar. 14, 2019) (Sen. Jordan: "[A] Doppler or on-the-abdomen ultrasound won't pick up the fetal cardiac activity until about 12 weeks normally; correct?" Rep. Setzler: "I've been told 8 to 12 weeks, yes.… We don't establish a methodology by which that determination is made. We give physicians broad discretion to make that determination.").

Moreover, the LIFE Act provides multiple exceptions to its restrictions on abortion. First, the Act allows a post-heartbeat abortion if the mother has a "medical emergency," which is defined as "a condition in which an abortion is necessary in order to prevent the death of the pregnant woman or the substantial and irreversible physical impairment of a major bodily function of the pregnant woman." H.B. 481 §4(a)(3), (b)(1). The Act also allows post-heartbeat abortion if the "probable gestational age of the unborn child is 20 weeks or less and the pregnancy is the result of rape or incest in which an official police report has been filed alleging the offense of rape or incest." *Id.* at §4(b)(2). And the Act gives abortionists five different defenses to prosecution. *See id.* at §4(h).

---

[1] The unborn child's gestational age is typically dated in weeks starting from the first day of the mother's last menstrual period, or "lmp."

[2] *See, e.g.*, Avick G. Mitra, MD, et al., *Transvaginal versus transabdominal Doppler auscultation of fetal heart activity: A comparative study*, 175 Am. J. Obstet. Gynecol. 41 (1996), *available at* https://www.ncbi.nlm.nih.gov/pubmed/8694073.

By "applying reasoned judgment to the full body of modern medical science," the LIFE Act recognizes that "[m]odern medical science, not available decades ago, demonstrates that unborn children are a class of living, distinct persons." *Id.* at §2(3). As such, the Act advances Georgia's unique and substantial constitutional interest in protecting unborn human lives, in addition to its interests in protecting maternal health, encouraging childbirth, and safeguarding the integrity of the medical profession.

## ARGUMENT

This Court may grant a preliminary injunction only if: (1) Plaintiffs have a substantial likelihood of success on the merits; (2) Plaintiffs will suffer irreparable injury without injunctive relief; (3) the alleged injury to Plaintiffs outweighs the damage caused to Defendants by granting an injunction; and (4) if issued, the injunction will not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Because an injunction may not be granted unless Plaintiffs "clearly establish[] the burden of persuasion as to each of the[se] four prerequisites," it is "an extraordinary and drastic remedy" and "the exception rather than the rule." *Id.* (cleaned up).

## I.   Plaintiffs Do Not Have a Substantial Likelihood of Success.

In analyzing the plaintiff's likelihood of success on the merits, courts "do not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). If the relevant legal claims "involve unsettled questions of law," this "uncertainty discounts the

7

likelihood of success on the merits." *Morefield v. NoteWorld, LLC*, 1:10-cv-00117, 2012 WL 1355573, at *4 (S.D. Ga. 2012).

Here, Georgia asserts an interest in protecting unborn life. The Supreme Court has acknowledged the legitimacy of that interest, but has not directly addressed that interest's precise contours or the constitutionality of a fetal heartbeat law enacted to protect it. Plaintiffs thus cannot show at this early stage of the litigation that they are *likely* to succeed on the merits. Current law simply does not provide the legal certainty that Plaintiffs suggest is on their side. Contrary to Plaintiffs' assertions, the right to choose an abortion (even pre-viability) is not absolute. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 154 (1973) ("The privacy right … cannot be said to be absolute."). Moreover, while the Court has struck down abortion regulations that it deemed pretextual, *see, e.g.*, *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), it has upheld restrictions on abortion where they are properly tailored to advancing the State's asserted interest, *see Gonzales*, 550 U.S. at 156-66. Even under intermediate scrutiny—the highest level of scrutiny that could apply to this case—Defendants should prevail because the State's asserted interest in enacting the LIFE Act is substantial, its chosen means are rational, and those rational means are closely tailored to that substantial interest. Finally, Plaintiffs lack standing to bring their void-for-vagueness claim, and that claim is in any event unlikely to succeed on the merits.

**A.    The LIFE Act is a valid law to protect unborn human life.**

  *1.    The Act is not a "ban" on abortion or "per se" invalid.*

Plaintiffs allege that the LIFE Act violates substantive due process by "infring[ing] on women's right to abortion and bodily autonomy." Pls.' Compl. at 34. In particular, they argue that the LIFE Act is "*per se*" unconstitutional because it "bans" pre-viability abortions. Pls.' Mem. at 10-14, 18. Those arguments do not establish a substantial likelihood of success on the merits.

First, as a factual matter, the LIFE Act does not "ban" pre-viability abortions. It allows a woman to have an elective abortion up to the point that a heartbeat is detected, which (depending on the type of ultrasound used) may not occur until 9 to 12 weeks lmp. *See supra* 5-6. The LIFE Act also contains exceptions allowing post-heartbeat abortions where there is a medical emergency, rape, or incest. The Act is not a "ban" on pre-viability abortion.

Second, the Supreme Court has upheld a "ban" (to use Plaintiffs' term) on pre-viability dilation and extraction ("D&X") abortions. *See Gonzales*, 550 U.S. at 156-66. Plaintiffs maintain that "a ban on abortion at *any* point before viability is *per se* unconstitutional, no matter what interests the state asserts to support it." Pls.' Mem. at 11. Plaintiffs cite no authority for that proposition, and they ignore *Gonzales*, which refutes it. No Supreme Court case has ever held that a pre-viability abortion restriction is *per se* unlawful. On the contrary, the Court rejects such "rigid prohibition[s] on all previability regulation aimed at the protection of fetal life." *Casey*, 505 U.S. at 873; *see*

*also Roe*, 410 U.S. at 154 (the right to choose an abortion "cannot be said to be absolute.").

Third, and tellingly, Plaintiffs do not argue that the LIFE Act runs afoul of the Supreme Court's "undue burden" test. *See* Pls.' Mem. at 11 n.12. Plaintiffs thus seem to acknowledge that this test does not apply here. Indeed, the Supreme Court has applied the "undue burden" test only in cases dealing with maternal health and "potential life" regulations—laws that encourage women to freely choose childbirth over abortion. *See Whole Woman's Health*, 136 S. Ct. 2292 (maternal health); *Casey*, 505 U.S. 833 (potential life); *see also Gonzales*, 550 U.S. 124 (potential life and other interests). But the LIFE Act is different. Unlike most abortion laws reviewed by the Supreme Court—such as laws on informed consent, parental notification, or hospital admitting privileges—the LIFE Act takes the novel step of advancing a *separate and distinct* constitutional interest in protecting unborn human life.

In short, as explained below, the LIFE Act seeks to advance a critical government interest in protecting unborn human life in a context that has not been squarely addressed by the Supreme Court. Given that the law in this area remains unsettled, Plaintiffs cannot demonstrate a substantial likelihood of success on the merits. *See*, *e.g.*, *Carson*, 450 U.S. at 88 n.14 (no likelihood of success where "unsettled legal questions" remain).

### 2. *The LIFE Act pursues a legitimate and substantial state interest in protecting unborn human life.*

The Supreme Court has long recognized the States' "legitimate and substantial interest" in protecting unborn human life and has invoked that interest to uphold pre-viability restrictions on abortion. *Gonzales*, 550 U.S. at 145, 158 ("[T]he State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus …"); *see also Casey*, 505 U.S. at 870-71 ("[T]he State has a legitimate interest in promoting the life or potential life of the unborn."); *Thornburgh v. Am. College of Obstetricians and Gynecologists*, 476 U.S. 747, 770 (1986).

The Supreme Court first recognized the States' substantial interest in protecting unborn life in *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 482-86 (1983). There the Court considered the constitutionality of a state law that required a second physician to be present during the abortion of a viable unborn child. If the child survived the abortion, the law required the second physician to "take all reasonable steps in keeping with good medical practice to preserve the life and health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman." *Id.* at 483 (plurality) (cleaned up). The Court upheld the law, and the plurality opinion declared that the law was appropriately tailored to the State's "compelling interest" in protecting "the life of a viable fetus." *Id.* at 482.

Later, in a case dealing with a similar law, a majority of the Supreme Court adopted the approach of the *Ashcroft* plurality, recognizing that States

11

may properly legislate to save unborn human lives. *See Thornburgh*, 476 U.S. at 768-70. The Court later reaffirmed the States' interest in protecting unborn life in *Planned Parenthood of S.E. Pennsylvania v. Casey*, 505 U.S. at 870, holding that "the State has a legitimate interest in promoting the *life* or potential life of the unborn." *Id.* (emphasis added). However, unlike *Ashcroft* and *Thornburgh*, *Casey* did not involve abortion laws that were designed to protect unborn human life—instead, it concerned laws requiring informed consent, parental notification, spousal notification, and reporting. *Id.* at 844. Therefore, the Court did not consider whether those laws were properly tailored to the state's interest in protecting unborn human life, but instead, whether they were tailored to the State's interest in "potential life." 505 U.S. at 877-79.

The State's interest in "potential life" is another way of describing its interest in encouraging mothers to voluntarily choose childbirth instead of abortion. *See, e.g.*, *Beal v. Doe*, 432 U.S. 438, 445-46 (1977). *Casey* held that, if a state law is designed to encourage a woman to freely choose life of her own accord, "the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." 505 U.S. at 877. Accordingly, "potential life" regulations may not impose an "undue burden" on the right to choose abortion pre-viability. *Id.* If such a regulation purports to "inform the woman's free choice"—but effectively "hinder[s] it"—that regulation is pretextual, and as such, is unconstitutional. *Id.* This entire inquiry is separate and distinct from the inquiry (conducted

12

briefly in *Ashcroft* and *Thornburgh*) concerning the State's unique interest in protecting unborn lives.

In *Gonzales v. Carhart*, the Court again recognized that a State has a "legitimate and substantial interest in preserving and promoting fetal life." 550 U.S. at 145; *see also id.* at 158 ("[T]he State, from the inception of the pregnancy, maintains its own regulatory interest in protecting the life of the fetus that may become a child."). *Gonzales* concerned a ban on pre- and post-viability D&X abortions. Like *Casey*, the Court in *Gonzales* did not treat this law as an effort to actually save unborn lives. *Id.* at 157. Instead, the Court characterized the ban as a "potential life" law designed to encourage women to freely choose childbirth by showing "profound respect for the life within the woman." *Id.*

The Court also held that the D&X ban simultaneously advanced three other substantial state interests. First, the ban safeguarded "the integrity and ethics of the medical profession" by prohibiting brutal procedures that "confuse[] the medical, legal, and ethical duties of physicians to preserve and promote life" and "coarsen society to the humanity of … all vulnerable and innocent human life." *Id.* Second, the ban protected women from experiencing psychological trauma from abortion. *Id.* at 159-60. Third, the ban addressed "additional ethical and moral concerns" that are implicated by the "disturbing similarity" of D&X to infanticide. *Id.* at 158. In light of these combined state interests, the Court applied a modified "undue burden" standard, giving

special solicitude to Congress, and finding no undue burden—even though the ban did not contain a maternal health exception. *See id.* at 156-66.

Here, the LIFE Act advances multiple interests that the Supreme Court has accepted as legitimate. It protects unborn life. It safeguards the medical profession from the coarsening effect of brutal abortion procedures, such as live-dismemberment and vacuum-suction abortion. It protects maternal health by ensuring that mothers who choose to abort their child use abortifacients or early-term procedures, which are far safer for the mother.[3] And it encourages women to freely choose childbirth of their own accord by showing a "profound respect for the life within the woman." *Id.* at 157.

### 3. The LIFE Act's restriction on pre-viability abortions is closely tailored to its interest in protecting unborn life.

Without the undue burden test—which, again, Plaintiffs have not asked this Court to apply here—the highest level of scrutiny that could apply to the LIFE Act is intermediate scrutiny. *See Casey*, 505 U.S. at 871 (prohibiting the use of strict scrutiny in abortion cases). And even under that level of scrutiny, Plaintiffs cannot establish a likelihood of success, because

---

[3] *See, e.g.*, Linda A. Bartlett, MD, MHSc, et al., *Risk Factors for Legal Induced Abortion–Related Mortality in the United States*, 103 Am. J. Obstet. Gynecol. 729, 729, 736 (2004) ("The risk of death [for abortion] increase[s] exponentially by 38% for each additional week of gestation," and, "[i]f women who terminated their pregnancies after 8 weeks of gestation had accessed abortion services during the first 8 weeks of gestation, up to 87% of deaths might have been avoided."), *available at* https://bit.ly/31MctM2.

the LIFE Act is closely tailored to Georgia's substantial interest in protecting unborn life.

First, Georgia's decision to draw a line at the heartbeat is substantially related to its important interest in protecting life because the heartbeat is an extremely accurate indicator that an unborn child will survive until birth. *See, e.g.*, David F. Forte, *Life, Heartbeat, Birth: A Medical Basis for Reform*, 74 Ohio St. L.J. 121, 140 (2013) (collecting post-*Casey* medical research). "[T]he miscarriage rate for all pregnancies may be as high as 30%." *Id.* However, "[r]ecent medical research has determined that … once a fetus possesses cardiac activity, its chances of surviving to full term are between 95%-98%." *Id.* (footnote omitted). In short, once a heartbeat is detected, it is almost certain that an unborn child will survive to birth absent affirmative interventions to take away its life. The LIFE Act's restriction on post-heartbeat abortion is, therefore, a closely tailored means of saving unborn human lives. At the same time, the LIFE Act preserves the mother's ability to obtain an elective abortion at earlier stages of the pregnancy, which is when the vast majority of women choose to do so. In fact, statistical data show that 66% of mothers who have an abortion do so within 8 weeks lmp, and 89% within 12 weeks.[4] *See Casey*, 505 U.S. at 869 (restrictions must leave a mother with "some freedom" to abort her child).

------------------------

[4] Guttchmacher Institute, *Induced Abortion in the United States* (Jan. 2018), *available at* https://www.guttmacher.org/fact-sheet/induced-abortion-united-states (citing recent statistical data).

Second, the heartbeat is a more logical marker of the presence of human life than other alternatives, such as viability. It is widely recognized both in science and in law that a living person dies the moment their heart irreversibly stops beating. *See, e.g.*, Uniform Determination of Death Act §1(2) (1980) ("An individual who has sustained … irreversible cessation of circulatory and respiratory functions … is dead."); O.C.G.A. §31-10-16 (same). If life ends when the heart *stops* beating, it is reasonable for Georgia to conclude as a matter of policy that a life is worthy of protection once the heart *starts* beating.

Third, unlike other measures (such as viability), the heartbeat standard provides clear notice to abortionists of what conduct is prohibited. While the time for detecting a heartbeat may vary—and may not occur until 8 to 12 weeks—detecting a heartbeat is easy and reliable. *See supra* 5-6. Viability, by contrast, is a highly "uncertain[]" marker. *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). Because "a physician determines whether or not a fetus is viable after considering a number of variables," viability "can be determined only with difficulty." *Id.* at 395-96.

Fourth, the Act's exceptions substantially advance Georgia's interest in protecting *all* human life, born and unborn. The Supreme Court has held that state laws designed to save unborn life must have an "emergency exception" to allow the mother to abort her child if continuing the pregnancy would cause her death. *Thornburgh*, 476 U.S. at 770-71. The LIFE Act does this and more. It allows a mother to abort her child, even after the heartbeat is

16

detected, if her life or health is threatened. *See* H.B. 481 §4(a)(3) (allowing post-heartbeat abortion where "necessary in order to prevent the death of the pregnant woman or the substantial and irreversible physical impairment of a major bodily function of the pregnant woman"). The LIFE Act even allows post-heartbeat abortions of children conceived by rape or incest. *See id.* at §4(b)(2). By satisfying the constitutional minimum, these abortion exceptions demonstrate the LIFE Act's commitment to protecting all human life, both mother and child. *Cf. Gonzales*, 550 U.S. at 161-67 (upholding a "potential life" restriction on pre-viability abortion that did not contain an exception for maternal health).[5]

### B.    The LIFE Act is not unconstitutionally vague.

Plaintiffs further argue that Section 3 of the LIFE Act—which amends Georgia's definition of "natural person" to include "an unborn child"—makes *other* criminal laws (not the LIFE Act) unconstitutionally vague. *See* Pls.' Mem. 15-18. Plaintiffs have not shown a substantial likelihood of success on this claim.

---

[5] Plaintiffs argue that the LIFE Act is invalid under *MKB Mgt. Corp. v. Stenehjem*, 795 F.3d 768 (8th Cir. 2015), but that decision is inapposite because it did not consider the separate and distinct state interest in protecting unborn life. *See id.* at 771-73. North Dakota did not even assert any interest in saving unborn lives. *See* Appellants' Brief, 2014 WL 3421303. The Eighth Circuit thus applied *Casey* and determined that the law did not meet *Casey*'s "undue burden" standard. *See Stenehjem*, 795 F.3d at 771-73.

At the outset, Plaintiffs lack Article III standing to bring this claim. "To demonstrate … standing to bring a vagueness challenge … [the claimant] must show that: (1) he has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the [law]; and (3) a favorable judgment is likely to redress the injury." *Harrell v. The Fla. B.*, 608 F.3d 1241, 1253 (11th Cir. 2010). To make this showing, Plaintiffs must demonstrate that they personally intend "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). In other words, there must be a "causal nexus" between the purportedly vague law and the alleged injury of the party who raises the claim. *E.g.*, *D.H. v. City of New York*, 309 F. Supp. 3d 52, 68-69 (S.D.N.Y. 2018) (dismissing a vagueness claim where the "plaintiffs [did] not plead that uncertainty over the conduct prohibited by the statute resulted in their arrests"); *see Porter v. Kimzey*, 309 F. Supp. 993, 995 (N.D. Ga. 1970).

Plaintiffs have not made this showing. They speculate about hypothetical conduct that might violate other laws (not the LIFE Act), *see* Pls.' Mem. 15-18, but Plaintiffs do not identify any specific actions that *they* intend to take whose legal consequences are now made unclear or vague by the LIFE Act. Even if the Act makes other statutes vague or unclear, Plaintiffs have not identified any concrete, non-speculative "course of conduct" that they plan to take that would create a "credible threat of

18

prosecution" under those statutes. *Driehaus*, 573 U.S. at 159. Having failed to show Article III standing for their vagueness claim, Plaintiffs have failed to demonstrate a likelihood of success on the merits.

In all events, even if Plaintiffs had standing, their vagueness challenge would fail on the merits. "A statute … need only be written with a reasonable degree of certainty in order to withstand constitutional scrutiny." *U.S. v. Marino-Garcia*, 679 F.2d 1373, 1383 (11th Cir. 1982). "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *F.C.C. v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). Additionally, because Plaintiffs bring a facial challenge, they have an especially heavy burden of proving vagueness here. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). *All* statutes have some ambiguity at the margin, and "[i]t would indeed be undesirable for [federal courts] to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." *Gonzales*, 550 U.S. at 168 (quotation marks omitted); *see also id.* at 167-68 (noting that "as-applied challenges are the basic building blocks of constitutional adjudication" and that facial challenges generally "should not … [be] entertained" in abortion cases). Therefore, "[a] facial challenge … must establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.

Under these demanding standards, Plaintiffs do not come close to showing that the LIFE Act is unconstitutionally vague. The Act's definition of

"natural person" is clear and straightforward: "'Natural person' means any human being including an unborn child." H.B. 481 §3(b). The phrase "unborn child" is further defined, with painstaking precision, as "a member of the species Homo sapiens at any stage of development who is carried in the womb." *Id.* at §3(e)(2). It would be difficult for this definition to be more exact as to "what fact must be proved." *Fox*, 567 U.S. at 253.

In arguing that the LIFE Act makes *other* laws vague, Plaintiffs give as their prime example the crime of "reckless conduct," which prohibits "caus[ing] bodily harm to or endanger[ing] the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person." O.C.G.A. §16-5-60(b) (emphasis added). Plaintiffs argue that the LIFE Act makes it unclear whether this crime now prohibits abortion from the moment of conception. *See* Pls.' Mem. at 16-17.

That argument rests on a highly implausible reading of the relevant statutes. Even if the LIFE Act's revised definition of "natural person" now applies to the crime of reckless conduct, an individual's behavior would violate that prohibition only if there were a conscious disregard of an "unjustifiable" risk of harm. O.C.G.A. §16-5-60(b). Pre-heartbeat abortions were lawful in Georgia both before and after the enactment of the LIFE Act, and would therefore be "justifiable." *See also* O.C.G.A. §16-3-20 (giving a "defense to prosecution" for "conduct [that] is justified for any … reason under the laws of this state"). Moreover, given that Georgia's asserted

20

interest in protecting life begins with the detection of a fetal heartbeat, any attempts to ban or prosecute pre-heartbeat abortions would likely be found unconstitutional. In short, no citizen could reasonably believe that pre-heartbeat abortions could be prosecuted as reckless conduct.

Plaintiffs offer various other examples of crimes that the LIFE Act purportedly renders vague, but all are unavailing. *See* Pls.' Mem. at 16. For example, Plaintiffs try to argue that "aggravated assault," O.C.G.A. §16-5-21, would apply to pre-heartbeat abortions, but Plaintiffs ignore the fact that a person may be convicted of "aggravated assault" against an unborn child only if that person first committed "assault of unborn child"—which the Code expressly defines to exclude abortion. O.C.G.A. §16-5-28(d) ("Nothing in this Code section shall be construed to permit the prosecution of … abortion …"). Plaintiffs also argue that criminal prohibitions on the sale of tobacco to minors or the sexual exploitation of children, *see* O.C.G.A. §16-12-171; §19-7-5, have become unconstitutionally vague, but they identify no lawful conduct that Plaintiffs intend to engage in that could be deemed to violate these prohibitions. Plaintiffs are unlikely to prevail on their vagueness claim.

## II.   A Preliminary Injunction is Unnecessary and Premature.

"A preliminary injunction requires showing '*imminent*' irreparable harm. Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights *before a case can be resolved on its merits*." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d

21

1244, 1248 (11th Cir. 2016) (emphasis added) (cleaned up) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see Siegel*, 234 F.3d at 1176 ("[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." (cleaned up)).

      The LIFE Act does not go into effect until January 1, 2020, and there is thus sufficient time for this case to be adjudicated on the merits before any alleged harm to Plaintiffs could materialize. Because most of the issues in this case turn on pure questions of law—such as how the State may legitimately advance its interests and what standard of review applies— Georgia will use a limited number of fact and/or expert witnesses. With more than four months before the LIFE Act takes effect, the State believes that there is ample time to resolve this entire case through a joint hearing on the merits and the preliminary injunction motion in October or November. *See* Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."). The State remains willing to work expeditiously toward a final decision on the merits before the LIFE Act goes into effect on January 1st.

      Moreover, if this Court believes there is not enough time to reach a decision on the merits before the end of the year, it is largely the product of Plaintiffs' own lack of urgency in litigating this case. When seeking the extraordinary remedy of a preliminary injunction, any "delay in seeking a preliminary injunction … even [by] only a few months—though not

22

necessarily fatal—militates against a finding of irreparable harm." *Wreal*, 840 F.3d at 1248. The LIFE Act was first introduced in late February of 2019, and was widely reported by news outlets as early as March. In fact, Plaintiff SisterSong Women of Color Reproductive Justice Collective discussed the law with news reporters in March, and the ACLU announced in March its intention to sue to challenge the law. This law did not blindside Plaintiffs when the Governor signed it on May 7.

Plaintiffs nonetheless waited until June 28, nearly two months after the LIFE Act was passed, to file their complaint with this Court. Plaintiffs then delayed further by failing to serve Defendants until the end of July. And they did not file their motion for a preliminary injunction until July 23—over two and a half months after the Act was signed into law. Plaintiffs' "failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm" or the need for an immediate decision from this Court in advance of a decision on the merits. *Id.*

The better way to proceed is through consolidation with a full merits hearing pursuant to Rule 65(a)(2). There is ample time before the LIFE Act's effective date to conduct limited discovery, proceed to a full hearing in the fall, and allow the Court to resolve the entirety of this case all at once. For example, Defendants would propose that written discovery be served by August 26 (with responses due by September 9); that any expert opinions be disclosed by October 2; that any depositions (which will be few) be completed by October 11; and that briefing be completed by the end of October for a

hearing in early November. Although compressed, this schedule would be sufficient to develop the necessary record to finally dispose of this matter in this Court. And "[d]eciding these issues once and for all on a full record will be most beneficial to all parties." *Allen v. School Bd. for Santa Rosa County, Fla.*, 782 F.Supp.2d 1304, 1327 (N.D. Fla. 2011).

## III. Plaintiffs' Requested Injunction Is Overbroad.

Although Defendants believe that Plaintiffs are not entitled to any relief at this stage, Plaintiffs' requested injunction is also grossly overbroad. Plaintiffs devote their entire preliminary injunction motion to the abortion-related aspects of the Act, and then assert in a footnote that the *entire* Act should be enjoined—notwithstanding its severability clause. *See* Pls.' Mem. 14-15 & n.16. But a number of the Act's provisions have nothing to do with abortion. For example, Section 5 requires the father of an unborn child to pay child support for the "direct medical and pregnancy related expenses of the mother of the unborn child." Section 6 sets monetary damages for the homicide of an unborn child. And Section 12 allows a family to claim a personal exemption for an unborn child. Plaintiffs have not even attempted to argue that these provisions are unconstitutional. Even if other sections of the Act were held invalid, these sections would be severable, *see* H.B. 481 §14, and should not be enjoined.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted,

Dated:     August 19, 2019

/s/ *Andrew A. Pinson*

Jeffrey M. Harris (*pro hac vice*)
Steven C. Begakis (*pro hac vice pending*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

Patrick Strawbridge (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South, PMB #706
Boston, MA 02109
(617) 227-0548

Christopher M. Carr
   *Attorney General of Georgia*
Andrew A. Pinson (Bar #584719)
   *Solicitor General*
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334
(404) 651-9453

*Counsel for Defendants*

25

## CERTIFICATE OF COMPLIANCE

I certify that this brief uses 13-point Century Schoolbook in compliance with Local Rule 5.1(B).

/s/ *Andrew A. Pinson*
Andrew A. Pinson

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing brief was electronically filed with the Clerk of Court using the CM/ECF system on August 19, 2019, thereby serving all counsel of record.

/s/ *Andrew A. Pinson*

Andrew A. Pinson