**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**SISTERSONG WOMEN OF COLOR
REPRODUCTIVE JUSTICE
COLLECTIVE, on behalf of itself
and its members,** *et al.,*

   **Plaintiffs,**

**v.**

**BRIAN KEMP, Governor of the State
of Georgia, in his official capacity,**
*et al.,*

   **Defendants.**

**CIVIL ACTION FILE
No. 1:19-cv-02973-SCJ**

<u>**ORDER**</u>

This matter is before the Court on Plaintiffs' Motion for Preliminary

Injunction. Doc. No. [24].[1]

On June 28, 2019, Plaintiffs SisterSong Women of Color Reproductive

Justice Collective, on behalf of itself and its members; Feminist Women's

Health Center, Planned Parenthood Southeast, Inc., Atlanta Comprehensive

---

[1] All citations are to the electronic docket unless otherwise noted, and all page
numbers are those imprinted by the Court's docketing software.

Wellness Clinic, Atlanta Women's Medical Center, FemHealth USA d/b/a Carafem, Columbus Women's Health Organization, P.C., Summit Medical Associates, P.C., on behalf of themselves, their physicians and other staff, and their patients; Carrie Cwiak, M.D., M.P.H., Lisa Haddad, M.D., M.S., M.P.H., and Eva Lathrop, M.D., M.P.H., on behalf of themselves and their patients, (collectively, the "Plaintiffs"), filed a Verified Complaint for Declaratory and Injunctive Relief against Defendants Brian Kemp (in his official capacity as Governor of the State of Georgia), Christopher M. Carr (in his official capacity as Attorney General for the State of Georgia), Kathleen Toomey (in her official capacity as Georgia Commissioner for Department of Public Health), Members of the Georgia Composite Medical Board in their official capacities (John S. Antalis, M.D.; Gretchen Collins, M.D.; Debi Dalton, M.D.; E. Daniel DeLoach, M.D.; Charmaine Faucher, PA-C; Michael Fowler, Sr., C.F.S.P.; Alexander S. Gross, M.D.; Thomas Harbin, Jr., M.D.; Rob Law, C.F.A.; Matthew W. Norman, M.D.; David W. Retterbush, M.D.; Andrew Reisman, M.D.; Joe Sam Robinson, M.D.; Barby J. Simmons, D.O.; and Richard L. Weil, M.D.), LaSharn Hughes, M.B.A. (in her official capacity as Executive Director of the Georgia Composite Medical Board), Paul L. Howard, Jr. (in his official capacity as District Attorney for Fulton County), Sherry Boston (in her official capacity as District Attorney

2

for the Stone Mountain Judicial Circuit), Julia Slater (in her official capacity as District Attorney for the Chattahoochee Judicial Circuit), Joyette M. Holmes[2] (in her official capacity as District Attorney for the Cobb Judicial Circuit), Danny Porter (in his official capacity as District Attorney for the Gwinnett Judicial Circuit), and Meg Heap (in her official capacity as District Attorney for the Eastern Judicial Circuit) (collectively, the "Defendants"). Doc. No. [1].

In their Complaint, Plaintiffs, pursuant to 42 U.S.C. § 1983,[3] challenge the constitutionality of Georgia House Bill 481 (hereinafter, "H.B. 481"), which,

---

[2] In the Complaint, Plaintiffs name John Melvin, in his official capacity as Interim District Attorney for the Cobb Judicial Circuit, as a Defendant. Doc. No. [1]. On July 1, 2019, Joyette M. Holmes was sworn in as District Attorney for the Cobb Judicial Circuit. Under Federal Rule of Civil Procedure 25(d), an "officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Accordingly, the Court granted Defendants' Notice of Automatic Substitution and Unopposed Motion for Appropriate Relief, thereby substituting Joyette Holmes for John Melvin as a party to this action. Doc. No. [83].

[3] 42 U.S.C. § 1983 provides, in relevant part, that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial

*inter alia*, prohibits abortions after the detection of a fetal heartbeat. H.B. 481 §

4, 155th Gen. Assemb., Reg. Sess. (Ga. 2019). H.B. 481 also recognizes unborn

children as "natural persons" and further defines an "unborn child" as an

embryo/fetus "at any stage of development who is carried in the womb."

Id. § 3. Plaintiffs assert two causes of action: (1) violation of the Substantive Due

Process right to privacy and liberty under the Fourteenth Amendment to the

United States Constitution; and (2) violation of Due Process under the

Fourteenth Amendment to the United States Constitution.

On July 23, 2019, Plaintiffs filed a Motion for Preliminary Injunction, in

which they ask the Court to enjoin Defendants from enforcing H.B. 481,

scheduled to take effect on January 1, 2020. Doc. No. [24]. The motion has been

fully brief by the parties.[4] The Court also held a hearing on the motion on

September 23, 2019. This matter is now ripe for review.

---

capacity, injunctive relief shall not be granted unless a
declaratory decree was violated or declaratory relief was
unavailable.

[4] Defendants Sherry Boston and Paul L. Howard, Jr. filed their own responses
to the motion apart from the other Defendants (hereinafter, the "State Defendants").
In her response, Defendant Boston contests whether Plaintiffs have standing to bring
claims against her and whether they can overcome her right to immunity under the
Eleventh Amendment. Doc. No. [71]. Defendant Howard does not oppose Plaintiffs'
motion. Doc. No. [75]. Plaintiffs have filed replies to the responses of both the State

## I.   BACKGROUND

Before entertaining the merits of Plaintiffs' motion, the Court finds that an overview of the current state of abortion law, based on United States Supreme Court precedent, Georgia abortion law and H.B. 481, and the facts set forth in Plaintiffs' Complaint is warranted.

### A.   <u>Abortion Law</u>

The origin of the Supreme Court's abortion jurisprudence begins with <u>Roe v. Wade</u>, 410 U.S. 113, 153–54 (1973), in which the Court first held that the Due Process Clause of the Fourteenth Amendment provides a fundamental constitutional right of access to abortions. In doing so, the Supreme Court in <u>Roe</u> declared that the constitutional right of privacy, "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action," is "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." <u>Id.</u> at 153.

While the Constitution does not explicitly mention any such right of privacy, the Supreme Court has recognized, dating as far back to 1891, that an implied right of privacy, or a guarantee of certain areas or zones of privacy,

Defendants and Defendant Boston. Doc. Nos. [87]; [88].

exists under the Constitution. Id. at 152; see also Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."). Since that time, the Court has found that this right of privacy affords constitutional protections to personal and intimate decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. Carey v. Population Servs., Int'l, 431 U.S. 678, 684–85 (1977); see also Whalen v. Roe, 429 U.S. 589, 599–600 (1977) (noting that the right of privacy includes "the interest in independence in making certain kinds of important decisions"). The Court has particularly made clear, in a series of cases, that "[t]he decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices." Carey, 431 U.S. at 685. In Griswold v. Connecticut, 381 U.S. 479, 485–86 (1965), the Supreme Court first held that the Constitution does not permit a State to forbid a married couple from using contraceptives. The Court later guaranteed that same freedom to unmarried couples. See Eisenstadt v. Baird, 405 U.S. 438, 454–55 (1972). In Carey, the Supreme Court

6

extended constitutional protection to the sale and distribution of contraceptives. 431 U.S. at 701–02.

These precedents have thus reiterated "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." Eisenstadt, 405 U.S. at 453; see also Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 851 (1992) ("These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.").

### 1.   *Roe* and the Trimester Framework

In Roe, the Supreme Court broadened the scope of the constitutional right of privacy to encompass the abortion decision. 410 U.S. at 154. Yet the Court in Roe also made clear that this right to abortion is "not absolute" and thus must be considered against important "state interests as to protection of health, medical standards, and prenatal life." 410 U.S. at 154–55.

Accordingly, the Supreme Court in Roe established a trimester framework to govern abortion regulations. Under this framework, no State interest could justify any regulation of abortion during the first trimester of

7

pregnancy. <u>Id.</u> at 164 ("For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician."). During the second trimester of pregnancy, the Court in <u>Roe</u> concluded that the State's interest in the health of the mother is sufficiently compelling to permit regulation of "the abortion procedure in ways that a reasonably related to maternal health." <u>Id.</u> ("For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.").

It is only during the third trimester of pregnancy, when the fetus is viable, that the State's interest in "the potentiality of human life" becomes compelling. <u>Id.</u> at 164–65. Thereafter, the Supreme Court in <u>Roe</u> held that the State "may, if it chooses, regulate and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." <u>Id.</u> This is because, as the Court in <u>Roe</u> stated, at the point of viability, "the fetus then presumably has the capability of meaningful life outside the mother's womb." <u>Id.</u> at 163.

## 2. *Casey* and the *Undue Burden Standard*

In <u>Casey</u>, a plurality of the Supreme Court upheld the core holding in <u>Roe</u> by reaffirming "the right of the woman to choose to have an abortion before viability and to obtain it without undue influence from the State." <u>Casey</u>, 505 U.S. at 846. The Court, however, jettisoned both the trimester framework and strict scrutiny standard established in <u>Roe</u>, finding that State interests in both a woman's health and fetal life are present and "substantial" from the outset of pregnancy. <u>Casey</u>, 505 U.S. at 846, 873. The Court instead held that "[o]nly where state regulation imposes an undue burden on a woman's ability to [choose to terminate or continue her pregnancy before viability] does the power of the State reach into the heart of the liberty protected by the Due Process Clause." <u>Id.</u> at 874; <u>see also id.</u> at 878 ("An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."). Thus, in order "to protect the central right recognized by [<u>Roe</u>] while at the same time accommodating the State's profound interest in potential life," the Court held that the undue burden analysis—and not the trimester framework—must be employed. <u>Casey</u>, 505 U.S. at 878.

9

The Supreme Court in <u>Casey</u> nevertheless left the essential holding of <u>Roe</u> untouched, stating that "[t]he woman's right to terminate her pregnancy before viability is the most central principle of [<u>Roe</u>]. It is a rule of law and a component of liberty we cannot renounce." <u>Id.</u> at 871. Furthermore, while acknowledging that advances in neonatal care and maternal care have advanced viability to an earlier point, the Court dismissed such factual divergences as having "no bearing on the validity of <u>Roe</u>'s central holding," which is that:

> viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions. The soundness or unsoundness of that constitutional judgment in no sense turns on whether viability occurs at approximately 28 weeks, as was usual at the time of <u>Roe</u>, at 23 or 24 weeks, as it sometimes does today, or at some moment even slightly earlier in the pregnancy, as it may if fetal respiratory capacity can somehow be enhanced in the future. Whenever it may occur, the attainment of viability may continue to serve as the critical fact, just as it has done since <u>Roe</u> was decided; which is to say that no change in <u>Roe</u>'s factual underpinning has left its central holding obsolete, and none supports an argument for overruling it.

<u>Casey</u>, 505 U.S. at 860; <u>id.</u> at 846 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a

substantial obstacle to the woman's effective right to elect the procedure.");
see also Gonzales v. Carhart, 550 U.S. 124, 146 (2007) ("Before viability, a State
'may not prohibit any woman from making the ultimate decision to terminate
her pregnancy.'") (citing Casey, 505 U.S. at 879).

This core holding, established by the Supreme Court in Roe and
reaffirmed in Casey and in subsequent cases, is binding upon this Court.

### 3.   *Stare Decisis and the Binding Precedent Rule*

"The United States federal legal system is structured as a common law
system. This system embodies the rule of stare decisis that courts should not
lightly overrule past decisions because stability and predictability are essential
factors in the proper operation of the rule of law." McGinley v. Houston,
361 F.3d 1328, 1331 (11th Cir. 2004) (citations and quotations omitted). "In cases
involving questions of federal law the doctrine of stare decisis also implicates
the binding nature of decisions rendered by one federal court over another."
Id. "A circuit court's decision binds the district courts sitting within its
jurisdiction while a decision by the Supreme Court binds all circuit and district
courts." Id.

It is a "basic principle that district courts must follow the holdings of
their court of appeals and the Supreme Court." Johnson v. DeSoto Cty. Bd. of

11

Comm'rs, 72 F.3d 1556, 1559 n.2 (11th Cir. 1996). "The binding precedent rule affords a [district] court no . . .  discretion where a higher court has already decided the issue before it." Id.

To this regard, the Supreme Court and the Eleventh Circuit have yet to overrule the Roe and Casey line of cases. Accordingly, this Court, as a district court, is bound by those decisions and, as stated above, is without discretion to overrule or otherwise change this abortion law precedent.

**B.    Georgia Abortion Law and H.B. 481**

Prior to the passage of H.B. 481, Georgia law prohibited abortions at twenty weeks or more "from the time of fertilization," O.C.G.A. § 31-9B-1(5), "unless the pregnancy [was] diagnosed as medically futile" or, in reasonable medical judgment, an abortion was necessary to "avert the death of the pregnant woman or avert serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman" or to "[p]reserve the life of an unborn child." O.C.G.A. §§ 16-12-141(c)(1)(A–B).

On March 29, 2019, the Georgia Legislature passed H.B. 481—also known as the "Living Infants Fairness and Equality (LIFE)" Act. Governor Kemp signed the bill into law on May 7, 2019. It is set to go into effect on January 1, 2020. H.B. 481 § 15.

12

H.B. 481 makes a series of amendments to Georgia abortion law. Section 3 of H.B. 481 amends O.C.G.A. § 1-2-1—which contains the definition of "Persons and their Rights" that applies throughout the Official Code of Georgia Annotated (hereinafter, "the Code")—to define "natural person" as including "any human being including an unborn child." Id. § 3(b). It further defines "unborn child" as "a member of the specifies Homo sapiens at any stage of development who is carried in the womb." Id. § 3(e)(2).

Section 4 of H.B. 481 prohibits abortions if a fetus has been determined to have a "detectable human heartbeat." H.B. 481 § 4(b). H.B. 481 accordingly amends O.C.G.A. § 31-9B-2(a), "relating to physician's obligation in performance of abortions," to require "a determination of the presence of a detectable human heartbeat, as such term is defined in Code Section 1-2-1." Id. § 10. "Abortion", however, does not include removing an "ectopic pregnancy" or a "dead" fetus "caused by a spontaneous abortion," sometimes referred to as a miscarriage. Id. § 4(a)(1). Section 4 of H.B. 481 contains three exceptions, permitting otherwise banned abortions where: (1) a physician determines, in reasonable medical judgment, that a "medical emergency"

13

exists;[5] (2) the pregnancy is at or below twenty weeks post-fertilization and is the result of rape or incest in which an official police report has been filed alleging the offense of rape or incest; or (3) the physician determines, in reasonable medical judgment, that the pregnancy is "medically futile." Id. §§ 4(b)(1–3).

Furthermore, a violation of Section 4 of H.B. 481 is punishable by imprisonment of one to ten years. O.C.G.A. § 16-12-140(b). A patient may also bring a civil action for a violation of Section 4. H.B. 481 § 4(g). Section 4 provides affirmative defenses, once a prosecutor proves a *prima facie* case of a violation of H.B. 481, if a physician, nurse, physician assistant, or pharmacist "provide[d] care for a pregnant woman which results in the accidental or unintentional

---

[5] A "medical emergency" is further defined as:

> a condition in which an abortion is necessary in order to prevent the death of the pregnant woman or the substantial and irreversible physical impairment of a major bodily function of the pregnant woman. No such greater risk shall be deemed to exist if it is based on a diagnosis or claim of a mental or emotional condition of the pregnant woman or that the pregnant woman will purposefully engage in conduct which she intends to result in her death or in substantial and irreversible physical impairment of a major bodily function.

H.B. 481 § 4(a)(3).

14

injury or death of an" embryo or fetus, H.B. 481 §§ 4(h)(1–4), and if "[a] woman sought an abortion because she reasonably believed that an abortion was the only way to prevent a medical emergency." H.B. 481 § 4(h)(5).

Moreover, Sections 7, 8, 9, and 11 of H.B. 481 amend Georgia's informed consent and abortion reporting statutes to mandate that the information the patient receives twenty-four hours before an abortion includes "the presence of . . . detectable" fetal cardiac activity, id. § 7, to mandate that the Department of Public Health materials available to abortion patients refer to detectable cardiac activity, id. § 8, and to reflect the ban on abortion where there is detectable fetal cardiac activity. Id. § 11.

Section 5 of H.B. 481 requires the father of an unborn child, as defined under Section 3 of H.B. 481, to pay child support for the "direct medical and pregnancy related expenses of the mother of the unborn child." Id. § 5. Section 6 of H.B. 481 sets monetary damages "[f]or the homicide of an unborn child." Id. § 6. Finally, Section 12 allows for a family to claim a personal tax exemption for an unborn child. Id. § 12.

## C.   Plaintiffs' Verified Complaint

Plaintiffs filed their Verified Complaint for Declaratory and Injunctive Relief against Defendants on June 28, 2019. Doc. No. [1].

15

In Count I of their Complaint, Plaintiffs contend that Section 4 of H.B. 481, which prohibits abortions after a fetal heartbeat is detected, directly conflicts with Roe's central holding and thus violates the right to privacy and liberty as secured by the Fourteenth Amendment to the United States Constitution. Id. ¶ 73. According to the Complaint, in a typically developing embryo, cells that eventually form the basis for development of the heart later in the pregnancy produce cardiac activity that is generally detectable—via ultrasound—beginning at approximately six weeks LMP.[6] Id. ¶ 50. Viability, however, does not occur until months later. See Roe, 410 U.S. at 160 ("Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks."); Casey, 505 U.S. at 932 n.6 ("The joint opinion agrees with Roe's conclusion that viability occurs at 23 or 24 weeks at the earliest."); see also MKB Mgmt. Corp. v. Stenehjem, 795 F.3d 768, 772–73 (8th Cir. 2015) ("Today, viability generally occurs at 24 weeks, but it may occur weeks earlier."). Even further, Plaintiffs state that a majority of abortions patients are unable to confirm their pregnancy and schedule and obtain an abortion prior to six weeks

---

[6] Pregnancy is uniformly measured from the first day of the patient's last menstrual period ("LMP"). A full-term pregnancy is approximately forty weeks LMP. Doc. No. [1], ¶48.

16

LMP. Id. ¶ 52. Assuming a patient has regular monthly menstrual periods, six weeks LMP is only two weeks after missing their period. Id. ¶ 53. Prior to and even after six weeks LMP, many women do not even know they are pregnant—particularly the women with irregular periods, who have certain medical conditions, who have been using contraceptives, or who are breastfeeding. Id. ¶ 52.

In Count II of their Complaint, Plaintiffs contend that Section 3 of H.B. 481, which amends O.C.G.A. § 1-2-1 to define "natural person" as including an unborn child, is unconstitutionally vague in that it is unclear if or how the definition amends other provisions of the Official Code Georgia Annotated (hereinafter, "the Code"). Id. ¶ 76. Plaintiffs specifically state that certain criminal and civil Code provisions, as amended by Section 3 of H.B. 481, make it impossible for pregnant women and medical providers to know what actions are forbidden or required, and thus do not provide adequate guidance as to how they can comply with the law, violating their rights secured to them by the Due Process guarantees of the Fourteenth Amendment. Id. ¶ 79.

## II.    PRELIMINARY MATTERS

Before discussing the appropriateness of a preliminary injunction, the Court must address a number of preliminary matters. First, the Court will

address the standing arguments raised by Defendant Boston and the State Defendants. Second, the Court will address Defendant Boston's Eleventh Amendment immunity arguments.

### A. Standing

#### 1. Standing to Bring Claims Against Defendant Boston

Defendant Boston argues that Plaintiffs lack standing to seek a preliminary injunction against her. See Doc. No. [71], pp. 1–2. She asserts that, because she "believes H.B. 481 is unconstitutional on its face," there is no case or controversy between her and the Plaintiffs. Doc. No. [71], p. 2.

A person "c[an] bring a pre-enforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution.'" Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1304 (11th Cir. 2017) (quoting Susan B. Anthony List v. Dreihaus, 573 U.S. 149, 159 (2014)). "[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases." Younger v. Harris, 401 U.S. 37, 42 (1971). When plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they do not allege a

18

dispute susceptible to resolution by a federal court. Id. Still, the Eleventh Circuit has noted that the "credible threat of prosecution" standard is "quite forgiving." Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998) (citation omitted).

Plaintiffs state that they provide and will continue to provide treatment and services which will "undisputedly be criminal under H.B. 481." Doc. No. [88], p. 3. They have therefore alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest" which is "'proscribed by [the] statute' they wish to challenge." Driehaus, 573 U.S. 149 at 162–63 (quoting Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298, (1979)). Defendant Boston counters that, even so, there is no credible threat of prosecution, as she has assured the media and her constituents that H.B. 481 "will not be enforced by her office." Doc. No. [71], p. 10.

The Eleventh Circuit has recognized that "[m]id-litigation assurances are all too easy to make and all too hard to enforce," which is why "the Supreme Court has refused to accept them." W. Ala. Women's Ctr. v. Williamson, 900 F.3d 1310, 1328 (11th Cir. 2018) (citing Stenberg v. Carhart, 530 U.S. 914, 940 (2000)). In Stenberg, the Supreme Court declined to defer to the Nebraska Attorney General's statements that he would "narrowly" interpret a state

19

abortion statute. 530 U.S. at 940. This was because "precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law" when that interpretation is not binding on state courts or law enforcement officials. Id. See also Crandon v. U.S., 494 U.S. 152, 177 (1990) (Scalia, J., concurring in judgment) ("[W]e have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference."). Similarly, in Williamson, the Eleventh Circuit declined to defer to Alabama's non-binding assurances that it would permit broad application of a health exception in the state's abortion law. 900 F.3d at 1328.

While Defendant Boston is a District Attorney and not the Attorney General or the State, Stenberg and Williamson are analogous. A "prosecutor has the power to promise to forgo prosecution" under Georgia law—however, to be binding, "this promise must be limited to prosecution as to specific crimes or transactions" and must be approved by a court. State v. Hanson, 295 S.E.2d 297, 302 (1982). Because Defendant Boston has not "obtain[ed] court approval of [any] agreement to forgo prosecution," her promise not to prosecute under H.B. 481, however sincere, is not binding on her office or local law enforcement. Id.

Additionally, Defendant Boston argues that recognizing Plaintiffs' standing against her would "invade the broad prosecutorial discretion afforded to district attorneys in this state[.]" Doc. No. [71], p. 3. However, this discretion is precisely what creates the credible threat of prosecution—Defendant Boston (or her eventual successor) remains free to change her mind. For these reasons, it cannot be said that Plaintiffs' fears of prosecution in the Stone Mountain Judicial Circuit for engaging in conduct that is criminal under H.B. 481 are "imaginary or speculative." Younger, 401 U.S. at 42. Therefore, Plaintiffs have standing against Defendant Boston.

### 2. *Standing to Bring Count II: Due Process/Vagueness Claim*

Count II of Plaintiffs' Complaint states:

> It is unclear if and/or how the new definitions in Section 3 of H.B. 481 effectively amend other provisions of the Official Code of Georgia Annotated that include the term "person" and/or "human being." These terms appear in the Code hundreds of times, and they are included in sections of the code that set forth the scope of, *inter alia*, criminal acts and civil liability. These provisions and others, as amended by the new definitions in Section 3 of H.B. 481, make it impossible for pregnant women and medical providers to know what actions are forbidden or required, and thus do not provide adequate guidance as to how they can comply with the law.

21

Doc. No. [1], p. 35, ¶¶ 76–77. Plaintiffs argue that, because they are unable to determine what conduct might expose them to prosecution or liability under the Code, as amended by Section 3 of H.B. 481, the law violates "rights secured to them by the Due Process guarantees of the Fourteenth Amendment to the United States Constitution." Id. ¶ 79. The State Defendants counter that, "even if the Act makes other statutes vague or unclear, Plaintiffs have not identified any concrete, non-speculative 'course of conduct' that they plan to take that would create a 'credible threat of prosecution' under those statutes," and that they therefore lack standing to raise a vagueness claim. Doc. No. [74], pp. 18–19.

To establish standing to bring a vagueness challenge, Plaintiffs must show that (1) [they] ha[ve] suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the [statute]; and (3) a favorable judgment is likely to redress the injury." Harrell v. The Fla. Bar, 608 F.3d 1241, 1253 (11th Cir. 2010) (citing Kelly v. Harris, 331 F.3d 817, 819–20 (11th Cir. 2003)).

In fact, Plaintiffs have identified several services their practitioners provide that might expose them to liability under statutes amended by Section 3's new personhood definition. Plaintiffs regularly provide treatment

22

such as miscarriage management, cancer treatment, amniocenteses, and hormone therapy, all of which may affect a patient's pregnancy. Doc. No. [87], p. 9.[7] Plaintiffs are thus unsure whether providing such services may now violate statutes like the reckless conduct statute, O.C.G.A. § 16-5-60, which makes it a criminal offense to "cause bodily harm or to endanger the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that [the] act or omission will cause harm or endanger the safety of another person." Id. It remains unclear what kind of conduct might be

_____

[7] The Court notes that Plaintiff SisterSong, unlike the other Plaintiffs, does not provide medical services. However, the Supreme Court has long recognized that an organization has standing to raise claims on behalf of its members when its members are suffering immediate or threatened injury and would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to their organization's purpose and neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. See Warth v. Seldin, 422 U.S. 490, 511 (1975); Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 342–43 (1977). "A membership organization, SisterSong organizes with a large base whose members include Georgians who can become pregnant and need the freedom to make their own health care decisions, including the decision to end a pregnancy." Doc. No. [1], p. 6, ¶ 10. Plaintiff SisterSong's members thus suffer immediate or threatened injury. The interests implicated here are germane to the organization's purpose of protecting "the human right to reproductive justice," id., and the preliminary injunction requested does not require participation of individual members in the lawsuit. Plaintiff SisterSong therefore meets the standing requirements of Warth and Hunt.

prosecuted for presenting a "substantial and unjustifiable risk" of causing harm to or endangering the safety of a developing fetus. Id.

Plaintiffs also argue that practitioners could now be liable for failing to report conduct that might harm a developing fetus under the child abuse statute, O.C.G.A. § 19-7-5, which makes physicians mandatory reporters.[8] Other statutes which Plaintiffs argue would be implicated are O.C.G.A. §§ 16-5-70 (cruelty to children), 16-5-21 (aggravated assault) and 16-12-171 (sale or distribution to, or possession by, minors or cigarettes and tobacco related products).

Furthermore, to the extent Plaintiffs are forced to hypothesize about ways in which their conduct might violate statutes amended by the new personhood definition, it is precisely *because* application of the new personhood definition is vague and unclear. Defendants have not denied that the above statutes might now criminalize conduct Plaintiffs engage in—they only argued that those statutes would not apply to abortions performed before fetal cardiac

---

[8] For example, in oral argument, Plaintiffs argued that a physician might be criminally liable for failing to report a pregnant patient living with an abusive partner. That conduct could now be characterized as "endangering a child" under O.C.G.A. § 19-7-5(b)(6.1).

activity is detectable. Doc. No. [74], p. 20. The degree to which *other* medical

treatment provided after detectable fetal cardiac activity is implicated by the

amended statutes remains unclear.

Application of Section 3's personhood definition to other Georgia laws

"makes it impossible for [P]laintiffs to do their work with 'fair notice of conduct

that is forbidden or required.'" Doc. No. [87], p. 9 (quoting FCC v. Fox

Television Stations, Inc., 567 U.S. 239, 253 (2012). They have thus shown that

they have "suffered, or imminently will suffer, an injury-in-fact." Harrell, 608

F.3d at 1253. This "injury is fairly traceable to the operation" of H.B. 481 because

the uncertainty is rooted in how the Section 3 personhood definition might be

applied to other civil and criminal statutes. Id. Finally, "a favorable judgment

is likely to redress the injury" because a preliminary injunction halts

implementation of H.B. 481, including Section 3's personhood definition. Id.

Therefore, Plaintiffs have standing to raise their vagueness claim.

### B.   Eleventh Amendment Immunity

In her response to Plaintiffs' Motion for Preliminary Injunctive,

Defendant Boston argues that Plaintiffs cannot overcome her established right

(as a state official) to immunity under the Eleventh Amendment.  Doc. No. [71],

pp. 2–3. Defendant Boston recognizes the *Ex parte* Young injunctive relief

exception to Eleventh Amendment immunity, but asserts that the "exception only applies to state officials who are 'clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act.'" Doc. No. [71], p. 15. Defendant Boston argues that because she "has not enforced or even threatened to enforce H.B. 481 against any of the Plaintiffs, she thus enjoys Eleventh Amendment immunity from Plaintiffs' claims." Id. p. 16.

"The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state [and its officers], except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity." Cross v. Ala. State Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1502 (11th Cir. 1995) (citations omitted); see U.S. Const. amend. XI ("[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . .").[9]

---

[9] Eleventh Amendment immunity is a threshold issue that is "in the nature of a jurisdictional bar" to be decided early in the litigation. Bouchard Transp. Co. v. Fla. Dep't of Envtl. Prot., 91 F.3d 1445, 1448 (11th Cir. 1996).

26

"Under the doctrine enunciated in _Ex parte_ Young, 209 U.S. 123 (1908), . . . . a suit alleging a violation of the federal constitution against a state official in [her] official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment."  Grizzle v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2011) (citations omitted); see also Alden v. Maine, 527 U.S. 706, 756–57 (1999) ("The rule [of sovereign immunity], however, does not bar certain actions against state officers for injunctive or declaratory relief.") and Will, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'").

"[A] court need only conduct a 'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 636 (2002); cf. League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 474 (6th Cir. 2008) (indicating that the focus of the inquiry into whether suit lies under _Ex parte_ Young is on the allegations of the complaint only).  "Prospective relief is designed to avoid future harm." Luckey

v. Harris, 860 F.2d 1012, 1017 (11th Cir. 1988) (citing Swift & Co. v. United States, 276 U.S. 311, 326 (1928)).

As correctly noted by Plaintiffs, in Summit Medical Associates., P.C. v. Pryor, 180 F.3d 1326 (11th Cir. 1999), the Eleventh Circuit rejected an argument that was similar to the one presently raised by Defendant Boston. In the Summit case, the Eleventh Circuit considered a challenge to an Alabama abortion ban. The State Defendants asserted an Eleventh Amendment defense, which the district court rejected under the *Ex parte* Young exception.  180 F.3d at 1333.  In affirming the district court, the Eleventh Circuit noted that the plaintiffs "unquestionably [sought] prospective relief—a declaratory judgment that the partial-birth and post-viability abortion statutes are unconstitutional." Id. at 1339. The Eleventh Circuit also held that the plaintiffs "sufficiently alleged an ongoing and continuous violation of federal law," even though the State Defendants had not yet initiated prosecution or specifically threatened the plaintiffs with prosecution. Id. at 1339. In doing so, the Eleventh Circuit appeared to recognize that any enforcement directive could be withdrawn.  Id.

Similarly, here, in their Complaint, Plaintiffs unquestionability seek prosecutive relief and sufficiently allege an ongoing and continuous violation

of federal law. Plaintiffs' claims against Defendant Boston fall within the *Ex parte* Young exception and Defendant Boston's arguments to the contrary, fail.

## III.   DISCUSSION

### A.   Preliminary Injunction

Turning now to the motion currently before the Court, Plaintiffs seek immediate relief from this Court in the form of a preliminary injunction. Doc. No. [24]. The Court may grant a preliminary injunction only if: (1) Plaintiffs have a substantial likelihood of success on the merits; (2) Plaintiffs will suffer irreparable injury without injunctive relief; (3) the injury to Plaintiffs outweighs the damage caused to Defendants; and (4) an entry of relief in Plaintiffs' favor is in the public interest. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998). Further, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'"[10]

---

[10] In the case *sub judice*, the Court has reviewed the Plaintiffs' Verified Complaint, which serves as the equivalent of an affidavit. See Sears v. Roberts, 922 F.3d 1199, 1206 (11th Cir. 2019) and Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014). The Court has also reviewed the declaration of Plaintiffs' Counsel, Sean Young, and certified transcripts of the relevant Georgia General Assembly

Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995).

The Court now addresses each of the four factors in turn.

        **1.**    *Substantial Likelihood of Success on the Merits*

        **i.**    <u>**Count I: Substantive Due Process**</u>

The Court first concludes, based on current Supreme Court precedent, that Plaintiffs are likely to succeed on the merits of Count I of their Complaint.

In Count I of their Verified Compliant, Plaintiffs argue that, "[b]y prohibiting an individual from making the ultimate decision whether to continue or to terminate a pregnancy prior to viability, H.B. 481 violates Georgians' right to privacy and liberty secured by the Fourteenth Amendment to the United States Constitution." Doc. No. [1], p. 34, ¶ 73. Before the Supreme Court's decision in <u>Casey</u>, a plaintiff bringing a facial challenge to a statute had the difficult burden of establishing "that no set of circumstances exists under which the Act would be valid." <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1986) (applying the "no set of circumstances" test to a facial challenge to the Bail Reform Act of 1984). However, the plurality in <u>Casey</u> enunciated a more relaxed standard for facial challenges to abortion laws: if "in a large fraction of

---

proceedings attached as exhibits to Plaintiffs' Motion for Preliminary Injunction. Doc. No. [24].

the cases in which the [abortion law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion," the law is invalid. 505 U.S. at 895. "[I]n considering facial challenges to abortion restrictions, every circuit, with one exception, has applied <u>Casey</u>'s test rather than <u>Salerno</u>'s more restrictive 'no set of circumstances' test." <u>Cincinnati Women's Servs. v. Taft</u>, 468 F.3d 361, 367 (6th Cir. 2006) (citations omitted).[11]

The Verified Complaint states that, because "[p]rior to and even after six weeks lmp, many women do not know they are pregnant," "[t]he great majority of abortion patients are simply not able to confirm a pregnancy and schedule and obtain an abortion before 6 weeks lmp." Doc. No. [1], p. 24, ¶¶ 51–52. This is why "[t]he great majority of abortions take place at or after

---

[11] The Court notes that the State Defendants also cite <u>Salerno</u> in the vagueness section of their Response Brief. Doc. No. [74], p. 19. Defendants confuse Plaintiffs' vagueness challenge with their facial 14th Amendment challenge. As discussed above, the question of whether <u>Salerno</u> should apply or whether that rule has been replaced by <u>Casey</u>'s "large-fraction test" applies to Plaintiffs' claim that the statute is facially unconstitutional. "The 'void for vagueness' argument is an entirely separate issue for which the test, in its simplest terms, is whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly.'" <u>Evans v. Kelley</u>, 977 F. Supp. 1283, fn.27 (E.D. Mich. 1997) (citing <u>Grayned v. City of Rockford</u>, 408 U.S. at 108). "Defendants have not cited, and the Court has not found, any 'void for vagueness' cases in which a statute or ordinance withstands a void for vagueness challenge and is found to be constitutional because the statute might not be vague in 'some particular circumstances.'" <u>Id.</u>

six weeks lmp." Id. ¶ 54. "In a typically developing embryo, cells that eventually form the basis for development of the heart later in pregnancy produce cardiac activity that is generally detectible—via ultrasound—beginning at approximately six weeks lmp." Id. ¶ 50. Plaintiffs have therefore met their burden of showing that H.B. 481, in prohibiting abortions after a fetal heartbeat is detectable, would operate as "a substantial obstacle to a woman's choice to undergo an abortion" in "a large fraction" of relevant cases. Casey, 505 U.S. at 895.

Furthermore, as discussed above in detail, the Supreme Court has repeatedly and unequivocally held that a State may not ban abortion prior to viability. See, e.g., Casey, 505 U.S. at 879 ("[A] State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."); Roe, 410 U.S. at 153–54; see also Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2299 (2016); Stenberg, 530 U.S. at 921. By prohibiting abortions once a fetal heartbeat is detected, months before the point of viability, Section 4 of H.B. 481 does exactly that.

In the face of this clear Supreme Court precedent, established nearly a half-century ago in Roe and reaffirmed decades later in Casey and subsequent cases, the State Defendants insist that the law on this matter is "unsettled."

Doc. No. [74], p. 10. The Court, however, disagrees. The State Defendants further insist that the Supreme Court has recognized the State's interest in protecting the life of the unborn and that the "precise contours" of that interest remain undefined. Id. at p. 3. What is clearly defined, however, is that under no circumstances whatsoever may a State prohibit or ban abortions at any point prior to viability, no matter what interests the State asserts to support it. See Casey, 505 U.S. at 846, 879 ("Before viability, the State's interest are not strong enough to support a prohibit of abortions . . . . [A] State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.").

The Court also notes that several lower and intermediate federal courts have uniformly and repeatedly struck down similar attempts to ban abortions prior to viability. See, e.g., Stenehjem, 795 F.3d at 773 (North Dakota fetal heartbeat law was an unconstitutional prohibition on pre-viability abortions); Edwards v. Beck, 786 F.3d 1113, 1117 (8th Cir. 2015), cert. denied, 136 S.Ct. 895 (2016) (Arkansas law prohibiting abortions where fetal heartbeat was detected and gestational age was 12 weeks or more was unconstitutional); Isaacson v. Horne, 716 F.3d 1213, 1227 (9th Cir. 2013), cert. denied, 134 S.Ct. 905 (2014) (Arizona law prohibiting abortions at 20 weeks gestational age was

unconstitutional); <u>Preterm-Cleveland v. Yost</u>, No. 1:19-cv-00360 (S. D. Ohio Sept. 3, 2019) (order granting preliminary injunction) (finding plaintiffs were likely to prove Ohio heartbeat bill was an unconstitutional prohibition on pre-viability abortions); <u>Jackson Women's Health Org. v. Dobbs</u>, No. 3:18-cv-171-CWR-FKB (S.D. Miss. May 24, 2019) (order granting preliminary injunction) (finding Plaintiffs were likely to prove Mississippi heartbeat bill was an unconstitutional prohibition on pre-viability abortions); <u>EMW Women's Surgical Ctr. v. Beshear</u>, 2019 WL 1233575, No. 3:19-cv-178-DJH (W.D. Ky. March 15, 2019) (order granting temporary restraining order) (finding Plaintiffs had a strong likelihood of success on the merits of their constitutional objection to Kentucky abortion bill); <u>Planned Parenthood of Ind. And Ky., Inc. v. Comm'r Ind. Dep't of Health</u>, 194 F.Supp.3d 818 (S.D. Ind. 2016) (order granting preliminary injunction) (holding that plaintiffs were likely to succeed on the merits of their constitutional objections to the Indiana abortion bill).

The State Defendants' attempt to characterize H.B. 481's pre-viability abortion ban as merely a pre-viability abortion "restriction" is equally unavailing. Doc. No. [74], p. 9 (citing <u>Gonzales</u> in support of their argument that "the Supreme Court has never held that a pre-viability abortion restriction is *per se* unlawful"). By banning abortions after a fetal heartbeat is detected, H.B.

34

481 prohibits women from making the ultimate decision to terminate her pregnancy at a point before viability. See, e.g., Edwards, 786 F.3d at 1117 (rejecting the assertion that a twelve-week ban is a "regulation, not a ban"). H.B. 481's limited exceptions do not save it from being an otherwise unconstitutional pre-viability abortion ban. See Casey, 505 U.S. 846, 879; see also W. Ala. Women's Ctr., 299 F. Supp. 3d at 1283.

Moreover, aside from the pre-viability abortion ban in Section 4, Plaintiffs correctly point out that Section 3 of H.B. 481 faces a different yet equally concerning problem. Doc. No. [24-1], pp. 7–8. Section 3 amends O.C.G.A. § 1-2-1 by redefining "natural person" to include "any human being including an unborn child" and by defining "unborn child" as an embryo/fetus "at any stage of development who is carried in the womb." H.B. 481 § 3. This precise definition, however, was considered and rejected by the Supreme Court in Roe. Specifically, in Roe, the Supreme Court considered whether a "person," as used in the Fourteenth Amendment, includes an unborn child. 410 U.S. at 157. The Court noted that the Fourteenth Amendment speaks only of persons "born or naturalized in the United States," and that the use of the word has application only postnatally. Id. Therefore, the Court in Roe ultimately concluded that the word "person" does not include the unborn and, thus,

rejected the notion that an embryo/fetus is entitled to Fourteenth Amendment protection. Id. at 158.

Ultimately, the State Defendants fail to refute the critical fact that H.B. 481, by prohibiting a woman from terminating her pregnancy after a fetal heartbeat is detected, bans abortions prior to the point of viability. As this prohibition is in direct conflict with current Supreme Court precedent, which this Court is bound by and must follow, Plaintiffs have therefore established a substantial likelihood of success on the merits with respect to Count I.

### ii.    Count II: Due Process/Vagueness

The Court also concludes that Plaintiffs are likely to succeed on the merits of Count II of their Complaint.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). There are two kinds of statutes which are unconstitutionally vague. First, laws that fail to give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited" are unconstitutionally vague. Id. (footnotes omitted). Second, because "laws must provide explicit standards for those who apply them," a law is unconstitutionally vague if it "impermissibly delegates basic policy matters to

36

policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." Id. at 108–09 (footnotes omitted). The Supreme Court has "recognized recently that the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" Kolender v. Lawson, 461 U.S. 352, 357–58 (1983) (quoting Smith v. Goguen, 415 U.S. 566, 574 (1974)).

Defendants argue that H.B. 481 cannot be vague, as its personhood definition is "clear and straightforward": "'Natural person' means any human being including an unborn child," and "unborn child" is defined as "a member of the species Homo sapiens at any stage of development who is carried in the womb." Doc. No. [74], p. 20; H.B. 481 § 3(b). But Plaintiffs do not argue that the definition itself is vague. Rather, they object to application of the new definition throughout the Code.

Section 3 amends "Chapter 2 Title 1 of the O.C.G.A., relating to persons and their rights . . . by revising Code Section 1-2-1." H.B. 481 § 3(b). O.C.G.A. § 1-2-1 defines "natural persons," which would now mean "any human being including an unborn child." Id. O.C.G.A. § 1-3-2 states: "As used in this Code or in any other law of this state, defined words shall have the

37

meanings specified, unless the context in which the word or term is used clearly requires that a different meaning be used." Defendants have not contested that H.B. 481 § 3(b) will thus amend any Georgia statute which includes the term "natural person" or "human being."

Instead, Defendants argue that Plaintiffs' argument rests on a "highly implausible reading of the relevant statutes." Doc. No. [74], p. 20. For example, because "[p]re-heartbeat abortions were legal in Georgia both before and after the enactment of [H.B. 481]," and the reckless conduct statute criminalizes only conscious disregard of unjustifiable risks of harm, "no citizen could reasonably believe that pre-heartbeat abortions could be prosecuted" as unjustifiable. Id. at 20–21. As for the applicability of the aggravated assault statute, Defendants note that O.C.G.A. § 16-5-21 expressly excludes abortions. See Doc. No. [74], p. 21.

By making these arguments, Defendants acknowledge that Section 3's personhood definition will change the operation of each Code section including "natural person" or "human being." They argue that pre-cardiac activity abortions will not be prosecuted under the reckless conduct or aggravated assault statutes. However, they have failed to address (1) post-cardiac activity, pre-viability abortions, (2) *any other* medical procedure which has potential to

38

adversely affect a patient's pregnancy—either before or after fetal cardiac activity is detectable, or (3) other statutes including "natural person" which might now prohibit conduct which was not prohibited previously.

These unanswered questions leave Plaintiffs unclear as to "whether and when clinicians could face criminal prosecution" for providing comprehensive gynecological care, "including family planning, abortion, miscarriage management, hormone therapy, and cancer screening and treatment." Doc. No. [87], p. 8–9. Plaintiffs have thus met their burden of a likelihood of success on the merits of their claim that Section 3(b) lacks "sufficient definiteness [so] that ordinary people can understand what conduct is prohibited." Kolender, 461 U.S. at 357.

Plaintiffs also have a likelihood of success in showing that Section 3's personhood definition leaves them open to arbitrary or discriminatory enforcement. Where a "statute permit[s] 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections,'" it is unconstitutionally vague. Kolender, 461 U.S. at 358 (quoting Smith, 415 U.S. at 575). For example, while it is Defendants' position that pre-heartbeat abortions would be "justifiable," and therefore not criminally reckless, the personhood definition explicitly includes fetuses at all stages of development. See H.B. 481

§ 3(b). This means an individual prosecutor who believed a pre-heartbeat abortion is unjustifiable would have authority under the statute to press charges against the practitioner—Defendants' current litigation position notwithstanding. H.B. 481 § 3(b) changes the definition of a natural person in Georgia, but Defendants have been unable to point to any guidance for law enforcement or the judiciary on how to implement that change throughout the Code.[12]

### 2.    *Irreparable Harm*

Plaintiffs have also shown that, absent a preliminary injunction, they will suffer irreparable harm. By banning pre-viability abortions, H.B. 481 violates the constitutional right to privacy, which, in turn, inflicts *per se* irreparable harm on Plaintiffs. See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of [F]irst [A]mendment and right of

---

[12] The current disagreement among Georgia District Attorneys as to the constitutionality of H.B. 481 suggests that different prosecutors might take very different stances regarding enforcement of criminal laws implicated by Section 3's personhood definition. Compare Doc. No. [71] (Defendant Boston's Response in Opposition to Plaintiffs' Motion for Preliminary Injunction) with Doc. No. [75] (Defendant Howard's Response to Plaintiffs' Motion for Preliminary Injunction).

privacy jurisprudence."). "[T]he right of privacy must be carefully guarded for once an infringement has occurred it cannot be undone by monetary relief." Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B. 1981). Accordingly, "courts presume that violations to the fundamental right to privacy are irreparable." Planned Parenthood, Se., Inc. v. Bentley, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) (citing Deerfield, 661 F.2d at 338 (finding a conclusion that the constitutional right to privacy was threatened by ban on abortions facilities "mandates a finding of irreparable injury")). Accordingly, the Court finds that this factor weighs in favor of Plaintiffs.

### 3.    *Balance of Hardships*

Plaintiffs argue that, while they "and their patients will suffer numerous irreparable harms without an injunction, Defendants will suffer no injury whatsoever" because Plaintiffs seek only to "preserve the status quo of nearly five decades." Doc. No. [24-1], p. 23. The Court agrees. To be sure, Casey recognized the State's "important and legitimate interest in preserving and protecting the health of the pregnant woman [and] in protecting the potentiality of human life." 505 U.S. at 875–76 (quoting Roe, 410 U.S. at 162). However, Casey was clear that "weight [of the State's interest] is *insufficient* to justify a ban on abortions prior to viability even when it is subject to certain

41

exceptions." Id. (emphasis added). Because a preliminary injunction preserves the status quo before the entry of a final order, see Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1990), Plaintiffs' requested relief will leave the Defendants in the same position they occupy now, and have occupied for nearly 50 years. This factor weighs in favor of Plaintiffs. See also Preterm-Cleveland v. Yost, No. 1:19-cv-00360 (S. D. Ohio Sept. 3, 2019) (order granting preliminary injunction).

### 4.   *Public Interest*

"The public interest is promoted by the robust enforcement of constitutional rights." See id. (quoting Am. Freedom Def. Initiative v. Suburban Mobility Auth. For Reg'l Transp., 698 F.3d 885, 896 (6th Cir. 2012)). It is in the public interest, and is this Court's duty, to ensure constitutional rights are protected. Because "the constitutional liberty of the woman to have some freedom to terminate her pregnancy" is implicated here, and because a preliminary injunction preserves the status quo, the public interest factor weighs in favor of Plaintiffs. Casey, 505 U.S. at 869.

### B.   Severability

In their response in opposition to Plaintiffs' Motion for Preliminary injunction, the State Defendants argue that the requested injunction is "grossly overbroad" and that there is no basis for enjoining anything beyond H.B. 481's

limitations on abortion. Doc. No. [74], pp. 5, 24. Defendants assert that even if

other sections of H.B. 481 are declared invalid, Section 5 (pertaining to child

support), Section 6 (pertaining to tort recovery), and Section 12 (pertaining to a

tax exemption) are not unconstitutional and severable.  Doc. No. [74], p. 24.  In

support of their argument, Defendants reference the severability clause

contained in H.B. 481, Section 14.  Id.  Said clause states in relevant part:

"All provisions of this Act shall be severable in accordance with Code

Section 1-1-3."[13]

---

[13] O.C.G.A. § 1-1-3 pertains to invalid or unconstitutional code provisions and
states in relevant part:

> Except as otherwise specifically provided in this Code or
> in an Act or resolution of the General Assembly, in the
> event any title, chapter, article, part, subpart, Code section,
> subsection, paragraph, subparagraph, item, sentence,
> clause, phrase, or word of this Code or of any Act or
> resolution of the General Assembly is declared or
> adjudged to be invalid or unconstitutional, such
> declaration or adjudication shall not affect the remaining
> portions of this Code or of such Act or resolution, which
> shall remain of full force and effect as if such portion so
> declared or adjudged invalid or unconstitutional were not
> originally a part of this Code or of such Act or resolution.
> The General Assembly declares that it would have enacted
> the remaining parts of this Code if it had known that such
> portion hereof would be declared or adjudged invalid or
> unconstitutional. The General Assembly further declares
> that it would have enacted the remaining parts of any
> other Act or resolution if it had known that such portion

"Severability is . . . a matter of state law." <u>Leavitt v. Jane L.</u>, 518 U.S. 137,

139 (1996). The Supreme Court of Georgia has stated:

> It is generally held that a saving (severability)
> clause . . . is only an aid to construction, and is not an
> absolute command. It merely creates a presumption
> in favor of separability, and does not authorize the
> court to give to the statute an effect altogether
> different from that sought by it when considered as a
> whole. It in no way alters the rule that in order to hold
> one part of a statute unconstitutional and uphold
> another part as separable, they must not be mutually
> dependent upon each other.

<u>City Council of Augusta v. Mangelly</u>, 243 Ga. 358, 363, 254 S.E.2d 315, 320 (1979)

(citing <u>Carter v. Carter Coal Co.</u>, 298 U.S. 238 (1936)) (quotations omitted).

A review of Sections 5, 6, and 12 shows that they each contain language

that references the definition of a "detectable human heartbeat, as such term is

defined in Code Section 1-2-1," which is Section 3 of H.B. 481.  Doc. No. [1],

pp. 44, 47. In other words, Sections 5, 6, and 12 are mutually dependent on

Section 3 of H.B. 481. If Section 3 is subject to the injunction, Sections 5, 6, and

---

> thereof would be declared or adjudged invalid or
> unconstitutional unless such Act or resolution contains an
> express provision to the contrary.

O.C.G.A. § 1-1-3.

12 are not complete code sections without the definitional language of Section 3/Code Section 1-2-1.

The Court recognizes the legislative intent to provide the benefits described in Sections 5, 6, and 12. However, those Sections are incomplete without the operative definitional language in Code Section 1-2-1. Without the definition, it is not possible to identify those Georgians who would qualify for the benefits. Accordingly, for purposes of the preliminary injunction, the Court declines to sever any portions of H.B. 481. The entire bill is subject to the injunction.

### C.   Propriety of a Preliminary Injunction

The State Defendants and Defendant Boston challenge the propriety of a preliminary injunction at this stage of the case.  Doc. Nos. [71], p. 23, [72], p. 4. Collectively, these Defendants assert that a preliminary injunction is premature and unnecessary, because a final judgment can be reached in advance of H.B. 481's January 1, 2020 effective date. Id.

In their reply brief, Plaintiffs concede that the case can be resolved expeditiously, but only on the current record, i.e., without the discovery period that Defendants have requested in the Joint Preliminary Report.  Doc. No. [90].

As stated at the hearing, this Court has determined that discovery is appropriate for this case and that the four-month discovery track provided for by the Court's Local Rules is applicable. To this regard, final judgment will not be reached in advance of H.B. 481's effective date and injunctive relief is appropriate to maintain the status quo of the parties during the pendency of this lawsuit. See Cate v. Oldham, 707 F.2d 1176, 1185 (11th Cir. 1983) ("maintenance of the status quo is the primary purpose of preliminary injunctive relief . . . .") and Reprod. Health Servs. of Planned Parenthood v. Parson, 389 F. Supp. 3d 631, 637 (W.D. Mo. 2019) ("Enjoining new legislation pending litigation and before the effective date seems to be a method of preserving the status quo during the pendency of the lawsuit.").

## IV.    CONCLUSION

For the foregoing reasons, and in light of binding precedent, the Court determines that Plaintiffs have met their burden for the issuance of a preliminary injunction.  Therefore, the Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction. Doc. No. [24]. The Court hereby **ORDERS** that Defendants, and all their respective officers, successors in office, agents, servants, employees, attorneys, and persons acting in concert or participation with them, are **PRELIMINARILY ENJOINED** from enforcing H.B. 481

(Georgia General Assembly 2019–20 Legislative Session). This preliminary injunction remains in effect until further order from this Court. As a result, the State of Georgia's abortion laws that were in effect prior to the passage of H.B. 481 remain in effect.

Consistent with the foregoing reasons and in the absence of a request from Defendants, the Court, in the exercise of its discretion, waives the bond requirement set forth in Federal Rule of Civil Procedure 65(c).[14]

**IT IS SO ORDERED** this 1st day of October, 2019.

s/Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

---

[14] "[I]t is well-established that 'the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.'" BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 971 (11th Cir. 2005).