**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| SISTERSONG WOMEN OF COLOR REPRODUCTIVE JUSTICE COLLECTIVE *et al*., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 1:19-cv-02973-SCJ |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIAN KEMP *et al*., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
<u>PERMANENT INJUNCTION</u>**

## INTRODUCTION

H.B. 481 flies in the face of nearly a half century of Supreme Court precedent, beginning with *Roe v. Wade*, 410 U.S. 133 (1973). As this Court has already recognized in entering a preliminary injunction, it is bound by that precedent to hold that the State may not ban abortion before the point of fetal viability. Order ("PI Order") at 11, 39, ECF No. 97. With H.B. 481, the State "does exactly that." *Id.* at 32. Discovery is now closed. It is undisputed that H.B. 481 is a pre-viability abortion ban; as such, it is unconstitutional as a matter of law and should be enjoined permanently.

The Constitution protects the right to abortion because it involves one of "the most intimate and personal choices a person may make in a lifetime." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992). The Supreme Court has long recognized and repeatedly affirmed that the right to abortion—and to "retain the ultimate control over her destiny and her body," *id.* at 869—is essential to a person's dignity, equality, and ability to shape a meaningful life. *See id.* at 851. These freedoms lie at the core of Due Process. *Id.*

Georgia should be seeking to vindicate the rights of its citizens and supporting their access to the reproductive care they seek, whether that care is to terminate a pregnancy or to ensure a healthy pregnancy and safe birth. Instead,

H.B. 481 actively seeks to limit the reproductive lives of Georgians by erecting an insurmountable barrier to abortion care and adding to the many structural, institutional, and cultural barriers that already inhibit access to pregnancy care in the state.[1] For these reasons, H.B. 481 is not just an unconstitutional ban, but an affront to the health and dignity of Georgians.

Additionally, as this Court found in entering the preliminary injunction, the application of H.B. 481's redefinition of the term "natural person" throughout the Official Code of Georgia ("the Code") to include an embryo/fetus "at any stage of development" in utero is unconstitutionally vague: it both "lacks 'sufficient definiteness [so] that ordinary people can understand what conduct is prohibited'" and "leaves [Plaintiffs] open to arbitrary or discriminatory enforcement." PI Order at 39–40 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Finally, because the unconstitutional provisions of H.B. 481 are central to the statute as a whole, H.B. 481 should be enjoined in its entirety. PI Order at 44–45.

---

[1] The language in H.B. 481 explicitly speaks of women, but people of all gender identities, including transgender men and gender-diverse individuals, may also become pregnant and seek abortion services and other care while pregnant, and would thus also suffer irreparable harm under H.B. 481.

## BACKGROUND

## I.  ABORTION CARE AND MATERNAL HEALTH

Approximately one in four women in this country will have an abortion by age forty-five. Pls.' Statement of Undisputed Material Facts (hereinafter "Facts"), attached hereto as Ex. A, ¶ 18. Women have varying motivations for seeking abortions. *Id.* ¶ 17. A majority of them (61%) already have at least one child, while most (66%) also plan to have a child or additional children in the future. *Id.* ¶ 19.

There were approximately 34,000 abortions in Georgia in 2018, the last year for which numbers are available. *Id.* ¶ 20. Approximately 87% of them took place at or after 6.0 weeks from the first day of a patient's last menstrual period ("lmp"),[2] *id.* ¶ 22—the point at which Section 4 of H.B. 481 would ban abortion.

In a typically developing embryo, cells that eventually form the basis for development of the heart later in pregnancy produce cardiac activity that is generally detectable via vaginal ultrasound starting at approximately 6.0 weeks

---

[2] Clinicians measure pregnancy from the first day of a patient's last menstrual period ("lmp"). Facts ¶ 21. They also generally date pregnancy (i.e., indicate how far along the pregnancy has advanced) with the weeks before the decimal point and the days after: for example, "6.2 weeks lmp" means six weeks and two days after the patient's lmp. *Id*. A full-term pregnancy is approximately forty weeks lmp. *Id*.

lmp.[3] *Id.* ¶ 25. Viability—the point at which a healthy, singleton fetus has a reasonable likelihood of sustained survival outside the uterus, with or without artificial aid, *Casey*, 505 U.S. at 870—does not occur until months after cardiac activity is detectable. Facts ¶ 27.

Fertilization typically occurs two weeks after the start of a patient's last menstrual period. *Id.* ¶ 23. For patients with fairly regular, four-week menstrual cycles, six weeks lmp is a mere two weeks after they will have missed their period. *Id*. Some patients have irregular cycles, or regular cycles of different lengths, *id.*, which means they may not realize they have missed a period before six weeks lmp. Thus, it is unsurprising that the great majority of abortions—approximately 87% of abortions in Georgia—take place at or after six weeks lmp. *See id.* ¶ 22.

In some cases of miscarriage before viability, cardiac activity persists while the patient passes embryonic/fetal tissue, or when cervical dilation makes pregnancy loss inevitable. *Id.* ¶ 29. In those cases, some physicians determine that it is medically appropriate to offer the patient treatment to empty her uterus. *Id*. Additionally, other forms of medical care aside from abortion and miscarriage management can harm or end a pregnancy. *Id.* ¶ 28.

---

[3] While Plaintiffs' maintain that cardiac activity is generally detectable at 6.0 weeks lmp, and may be detectable a few days earlier, State Defendants' position is that it is detectable by approximately 6–7 weeks lmp. *Id.* ¶ 26.

## II. STATUTORY FRAMEWORK AND OPERATION OF H.B. 481

H.B. 481 criminalizes the vast majority of abortion care and would prevent medical providers from offering other medically-appropriate treatment to pregnant patients who need it. In addition to banning pre-viability abortions outright, H.B. 481 also amends hundreds of provisions of the Code in a manner that threatens all medical care that could harm an embryo/fetus.

Section 4 of H.B. 481 bans abortion once there is "a detectable human heartbeat," defined as "embryonic or fetal cardiac activity." H.B. 481 §§ 4(a)(2), (b). H.B. 481 itself makes clear that Section 4 will ban abortion this early in pregnancy. *See id.* § 8 ("*As early as six weeks gestation*, an unborn child may have a detectable human heartbeat." (emphasis added)).[4]

Section 4's affirmative defenses allow an accused "woman [who] sought an abortion" to prove that "she reasonably believed than an abortion was the only way to prevent a medical emergency," and allow an accused physician, nurse, physician assistant or pharmacist to prove that she "provide[d] care for a pregnant woman

---

[4] Section 4 has three extremely narrow exceptions. It allows abortion after cardiac activity is detectable only when: (1) abortion is necessary to prevent death or "substantial and irreversible impairment of a major bodily function"; (2) the pregnancy is a result of rape or incest that has been reported to the police; or (3) there is a "profound and irremediable congenital or chromosomal anomaly that is incompatible with sustaining life after birth." H.B. 481 §§ 4(a), (b).

which result[ed] in the accidental or unintentional injury or death of an" embryo/fetus. *id.* § 4(h). Thus, under Section 4, medical professionals providing care to a pregnant patient that harms an embryo/fetus could be charged for that conduct, even if the resulting harm to the embryo/fetus was accidental or incidental to other treatment. Those who are prosecuted as a result of offering such care would be forced to raise and prove as an affirmative defense that the impact on the pregnancy was accidental.

The consequences of violating Section 4 include imprisonment of one to ten years, O.C.G.A. § 16-12-140(b), licensing penalties up to and including license revocation, H.B. 481 § 10(B); O.C.G.A. §§ 43-34-8(a)(7), (8), and civil actions by patients, H.B. 481 § 4(g).

Section 3 of H.B. 481, which amends Title I of the Code, sets forth definitions of "Persons and their Rights" that apply throughout the civil and criminal Codes. It redefines "natural person" to include "an unborn child," defined as an embryo/fetus "at any stage of development" in utero ("Personhood Definition"). H.B. 481 §§ 3(b), (e)(2). Section 3's Personhood Definition amends hundreds of Code provisions that contain the terms "person" and "human being." This amendment of the Code threatens an array of medical care for pregnant patients that can harm an embryo/fetus. *See* Facts ¶ 28. In addition to abortion and

miscarriage care, cancer treatment, amniocentesis, and hormone therapy all may affect a patient's pregnancy and are implicated by Section 3's amendment of the Code. PI Order at 23; *see also* Facts ¶ 28. Thus, medical providers face the threat of criminal prosecution for the provision of a wide variety of health care.

## III.   PROCEDURAL HISTORY

Plaintiffs are SisterSong Women of Color Reproductive Justice Collective ("SisterSong"), seven reproductive health care clinics, and three individual physicians. Facts ¶¶ 2–4. SisterSong's members include Georgians who can become pregnant and need the freedom to make their own health care decisions, and it is SisterSong's mission to address the barriers that limit the reproductive lives of people of color and indigenous people. *Id.* ¶ 2. Plaintiff clinics provide comprehensive outpatient reproductive health care services, including abortion services, to thousands of patients in Georgia each year. *Id.* ¶ 3. Plaintiff physicians are board-certified obstetrician and gynecologists who provide their patients with labor and delivery care and hospital-based comprehensive obstetric and gynecological care, including abortion care. *Id.* ¶ 4.

After filing this case on June 28, 2019, Plaintiffs moved for a preliminary injunction on July 23, 2019, ahead of H.B. 481's scheduled January 1, 2020 effective date. Pls.' Mot. for a Prelim. Inj., ECF No. 24. The Court held a hearing

on that motion on September 23, 2019, and granted it in its entirety on October 1, 2019, finding Plaintiffs likely to succeed on their substantive due process and vagueness claims. PI Order at 36. In its order, this Court recognized that it "is bound by and must follow" Supreme Court precedent that "has repeatedly and unequivocally held that a State may not ban abortion prior to viability." *Id.* at 36, 32. This Court correctly found that Section 4 would ban abortion "months before the point of viability," *id.* at 32, and so is in "direct conflict with current Supreme Court precedent," *id.* at 36. This Court also found that the Personhood Definition results in "unanswered questions" that "leave Plaintiffs unclear as to whether and when clinicians could face criminal prosecution for providing comprehensive gynecological care" and "leaves [Plaintiffs] open to arbitrary or discriminatory enforcement." *Id.* at 39 (internal quotations omitted). As a result of these findings, this Court held that the Personhood Definition is likely unconstitutionally vague. *Id*. Finally, this Court found that H.B. 481 was nonseverable because the provisions were "mutually dependent" on one another and preliminarily enjoined the statute in its entirety. *Id.* at 44–45.

On December 4, 2019, this Court granted Plaintiffs' motion to preclude discovery on the state's interest in banning abortion prior to viability, Pls.' Mot. to Limit Disc. & for Expedited Consideration, ECF No. 104, recognizing that "the

Supreme Court has repeatedly and unequivocally held that under no circumstances whatsoever may a state prohibit or ban abortions prior to viability, no matter what interests the state asserts to support it." Order at 2–3, ECF No. 115. The parties entered into a series of stipulations and agreed to forego expert reports and discovery. Stipulations Regarding Preclusion of Expert Testimony & Stipulations of Fact, attached to Ex. A (Facts) as Ex. 1.

## STANDARD OF REVIEW

Summary judgment is appropriate where, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact will preclude summary judgment only if the dispute "might affect the outcome of the suit under the governing law." *Id.* "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48; *see also Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990). "An issue is not genuine if it is created by evidence that is 'merely colorable' or is 'not significantly probative.'" *White v. City of Atlanta*, Civ. Action No. 1:08-cv-3584-cc, 2011 WL 13176144, at

*1 (N.D. Ga. Mar. 28, 2011) (quoting *Anderson*, 477 U.S. at 249–50). Here,

Defendants can point to no genuine dispute of material fact, and Plaintiffs are

entitled to judgment as a matter of law. *Tipton v. Bergrohr GMBH-Siegen*, 965

F.2d 994, 998–99 (11th Cir. 1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986)).

## ARGUMENT

## I.  H.B. 481 VIOLATES GEORGIANS' RIGHT TO PRIVACY AS A MATTER OF LAW.

A single undisputed (and indisputable) fact resolves Plaintiffs' privacy

claim: H.B. 481 bans abortion at a pre-viability point in pregnancy. Facts ¶ 27. By

doing so, H.B. 481 is in "direct conflict with Supreme Court precedent." PI Order

at 36. Thus, the statute is unconstitutional as a matter of law.

For nearly five decades, the U.S. Supreme Court has repeatedly and

unequivocally held that a state may not ban abortion at any point prior to viability.

*See*, *e.g.*, *Casey*, 505 U.S. at 789; *Roe*, 410 U.S. at 153–54, 164–65; *see also Whole

Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016); *Stenberg v. Carhart*,

530 U.S. 914, 921 (2000). Since *Roe*, the Supreme Court has repeatedly affirmed

that a "woman's right to terminate her pregnancy before viability is the most

central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we

cannot renounce." *Casey*, 505 U.S. at 871; *see also Whole Woman's Health*, 136 S.

Ct. at 2299. Therefore, a ban on abortion at any point before viability is *per se* unconstitutional because "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey* 505 U.S. at 879.[5]

Accordingly, lower courts have uniformly rejected attempts to ban abortion prior to viability. *See*, *e.g.*, *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 276–77 (5th Cir. 2019) (striking down fifteen-week ban); *MKB Mgmt. Corp v. Stenehjem*, 795 F.3d 768, 772–73 (8th Cir. 2015) (striking down six-week ban based on detectable cardiac activity), *cert. denied*, 136 S. Ct. 981 (2016); *Edwards v. Beck*, 786 F.3d 1113, 1117–19 (8th Cir. 2015) (striking down twelve-week ban), *cert. denied*, 136 S. Ct. 895 (2016); *Isaacson v. Horne*, 716 F.3d 1213, 1217, 1231 (9th Cir. 2013) (striking down twenty-week ban) *cert. denied*, 134 S. Ct. 905

---

[5] As the Ninth Circuit held when evaluating an abortion ban, the undue burden test—which considers whether a *regulation* operates as a "substantial obstacle to a woman's choice to undergo an abortion," *Casey*, 505 U.S. at 895—"has no place where, as here, the state is *forbidding* certain women from choosing pre-viability abortions rather than specifying the conditions under which such abortions are to be allowed." *Isaacson v. Horne*, 716 F.3d 1213, 1225 (9th Cir. 2013); *see also*, *e.g.*, *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 274 (5th Cir. 2019); *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015). In any case, H.B. 481 would also certainly fall if analyzed under the undue burden test because it has the purpose and effect of placing not merely a substantial obstacle, but an absolute obstacle, in the path of Georgians seeking pre-viability abortions. *See Casey*, 505 U.S. at 877; PI Order at 31–32.

(2014); *Jane L. v. Bangerter*, 102 F.3d 1112, 1117–18 (10th Cir. 1996) (striking down twenty-two-week ban), *cert. denied*, 520 U.S. 1274 (1997); *Sojourner T. v. Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992) (striking down total ban), *cert. denied* 507 U.S. 972 (1993); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368–69, 1371–72 (9th Cir. 1992) (same), *cert. denied*, 506 U.S. 1011 (1992); *Robinson v. Marshall*, No. 2:19-cv-365-MHT, 2019 WL 5556198, at *3 (M.D. Ala. Oct. 29, 2019) (preliminarily enjoining total ban); *Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 800–804 (S.D. Ohio 2019) (preliminarily enjoining six-week ban based on detectable cardiac activity); *Jackson Women's Health Org. v. Dobbs*, 379 F. Supp. 3d 549, 552–53 (S.D. Miss. 2019) (same), *appeal docketed*, No. 19-60455 (5th Cir. June 24, 2019); *Bryant v. Woodall*, 363 F. Supp. 3d 611, 630–32 (M.D.N.C. 2019) (striking down twenty-week ban), *appeal docketed*, No. 19-1685 (4th Cir. June 26, 2019); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, No. 3:19-cv-178-DJH, 2019 WL 1233575, at *2 (W.D. Ky. Mar. 15, 2019) (TRO against six-week ban based on detectable cardiac activity).[6]

---

[6] Section 4's narrow exceptions cannot save H.B. 481. "Regardless of whether exceptions are made for particular circumstances, a State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879 (emphasis added); *see also*, *e.g.*, *W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1283 (M.D. Ala. 2017) ("[A] medical exception cannot save an otherwise unconstitutional [abortion] ban.").

Because H.B. 481 undisputedly bans pre-viability abortion, there are no material facts for Defendants to genuinely dispute. Section 4 bans pre-viability abortion by its own terms. Section 3 attempts an end-run around *Roe* by declaring an embryo/fetus a "person" under the Fourteenth Amendment—a notion that *Roe* explicitly rejected, 410 U.S. at 158—thereby criminalizing abortion. *See* PI Order at 38–39 (Defendants argue that Section 3 would not ban abortion before cardiac activity but remain silent as to whether it would ban abortion after cardiac activity). As this Court has already recognized, neither of these provisions can survive constitutional scrutiny. *Id*. at 35–36.

H.B. 481 is plainly unconstitutional under decades of binding precedent, and Plaintiffs are thus entitled to judgment as a matter of law.

## II. H.B. 481 IS UNCONSTITUTIONALLY VAGUE AS A MATTER OF LAW.

HB 481 is unlawful for the additional reason that it is unconstitutionally vague. That H.B. 481's Personhood Definition lacks clarity is apparent on the face of the statute. Thus, there is no genuine dispute of material fact with regard to Plaintiffs' vagueness claim, and this Court needs no other facts to rule that H.B. 481 is unconstitutional as a matter of law.

To overcome vagueness, the "requirement of clarity in regulation is essential," and calls on courts to consider "two connected but discrete due process

concerns." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). First, the law must provide "fair notice" by giving "[a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 112 (1972); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). Second, the law must provide "explicit standards for those who apply them" to avoid "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108; *see also Kolender*, 461 U.S. at 358 (1983); *Papachristou*, 405 U.S. at 170 (same). H.B. 481 fails to meet both standards.

Section 3 of H.B. 481 redefines "natural person" to include "any human being including an unborn child," and defines "unborn child" as "a member of the species Homo sapiens at any stage of development" in utero. H.B. 481 §§ 3(b), (e)(2). Because this Personhood Definition applies throughout the Code, *see id.* § 3 (amending definitions of "Persons and Rights" in O.C.G.A. § 1-2-1, which apply throughout the Code), the hundreds of civil and criminal code provisions that include the term "person" or "human being" must be read to include in-utero embryos/fetuses at any stage of development. Given this broad reach, it is unsurprising that the Personhood Definition renders numerous criminal and civil provisions of the Code unclear. *See, e.g.*, O.C.G.A. § 16-5-60 (reckless conduct); §

15

16-5-70 (cruelty to children); § 16-5-21 (aggravated assault); § 16-12-171 (sale or distribution to, or possession by, minors of cigarettes and tobacco related objects); § 19-7-5 (mandatory reporting of child abuse by, *inter alia*, physicians, carrying criminal penalties). It remains undisputed here that Plaintiff clinics and physicians provide, and that patients such as Plaintiff SisterSongs' members seek, medical care that can harm or end a pregnancy. Facts ¶¶ 2–4; *see also* PI Order 22–23 & n.7. That care thus falls within the purview of care the new Personhood Definition threatens.

To elaborate on just one example, a person commits "Reckless Conduct" in Georgia when he "causes bodily harm to or endangers the bodily safety of another *person* by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other *person*." O.C.G.A. § 16-5-60 (emphasis added). Under such provisions, as amended by the Personhood Definition, it is unclear whether and when clinicians could face criminal prosecution for providing care to a pregnant patient that could harm an embryo/fetus, regardless of whether the patient needs the treatment to maintain her health. Comprehensive gynecological care, including family planning, abortion, miscarriage management, hormone therapy, and cancer screening and treatment all could harm an embryo/fetus. PI Order at 39; *see also* Facts ¶ 28.

This uncertainty about what actions give rise to criminal and civil liability under numerous sections of the Code violates both of the principles that underlie the vagueness doctrine. First, as described above, neither patients nor providers have "fair notice of conduct that is forbidden or required" when seeking or providing medical care under H.B. 481. *Fox*, 567 U.S. at 253; *see also Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349 (11th Cir. 2011) ("[N]o man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."). Second, by failing to provide "explicit standards" for law enforcement and prosecutors, H.B. 481 leaves patients and providers open to "arbitrary or discriminatory" enforcement. *Grayned*, 408 U.S. at 358; *Kolender*, 461 U.S. at 538 (where a statute "permit[s] 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections,'" it is unconstitutionally vague (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974))). Because the Personhood Definition renders applicable Code provisions unconstitutionally vague, Plaintiffs are entitled to judgment as a matter of law.

## III. PLAINTIFFS SATISFY THE REMAINING FACTORS FOR PERMANENT INJUNCTIVE RELIEF AS A MATTER OF LAW.

"[T]o obtain a permanent injunction a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3)

17

irreparable harm will result if this court does not order injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). "Irreparable harm is the equitable cornerstone of an injunction." *Sturgis Motorcycle Rally, Inc. v. Mortimer*, 2:14-cv-00175-wco, 2014 WL 12479644, at *4 (N.D. Ga. Dec. 23, 2014) (citing *Beason Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.")). Having established *supra* that H.B. 481 violates Plaintiffs' and their patients' and members' constitutional rights, Plaintiffs handily meet the remaining permanent injunction factors.

As this Court has already recognized, "[b]y banning pre-viability abortions, H.B. 481 violates the constitutional right to privacy, which, in turn, inflicts *per se* irreparable harm on Plaintiffs." PI Order at 40 (citing *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). "[T]he right of privacy must be carefully guarded for once an infringement has occurred it cannot be undone by monetary relief." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981). More specifically, the "harm to particular women's constitutional rights to access a pre-viability abortion" is "a harm that cannot be undone once denied." *Miller*, 299 F. Supp. 3d at 1288 (permanently enjoining two abortion restrictions). Additionally, being

subject to vague laws is itself a constitutional violation, *see supra*, that would impose irreparable harm on Plaintiffs and their patients and members. *Cf. Am. Civil Liberties Union of Ga. v. Miller*, 977 F. Supp. 1228, 1235 (N.D. Ga. 1997). Indeed, the constitutional violations that would result from the enforcement of H.B. 481 mandate a finding of irreparable injury.

Additionally, a long line of abortion jurisprudence recognizes the irreparable physical, emotional, and psychological harms that H.B. 481 would impose by forcing Plaintiffs' patients and members to remain pregnant against their will and by threatening access to medical treatment for pregnant patients. As the Supreme Court held in *Roe*, "The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved." 410 U.S. at 153; *see also*, *e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2315 ("Nationwide, childbirth is 14 times more likely than abortion to result in death . . . ."); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 868 (W.D. Wis. 2013) (abortion restrictions cause irreparable harm by increasing health risks); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) (forcing patients to remain pregnant puts them at "increased risk of death and . . . complications."). A patient who carries to term and gives birth "is subject to anxieties, to physical

constraints, to pain that only she must bear." *Casey*, 505 U.S. at 852. These harms

will disproportionately affect people of color and people who have low incomes.

*See, e.g.*, *EMW Women's Surgical Ctr., P.S.C. v. Glisson*, No. 3:17-CV-00189-

GNS, 2018 WL 6444391, at *8 n.11 (W.D. Ky. Sept. 28, 2018) (noting that

abortion patients are disproportionately likely to be women of color and women

who have low incomes); *Planned Parenthood of Greater Tex. Surgical Health*

*Servs. v. Abbott*, 769 F.3d 330, 347 (5th Cir. 2014) (burdens on abortion access are

"higher for younger women, women of color, and low-income women"); *Margaret*

*S. v. Edwards*, 488 F. Supp. 181, 194 n.35 (E.D. La. 1980) ("Unintended

pregnancies most often affect those with the least resources," particularly "young,

poor, and minority women" who already face worse health outcomes as compared

to general population).

There is no adequate remedy at law for these violations. "Invasions of

privacy, because of their intangible nature, could not be compensated for by

monetary damages; in other words, plaintiffs could not be made whole." *Ne. Fla.*

*Chapter of Ass'n of Gen. Contractors*, 896 F.2d at 1285. Accordingly, Plaintiffs

are entitled to a permanent injunction of H.B. 481.

Finally, this Court has already found H.B. 481 is inseverable. PI Order at

42–45. Because the remaining provisions of H.B. 481 are "mutually dependent

upon" the clearly unconstitutional provisions, and because independent enforcement of these remaining provisions would "give the statute an effect altogether different from that sought by it when considered as a whole," this Court should permanently enjoin H.B. 481 in its entirety. *See City Council of Augusta v. Mangelly*, 254 S.E.2d 315, 320 (Ga. 1979); PI Order at 42–45.

## CONCLUSION

For the foregoing reasons, H.B. 481 is unconstitutional as a matter of law, and this Court should grant Plaintiffs' Motion.

Respectfully submitted this 20th day of February, 2020.


Susan Talcott Camp*
Elizabeth Watson*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
tcamp@aclu.org
ewatson@aclu.org

*Attorneys for Plaintiffs SisterSong, ACWC, AWMC, carafem, Summit, and Drs. Cwiak, Haddad and Lathrop*

Carrie Y. Flaxman*
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Avenue, NW
Suite 300
Washington, DC 20005
(202) 973-4800
carrie.flaxman@ppfa.org

Susan Lambiase*
PLANNED PARENTHOOD FEDERATION
OF AMERICA
123 William St., Floor 9
New York, NY 10038
(212) 541-7800 (phone)
(212) 247-6811 (fax)
susan.lambiase@ppfa.org

*Attorneys for PPSE*

**<u>Sean Young</u>**
Attorney Bar Number: 790399
Attorney for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org

Julie Rikelman*
Emily Nestler*
Kirby Tyrrell*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3670 (phone)
(917) 637-3666 (fax)
jrikelman@reprorights.org
enestler@reprorights.org
ktyrrell@reprorights.org

*Attorneys for Plaintiffs Feminist and CWHO*

* *Admitted pro hac vice*

## CERTIFICATE OF COMPLIANCE

Pursuant to N.D. Ga. Local Civil Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with N.D. Ga. Local Civil Rule 5.1(C) in Times New Roman 14-point typeface.

**Sean Young**
Attorney Bar Number: 790399
Attorney for Plaintiffs
American Civil Liberties Union Foundation of Georgia, Inc.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org

## CERTIFICATE OF SERVICE

I hereby certify that on the aforementioned date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which constitutes service on ECF registered users. N.D. Ga. Civil Local Rule 5.1(A)(3). Defendants' attorneys who later enter a notice of appearance will be served a copy of the foregoing by mail. Fed. R. Civ. P. 5(b)(2)(C).

**Sean Young**
Attorney Bar Number: 790399
Attorney for Plaintiffs
American Civil Liberties Union Foundation of Georgia, Inc.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org