**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**SISTERSONG WOMEN OF COLOR**
**REPRODUCTIVE JUSTICE**
**COLLECTIVE, on behalf of itself**
**and its members,** *et al.*,

    **Plaintiffs,**

**v.**

**BRIAN KEMP, Governor of the State**
**of Georgia, in his official capacity,**
*et al.*,

    **Defendants.**

**CIVIL ACTION FILE**
**No. 1:19-cv-02973-SCJ**

## <u>ORDER</u>

This matter concerns the constitutionality of Georgia House Bill 481 ("H.B. 481"), also known as the Living Infants Fairness and Equality ("LIFE") Act. H.B. 481 § 1, 155th Gen. Assemb., Reg. Sess. (Ga. 2019). H.B. 481, in relevant part, prohibits abortions after the detection of a fetal heartbeat. <u>Id.</u> § 4. H.B. 481 also recognizes unborn children as "natural persons" and further defines an "unborn child" as an embryo/fetus "at any stage of development who is carried in the womb." <u>Id.</u> § 3.

1

On June 28, 2019, Plaintiffs filed a Verified Complaint for Declaratory and Injunctive Relief against all Defendants[1] pursuant to 42 U.S.C. § 1983, wherein they challenge the constitutionality of H.B. 481. Doc. No. [1]. Plaintiffs assert two claims against Defendants: (1) a violation of the Substantive Due Process right to privacy and liberty under the Fourteenth Amendment to the United States Constitution (Count I); and (2) a violation of Due Process under the Fourteenth Amendment to the United States Constitution (Count II). Id.

Before the Court now are the parties' cross motions for summary judgment.[2] Plaintiffs move for summary judgment on both claims, requesting that the Court declare H.B. 481 unconstitutional and permanently enjoin all Defendants and their successors in office from enforcing it. Doc. No. [124]. The State Defendants also move for summary judgment on both claims, asserting that Plaintiffs have failed to establish standing to bring this suit. Doc. No. [125]. The State Defendants alternatively move for partial summary judgment on Count II of the Complaint and on the ground that the provisions of H.B. 481

---

[1] Defendants are composed of: (1) Paul L. Howard, Jr., in his official capacity as District Attorney for Fulton County; (2) Sherry Boston, in her official capacity as District Attorney of the Stone Mountain Judicial Circuit; and (3) the State Defendants.

[2] Defendants Howard and Boston did not file summary judgment motions.

2

not specifically found unconstitutional are severable. Id. Both motions have been fully briefed by the parties.[3] Doc. Nos. [127]; [129]; [135]; [137]. After due consideration, and with the benefit of oral argument,[4] the Court rules as follows.

## I.   BACKGROUND

Before proceeding to the merits of the parties' summary judgment motions, the Court finds that an overview of the current state of abortion law, based on United States Supreme Court precedent, the undisputed material facts, and the procedural history of this case is warranted.

### A.   Abortion Law

 The hallmark of the Supreme Court's abortion jurisprudence is Roe v. Wade, 410 U.S. 113, 153–54 (1973), wherein the Court held that the Due Process Clause of the Fourteenth Amendment provides a fundamental constitutional right of access to abortions. Specifically, the Court found that the constitutional right of privacy, "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action," is "broad enough to encompass a

---

[3] Defendant Howard does not oppose Plaintiffs' motion. Doc. No. [126]. Defendant Boston filed her own response in opposition to Plaintiffs' motion, to which Plaintiffs replied. Doc. Nos. [128]; [136].

[4] The Court conducted an evidentiary hearing on the parties' motions on June 15, 2020. Doc. No. [143].

woman's decision whether or not to terminate her pregnancy." Id. at 153. Yet the Court also made clear that this right is "not absolute" and thus must be considered against important "state interests as to protection of health, medical standards, and prenatal life." Id. at 154–55.

Nearly twenty years later, the Supreme Court upheld the core ruling in Roe by reaffirming "the right of the woman to choose to have an abortion before viability and to obtain it without undue influence from the State." Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 846 (1992) (plurality opinion). In doing so, however, the Court recognized that state interests in both a woman's health and fetal life are present and "substantial" from the outset of pregnancy. Id. at 846, 873. Because of this, the Court held that "[o]nly where state regulation imposes an undue burden on a woman's ability to [choose to terminate or continue her pregnancy before viability] does the power of the State reach into the heart of the liberty protected by the Due Process Clause." Id. at 874; see also id. at 878 ("An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."). Thus, in order "to protect the central right recognized by [Roe] while at the same time accommodating the State's profound interest in

4

potential life," it is the "undue burden" analysis—and not the trimester framework previously established in Roe—that must be employed. Id. at 878.

The Supreme Court in Casey nevertheless left the essential holding of Roe untouched, stating that "[t]he woman's right to terminate her pregnancy before viability is the most central principle of [Roe]. It is a rule of law and a component of liberty we cannot renounce." Id. at 871. While acknowledging that advances in neonatal care and maternal care have moved viability to an earlier point, the Court dismissed such factual divergences as having "no bearing on the validity of Roe's central holding," which is that:

> viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions. The soundness or unsoundness of that constitutional judgment in no sense turns on whether viability occurs at approximately 28 weeks, as was usual at the time of Roe, at 23 or 24 weeks, as it sometimes does today, or at some moment even slightly earlier in the pregnancy, as it may if fetal respiratory capacity can somehow be enhanced in the future. Whenever it may occur, the attainment of viability may continue to serve as the critical fact, just as it has done since Roe was decided; which is to say that no change in Roe's factual underpinning has left its central holding obsolete, and none supports an argument for overruling it.

Id. at 860; see also id. at 846 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."); see also Gonzales v. Carhart, 550 U.S. 124, 146 (2007) ("Before viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'") (quoting Casey, 505 U.S. at 879).

This core holding—established in Roe and reaffirmed in Casey and its progeny—is binding upon this Court. See Johnson v. DeSoto Cty. Bd. of Comm'rs, 72 F.3d 1556, 1559 n.2 (11th Cir. 1996) ("The binding precedent rule affords a [district] court no . . . discretion where a higher court has already decided the issue before it.").

### B.   Statement of Material Facts

Turning now to the facts of this case, the Court makes the following findings of fact for the purpose of resolving the cross motions for summary judgment. In doing so, the Court derives the facts from the admitted portions of the parties' statements of material facts and the Court's own review of the record. Doc. Nos. [124-2] (Plaintiffs' Statement of Material Facts) ("PSOMF"); [125-2] (The State Defendants' Statement of Material Facts) ("DSOMF"); [127-1] (Plaintiffs' Additional Facts) ("PAF"). The Court also

page 7 of 67

derives the facts from the parties' joint stipulations.[5] Doc. Nos. [124-3]; [125-2] ("Stip").

The Court resolved the parties' objections to each other's facts as it reviewed the record. If a party admitted a fact in part, the Court includes the substance of the undisputed part. If a party denied a fact in whole or in part, the Court reviewed the record to determine if a dispute exists and if it is material. The Court excludes facts, or parts of facts, that are legal conclusions, immaterial, inadmissible at trial, or not supported by citation to record evidence. See LR 56.1(B)(2)(a)(2), NDGa. With that in mind, the undisputed material facts for the purposes of summary judgment are as follows.

### 1.    Facts about Abortion in the U.S. and Georgia

A recent study found that approximately one in four women in this country will have an abortion by age forty-five. PSOMF, ¶ 18; Stip. #1 (citing Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates & Lifetime Incidence of Abortion: United States, 2008–2014*, 107 Am. J. Pub. Health 1904

---

[5] The Court acknowledges Defendant Boston's repeated objections to the parties' stipulations on the grounds that it was never presented to her for her consideration and that she never agreed to the statements contained therein. See, e.g., Doc. No. [128-2], ¶ 18. The Court nevertheless overrules her objections on those grounds.

(2017)). Other research has found that a majority of women having abortions (61%) already have at least one child, while most (66%) also plan to have a child or additional children in the future. PSOMF, ¶ 19; Stip. #1 (citing News Release, Guttmacher Inst., *Concern for Current and Future Children a Key Reason Women Have Abortions* (Jan. 7, 2008), https://www.guttmacher.org/news-release/2008/concern-current-and-future-children-key-reason-women-have-abortions; Nat'l Abortion Fed'n, *Abortion Facts: Women Who Have Abortions* (last updated 2003), https://prochoice.org/education-and-advocacy/about-abortion/abortion-facts/). In Georgia, there were more than 33,800 abortions performed in 2018. PSOMF, ¶ 20.

Almost uniformly, clinicians measure pregnancy from the first day of a patient's last menstrual period ("lmp"). PSOMF, ¶ 21; Stip. #2. Clinicians also generally date a pregnancy (*i.e.*, indicate how far along a pregnancy has advanced) with the weeks before the decimal point and the days after: "6.2 weeks lmp" means six weeks and two days lmp. Id. A full-term pregnancy is approximately forty weeks lmp. Id. In 2018, approximately 87% of induced abortions in Georgia took place at or after six completed weeks of pregnancy measured from the first day of the patient's last menstrual period (based on clinical estimate), that is, at or after 6.0 weeks lmp. PSOMF, ¶ 22; Stip. #5.

In 2018, approximately 61% of induced abortions in Georgia took place at or after seven completed weeks of pregnancy measured from the first day of the patient's last menstrual period (based on clinical estimate), that is, at or after 7.0 weeks lmp. Id.

Some patients have fairly regular, four-week menstrual cycles; other patients have regular cycles of different lengths; and still others have irregular cycles. PSOMF, ¶ 23; Stip. #3. In a person with regular four-week cycles, fertilization typically occurs two weeks after the start of that person's last menstrual period. Id. A woman with a highly regular, four-week cycle would be four weeks lmp when she misses her period. PSOMF, ¶ 24; Stip. #3.

In a typical developing embryo, cells that eventually form the basis for development of the heart later in pregnancy produce cardiac activity that is generally detectable via vaginal ultrasound early in pregnancy. PSOMF, ¶ 25; Stip. #4. Plaintiffs' position is that cardiac activity is generally detectable at 6.0 weeks lmp, and may be detectable a few days earlier. PSOMF, ¶ 26; Stip. #4. The State Defendants' position is that cardiac activity is detectable by approximately 6-7 weeks lmp. Id. Regarding viability, i.e., the point at which a healthy, singleton fetus has a reasonable likelihood of sustained survival outside the uterus with or without artificial aid, Plaintiffs' position is that it

occurs at approximately 24 weeks lmp. PSOMF, ¶ 27; Stip. #6. The State

Defendants' position is that viability occurs as early as 20 weeks lmp. Id.

Some medical care for a pregnant patient aside from abortion and

miscarriage management can harm or end a pregnancy. PSOMF, ¶ 28; Stip. #8.

In some cases of miscarriage that occur before viability, cardiac activity persists

while the patient passes embryonic/fetal tissue, or when cervical dilation

makes pregnancy loss inevitable. PSOMF, ¶ 29; Stip. #7. In those cases, some

physicians determine that it is medically appropriate to offer the patient

treatment to empty her uterus. Id. In other cases, in which miscarriage is only

potential, physicians or patients may seek to save the pregnancy as long as

cardiac activity persists. Id. All medical care entails the risk of unintentional

harm to the patient; clinicians, including clinicians treating patients who are

pregnant, might be pregnant, or might become pregnant, accept that risk and

weigh that risk against the benefits of treatment. DSOMF, ¶ 6; Stip. #9.

### 2.    *Georgia Abortion Law and H.B. 481*

Prior to the passage of H.B. 481, Georgia law prohibited abortions at

twenty weeks or more "from the time of fertilization," O.C.G.A. § 31-9B-1(5),

"unless the pregnancy [was] diagnosed as medically futile" or, in reasonable

medical judgment, an abortion was necessary to "avert the death of the

pregnant woman or avert serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman" or to "[p]reserve the life of an unborn child." O.C.G.A. §§ 16-12-141(c)(1)(A–B).

The Georgia Legislature passed H.B. 481 on March 29, 2019, and the Governor signed the bill into law on May 7, 2019. PSOMF, ¶ 1; H.B. 481 § 15. The effective date was January 1, 2020. Id.

H.B. 481 makes a series of amendments to Georgia abortion law. Section 3 of H.B. 481 amends O.C.G.A. § 1-2-1, which sets forth definitions of "Persons and their Rights" that apply throughout the Official Code of Georgia (hereinafter, "the Code"). H.B. 481 § 3. Section 3 specifically amends the definition of "natural person" to include "any human being including an unborn child." Id. § 3(b). It further defines "unborn child" as "a member of the species Homo sapiens at any stage of development who is carried in the womb." Id. § 3(e)(2).

Section 4 of H.B. 481 prohibits abortions[6] once an "unborn child" has been determined to have a "detectable human heartbeat." Id. § 4(b). H.B. 481

---

[6] An act is not considered an "abortion," however, if it is performed with the purpose of removing an "ectopic pregnancy" or a "dead" fetus "caused by a spontaneous abortion," sometimes referred to as a miscarriage. H.B. 481 § 4(a)(1).

thus amends O.C.G.A. § 31-9B-2(a), "relating to physician's obligation in performance of abortions," to require "a determination of the presence of a detectable human heartbeat, as such term is defined in Code Section 1-2-1."[7] Id. § 10. A violation of Section 4 is punishable by imprisonment of one to ten years. O.C.G.A. § 16-12-140(b). A patient may also bring a civil action for a violation of this section. H.B. 481 § 4(g). Section 4 provides affirmative defenses, once a prosecutor proves a *prima facie* case of a violation of H.B. 481, if a physician, nurse, physician assistant, or pharmacist "provide[d] care for a pregnant woman which results in the accidental or unintentional injury or death of an" embryo or fetus, id. §§ 4(h)(1–4), and if "[a] woman sought an abortion because she reasonably believed that an abortion was the only way to prevent a medical emergency." Id. § 4(h)(5).

Sections 7, 8, 9, and 11 of H.B. 481 amend Georgia's informed consent and abortion reporting statutes to mandate that the information the patient receives twenty-four hours before an abortion includes "the presence of . . .

_____

[7] Section 4 contains three exceptions, permitting otherwise banned abortions where: (1) a physician determines, in reasonable medical judgment, that a "medical emergency" exists; (2) the pregnancy is at or below twenty weeks post-fertilization and is the result of rape or incest in which an official police report has been filed alleging the offense of rape or incest; or (3) the physician determines, in reasonable medical judgment, that the pregnancy is "medically futile." H.B. 481 §§ 4(b)(1–3).

detectable" fetal cardiac activity, id. § 7, to mandate that the Department of Public Health materials available to abortion patients refer to detectable cardiac activity, id. § 8, and to reflect the ban on abortion where there is detectable fetal cardiac activity. Id. § 11. Section 5 of H.B. 481 requires the father of an "unborn child," as defined under Section 3 of H.B. 481, to pay child support for the "direct medical and pregnancy related expenses of the mother of the unborn child." Id. § 5. Section 6 of H.B. 481 sets monetary damages "[f]or the homicide of an unborn child." Id. § 6. Finally, Section 12 of H.B. 481 allows a family to claim a personal tax exemption for an unborn child. Id. § 12.

C.   **Procedural History**

Plaintiffs are composed of SisterSong Women of Color Reproductive Justice Collective, seven reproductive health care clinics,[8] and three individual physicians.[9] PSOMF, ¶¶ 2–4. Plaintiff SisterSong is a non-profit organization whose members include Georgians who can become pregnant and need the

---

[8] These clinics are Feminist Women's Health Canter; Planned Parenthood Southeast, Inc.; Atlanta Comprehensive Wellness Clinic; Atlanta Women's Medical Center; FemHealth USA d/b/a carafem; Columbus Women's Health Organization, P.C.; and Summit Medical Associates, P.C. PSOMF, ¶ 3.

[9] These physicians are Carrie Cwiak, M.D., M.P.H.; Lisa Haddad, M.D., M.S., M.P.H.; and Eva Lathrop, M.D., M.P.H. PSOMF, ¶ 4.

freedom to make their own health care decisions, including the decision to end a pregnancy. Id. ¶ 2. Plaintiff SisterSong works to build an effective network of individuals and organizations addressing institutional policies, systems, and cultural practices that limit the reproductive lives of marginalized people. Id. "Plaintiff Providers," *i.e.*, the named-clinics and physicians, provide reproductive health care services to patients in Georgia, including abortion services. Id. ¶¶ 3–4.

Prior to H.B. 481's effective date, Plaintiffs filed their Complaint against all Defendants on June 28, 2019. Doc. No. [1]. Thereafter, Plaintiffs moved to preliminarily enjoin the enforcement of H.B. 481 on July 23, 2019. Doc. No. [24]. Following an evidentiary hearing, the Court granted Plaintiffs' motion on October 1, 2019. Doc. No. [97].

The Court subsequently placed this case on a four-month discovery track. Doc. Nos. [94]; [97], p. 46. On December 4, 2019, the Court granted Plaintiffs' motion to preclude discovery on the State's interest underlying H.B. 481. Doc. No. [115]. In doing so, the Court emphasized that "[t]he Supreme Court has repeatedly and unequivocally held that under no circumstances whatsoever may a state prohibit or ban abortions prior to viability, no matter what interests the state asserts to support it." Id. at pp. 2–3. The Court thus

found that "discovery, including expert discovery, regarding the state's interests underlying H.B. 481 should be precluded." Id. at p. 5. In light of this order, the parties entered into a series of stipulations, as referenced *supra*, and agreed to forego expert reports and disclosures. Doc. Nos. [124-3]; [125-2].

On February 20, 2020, the parties filed their cross motions for summary judgment. Doc. Nos. [124]; [125]. Plaintiffs move for summary judgment on both claims. Doc. No. [124]. They first assert that Section 4 of H.B. 481, which prohibits abortions upon the detection of a fetal heartbeat, directly conflicts with binding Supreme Court precedent and thus violates their right to privacy and liberty secured by the Fourteenth Amendment. Doc. No. [124-1], p. 11. They further assert that Section 3 of H.B. 481, which amends the definition "natural person" to include an "unborn child," is unconstitutionally vague in that it is unclear if or how the definition amends other provisions of the Code. Id. at p. 14. Plaintiffs argue that they are therefore entitled to judgment as a matter of law and move the Court to permanently enjoin the enforcement of H.B. 481 in its entirety. Id. at p. 21.

The State Defendants also move for summary judgment on both claims, asserting that Plaintiffs have failed to establish standing to bring this suit. Doc. No. [125-1], p. 15. They alternatively move for partial summary judgment

on Plaintiffs' vagueness claim, and on the ground that all provisions of H.B. 481 not specifically found unconstitutional are severable. Id. at pp. 22, 28.

## II.   DISCUSSION

### A.   Preliminary Matters

Before analyzing the merits of the parties' summary judgment motions, the Court must first address the arguments made by Defendant Boston in her response to Plaintiffs' motion. Doc. No. [128]. Therein, Defendant Boston argues that Plaintiffs' motion should be denied as to her for two reasons: (1) "because the undisputed evidence shows that Plaintiffs do not have standing to bring their claims against her" and, (2) "even if they did, she is entitled to immunity from those claims under the Eleventh Amendment to the United States Constitution." Id. at p. 2. The Court addresses each of these arguments in turn.

#### 1.   *Standing*

A plaintiff "c[an] bring a pre-enforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution.'" Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1304 (11th Cir. 2017) (quoting Susan B. Anthony List v. Dreihaus, 573 U.S. 149, 159

16

(2014)). "[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases." Younger v. Harris, 401 U.S. 37, 42 (1971). When plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they do not allege a dispute susceptible to resolution by a federal court. Id. Still, the Eleventh Circuit has noted that the "credible threat of prosecution" standard is "quite forgiving." Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998) (citation omitted).

Defendant Boston argues Plaintiffs have offered "no evidence showing that they fear being prosecuted by D.A. Boston under H.B. 481 or that D.A. Boston will, intends to, or even might in the future prosecute them under H.B. 481, much less that they face a 'credible threat of prosecution'" by her office. Doc. No. [128], p. 3. Because "the undisputed evidence of record shows that D.A. Boston has at all times vowed not to enforce H.B. 481," she argues, "Plaintiffs face no threat of prosecution from D.A. Boston." Id. [10] "In the

---

[10] Defendant Boston seems to assume that her prosecutorial discretion is so broad as to allow her to refuse to enforce, in any circumstances, a duly enacted state criminal statute. Because it finds the threat of prosecution is credible regardless, the Court need

exceedingly unlikely event that D.A. Boston or her successor ever seeks to enforce H.B. 481 against any of the Plaintiffs, or gives them any reason to believe she might do so," she argues the issue would then be ripe for this Court to consider. Id. at p. 11. But, "on the current record," she maintains, "Plaintiffs have not asserted a claim against D.A. Boston that this Court can properly adjudicate." Id.

Plaintiffs argue they do face a credible threat of prosecution because "[each Plaintiff] 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.'" Doc. No. [136], p. 2 (quoting Wollschlaeger, 848 F.3d at 1304) (quoting Driehaus, 573 U.S. at 159)). They maintain that, although Defendant Boston has attached an affidavit swearing she will not enforce H.B. 481, see Doc. No. [128-1], "that affidavit is irrelevant because it is not binding even on Defendant, let alone on her successors." Id. at p. 3.

Defendant Boston's argument rests primarily upon the fact that she has repeatedly stated she believes H.B. 481 to be unconstitutional, and has no intention of enforcing it. But again, the Eleventh Circuit has recognized that

---

not address the accuracy of this assumption.

18

"[m]id-litigation assurances are all too easy to make and all too hard to enforce," which is why "the Supreme Court has refused to accept them." W. Ala. Women's Ctr. v. Williamson, 900 F.3d 1310, 1328 (11th Cir. 2018) (citing Stenberg v. Carhart, 530 U.S. 914, 940 (2000)). As this Court stated in its Preliminary Injunction Order:

> In Stenberg, the Supreme Court declined to defer to the Nebraska Attorney General's statements that he would "narrowly" interpret a state abortion statute. 530 U.S. at 940. This was because "precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law" when that interpretation is not binding on state courts or law enforcement officials. Id. See also Crandon v. U.S., 494 U.S. 152, 177 (1990) (Scalia, J., concurring in judgment) ("[W]e have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference."). Similarly, in Williamson, the Eleventh Circuit declined to defer to Alabama's non-binding assurances that it would permit broad application of a health exception in the state's abortion law. 900 F.3d at 1328.

Doc. No. [97], pp. 19–20. While Defendant Boston is a District Attorney and not the Attorney General or the State, Stenberg and Williamson are analogous.

Defendant Boston cites Summit Medical Associates, P.C. v. Pryor, 180 F.3d 1326 (11th Cir. 1999) to support her argument that standing cannot lie where a prosecutor has no intention of enforcing the challenged statute.

However, the relevant portion of that case dealt with the question of whether prosecution need be *imminent*, not merely threatened, to be credible. Id. at 1338. There, no prosecutions had yet been initiated, nor had plaintiffs been directly threatened with prosecution. Id. at 1339. But as the Eleventh Circuit noted, it would be impossible, "as a practical matter, [for] a potential plaintiff . . . to predict when prosecution is indeed 'imminent.'" Id. Thus, it held an "imminence requirement would essentially render *Ex parte* Young a nullity, leaving plaintiffs with only the most narrow window in which to initiate suit in federal court." Id. at 1338 (noting that, "under the abstention doctrine of Younger v. Harris, 401 U.S. 37 (1971), once a state prosecution is pending, a criminal defendant is barred from challenging the constitutionality of a state law in federal court except under very limited circumstances").

It is true that, while no actual prosecutions had been brought, the appellants in Summit stated an "intention to prosecute violators of both [challenged] statutes, at least in cases where the fetus is viable." Id. at 1339. Defendant Boston argues this stated intention was central to the Eleventh Circuit's holding. Doc. No. [128], p. 9. The Court disagrees. While a stated intention to prosecute is certainly *evidence* that the threat prosecution is credible, this Court does not read Summit to hold that it is *necessary* to confer standing.

In fact, the Eleventh Circuit explicitly noted that, although the Attorney General in <u>Summit</u> had issued an enforcement directive not to prosecute pre-viability partial birth abortions, "the Attorney General could withdraw the enforcement directive and prosecute partial-birth abortions pre-viability" under the challenged statute. <u>Id.</u>

The same is true here—Defendant Boston is free to change her mind at any time.[11] Plaintiffs state that they provide and will continue to provide treatment and services which will "undisputedly be criminal under H.B. 481." Doc. No. [88], p. 3. They have therefore alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest" which is "'proscribed by [the] statute' they wish to challenge." <u>Driehaus</u>, 573 U.S. 149 at 162–63 (quoting <u>Babbitt v. United Farm Workers Nat. Union</u>, 442 U.S. 289, 298 (1979)). Because Defendant Boston's mid-litigation assurances are binding on neither her nor her eventual successors, Plaintiffs have standing against her.

---

[11] And, as Plaintiffs note, Defendant Boston concedes her successors "may or may not share her views on H.B. 481." Doc. No. [95-1], p. 13. "Crimes committed while Boston is in office can still be prosecuted by her successor within any applicable statute of limitations." Doc. No. [136], p. 3 n.2.

##### 2.   *Eleventh Amendment Immunity*

Additionally, Defendant Boston argues that Plaintiffs cannot overcome her established right, as a state official, to immunity under the Eleventh Amendment. Doc. No. [128], p. 8. She further contends that the injunctive relief exception to Eleventh Amendment immunity, as first enunciated in *Ex parte* Young, 209 U.S. 123 (1908), does not apply because there is no evidence that she has enforced or even threatened to enforce H.B. 481 against Plaintiffs. Id.

"The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state [and its officers], except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity." Cross v. Ala. State Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1502 (11th Cir. 1995) (citations omitted); see U.S. Const. amend. XI ("[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."). However "[u]nder the doctrine enunciated in *Ex parte* Young, 209 U.S. 123 (1908), . . . a suit alleging a violation of the federal constitution against a state official in [her] official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." Grizzle

v. Kemp, 634 F.3d 1314, 1319 (11th Cir. 2011) (citations omitted); see also Alden v. Maine, 527 U.S. 706, 756–57 (1999) ("The rule [of sovereign immunity], however, does not bar certain actions against state officers for injunctive or declaratory relief.") and Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'").

In Summit, the state defendants asserted a similar Eleventh Amendment immunity defense, which the district court rejected under the *Ex parte* Young exception. 180 F.3d at 1333. In affirming the district court, the Eleventh Circuit noted that the plaintiffs "unquestionably [sought] prospective relief—a declaratory judgment that the partial-birth and post-viability abortion statutes are unconstitutional." Id. at 1339. The Eleventh Circuit also held that the plaintiffs "sufficiently alleged an ongoing and continuous violation of federal law," even though the state defendants had not yet initiated prosecution or specifically threatened the plaintiffs with prosecution. Id. In doing so, the Eleventh Circuit appeared to recognize that any enforcement directive could be withdrawn. Id.

Similarly, here, Plaintiffs unquestionability seek prospective relief—a declaratory judgment that H.B. 481 is unconstitutional and a permanent injunction against its enforcement. They also sufficiently allege an ongoing and continuous violation of federal law. Plaintiffs' claims against Defendant Boston fall within the _Ex parte_ Young exception, and Defendant Boston's arguments to the contrary fail.

### B.   Summary Judgment

The filing of cross motions for summary judgment "does not give rise to any presumption that no genuine issues of material fact exist." 3D Medical Imaging Systems, LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017). Rather, cross motions for summary judgment "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Id. (citing Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004)). Accordingly, the Court examines the parties' summary judgment motions separately.

### 1.   _Legal Standard_

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgement if the movant shows that there is no genuine dispute

24

as to any material act and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden can be discharged either by showing an absence of evidence to support an essential element of the nonmoving party's case or by showing that the nonmoving party will be unable to prove their case at trial. Celotex, 477 U.S. at 325; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In determining whether the moving party has met this burden, the court must consider the facts in the light most favorable to the nonmoving party. See Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper

by coming forward with specific facts showing a genuine dispute. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. <u>Id.</u> All reasonable doubts, however, are resolved in the favor of the nonmoving party. <u>Fitzpatrick</u>, 2 F.3d at 1115. In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." <u>Stewart v. Booker T. Washington Ins.</u>, 232 F.3d 844, 848 (11th Cir. 2000).

### 2.   *Plaintiffs' Motion for Summary Judgment*

Plaintiffs move for summary judgment on both Counts I and II of the Complaint, wherein they assert that H.B. 481 violates the Due Process Clause of the Fourteenth Amendment because it "bans abortions at a pre-viability point in pregnancy" and "is unconstitutionally vague." Doc. No. [124], p. 2.

### i.   <u>Count I: Substantive Due Process</u>

In Count I of the Complaint, Plaintiffs state that "[b]y prohibiting an individual from making the ultimate decision whether to continue or to terminate a pregnancy prior to viability, H.B. 481 violates Georgians' right to privacy and liberty secured by the Fourteenth Amendment to the United States Constitution." Doc. No. [1], ¶ 73. Plaintiffs argue that Section 4 of H.B. 481,

which prohibits abortions after the detection of a fetal heartbeat, constitutes a pre-viability abortion ban and is therefore unconstitutional. Doc. No. [124-1], p. 11. Upon further review, and in light of binding Supreme Court precedent, this Court must agree.

The Supreme Court has repeatedly and unequivocally held that under no circumstances whatsoever may a state prohibit or ban abortions at any point prior to viability. See Casey, 505 U.S. at 879 ("[A] State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."); Roe, 410 U.S. at 153–54; see also Whole Woman's Health v. Hellerstedt, --- U.S. ----, 136 S. Ct. 2292, 2299 (2016); Stenberg, 530 U.S. at 921; Gonzales, 550 U.S. at 146. Consequently, a prohibition or ban on abortion at any point prior to viability is inherently unconstitutional—no matter what interests a state asserts to support it. Casey, 505 U.S. at 846 ("Before viability, the State's interests are not strong enough to support a prohibition of abortions."). The constitutionality of Section 4 thus hinges on one critical finding: whether its prohibition on abortions once an unborn child has been determined to have a "detectable human heartbeat" constitutes a pre-viability abortion ban.

While the parties mostly concur in their stipulations, they differ on two crucial facts—the point at which embryonic cardiac activity can be detected via

vaginal ultrasound, and the point at which viability occurs. Plaintiffs' position is that cardiac activity is generally detectable at 6 weeks lmp, and may be detectable a few days earlier. PSOMF, ¶ 26; Stip. #4. The State Defendants' position is that cardiac activity is detectable by approximately 6-7 weeks lmp. Id. Regarding viability, Plaintiffs' position is that it occurs at approximately 24 weeks lmp. PSOMF, ¶ 27; Stip. #6. The State Defendants' position is that viability occurs as early as 20 weeks lmp. Id. Applying Plaintiffs' proffered facts, Section 4 would prohibit abortions as early as 6 weeks lmp—roughly eighteen weeks before viability occurs. Applying the State Defendants' proffered facts, Section 4 would prohibit abortions at approximately 6-7 weeks lmp—roughly thirteen or fourteen weeks before viability occurs. Thus, under either party's version of the facts, it is indisputable that Section 4 prohibits abortions at a pre-viability point in pregnancy.

The State Defendants do not, and cannot, refute this critical finding. Rather, they suggest that their inability to fully develop the record and proffer expert testimony regarding the State's interests underlying H.B. 481 prevents the Court from granting summary judgment in favor of Plaintiffs.[12] Doc. No.

---

[12] The State Defendants again improperly characterize Section 4 of H.B. 481 as a

[129], p. 4. Yet as this Court explained in its December 4, 2019 Order, "any discovery that the State Defendants seek to proffer regarding the purported state interests underlying H.B. 481 is irrelevant under the current Supreme Court viability framework." Doc. No. [115], p. 3. See also MKB Mgmt. Corp. v. Stenehjem, 795 F.3d 768, 772–73 & n.4 (8th Cir. 2015) (affirming summary judgment permanently enjoining six-week abortion ban based on detectable cardiac activity and holding that the district court did not err in affirming a magistrate judge's order limiting discovery to the issue of viability); Jackson Women's Health Org. v. Currier, No. 3:18-CV-00171-CWR-FKB, 2018 WL 2219089, at *1 (S.D. Miss. May 15, 2018) (limiting discovery in challenge to fifteen-week abortion ban, holding that evidence about "any other issue" than "whether the 15-week mark is before or after viability" was irrelevant). Consequently, the Court concluded that Plaintiffs "should not be required to

---

"restriction" on pre-viability abortions. See Doc. No. [129], p. 5. As this Court previously explained, Section 4—by altogether prohibiting a woman from terminating her pregnancy after a fetal heartbeat is detected—constitutes a pre-viability abortion ban as opposed to merely a "restriction" or "regulation." Doc. No. [97], pp. 34–35. See Isaacson v. Horne, 716 F.3d 1213, 1225 (9th Cir. 2013) (finding that the "undue burden" analysis employed in Casey "has no place where, as here, the state is *forbidding* certain women from choosing pre-viability abortions rather than specifying the conditions under which such abortions are to be allowed.") (emphasis in original).

incur the substantial costs and other burdens of the irrelevant expert discovery the State Defendants requests." Doc. No. [115], p. 4.

Thus, the State Defendants' assertion that they were somehow prevented from developing a "complete" evidentiary record is inaccurate. Doc. No. [129], p. 4. In fact, this Court encouraged the parties to conduct discovery by placing this case on a four-month discovery track. See Doc. Nos. [94]; [97], p. 46. The Court's December 4, 2019 Order only precluded discovery regarding the State's interests underlying H.B. 481—which, under binding Supreme Court precedent, is irrelevant.[13] See Casey, 505 U.S. at 846. As such evidence would be immaterial to resolving Plaintiffs' summary judgment motion, the Court therefore sees no need to deny Plaintiffs' motion for this reason alone. See Anderson, 477 U.S. at 247–48 (stating that only "genuine issues of *material* fact" can defeat a motion for summary judgment) (emphasis added).

_____

[13] Additionally, to the extent that the State Defendants later wished to present "state interest" evidence to attempt to abrogate Supreme Court precedent, they have not been prevented from doing so. As the Court previously stated, the State Defendants can rely upon findings and determinations made by the Georgia Legislature, as reflected in H.B. 481 or its legislative history. See MKB Mgmt. Corp. v. Burdick, No. 1:13-CV-071, 2013 WL 6147204, at *4 (D.N.D. Nov. 15, 2013). They can also rely upon "legislative facts," which are "of the type that reviewing courts often rely upon in considering whether constitutional precedents should be overturned, even when not developed in the record." Id.

Moreover, in Count I of the Complaint, Plaintiffs further state that "[b]y redefining the meaning of natural person throughout the entire Georgia [C]ode to include an embryo/fetus in utero at any stage of development, H.B. 481 violates Georgians' right to privacy and liberty secured by the Fourteenth Amendment to the United States Constitution." Doc. No. [1], ¶ 74. Specifically, Section 3 of H.B. 481 amends the definition of "natural person" to include "any human being including an unborn child" and by defining "unborn child" as an embryo/fetus "at any stage of development who is carried in the womb." H.B. 481 § 3. Yet as Plaintiffs correctly point out, this precise definition has been considered and rejected by the Supreme Court. Doc. No. [124-1], p. 14.  In <u>Roe</u>, the Court considered whether a "person," as used in the Fourteenth Amendment, includes an unborn child. 410 U.S. at 157. The Court found that the Fourteenth Amendment speaks only of persons "born or naturalized in the United States," and that the use of the word has application only postnatally. <u>Id.</u> The Court therefore concluded that the word "person" does not include the unborn and rejected the notion that an embryo/fetus is entitled to Fourteenth Amendment protection.[14] <u>Id.</u> at 158.

---

[14] Otherwise, allowing *any* abortion—including abortions under the three exceptions

In sum, the undisputed material facts in this case lead to one, indisputable conclusion: that Section 4 of H.B. 481, by prohibiting a woman from terminating her pregnancy upon the detection of a fetal heartbeat, constitutes a pre-viability abortion ban. As this ban directly conflicts with binding Supreme Court precedent (*i.e.*, the core holdings in <u>Roe</u>, <u>Casey</u>, and their progeny) and thereby infringes upon a woman's constitutional right to obtain an abortion prior to viability, the Court is left with no other choice but to declare it unconstitutional.[15] Additionally, because Section 3's redefinition of "natural person" to include an unborn child was explicitly considered and rejected by the Supreme Court in <u>Roe</u>, it too is unconstitutional. Plaintiffs are therefore entitled to judgment as a matter of law on Count I of the Complaint. Doc. No. [124].

---

the State carves out in H.B. 481 §§ 4(b)(1–3)—would be "out of line with the Amendment's command." <u>Roe</u>, 410 U.S. at 157 n.54.

[15] The Court is certainly not alone in reaching this conclusion. Other courts have uniformly struck down similar pre-viability abortion bans. <u>See, e.g.</u>, <u>Jackson Women's Health Org. v. Dobbs</u>, 945 F.3d 265, 276–77 (5th Cir. 2019) (striking down fifteen-week abortion ban); <u>Stenehjem</u>, 795 F.3d at 727–73 (striking down six-week ban based on detectable cardiac activity), <u>cert. denied</u>, 136 S. Ct. 981 (2016); <u>Edwards v. Beck</u>, 786 F.3d 1113, 1117–19 (8th Cir. 2015), <u>cert. denied</u>, 136 S. Ct. 895 (2016) (striking down twelve-week ban based on detectable cardiac activity); <u>Isaacson</u>, 716 F.3d at 1227, <u>cert. denied</u>, 134 S. Ct. 905 (2014) (striking down twenty-week abortion ban).

ii.    <u>**Count II: Due Process/Vagueness**</u>

The above finding that Section 3 of H.B. 481 violates Plaintiffs' substantive due process rights under the Fourteenth Amendment is alone sufficient to render it unconstitutional. However, the Court will also address Plaintiffs' procedural due process claim.

Plaintiffs argue that Section 3 of H.B. 481 is unlawful for the additional reason that it its new definition of "natural person" (hereinafter referred to as the "Personhood Definition") is unconstitutionally vague. Doc. No. [124-1], p. 14. Count II of Plaintiffs' Complaint states:

> It is unclear if and/or how the new definitions in Section 3 of H.B. 481 effectively amend other provisions of the Official Code of Georgia Annotated that include the term "person" and/or "human being." These terms appear in the Code hundreds of times, and they are included in sections of the code that set forth the scope of, *inter alia*, criminal acts and civil liability. These provisions and others, as amended by the new definitions in Section 3 of H.B. 481, make it impossible for pregnant women and medical providers to know what actions are forbidden or required, and thus do not provide adequate guidance as to how they can comply with the law.

Doc. No. [1], ¶¶ 76–77. Plaintiffs argue that, because Section 3's Personhood Definition applies throughout the Code, <u>see</u> H.B. 481 §§ 3(b), (e)(2), the hundreds of civil and criminal code provisions that include the term "person"

or "human being" must be read to in utero include embryos/fetuses at any stage of development. Doc. No. [124-1], p. 15. "Given this broad reach," they argue, "the Personhood Definition renders numerous criminal and civil provisions of the Code unclear." Id.

The State Defendants argue that Plaintiffs "have not come close to making the extremely difficult showing to prevail on a facial vagueness claim." Doc. No. [129], p. 2. They argue the "new definition of 'natural person' unquestionably has applications that are clear, precise, and lawful." Id. "Under these circumstances," they assert, "Supreme Court and Eleventh Circuit precedent is clear that the law cannot be facially invalidated based on mere speculation about a handful of vague applications." Id. Any vague applications of the Personhood Definition, they argue, should be challenged in a series of as-applied challenges to those specific applications.

Due process encompasses the concepts of notice and fair warning, and at its core is the principle "that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." Bankshot Billiards, Inc. v. City of Ocala, Fla., 634 F.3d 1340, 1349 (11th Cir. 2011) (internal quotation marks omitted). The void-for-vagueness doctrine requires that a statute define an offense with sufficient definiteness that ordinary people

can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Village of Hoffman Estates v. Flipside, 455 U.S. 489 (1982). As the Supreme Court noted in Grayned v. City of Rockford:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

408 U.S. 104, 108–09 (1972) (internal citations omitted). Where the legislature fails to provide such minimal guidelines to guide law enforcement, a criminal statute may permit "policemen, prosecutors, and juries to pursue their personal predilections." Kolender v. Lawson, 461 U.S. 352, 358 (1983).

First, the Court finds that Section 3's Personhood Definition, which by its own terms amends every appearance of the word "person" or "human being,"

35

is unconstitutionally vague.[16] It remains entirely unclear to this Court how the amendments will be effectuated or enforced. To the extent Plaintiffs are forced to hypothesize about ways in which their conduct might violate statutes amended by the Personhood Definition, it is precisely *because* the Personhood Definition puts them at the mercy of the State's discretion, in violation of their due process rights.

If Section 3 is not enjoined, a pregnant woman with an eating disorder would be guilty of child cruelty. See O.C.G.A. §§ 16-5-70 ("A parent . . . commits the offense of cruelty to children in the first degree when such person willfully deprives the child of necessary sustenance to the extent that the child's health or well-being is jeopardized."). Health care providers would run afoul of O.C.G.A. § 19-7-5 for failing to report a pregnant patient living with an abusive partner. See O.C.G.A. § 19-7-5(b)(6.1), (c)(2) (making physicians licensed to practice medicine, physician assistants, interns, or residents, and hospital or medical personnel mandatory reporters of child abuse). The list goes on. And these are not *potential* applications, as the State Defendants attempt to

---

[16] Again, this is but an additional reason why the Personhood Definition is unconstitutional. See *supra*, Section II.B.2.i.

characterize them. Doc. No. [129], p. 12.  These would be lawful applications of existing criminal statutes. The only undefined variable is prosecutorial discretion: under which of these amended statutes will the State decide to bring charges? Such uncertainty provides precisely the kind of opportunity for "policemen, prosecutors, and juries to pursue their personal predilections." Kolender, 461 U.S. at 358.

Second, the Court declines to require Plaintiffs to "wait and see" how law enforcement officials will decide to enforce the Personhood Definition throughout the Code. The State Defendants cite Indigo Room, Inc. v. City of Fort Myers, 710 F.3d 1294, 1302 (11th Cir. 2013) to support their argument that a *single* valid application of the Personhood Definition precludes facial invalidity. However, central to that case was the recognition that the ordinance in question, which prohibited persons under 21 from entering alcoholic beverage establishments as defined by the ordinance, "provide[d] adequate notice of what conduct is prohibited, and a person of common intelligence would not need to guess at its meaning." Id. The complete sentence, of which the State Defendants cite only part, states that "*if* persons of reasonable intelligence 'can derive a core meaning from a statute, then the enactment may validly be applied to conduct within that meaning and the possibility of a valid

application necessarily precludes facial invalidity." Id. (citation omitted) (emphasis added). In Indigo Room, "a core meaning [could] be derived from the Ordinance at issue—individuals under the age of 21 are not permitted in alcoholic beverage establishments in the City of Fort Myers" and "for this reason the statute is not facially invalid." Id.

Conversely, here, people of common intelligence will be forced to guess at the core meaning of Section 3's Personhood Definition, precisely because it—by its own terms—applies throughout the entire Georgia Code. It explicitly grants embryos/fetuses at any stage of development all the protections "persons" enjoy under Georgia law. Clearly, that would render unlawful at least some actions that are currently lawful, but even the litigants in this case are forced to guess which. The State Defendants have been unable to articulate what this will mean for Plaintiffs and Georgians more generally. Given the severity of the potential penalties, the Court declines to find that Plaintiffs must wait to be prosecuted under an individual statute by operation of the Personhood Definition to challenge its validity.

As a final point, the disagreement between the parties regarding the reckless conduct statute is illustrative. Plaintiffs argue the services they provide could be prosecuted under the reckless conduct statute, O.C.G.A. § 16-5-60,

which makes it a criminal offense to "cause bodily harm or to endanger the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that [the] act or omission will cause harm or endanger the safety of another person." Id. They argue it remains unclear what kind of conduct might be prosecuted for presenting a "substantial and unjustifiable risk" of causing harm to or endangering the safety of a developing fetus. Doc. No. [124-1], p. 18.[17] The State Defendants counter that it is "inconceivable" that "physicians offering standard medical care to pregnant women who have fallen ill" could be charged for taking an "unjustified risk of harm" or being in "gross deviation from the standard of care." Doc. No. [129], p. 18.

First, the Court reiterates its aversion to mid-litigation assurances[18]— the State Defendants argue now that professionals providing pregnant patients with medical care would never be charged with reckless conduct, but the

---

[17] "[I]t is unclear whether and when clinicians could face criminal prosecution for providing care to a pregnant patient that could harm an embryo/fetus, regardless of whether the patient needs the treatment to maintain her health. Comprehensive gynecological care, including family planning, abortion, miscarriage management, hormone therapy, and cancer screening and treatment all could harm an embryo/fetus." Doc. No. [124-1], p. 20.

[18] "Mid-litigation assurances are all too easy to make and all too hard to enforce," which is why "the Supreme Court has refused to accept them." Williamson., 900 F.3d at 1328 (citing Stenberg, 530 U.S. at 940).

statute itself certainly does not preclude such prosecution. Second, the Court notes that it is unclear what the governing standard of care would be. As noted in oral argument, the existing standard of care charges medical professionals with treating one patient—the pregnant woman.[19] Under Section 3, medical professions would be charged with the care of *two* individual patients, whose medical needs might be in direct conflict with one another—necessitating an entirely new standard of care. That these highly sophisticated parties are currently litigating the meaning of "unjustified risk of harm" or "gross deviation from the standard of care" underscores that persons of common intelligence would be forced to guess what conduct might leave them open to criminal penalty.

In conclusion, application of Section 3's Personhood Definition "makes it impossible for [P]laintiffs to do their work with 'fair notice of conduct that is forbidden or required,'" in violation of their procedural due process rights. FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). Plaintiffs are

---

[19] See Hearing Transcript, Tr. 71:18–23 ("Before, a physician had one patient that they were considering. Now they clearly have liability for two people. The State Defendants do not dispute that. The law has been amended and . . . physicians treating pregnant patients need to treat the embryo or fetus as a separate person.").

therefore entitled to judgment as a matter of law on Count II of the Complaint.
Doc. No. [124].

### 3.   *The State Defendants' Motion for Summary Judgment*

The State Defendants also move for summary judgment on Counts I and II of the Complaint, asserting that Plaintiffs have failed to establish standing to bring this suit. Doc. No. [125-1], p. 15. They alternatively move for partial summary judgment on Count II and on the ground that the provisions of H.B. 481 not specifically found unconstitutional are severable from the remainder of the statute. Id. at pp. 22, 28.

### i.   <u>Standing</u>

"Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" <u>CAMP Legal Def. Fund, Inc. v. City of Atlanta</u>, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975)). Article III of the United States Constitution limits the courts to hearing actual "Cases" and "Controversies." U.S. Const. Art. III § 2; <u>see also</u> <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 559–60 (1992). Overall, the standing requirement arising out of Article III seeks to uphold separation-of-powers principles and "to prevent the judicial process from being used to

usurp the powers of the political branches." <u>Clapper v. Amnesty Int'l USA</u>,

568 U.S. 398, 408 (2013).

To establish standing, a plaintiff must show three things:

> First, the plaintiff must have suffered an "injury in
> fact"—an invasion of a legally protected interest
> which is (a) concrete and particularized, and (b)
> actual or imminent, not conjectural or hypothetical.
> Second, there must be a causal connection between
> the injury and the conduct complained of—the injury
> has to be fairly traceable to the challenged action of
> the defendant, and not the result of the independent
> action of some third party not before the court. Third,
> it must be likely, as opposed to merely speculative,
> that the injury will be redressed by a favorable
> decision.

<u>Lujan</u>, 504 U.S. at 560–61 (internal quotations, citations, and alterations

omitted). "The party invoking federal jurisdiction bears the burden of

establishing these elements." <u>Id.</u> at 561.

Organizations, like individuals, can also establish standing to sue. <u>See</u>

<u>Arcia v. Fla. Sec'y of State</u>, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (describing

two different theories under which an organization can demonstrate

standing—associational and diversion-of-resources). To establish associational

standing, an organization must prove that is members "would otherwise have

standing to sue in their own right." <u>Friends of the Earth, Inc. v. Laidlaw Envtl.</u>

42

Servs. (TOC), Inc., 528 U.S. 167, 181 (2000). Under the diversion-of-resources theory, an organization has standing to sue "when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." Arcia, 772 F.3d at 1341.

### (a)   Plaintiff SisterSong

The State Defendants argue that Plaintiff SisterSong has failed to establish standing. Doc. No. [125-1], p. 15. They first contend that Plaintiff SisterSong has failed to establish organizational standing under an associational theory because it cannot demonstrate that its members would otherwise have standing to sue in their own right Id. at p. 16. They further contend that Plaintiff SisterSong has failed to establish organizational standing under a diversion-of-resources theory because it cannot show that the State Defendants' "illegal acts" impaired its ability to engage in its own projects by forcing the organization to divert resources in response. Id.

First, the Court addresses whether Plaintiff SisterSong has organizational standing under a diversion-of-resources theory. A plaintiff demonstrates organizational standing under a diversion-of-resources theory by showing that the "defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." Fla. State

Conference of NAACP v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008). Here,

Plaintiff SisterSong states that the enforcement of H.B. 481 "would force [it] to

divert its scarce time and resources away from many other aspects to focus on

helping Georgians access abortion care out of state and otherwise adjust to H.B.

481's sweeping impact." PAF, ¶ 5. It further states that, "[i]n order to educate

its members and the public about H.B. 481's new restrictions and what they can

do about it," it has already diverted its "limited staff resources away from

managing trainings," which are a core part of its advocacy mission and a

"significant part of its annual income." Id. ¶¶ 5–7. Additionally, Plaintiff

SisterSong states that it had to "increase its spending on communications to

educate its members and the public about the impact of H.B. 481." Id. ¶ 9.[20]

The State Defendants respond that Plaintiff SisterSong's diversion-of-

resources argument fails, as it is supported only by "vague responses" and

"voluntary decisions." Doc. No. [125-1], pp. 18-19. Although Plaintiff

SisterSong provides statistics and dollar amounts of resources diverted from

---

[20] These expenditures included approximately $20,000 in 2019 in order to hire a public relations firm in response to the influx of media inquiries regarding H.B. 481. PAF, ¶ 9. The total amount of time spent in response to H.B. 481 encompassed 60% of Plaintiff SisterSong's Georgia Coordinator's time and 40% of Plaintiff SisterSong's Executive Director's time. Id. ¶¶ 10–11.

training to public and media educational efforts, the State Defendants still categorize its response as "vague" since it does not specify what the responses entailed or how they differed from regular trainings. Id. at p. 18. The State Defendants also assert that Plaintiff SisterSong's diversion of resources was a voluntary decision and therefore not an injury caused by H.B. 481 sufficient to confer standing. Id. at p. 19 (citing Lujan, 504 U.S. at 561 ("[S]tanding depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.")). Finally, the State Defendants argue that Plaintiff SisterSong's diversion of resources to educate others fits within its core activities and thus does not constitute injury adequate to establish standing. Id.

Upon review, the Court agrees with Plaintiff SisterSong and finds that it has organizational standing under a diversion-of-resources theory. Plaintiff SisterSong has articulated the resources it diverted from its trainings "[i]n order to educate its members and the public about H.B. 481's new restrictions and what they can do about it." PAF, ¶ 7. Two of its high-ranking officers have also had to dedicate significant portions of their time to responding to H.B. 481. This demonstrates a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources," which "constitutes far more than simply a setback to the organization's abstract social

interests." <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 379 (1982). Whether this diversion of resources was voluntarily incurred is irrelevant. As the Eleventh Circuit has noted, "[c]osts unrelated to the legal challenge . . . do qualify as an injury, whether they are voluntarily incurred or not." <u>Browning</u>, 522 F.3d at 1166 (finding the defendant's attempt to distinguish between voluntary and mandated diversion of resources had "no support in the law, and it misses the point").

Because the Court has determined that Plaintiff SisterSong has organizational standing under a diversion-of-resources theory, it need not address the parties' arguments regarding associational standing.

### (b)  *Plaintiff Providers*

The State Defendants also argue that Plaintiff Providers have failed to establish standing. Doc. No. [125-1], p. 19. Specifically, the State Defendants contend that Plaintiff Providers "are not alleging that any of their own constitutional rights are violated," and that they lack third-party standing to vicariously assert the rights of their non-party patients who seek to obtain an abortion. <u>Id.</u>

In response, Plaintiff Providers push back on the notion that they are not asserting a violation of their own constitutional rights. Doc. No. [127], p. 3.

Rather, they assert that H.B. 481's vagueness violates their *own* due process rights. Id.; see also Hearing Transcript, Tr. 21:17–23. Plaintiff Providers state that H.B. 481's criminal penalties directly threaten them with injury sufficient to confer standing. Id.; see also City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416, 440 n.30 (1983), overruled on other grounds by Casey, 505 U.S. 833 (1992); Doe v. Bolton, 410 U.S. 179, 188 (1973) ("The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physicians-appellants, therefore, assert a sufficiently direct threat of personal detriment.").

As to third-party standing, Plaintiff Providers state that "decades of precedent recognize abortion providers' ability to raise claims to protect their patients' fundamental right to access abortion." Doc. No. [127], p. 3; see, e.g., Singleton v. Wulff, 428 U.S. 106, 118 (1976) (plurality opinion) ("[I]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision."); Williamson, 900 F.3d at 1325 n.13 (noting that "all the landmark cases since [Roe] have been brought by physicians or clinics."). In acknowledging this third-party standing in abortion cases, the Supreme Court has recognized that abortion providers

47

are "uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against" a woman's decision to have an abortion. <u>Singleton</u>, 428 U.S. at 117.

Moreover, the Supreme Court recently reaffirmed this type of third-party standing in abortion cases in <u>June Medical Services, L.L.C. v. Russo</u>, --- U.S. ----, No. 18-1323, 2020 WL 3492640 (U.S. June 29, 2020). In <u>Russo</u>, the Supreme Court considered a challenge, brought by abortion providers, to a state law which required them to hold active admitting privileges at hospital within 30 miles of the place where they perform abortions. <u>Id.</u> at *4. The state defendants argued, *inter alia,* that the abortion providers lacked standing and that the proper plaintiffs were the patients themselves. <u>Id.</u> at *8. In finding that the state defendants had waived such an argument by failing to raise it earlier, the Supreme Court went on to state that it has "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations." <u>Id.</u> at *9. The Court further noted that it has "generally permitted plaintiffs to assert third-party rights in cases where the 'enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" <u>Id.</u> (citing <u>Kowalski v. Tesmer</u>, 543 U.S. 125, 130 (2004) (emphasis in original)). Thus, because the

48

abortion providers were challenging a law that regulated their own conduct, the Court found that they were "far better positioned than their patients to address the burdens of compliance"—or, in other words, "the least awkward" and most "obvious" claimants. Id. at *10 (citing Craig v. Boren, 429 U.S. 190, 197) (1976)).

Similarly, here, Plaintiff Providers seek to invoke their own rights as well as the rights of their non-party patients in challenging the constitutionality of H.B. 481. Plaintiff Providers further state that they have "unique physician-patient relationships with their patients, which are close, intimate, and special, and create ethical and medical duties." PAF, ¶ 1. The State Defendants maintain that this single sentence is "insufficient" to confer third-party standing. In light of binding Supreme Court precedent, however, the Court must disagree. Accordingly, the Court finds that Plaintiff Providers have sufficiently established standing—both on their own behalf and on behalf of their patients.

### ii.    Count II: Due Process/Vagueness

Because the Court has addressed the parties' vagueness arguments, it need not reiterate them here. See *supra* Section II.B.2.ii (holding that application of Section 3's Personhood Definition makes it impossible for Plaintiffs to do their work with fair notice of conduct that is forbidden or required, in violation

of their procedural due process rights). Because Plaintiffs are entitled to summary judgment on their procedural due process claim, the State Defendants are not entitled to summary judgment on Count II of the Complaint.

### iii.   <u>Severability</u>

In their summary judgment motion and briefing, Plaintiffs argue that this Court should permanently enjoin H.B. 481 *in its entirety*. Doc. No. [124-1], p. 1. By contrast, the State Defendants argue that they are entitled to *partial* summary judgment on the issue of severability on the ground that all provisions of H.B. 481 that are not specifically found unconstitutional are severable and should be allowed to take effect as the law of Georgia. Doc. No. [125-1], p. 28. More specifically, the State Defendants argue that H.B. 481 contains separate abortion-related and non-abortion-related provisions (concerning findings, informed consent, information, reporting, child support, tax benefits, tort damages, and other matters) that are capable of standing on their own and operating independently, even if Sections 3 and 4 of H.B. 481 are invalidated and enjoined. Doc. No. [137], p. 16.

The premise of the State Defendants' argument is that Plaintiffs' summary judgment briefing shows that they are only challenging Section 3(b) of H.B. 481 (providing a definition of "natural person") and Section 4 of H.B.

481 (relating to restrictions on the performance of abortions). The State Defendants maintain that Plaintiffs are not challenging the remainder of Section 3 of H.B. 481 that contains definitions of the terms "detectable human heartbeat" and "unborn child" in subsection (e), which are mentioned repeatedly in H.B. 481. Doc. No. [129], p. 3.

In opposition, Plaintiffs indicate that the State Defendants' premise is faulty, as their challenge is to Section 3's redefinition of the term "person" throughout the Georgia Code, which encompasses subsections 3(b) and 3(e) of H.B. 481. Doc. No. [135], p. 9, n.11.

To determine the scope of Plaintiffs' challenge to H.B. 481, the Court reviews Plaintiffs' Complaint, not the summary judgment briefing, as "a plaintiff cannot amend [the] complaint through argument made in [a] brief in opposition to the defendant's motion for summary judgment." Monaghan v. Worldpay US, Inc., 955 F.3d 855, 859 (11th Cir. 2020) (citations omitted). A review of Plaintiffs' Complaint shows that Plaintiffs discuss Section 3 of H.B. 481 as a whole and Plaintiffs do not specifically parse out subsections of Section 3 as being subject to their challenge. See Doc. No. [1], ¶¶ 37, 38, 68, 76, 77, 78, and 79. In paragraphs 38 and 68, Plaintiffs specifically focus on Section 3's new definition of "natural person," but in other paragraphs of the Complaint (e.g.

¶¶ 76–77), Plaintiffs reference the "new definition**s** in Section 3 of H.B. 481." Id.

¶¶ 38, 68, 76, 77 (emphasis added). From the Court's review of the Complaint,

it is reasonable to conclude that Plaintiffs' challenge encompasses the entirety

of Section 3 of H.B. 481.

Having determined the scope of Plaintiffs' challenge to H.B. 481, the

Court now considers the substantive law regarding severability. The Court

applies "Georgia law to determine what portion of a Georgia statute, if any,

survives due to a severability clause, when a portion of that statute is judicially

invalidated." Artistic Entm't, Inc. v. City of Warner Robins, 331 F.3d 1196, 1204

(11th Cir. 2003); see also Leavitt v. Jane L., 518 U.S. 137, 139 (1996) ("Severability

is . . . a matter of state law."). In Georgia, "in order to hold one part of a statute

unconstitutional and uphold another part as separable, they must not be

mutually dependent upon each other." City Council of Augusta v. Mangelly,

243 Ga. 358, 363, 254 S.E.2d 315, 320 (1979) (citations and quotations omitted).

It is also generally held that a saving or severability clause such as the one in

H.B. 481[21] "is only an aid to construction, and is not an absolute command. It

---

[21] The severability clause in H.B. 481 states in relevant part, "All provisions of this Act
shall be severable in accordance with Code Section 1-1-3." O.C.G.A. § 1-1-3 pertains
to invalid or unconstitutional code provisions and states in relevant part:

merely creates a presumption in favor of separability, and does not authorize the court to give to the statute an effect altogether different from that sought by it when considered as a whole." <u>Mangelly</u>, 243 Ga. at 363, 254 S.E.2d at 320 (citations omitted). This presumption is also "overcome where the stricken and upheld portions of the statute depend on one another." <u>The Lamar Co. v. City of Marietta</u>, 538 F. Supp. 2d 1366, 1375 (N.D. Ga. 2008) (citations omitted).

---

> Except as otherwise specifically provided in this Code or in an Act or resolution of the General Assembly, in the event any title, chapter, article, part, subpart, Code section, subsection, paragraph, subparagraph, item, sentence, clause, phrase, or word of this Code or of any Act or resolution of the General Assembly is declared or adjudged to be invalid or unconstitutional, such declaration or adjudication shall not affect the remaining portions of this Code or of such Act or resolution, which shall remain of full force and effect as if such portion so declared or adjudged invalid or unconstitutional were not originally a part of this Code or of such Act or resolution. The General Assembly declares that it would have enacted the remaining parts of this Code if it had known that such portion hereof would be declared or adjudged invalid or unconstitutional. The General Assembly further declares that it would have enacted the remaining parts of any other Act or resolution if it had known that such portion thereof would be declared or adjudged invalid or unconstitutional unless such Act or resolution contains an express provision to the contrary.

O.C.G.A. § 1-1-3.

In addition to Georgia law, this Court considers the preferred approach to severance and remedies, as stated by the United States Supreme Court in its abortion jurisprudence:

> Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact.

Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328–29 (2006) (citations omitted).[22]

The Supreme Court in Ayotte set forth three principles that informed their approach: (1) "try not to nullify more of a legislature's work than is necessary"; (2) "restrain . . . from 'rewrit[ing] state law to conform it to constitutional requirements' even as [the Court] strive[s] to salvage it"; and (3)

---

[22] In their briefing, the State Defendants refer the Court to non-binding opinions issued by other out-of-state district courts that appear to provide analysis/application of Ayotte and other Supreme Court authority. Doc. No. [125-1], p. 31. As the opinions are non-binding and not the law of Georgia or from the United States Supreme Court, the Court declines to consider the opinions. See McGinley v. Houston, 361 F.3d 1328, 1331 (11th Cir. 2004) ("The general rule is that a district judge's decision neither binds another district judge nor binds him . . . . A circuit court's decision binds the district courts sitting within its jurisdiction while a decision by the Supreme Court binds all circuit and district courts.") (citations omitted).

"the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'" <u>Id.</u> at 330. (citations omitted).[23]

The Court must now consider Georgia law and the United States Supreme Court's approach/principles to determine if any portion of H.B. 481 is severable, following the Court's above-stated invalidation of Sections 3 and 4 of the Act on the grounds of violation of the right to privacy and vagueness.

Under Georgia law, the Court must determine whether the invalid provisions of H.B. 481 are mutually dependent upon any other portions of the Act. A review of the remaining operative sections of H.B. 481, *i.e.*, Section 5 (relating to child support), Section 6 (relating to tort recovery), Section 7 (concerning informed consent), Section 10 (concerning physician's obligations in performance of an abortion), Section 11 (concerning reporting requirements), and Section 12 (relating to tax exemptions) shows that they each contain language that references one or more of the definitions in O.C.G.A. §1-2-1,

---

[23] In a notice of supplemental authority (Doc. No. [146]), the State Defendants refer the Court to a recent Supreme Court opinion, which reiterates these principles in a non-abortion context/review of an act of Congress. See <u>Seila Law LLC v. Consumer Fin. Prot. Bureau</u>, ---U.S. ----, No. 19-7, 2020 WL 3492641 (U.S. June 29, 2020).

which Section 3 of H.B. 481 amends. Doc. No. [1], pp. 44, 47.[24] In other words,

Sections 5, 6, 7, 10, 11, and 12 are mutually dependent on Section 3 of H.B. 481.

If Section 3 is subject to the injunction, Sections 5, 6, 7, 10, 11, and 12 are not

complete code sections without the operative definitional language of

Section 3/Code Section 1-2-1. In essence, the "balance of the legislation is

incapable of functioning independently." [25] United States v. Romero-

Fernandez, 983 F.2d 195, 196 (11th Cir. 1993) ("In determining whether to sever

a constitutionally flawed provision, courts should consider whether the

balance of the legislation is incapable of functioning independently.").

     As this mutual dependency ruling is determinative, it is not necessary to

consider the remainder of the severability rules and arguments concerning the

---

[24] While there are three sections of H.B. 481 that do not incorporate the definitional language of Section 3, i.e., Section 1 (providing for a title of H.B. 481), Section 2 (providing for legislative findings), Section 9 (repealing penalties section for failure to comply with Title 31 of the Official Code of Georgia), such does not alter the Court's ruling, as the balance of the legislation (i.e., Sections 5, 6, 7, 10, 11, and 12) are incapable of functioning independently.

[25] Were the Court to hold otherwise, it would be contradicting itself. As discussed supra, Section 3's Personhood Definition violates substantive due process. An embryo or fetus cannot be a "person," as that designation would effectively ban all abortions, even pre-viability. See also Roe, 410 U.S. at 157. For the same reason, an embryo or fetus cannot be a child entitled to tax deductions or child support payments. Had the legislature conferred these benefits on expectant parents without tying them to a new definition of personhood, the Court's analysis would be different.

Georgia General Assembly's purpose and intent in enacting H.B. 481. <u>See</u> <u>Daimler Chrysler Corp. v. Ferrante</u>, 281 Ga. 273, 274–75, 637 S.E.2d 659, 661–62 (2006) (indicating that severance is also proper if "the remaining portion of the Act accomplishes the purpose the legislature intended.' If, however, 'the objectionable part is so connected with the general scope of the statute that, should it be stricken out, effect cannot be given to the legislative intent, the rest of the statute must fall with it.'"); <u>see also</u> <u>Union City Bd. of Zoning Appeals v.</u> <u>Justice Outdoor Displays, Inc.</u>, 266 Ga. 393, 404, 467 S.E.2d 875, 884 (1996) ("When a statute cannot be sustained as a whole, the courts will uphold it in part when it is reasonably certain that to do so will correspond with the main purpose which the legislature sought to accomplish by its enactment, if, after the objectionable part is stricken, enough remains to accomplish that purpose.").

In the alternative, to the extent that it is proper to consider legislative purpose and intent, the Court notes that the United States Supreme Court has held that "[i]n ascertaining [legislative] purpose, [the court] may examine the title of the act, the source in previous legislation of the particular provision in question, and the legislative scheme or plan by which the general purpose of

the act is to be carried out." <u>United States v. Katz</u>, 271 U.S. 354, 357 (1926).[26] In terms of ascertaining intent, the Georgia Code states that "[i]n all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy." O.C.G.A. § 1-3-1(a). The Georgia courts appear to be in conflict as to how to determine legislative intent, as there is authority that indicates that legislative intent is determined by reviewing the caption of the statute and the statute as a whole. [27] <u>See e.g.</u>, <u>Sikes v. State</u>, 268 Ga. 19, 21, 485 S.E.2d 206, 209 (1997) ("in attempting to ascertain legislative intent of a doubtful statute, a court may look to the caption of the act and its legislative history."); <u>West v.</u>

---

[26] Georgia law seems to indicate that the purpose of the law is found in the preamble. <u>See e.g.</u>, <u>City of Marietta v. Summerour</u>, 302 Ga. 645, 652, 807 S.E.2d 324, 330 n.2 (2017) (finding the statement of legislative purpose in the codified preamble of the statute) and <u>Sawnee Elec. Membership Corp. v. Georgia Pub. Serv. Comm'n</u>, 273 Ga. 702, 704, 544 S.E.2d 158, 160 (2001) (same). There are other Georgia cases that have derived the purpose of the statute from the face of the act. <u>See e.g.</u>, <u>Greer v. State</u>, 233 Ga. 667, 670, 212 S.E.2d 836, 839 (1975); <u>cf.</u> <u>Kennedy v. Carlton</u>, 294 Ga. 576, 578, 757 S.E.2d 46, 48 (2014) (indicating that the "intent and purpose of the General Assembly in enacting the statute" was "obvious" and appearing to derive this information from the face of the statute).

[27] "The caption of an act of the legislature is properly an index to the contents of the statute as construed by the legislature itself,—a summarizing of the act, made right at the time when the discussion of every phase of the question is fresh in the legislative mind." <u>Copher v. Mackey</u>, 220 Ga. App. 43, 45, 467 S.E.2d 362, 364 (1996) (internal quotations and citations omitted).

58

City of Albany, 300 Ga. 743, 745, 797 S.E.2d 809, 811 (2017) ("in construing

language in any one part of a statute, a court should consider the entire scheme

of the statute and attempt to gather the legislative intent from the statute as a

whole"); Bennett v. State, 252 Ga. App. 451, 453, 557 S.E.2d 29, 32 (2001) ("In

construing legislation, nothing is more pertinent, towards ascertaining the true

intention of the legislative mind in the passage of the enactment, than the

legislature's own interpretation of the scope and purpose of the act, as

contained in the caption.") (internal quotations and citations omitted).

However, there is more recent authority which states that the Georgia General

Assembly "does not enact a general intention" and the concept of discerning

the collective intent of the legislators is "pure fiction." In re Whittle, 339 Ga.

App. 83, 85–86, 793 S.E.2d 123, 126 (2016).

For purposes of this Order, the Court will consider the statute and the

older authority. Sharpe v. Seaboard Coast Line R. Co., 528 F.2d 546, 548 (5th

Cir. 1976) ("Under Georgia law, the rule of stare decisis applies, which means

that the older case law must control.").[28]

---

[28] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the
Eleventh Circuit adopted as binding precedent all decisions rendered prior to the
close of business on September 30, 1981 by the United States Court of Appeals for the

To this regard, after considering H.B. 481 as a whole, the title, the caption, the prior legislation, the legislative scheme, the old law, the evil, and the remedy, the Court rejects the State Defendants' argument that the statutory purpose solely concerns "promoting fetal well-being." Hearing Transcript, Tr. 46:13–25. Instead, H.B. 481's specific references to Roe v. Wade[29] and "established abortion related precedents" as well as consideration of the old law (specifically the prior versions of the Georgia statute which tracked the language of the United States Supreme Court's Roe v. Wade abortion jurisprudence and the Roe Court's conclusion that the word "person" does not include the unborn),[30] the evil, and the remedy (the final version of H.B. 481,

_____

Fifth Circuit.

[29] See Doc. No. [1], ¶ 3.

[30] As stated in the Court's prior Preliminary Injunction Order,

> Section 3 amends O.C.G.A. § 1-2-1 by redefining "natural person" to include "any human being including an unborn child" and by defining "unborn child" as an embryo/fetus "at any stage of development who is carried in the womb." H.B. 481 § 3. This precise definition, however, was considered and rejected by the Supreme Court in Roe. Specifically, in Roe, the Supreme Court considered whether a "person," as used in the Fourteenth Amendment, includes an unborn child. 410 U.S. at 157. The Court noted that the Fourteenth Amendment speaks only of persons "born or naturalized in the United States," and that the use of the word has application only

which changes the old law to give personhood to the unborn) lends support to

Plaintiffs' argument that the purpose of H.B. 481 was to ban or *de facto* ban

abortion. Hearing Transcript, Tr. 79:7–9. To this regard, severance is not proper

as the objectional parts of H.B. 481, *i.e.*, Sections 3 and 4, are so connected with

the general scope of the statute that now that they have been invalidated, effect

cannot be given to the legislative intent. See Daimler Chrysler Corp., 281 Ga. at

274–75, 637 S.E.2d at 661–62 ("If, however, 'the objectionable part is so

connected with the general scope of the statute that, should it be stricken out,

effect cannot be given to the legislative intent, the rest of the statute must fall

with it.'"). Accordingly, the remainder of H.B. 481 falls.

In sum, the State Defendants have not met either of their summary

judgment burdens (*i.e.*, as movant or non-movant) and their request for partial

summary judgment in their favor on the issue of severability is denied. Cf.

Celotex Corp., 477 U.S. at 325 (indicating that the moving party's burden at

---

postnatally. Id. Therefore, the Court in Roe ultimately
concluded that the word "person" does not include the
unborn and, thus, rejected the notion that an
embryo/fetus is entitled to Fourteenth Amendment
protection. Id. at 158.

Doc. No. [97], p. 35.

summary judgment is to establish that there is an absence of evidence to support [an essential element of] the nonmoving party's case" and the non-movant's burden is to show that summary judgment is improper). Plaintiffs are entitled to summary judgment on the issue of severability. Accordingly, the Court declines to sever any portions of H.B. 481. The entire bill is subject to the permanent injunction.

### C.   Permanent Injunction

As noted above, Plaintiffs also move this Court to permanently enjoin the enforcement of H.B. 481 by all Defendants and their successors in office. Doc. No. [124], p. 2. To obtain a permanent injunction, a plaintiff must show "(1) that he has suffered an irreparable injury; (2) that his remedies at law are inadequate; (3) that the balance of hardships weighs in his favor; and (4) that a permanent injunction would not disserve the public interest." Barrett v. Walker Cty. Sch. Dist., 872 F.3d 1209, 1229 (11th Cir. 2017) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). The Court addresses each of these factors in turn.

#### 1   Irreparable Injury

"Irreparable harm is the equitable cornerstone of an injunction." Sturgis Motorcycle Rally, Inc. v. Mortimer, 2:14-cv-00175-wco, 2014 WL 12479644, at *4

(N.D. Ga. Dec. 23, 2014) (citing <u>Beason Theatres, Inc. v. Westover</u>, 359 U.S. 500, 506–07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.")).

As discussed *supra,* Plaintiffs have established that H.B. 481 is unconstitutional under the Due Process Clause of the Fourteenth Amendment because it prohibits abortions at a pre-viability point in pregnancy and is unconstitutionally vague. Consequently, H.B. 481 violates the constitutional right to privacy which, in turn, inflicts *per se* irreparable harm on Plaintiffs. <u>See</u> <u>Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville</u>, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence."); <u>Planned Parenthood, Se., Inc. v. Bentley</u>, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) ("Accordingly, courts presume that violations to the fundamental right to privacy are irreparable."). Additionally, being subject to unconstitutionally vague laws also imposes irreparable harm on Plaintiffs. <u>Cf.</u> <u>Am. Civil Liberties Union of Ga. v. Miller</u>, 977 F. Supp. 1228, 1235 (N.D. Ga. 1997) (finding a substantial threat of irreparable injury where the continued enforcement of a vague statute would "force plaintiffs either to continue self-

censorship or to risk prosecution"). The Court therefore finds that Plaintiffs have suffered an irreparable injury as a result of H.B. 481. and will continue to suffer irreparable harm absent an injunction. Accordingly, this factor is satisfied.

### 2.    *Inadequate Remedy at Law*

The Court also finds that there is no adequate remedy at law for the constitutional violations imposed by H.B. 481. "[T]he right of privacy must be carefully guarded for once an infringement has occurred it cannot be undone by monetary relief." Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B. 1981); see also Ne. Fla. Chapter of Ass'n of Gen. Contractors, 896 F.2d at 1285 ("Invasions of privacy, because of their intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole."). Similarly, the chilling effects of an unconstitutionally vague law cannot be compensated for by monetary damages. Cf. Miller, 977 F. Supp. at 1235. Accordingly, this factor is satisfied.

### 3.    *Balance of Hardships*

As for weighing the balance of hardships, Plaintiffs will suffer numerous irreparable harms absent an injunction of the enforcement of H.B. 481, as discussed *supra*. These harms most certainly outweigh any injury Defendants

may suffer from the imposition of an injunction. <u>See</u> <u>Causeway Med. Suite v.</u> <u>Foster</u>, 43 F. Supp. 2d 604, 619 (E.D. La. 1999) ("[T]he threatened injury of unduly burdening a woman in her decision to terminate her pregnancy by criminalizing a procedure in such a way as to chill abortion providers from practicing their profession greatly outweighs any damage the injunction may cause the state."). To be clear, the Supreme Court has recognized that a state has an "important and legitimate interest in preserving and protecting the health of the pregnant woman [and] in protecting the potentiality of human life." <u>Casey</u>, 505 U.S. at 875–76 (quoting <u>Roe</u>, 410 U.S. at 162). Yet the Court has also made clear that the "weight [of the state's interest] is *insufficient* to justify a ban on abortions prior to viability even when it is subject to certain exceptions." <u>Id.</u> (emphasis added). Accordingly, this factor is satisfied.

### 4.    *Public Interest*

Finally, the Court finds that a permanent injunction would not disserve the public interest. Rather, an injunction here would protect the public interest "by protecting those rights to which it too is entitled." <u>Nat'l Abortion Fed'n v.</u> <u>Metro. Atlanta Rapid Transit Auth.</u>, 112 F. Supp. 2d 1320, 1328 (N.D. Ga. 2000); <u>see also</u> <u>Am. Freedom Def. Initiative v. Suburban Mobility Auth. For Reg'l</u> <u>Transp.</u>, 698 F.3d 885, 896 (6th Cir. 2012) ("The public interest is promoted by

the robust enforcement of constitutional rights."). It is in the public interest, and is this Court's duty, to ensure constitutional rights are protected. Because "the constitutional liberty of the woman to have some freedom to terminate her pregnancy" is implicated here, the Court finds that a permanent injunction of H.B. 481 would not disserve the public interest. Accordingly, this factor is satisfied. Casey, 505 U.S. at 869.

As they have satisfied all four factors, Plaintiffs are therefore entitled to a permanent injunction of the enforcement of H.B. 481 by Defendants and their successors in office.

## III.   CONCLUSION

For the reasons discussed above, the Court finds that Plaintiffs are entitled to judgment as a matter of law on Counts I and II of their Verified Complaint for Declaratory and Injunctive Relief. Doc. No. [1]. Plaintiffs' Motion for Summary Judgment is **GRANTED**. Doc. No. [124]. The State Defendants' Motion for Summary Judgment and/or Partial Summary Judgment is **DENIED**. Doc. No. [125].

The Court thus declares the rights of the parties as follows: Sections 3 and 4 of H.B. 481 violate the Fourteenth Amendment of the United States Constitution.

66

The Court hereby **ORDERS** that all Defendants, and all their respective officers, successors in office, agents, servants, employees, attorneys, and persons acting in concert or participation with them, are **PERMANENTLY ENJOINED** from enforcing H.B. 481 (Georgia General Assembly 2019–20 Legislative Session) in its entirety. As a result, the State of Georgia's abortion laws that were in effect prior to the passage of H.B. 481 remain in effect.

As there are no further issues outstanding, the Clerk is **DIRECTED** to enter judgment in favor of Plaintiffs and **CLOSE THIS CASE**.

**IT IS SO ORDERED** this 13th day of July, 2020.


_____
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**